# 23-35060

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

United Federation of Churches, LLC (dba "The Satanic Temple")
*Plaintiff-Appellant,*

*v.*

David Alan Johnson, Leah Fishbaugh, Mickey Meeham, and
Nathan Sullivan
*Defendants-Appellees.*

On appeal from the United States District Court
for the Western District of Washington,
No. 2:20-cv-00509
Hon. Richard A. Jones, Senior U.S. District Judge, presiding

## EXCERPTS OF RECORD (Vol. 1 of 1)



**Matt Kezhaya**
Ark. # 2014161
Minn. # 0402193

matt@crown.law
direct: (479) 431-6112
general: (612) 276-2216

121 Washington Ave. N., 4th Floor, Minneapolis, MN 55402

<div align="center">

**INDEX**

</div>

<div align="right">

**Page**

</div>

Judgment,
Docket No. 49 (filed January 9, 2023) ………………………….. 4

Order on Motions to Dismiss and for Preliminary Injunction,
Docket No. 48 (filed January 6, 2023) …………………………. 5

Order on Motion to Dismiss Second Amended Complaint,
Docket No. 31 (filed April 15, 2022) …………………………..  10

Order Denying Motion for Reconsideration,
Docket No. 30 (filed April 12, 2022) …………………………..  43

Second Amended Complaint,
Docket No. 26 (filed May 24, 2021) …………………………….  49

Exhibit 1 to Second Amended Complaint,
Docket No. 26-1 (filed May 24, 2021) ………………………….  74

Exhibit 2 to Second Amended Complaint,
Docket No. 26-2 (filed May 24, 2021) ………………………….  76

Exhibit 3 to Second Amended Complaint,
Docket No. 26-3 (filed May 24, 2021) ………………………….  77

Exhibit 4 to Second Amended Complaint,
Docket No. 26-4 (filed May 24, 2021) ………………………….  78

Exhibit 5 to Second Amended Complaint,
Docket No. 26-5 (filed May 24, 2021) ………………………….  84

Exhibit 6 to Second Amended Complaint,
Docket No. 26-6 (filed May 24, 2021) ………………………….  89

Exhibit 7 to Second Amended Complaint,
Docket No. 26-7 (filed May 24, 2021) .............................. 92

Exhibit 8 to Second Amended Complaint,
Docket No. 26-8 (filed May 24, 2021) .............................. 93

Exhibit 9 to Second Amended Complaint,
Docket No. 26-9 (filed May 24, 2021) .............................. 110

Order Granting Motion to Dismiss
Docket No. 20 (filed February 26, 2021) ........................... 111

Complaint,
Docket No. 1 (filed April 3, 2020) ................................... 130

Notice of Appeal,
Docket No. 50 (filed January 24, 2023) ........................... 178

District Court Docket Sheet ............................................. 180

# United States District Court
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED FEDERATION OF CHURCHES, LLC, <br><br>                Plaintiff, <br><br> v. <br><br> DAVID ALAN JOHNSON, et al., <br><br>                Defendant. | **JUDGMENT IN A CIVIL CASE** <br><br> CASE NUMBER: 2:20-cv-00509-RAJ |

**____**    **Jury Verdict**. This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

**__X__**    **Decision by Court**.  This action came to consideration before the Court.  The issues have been considered and a decision has been rendered.

THE COURT HAS ORDERED THAT:

     Judgment is entered in favor of Defendants David Alan Johnson, Leah Fishbaugh, Mickey Meeham and Nathan Sullivan, against Plaintiff United Federation of Churches, LLC.

     DATED this 9th day of January, 2023.

                         RAVI SUBRAMANIAN,
                         Clerk of the Court

                         By:    _/s/ Victoria Ericksen_____
                                Deputy Clerk

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED FEDERATION OF CHURCHES,
LLC,

          Plaintiff,

    v.

DAVID ALAN JOHNSON, *et al*.,

          Defendants.

Case No. 20-cv-00509-RAJ

**ORDER GRANTING
DEFENDANT'S MOTION TO
DISMISS AND DENYING
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

## I.   INTRODUCTION

This matter comes before the Court on Defendants' Motion to Dismiss and Plaintiff's Motion for Preliminary Injunction. Dkt. ## 33, 42. For the reasons below, the Court **GRANTS** Defendants' Motion to Dismiss and **DENIES** Plaintiff's Motion for Preliminary Junction.

## II.   BACKGROUND

This case involves a dispute between Plaintiff United Federation of Churches and its former members, Defendants. Plaintiff alleges that Defendants hacked several social media accounts and began posting content critical of Plaintiff's organization. Two of the social media accounts at issue are located on Facebook—

the "Chapter" page and the "Allies" page. Dkt. # 26 at 6. Plaintiff brought federal law claims under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 and the Anti-Cybersquatting Consumer Protection Act ("ACPA"), and also brought associated state law claims.

Following two rounds of motions to dismiss, this Court dismissed Plaintiff's federal law claims and state law claims relating to the Chapter page on Facebook. Dkt. # 31 at 32. Plaintiff did not amend its complaint. Defendants now ask the Court to dismiss for lack of subject-matter jurisdiction. Dkt. # 33.

### III. LEGAL STANDARD

#### A. FRCP 12(b)(1)

Federal courts are tribunals of limited jurisdiction and may only hear cases authorized by the Constitution or a statutory grant. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). The burden of establishing subject-matter jurisdiction rests upon the party seeking to invoke federal jurisdiction. *Id*. Once it is determined that a federal court lacks subject-matter jurisdiction, the court has no choice but to dismiss the suit. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

### IV. DISCUSSION

With the Court's dismissal of Plaintiff's federal claims, Defendants now argue that there is no federal question jurisdiction and the requirements for diversity jurisdiction have not been met. District courts have diversity jurisdiction over all civil actions between citizens of different states where the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a). Defendants argue that Plaintiff cannot establish either prong.

#### A. Complete diversity.

Plaintiff has established the "complete diversity" requirement. To establish

complete diversity, the citizenship of each plaintiff must be diverse from the citizenship of each defendant. LLCs, such as Plaintiff, are citizens "of every state of which its owners/members are citizens." *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). Defendants take issue with the fact that Plaintiff's Corporate Disclosure Statement failed to list the states of which its owners/members are citizens. Dkt. # 33 at 5. In response to Defendant's motion, Plaintiff filed a revised Corporate Disclosure Statement addressing this issue. Dkt. # 34. This late filing is a minor procedural mistake which does not affect this Court's subject matter jurisdiction. Neither the Court nor the parties were prejudiced by this late filing. The revised Corporate Disclosure Statement clears any ambiguity regarding complete diversity of the parties. Plaintiffs are citizens of Massachusetts, and Defendants are citizens of Washington.

**B.      Amount in controversy.**

Defendants facially attack Plaintiff's complaint, arguing that the complaint fails to plead facts establishing the amount in controversy. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) ("In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.").

The amount-in-controversy requirement is generally determined by the amount claimed in the complaint, and this amount controls if the complaint was made in good faith. *See St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938). Nonetheless, a district court may be justified in dismissing the action where it appears to a legal certainty that the actual claim is less than the jurisdictional amount. *Lowdermilk v. United States Bank Nat'l Assoc.*, 479 F.3d 994, 999 (9th Cir. 2007). Here, the surviving claims seek injunctive relief and common law damages relating to misappropriation of the "Allies" page on Facebook that promotes Plaintiff's organization to non-members. Dkt. # 26 at 16.  The complaint specifically estimates the "loss" related to the misappropriation of the Allies page to be $1,037.52. Dkt. # 26 at 16. This is far below the required $75,000 to establish the amount in controversy. That Plaintiff also seeks

injunctive relief does not change this conclusion. *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 (9th Cir. 2002) (stating that "the amount in controversy is measured by the value of the object of the litigation" where the plaintiff seeks injunctive relief).

Nor do any other peripheral allegations nudge the complaint's stated amount-in-controversy into the realm of plausibility. Although the complaint seeks $100,000 in statutory damages, Plaintiff's statutory claims have already been dismissed. *See* Dkt. # 31 at 32. Same with Plaintiff's common law claims alleging damages for misappropriation of the "Chapter" page on Facebook. *Id.* Finally, Plaintiff's allegations regarding its losses for tortious interference with business relations are sparse. But in any event, the cumulative value of Plaintiff's lost business with Facebook does not exceed the jurisdictional minimum. *See* Dkt. # 26 at 16. Nor has Plaintiff established that punitive damages would be permitted under the applicable state law based on the conduct alleged. *See Davenport v. Mut. Ben. Health & Accident Ass'n*, 325 F.2d 785, 787 (9th Cir. 1963). For these reasons, the Court agrees with Defendants that the complaint fails to plead facts establishing the amount in controversy and **GRANTS** the Motion to Dismiss.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion to Dismiss. Dkt. # 33. Because the court lacks subject matter jurisdiction, Plaintiff's request for a preliminary injunction is rendered moot. The Court **DENIES** the motion on that basis. Dkt. # 42.

DATED this 6th day of January, 2023.

The Honorable Richard A. Jones
United States District Judge

ER_8

ER_9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED FEDERATION OF
CHURCHES, LLC,

               Plaintiff,

    v.

DAVID ALAN JOHNSON, et al.,

               Defendants.

CASE NO. C20-0509RAJ

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTION TO
DISMISS SECOND AMENDED
COMPLAINT

## I.    INTRODUCTION

Before the court is Defendants David Alan Johnson, Leah Fishbaugh, Mickey

Meehan, and Nathan Sullivan's (collectively, "Defendants") motion to dismiss Plaintiff

United Federation of Churches, LLC's (d/b/a "The Satanic Temple") ("TST") second

amended complaint.  (Mot. (Dkt. # 27); Reply (Dkt. # 29); *see also* 2d Am. Compl. (Dkt.

# 26).[1]) TST opposes Defendants' motion. (Resp. (Dkt. # 28).) The court has carefully reviewed all of the foregoing, the relevant portions of the record, and the applicable law. Being fully advised,[2] the court GRANTS in part and DENIES in part Defendants' motion to dismiss.

## II.    BACKGROUND

Below, the court sets forth the factual and procedural background of this case.

## A.    Factual Background[3]

TST is a religious organization that "advances seven fundamental tenets." (2d. Am. Compl. ¶¶ 8-9 (quoting https://www.thesatanictemple.org/our-tenets.html).) Its mission is to "encourage benevolence and empathy among all people, reject tyrannical authority, advocate practical common sense and justice, and be directed by the human conscience to undertake noble pursuits guided by the individual will." (*Id.* ¶ 10 (quoting https://www.thesatanictemple.org/our-mission.html).) It maintains sole title to the trade name "The Satanic Temple" in the context of religious organizations. (*Id.* ¶ 12; *see also id.*, Ex. 1 (registration of trademark).)

---

[1] TST refers to Mr. Meehan as "Mr. Meeham." (*See, e.g.*, 2d Am. Compl. at 1.) Defendants, however, clarify that "Meehan" is the correct spelling of his last name. (*See, e.g.*, Mot. at 9.)

[2] Neither party requests oral argument (*see* Mot. at 1; Resp. at 1), and the court finds that oral argument would not be helpful to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[3] The following allegations are taken as true for the purpose of this motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

TST has adherents in all 50 states, including Washington. (*Id.* ¶ 13.) It is organized at local levels in "Chapters" that are largely autonomous but subject to centralized control. (*Id.*) At all relevant times, TST has had a Washington State Chapter (the "Chapter") led by two individuals: the Chapterhead, who has administrative authority over the Chapter, and a Media Liaison, who promotes the Chapter's activities to the general public. (*Id.* ¶¶ 14-16.)

At all relevant times, Facebook was the Chapter's primary platform for communicating with its membership; Twitter was the Chapter's secondary communication platform; and the Chapter used Google to "facilitate its organizational purposes by creating and storing documents." (*Id.* ¶¶ 26-28.) In October 2014, the Chapter created a business page on Facebook (the "Chapter page") having the name "The Satanic Temple – Washington" and the URL "https://www.facebook.com/thesatanictemplewashington" "for the benefit of TST in its efforts to disseminate information for what was then the Seattle Chapter." (*Id.* ¶ 29; *see id.*, Ex. 2 (Chapter page history).) Over the next several years, the Chapter page's audience grew to over 17,000 followers. (*Id.* ¶ 30.) In January 2015, the Chapter created a Twitter account with the URL "https://twitter.com/TST_Washington", which currently has an audience of about 4,000 followers. (*Id.* ¶ 31.) In September 2018, the Chapter created a secondary Facebook page named "TST WA Allies" (the "Allies page") to communicate with individuals who were interested in TST but did not want to identify as a member. (*Id.* ¶ 32.)

Defendants were four of sixteen members of the advisory council to the Chapterhead.  (*Id.* ¶ 17.)  "Attendant to their positions on the council, Defendants were entrusted with management of the Chapter's social media presence along with the other councilors."  (*Id.*)  TST's Chapter page and Allies page were maintained and controlled exclusively by administrators approved by TST, who were subject to a written Code of Conduct.  (*Id.* ¶¶ 33-34; *id.*, Ex. 4 (form Code of Conduct agreement).)  TST entrusted each of the Defendants with administrative rights to the Facebook pages, subject to the Code of Conduct.  (*Id.* ¶ 36.)

On March 2, 2020, Mr. Johnson shared a post on the Allies page that, according to TST, was outside of the authority granted under the Code of Conduct.  (*Id.* ¶ 39.)  The post was subsequently deleted.  (*Id.* ¶ 40.)  Between March 2 and March 12, 2020, TST's Washington leadership "became increasingly frustrated with Defendants' organizational failures and inflammation of interpersonal conflicts within the advisory council."  (*Id.* ¶ 41; *id.* ¶ 42 (listing alleged organizational failures, including "repeatedly operating TST's social media to endorse leftist politics as opposed to Satanism, despite repeated reminders that this was unacceptable").)

On March 12, 2020, TST's Washington leadership removed Defendants from their positions on the council.  (*Id.* ¶¶ 18, 43.)  According to TST, "[b]y removing Defendants from their advisory positions, the Washington leadership revoked Defendants' authorization to manage the Chapter's social media activity and revoked Defendants' authorization to serve as custodians of records."  (*Id.* ¶ 44.)

On March 14, 2020, however, Mr. Meehan "exceeded authorization for the Allies page" by removing all TST-approved administrators except for Defendants; changing the name of the page to "Evergreen Memes for Queer Satanic Friends"; and posting a "manifesto", which stated that the page was no longer affiliated with TST. (*Id.* ¶ 46.) Mr. Meehan and the other Defendants began posting material on the page in violation of the Code of Conduct and in disregard of TST's revocation of their authority to manage TST's social media. (*Id.* ¶ 47.) Mr. Sullivan, for example, publicly stated that he was no longer affiliated with TST and posted that "we have a meme page that we stole from TST." (*Id.* ¶ 48; *id.*, Ex. 5.) TST leadership subsequently removed Defendants' "administrative access privileges" from its Facebook Chapter page, Twitter account, and Google account. (*Id.* ¶ 49.[4])

On or around March 18, 2020, however, Mr. Johnson "hacked" TST's Twitter account, removed TST's approved administrators, replaced those administrators with his co-Defendants, followed a number of "extremist groups," and changed the description of the page from "Washington State Chapter of the Satanic Temple to "Satan stands as the ultimate icon for selfless revolt. We oppose irrational, unjust hierarchies like white supremacy, patriarchy, ableism, & cishet normality." (*Id.* ¶ 50.) Mr. Johnson then "took control of the Chapter page by removing all TST-approved administrators, modifying the cover page without approval, and posting a three-page manifesto." (*Id.* ¶ 51; *see id.*, Ex. 6 (manifesto).) TST alleges that the manifesto included false claims about TST's

---

[4] TST does not allege that it removed administrative access privileges from the Allies page. (*See id.*)

leadership, including that they were "cozy with the alt-right," white supremacists, and "insufficiently leftist." (*Id.* ¶ 52.)

On March 20, 2020, the Chapter's Media Liaison emailed Mr. Johnson a "cease and desist instruction," and requested the return of the Chapter page. (*Id.* ¶ 53; *id.*, Ex. 7.) Mr. Johnson did not do so, and instead continued to make postings to the Chapter page that were inconsistent with TST's Code of Conduct. (*Id.* ¶¶ 54-55; *see id.*, Ex. 8 (Chapter page postings).) Later that same night, Ms. Fishbaugh "attempted to change the password to the Chapter's Google-based email account by changing the recovery email and changing the phone number." (*Id.* ¶ 56.) TST alleges that this action, like Mr. Johnson's, violated its explicit withdrawal of authority to manage its accounts following its removal of administrative access to the account. (*Id.*)

On or about March 22, 2020, Mr. Johnson changed the name of the Chapter page from "The Satanic Temple – Washington" to "Satanic Washington State – Archived Temple Chapter" and modified the profile picture. (*Id.* ¶ 57.) He did not, however, change the Chapter page's URL. (*Id.* ¶ 61.) TST alleges that these actions, too, were in violation of its revocation of authority to manage TST's social media and its revocation of his social media administrative access privileges. (*Id.*) TST estimates that the Chapter lost between 20 and 30 members because of Mr. Johnson's postings to the Chapter page. (*Id.* ¶ 62.)

TST further alleges that Mr. Sullivan has continued to have "exclusive control" of TST's original signed membership agreements, cloud-based trade secret documentation, background check documents, and an electronic database of members. (*Id.* ¶¶ 58-59.)

On March 23, 2020, TST sent a demand letter to Mr. Johnson, threatening

litigation unless he "permanently relinquish[ed] full control" of the Chapter page by

March 24, 2020.  (*Id.* ¶ 64; *id.*, Ex. 9.)  Mr. Johnson ignored the letter and, with his

co-Defendants, continued to maintain exclusive control over the Chapter page.  (*Id.* ¶ 65.)

After originally refusing to return control of the Chapter page to TST on the ground that

Defendants' use of that page was a "Page admin issue" rather than an "infringement[] of

[TST's] legal rights," Facebook returned control of the Chapter page to TST after it filed

the initial complaint in this matter.  (*Id.* ¶¶ 63, 66; *see also id.*, Ex. 2 (noting that the page

name was changed back to "The Satanic Temple – Washington Chapter" on May 27,

2020).)  TST also eventually recovered its Twitter and Google accounts through those

companies.  (*Id.* ¶ 68.)

## B.     Procedural Background

TST filed its initial complaint in this court on April 3, 2020.  (Compl. (Dkt. # 1).)

It asserted claims for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030

("CFAA"); violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C.

§ 1125(d) ("ACPA"); tortious interference with business expectancy; violation of

Washington's Consumer Protection Act, ch. 19.86 RCW ("CPA"); and defamation.  (*See*

*id.*)  On February 26, 2021, the court granted Defendants' motion to dismiss that

complaint.  (2/26/21 Order (Dkt. # 20).)  The court dismissed TST's CFAA, ACPA,

tortious interference, and CPA claims without prejudice and with leave to amend.  (*See*

*id.* at 19.)  It dismissed TST's defamation claim with prejudice.  (*Id.*)

TST moved the court to reconsider its dismissal of the ACPA and defamation claims. (MFR (Dkt. # 21).) While that motion was pending, TST filed a first amended complaint that, it asserted, "further developed" the facts supporting its CFAA and tortious interference claims; "replaced" its CPA claim with claims for trespass to chattels and conversion; and removed its ACPA and defamation claims pending the court's decision on its motion for reconsideration. (Am. Compl. (Dkt. # 22) ¶¶ 2-3.) Subsequently, the parties filed a stipulated motion for leave for TST to file a second amended complaint, which the court granted. (5/10/21 Stip. (Dkt. # 24); 5/11/21 Order (Dkt. # 25); *see* 2d Am. Compl.) The second amended complaint adds a claim for violation of the Federal Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125(c) ("FTDRA"). (2d Am. Compl. ¶¶ 106-18.) The court denied TST's motion for reconsideration on April 12, 2022. (4/12/22 Order (Dkt. # 30).) Defendants' motion to dismiss TST's second amended complaint is now ripe for consideration.

### III.    ANALYSIS

TST asserts five causes of action in its second amended complaint: (1) violation of the CFAA (2d Am. Compl. ¶¶ 69-81); (2) tortious interference with business expectancy (*id.* ¶¶ 82-90); (3) trespass to chattels (*id.* ¶¶ 91-99); (4) conversion (*id.* ¶¶ 100-05); and (5) violation of the FTDRA (*id.* ¶¶ 106-18). Below, the court sets forth the standard of review, then considers each claim in turn.

### A.    Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when a complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The

court construes the complaint in the light most favorable to the nonmoving party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## B.    CFAA

The CFAA creates criminal and civil liability for "acts of computer trespass by those who are not authorized users or who exceed authorized use." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065 (9th Cir. 2016). TST alleges that Defendants violated 18 U.S.C. § 1030(a)(2), which creates liability when a person "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer," by intentionally accessing the Chapter page and attempting to access TST's Twitter and Google Accounts. (Resp. at 4 (citing 18 U.S.C. § 1030(a)(2)); *see also* 2d Am. Compl. ¶¶ 49-53.[5]) The CFAA

---

[5] In its prior order, the court noted that it was unclear whether TST intended to bring its claim under 18 U.S.C. § 1030(a)(2) or 18 U.S.C. § 1030(a)(4), which prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access." (*See* 2/26/21 Order at 5); 18 U.S.C. § 1030(a)(4). TST has now clarified that it brings its claim under 18 U.S.C. § 1030(a)(2) and does not address Defendants' argument that it failed to plead fraudulent conduct with particularity as required by Federal Rule of Civil Procedure 9(b). (*See* Resp. at 4-9; Mot. at 14-16.) To the extent TST does assert a claim under 18 U.S.C. § 1030(a)(4), the court agrees that TST failed to plead fraud with particularity and DISMISSES its claim, if any, for violation of 18 U.S.C. § 1030(a)(4). *See Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1072 (N.D. Cal. 2018) (dismissing § 1030(a)(4) claim for failure to satisfy Rule 9).

authorizes a person damaged by prohibited conduct to bring a civil suit only where the conduct involves one of an enumerated set of factors. 18 U.S.C. § 1030(g) (citing 18 U.S.C. § 1030(c)(4)(A)(i)). In this case, TST may only bring suit if Defendants' conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I).

In its February 26, 2021 order, the court dismissed TST's CFAA claim because TST failed to plausibly allege that Defendants accessed its social media accounts without authorization or that Defendants exceeded their authorized access. (2/26/21 Order at 6-9.) In its original complaint, TST did not allege that it had revoked Defendants' administrative access to the accounts. (*Id.* at 6 (citing Compl. ¶ 30).) Rather, it alleged only that Defendants "exceeded their authority" when they failed to abide by the Code of Conduct. (*See id.* (citing Compl. ¶¶ 28-30, 33, 36-44); *see also id.* at 8 (noting that TST's "conclusory" allegation that it "demanded return of the Facebook pages" from Defendants was insufficient to show revocation of authority).) The court observed that TST did not allege that it ever explicitly revoked Defendants' authority; that demanding the return of the Facebook pages was insufficient to show revocation of authority; and that TST failed to state "when the revocation occurred, how the revocation was communicated, and what actions Defendants took afterwards." (*Id.* at 7-9.) The court concluded that TST's allegations were insufficient to meet the "without authorization or

exceeds authorized access" element of a CFAA claim. (*Id.* at 6-9 (citing *United States v. Nosal*, 676 F.3d 854, 857, 863 (9th Cir. 2012) (*en banc*)).)

In its second amended complaint, TST now alleges, based on further investigation by counsel, that it revoked Defendants' authorization to manage the Chapter's social media accounts when it removed them from their advisory positions on March 12, 2020; that it revoked Defendants' administrative access privileges to the accounts sometime before March 18, 2020; and that Mr. Johnson later "hacked" the Chapter page and Defendants attempted to "hack" the Twitter and Google accounts. (2d Am. Compl. ¶¶ 43-44, 49-51, 56; *see also* Resp. at 4 (explaining the "clarified sequence of events").) It asserts that Mr. Johnson's successful "hacking" of the Chapter page and Defendants' attempts to "hack" the Twitter and Google accounts are actionable under the CFAA. (Resp. at 5 (citing 18 U.S.C. § 1030(a)(2), (b)); *see* 2d Am. Compl. ¶¶ 69-81.) It estimates it suffered losses of $33,689.70 for misappropriation of the Chapter page and $1,037.52 for the Allies page; and that it would have lost $8,246.70 had Defendants successfully misappropriated the Twitter page. (2d Am. Compl. ¶ 77.)

Defendants contend that they remain entitled to dismissal because TST still has not stated a civil claim for violation of the CFAA. (Mot. at 6.) It argues (1) that TST's allegations show that Defendants' access to the Chapter page was authorized by Facebook, which is the true "owner" of the websites at issue (citing 2d Am. Compl. ¶ 63); (2) TST fails to allege that it explicitly revoked Defendants' authority to access the computers; (3) TST fails to sufficiently plead that it meets the $5,000 loss threshold of 18

U.S.C. § 1030(c)(4)(A)(i)(I); and (4) TST has not sufficiently alleged conduct by Mr.

Sullivan, Ms. Fishbaugh, and Mr. Meehan that would violate the CFAA. (Mot. at 6-16.)

### 1. Twitter and Google Accounts

The court begins by addressing TST's CFAA claims based on its Twitter and

Google accounts, and concludes that these claims must be dismissed because TST has not

sufficiently pleaded the threshold amount of "loss" necessary to sustain a CFAA civil

action. TST may only bring suit under the CFAA if it "suffer[ed] damage or loss by

reason of a violation of this section." 18 U.S.C. § 1030(g). Under the facts of this case,

TST must allege that its loss due to a violation of the CFAA exceeded $5,000 in a one-

year period. 18 U.S.C. § 1030(c)(4)(A)(i)(I).[6] The CFAA defines "loss" as "any

reasonable cost to any victim, including the cost of responding to an offense, conducting

a damage assessment, and restoring the data, program, system, or information to its

condition prior to the offense, and any revenue lost, cost incurred, or other consequential

damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). The

CFAA maintains a "narrow conception of 'loss,'" and its definition, "with its references

to damage assessments, data restoration, and interruption of service—clearly limits its

focus to harms caused by computer intrusions, not general injuries unrelated to the

hacking itself." *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262-63 (9th Cir.

---

[6] TST incorrectly asserts that the $5,000 "loss" threshold applies only to claims brought under 18 U.S.C. § 1030(a)(4). (*See* Resp. at 6-7.) 18 U.S.C. § 1030(g) is clear, however, that a party may only bring a civil claim for violation of the CFAA if the claim involves one of the factors enumerated in 18 U.S.C. § 1030(c)(4)(A)(i). *See* 18 U.S.C. § 1030(g). As discussed above, the only possible factor at issue in this case is loss aggregating at least $5,000 in value in a one-year period. *See* 18 U.S.C. § 1030(c)(4)(A)(i)(I).

2019). "[A]ny theory of loss must conform to the limited parameters of the CFAA's definition." *Id.* at 1263.

At the outset, the court agrees with Defendants that the alleged intrusions into the Facebook, Google, and Twitter systems must be treated as three separate violations involving three separate protected computers rather than considered together as a single violation. (*See* Reply at 5 (citing *Hayes v. Packard Bell NEC, Inc.*, 193 F. Supp. 2d 910, 912 (E.D. Tex. 2001)); *see* 18 U.S.C. § 1030(a)(2) (prohibiting accessing "*a computer* without authorization" or in excess of authorized access) (emphasis added); 18 U.S.C. § 1030(e)(1) (defining a computer as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device"). Thus, the court must separately determine whether TST has sufficiently alleged loss of at least $5,000 in a one-year period for each of the Facebook, Twitter, and Google "computers."

The court concludes that TST has failed to make this threshold showing with respect to the Twitter and Google accounts.[7] First, TST does not allege that it suffered any "loss" with respect to Defendants' alleged interference with its Google account. (*See generally* 2d Am. Compl.; *see also id.* ¶¶ 69-81.) Thus, it cannot bring a civil claim for violation of the CFAA based on an intrusion into the Google account. Second, with respect to the Twitter account, TST alleges only that it "would have lost $8,246.70" if

---

[7] The court discusses TST's alleged "loss" due to the intrusions into its Facebook accounts below. *See infra* § 3(B)(2)(b).

Defendants' misappropriation of that account had been successful. (*Id.* ¶ 77.) The CFAA, however, authorizes a civil action only for persons who "suffer[] damage or loss" meeting the threshold amount. 18 U.S.C. § 1030(g). Because TST does not allege that it suffered damage or loss due to misappropriation of the Twitter account—only that it "would have" suffered a loss if the misappropriation were successful—it cannot meet the threshold requirements for bringing a civil action based on the Twitter account. Therefore, the court GRANTS Defendants' motion to dismiss TST's CFAA claims based on alleged interference with its Google and Twitter accounts.

    2.    Facebook Accounts

The court now must consider whether TST has sufficiently alleged a CFAA claim based on Defendant's conduct with respect to its Facebook pages. The court begins by addressing whether TST has sufficiently alleged that Defendants acted without authorization, then considers whether TST has sufficiently alleged a cognizable loss exceeding $5,000.

        a.    *Authorization*

Defendants contend that TST has not plausibly alleged that they acted either without authorization or in excess of authorization as required to state a CFAA claim. They argue that (1) TST's own allegations show that Facebook, the owner of the website on which the Chapter page and Allies page are hosted, "explicitly determined that [Mr.] Johnson was authorized to access and alter the Chapter page" (Mot. at 8 (citing 2d Am. Compl. ¶ 63)); and (2) TST has not alleged that it explicitly revoked Defendants'

authority to access the social media accounts or otherwise informed Defendants of any revocation of their authority (*id.* at 8-9).[8]

A defendant violates the "without authorization" provision of 18 U.S.C. § 1030(a)(2) "'when he or she has no permission to access a computer or when such permission has been revoked explicitly.  Once permission has been revoked, technological gamesmanship or enlisting of a third party to aid in access will not excuse liability.'" *Domain Name Comm'n Ltd. v. DomainTools, LLC*, 449 F. Supp. 3d 1024, 1027 (W.D. Wash. 2020) (quoting *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016)).  Breaching a duty owed to the owner of the computer is not enough to violate the "without authorization" provision.  *Id.*  "Rather, whether access is authorized or unauthorized 'depends on actions taken by the employer.'"  *Id.* (quoting *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134-35 (9th Cir. 2009)).  "If the computer owner has not affirmatively rescinded the defendant's right to access the computer, any existing authorization/permission remains."  *Id.* (citing *Brekka*, 581 F.3d at 1134-35).

---

[8] To the extent TST's CFAA claim is based on an allegation that Defendants exceeded their authority when they accessed the accounts, the court DISMISSES that claim.  The Supreme Court has clarified that the "exceeds authorization" prong of 18 U.S.C. § 1030(a)(2) covers only "those who obtain information from particular areas of the computer—such as files, folders, or databases—to which their computer access does not extend."  *Van Buren v. United States*, --- U.S. ---, 141 S. Ct. 1648, 1652 (2021); *see also* 18 U.S.C. § 1030(e)(6) (defining "exceeds authorized access" as "access[ing] a computer with authorization and [using] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter").  "It does not cover those who . . . have improper motives for obtaining information that is otherwise available to them."  *Van Buren*, 141 S. Ct. at 1652.  TST makes no allegation that Defendants obtained or altered information from areas of Facebook beyond their authorized access.  (*See generally* 2d Am. Compl.)

As recounted above, TST alleges the following timeline of events. Defendants originally were authorized to access TST's social media accounts. (2d Am. Compl. ¶¶ 17, 36.) On March 12, 2020, TST removed Defendants from its advisory council, which "revoked Defendants' authorization to manage the Chapter's social media activity." (*Id.* ¶¶ 18, 43-44.) On March 14, 2020 Mr. Meehan removed all TST-approved administrators except Defendants from the Allies page, changed the name of the page, and with other Defendants began posting material on that page. (*Id.* ¶¶ 46-47.) Between March 14 and March 18, 2020, TST removed Defendants' "administrative access privileges" from the Facebook Chapter account, Twitter account, and Google account. (*Id.* ¶ 49.) On or around March 18, 2020, Mr. Johnson "took control of the Chapter page by removing all TST-approved administrators, modifying the cover page without approval, and posting a three-page manifesto." (*Id.* ¶ 51.) On March 20, 2020, the Chapter's Media Liaison emailed Mr. Johnson, stating "I'd like you to return the [Chapter] page back to us please. Please re-add me and Siri as admins," but Mr. Johnson did not do so. (*Id.* ¶¶ 53-55; *id.*, Ex. 7.) On March 23, 2020, TST sent a demand letter to Mr. Johnson, threatening litigation unless he "permanently relinquish[ed] full control" of the Chapter page, but Mr. Johnson did not respond. (*Id.* ¶ 64; *id.*, Ex. 9.) In May 2020, after originally refusing to assist, Facebook returned the Chapter page to TST. (*Id.* ¶¶ 63, 66; *see also id.*, Ex. 2.)

The court begins with Defendants' argument that Facebook's original refusal to assist TST demonstrates that Mr. Johnson's access to the Chapter page was authorized by the "computer owner." (*See* Mot. at 8-9.) The court is not convinced. As the Ninth

Circuit has recognized, the CFAA provides a civil action to "any person who suffers damage or loss by reason of a violation" of the Act. *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004). Unauthorized access to a plaintiff's account on a computer owned by another entity may be actionable under the CFAA as long as the other elements of the claim are met. *See, e.g.*, *Biesenbach v. Does 1-3*, No. 21-CV-08091-DMR, 2022 WL 204358, at *7 (N.D. Cal. Jan. 24, 2022) (holding that plaintiff plausibly alleged that Defendants accessed his accounts on Google's Voice Over IP and cloud computing systems without authorization, although his CFAA claim failed on other grounds). The court, therefore, must determine whether TST has plausibly alleged that Defendants accessed its Facebook accounts without authorization.

Viewing the reasonable inferences in the light most favorable to TST, the court concludes that TST has met its burden to plausibly allege that Mr. Johnson accessed the Chapter page without authorization after TST removed his administrative access to the page between March 14 and 18, 2020. The court can infer from TST's allegations that it revoked his ability to access and administer the page and that Mr. Johnson subsequently "hacked" the page and made changes to it. (*See* 2d Am. Compl. ¶ 49, 51.) After TST revoked his administrative access privileges, Mr. Johnson no longer had permission to access the account. As TST points out, Defendants have cited no authority to support its contention that where the plaintiff has removed the defendant's technological credentials to access a system, it must also send a separate notice in order to meet the revocation requirement. (*See* Resp. at 6); *see Facebook, Inc.*, 844 F.3d at 1067 (holding that a defendant accesses a system "without authorization" "when he or she has no permission

to access a computer *or* when such permission has been revoked explicitly" (emphasis added)).

The same cannot be said for the Allies page: TST alleges only that it revoked administrative access to the Chapter page and the Twitter and Google accounts, and its March 23, 2020 letter refers only to the Chapter page. (*See* 2d Am. Compl. ¶ 49; *see id.*, Ex. 9.) TST thus has not plausibly alleged that Defendants' access to the Allies page was "without authorization" within the meaning of the CFAA. Similarly, TST states no basis for a CFAA claim against Mr. Meehan, Ms. Fishbaugh, or Mr. Sullivan. It makes no allegation that any of them were involved in the alleged "hacking" of the Chapter page or obtained or altered information on that page in violation of 18 U.S.C. § 1030(a)(2). (*See generally* 2d Am. Compl.) Accordingly, the court DISMISSES TST's CFAA claim to the extent it is based on the Allies page and to the extent it is asserted against Mr. Meehan, Ms. Fishbaugh, and Mr. Sullivan.

   *b.*   *Loss*

Defendants raise several challenges to TST's claimed losses due to misappropriation of the Chapter page. First, they assert that "loss" cannot include expenses incurred in litigating an alleged CFAA allegation. (Mot. at 13.) The court agrees that litigation expenses are not "losses" that are cognizable under the CFAA. *See, e.g.*, *Wichansky v. Zowine*, 150 F. Supp. 3d 1055, 1071-72 (D. Ariz. 2015) ("litigation expenses . . . are not a cognizable loss under the CFAA"). Thus, to the extent TST claims $6,000 in losses due to "researching and drafting the original complaint" and ongoing

"costs and fees related to this lawsuit" (*see* 2d Am. Compl. ¶ 79), those alleged losses cannot be included in TST's calculation of the threshold "loss" amount.

Second, Defendants argue TST's alleged $1,037.52 loss based on the Allies page is insufficient to meet the "loss" threshold. (Mot. at 14.) Because, as discussed above, TST has failed to state a CFAA claim based on misappropriation of the Allies page, the court agrees that this sum cannot be included in TST's alleged "loss."

Third, Defendants argue that TST's allegations are conclusory and insufficient to support the "loss" element of a CFAA claim because they include no facts that support its claimed loss of $33,689.70 for misappropriation of the Chapter page. (Mot. at 13-14; *see* 2d Am. Compl. ¶ 77.) The court agrees. TST has alleged that the Chapter "lost between 20 and 30 members due to [Mr.] Johnson's false claims published to the Chapter page" and that its social media accounts "help to foster the kind of relationship which results in charitable donations to support TST's organizational purposes." (Am. Compl. ¶¶ 62, 78; *see also* Resp. at 7 (stating that TST's "loss" is "(1) the lost ability to communicate to an audience which TST had built through years of effort; and (2) the 20-30 lost members, as of the original complaint." (citations omitted)).) TST does not, however, explain how to value its temporary "lost ability to communicate" with its members and has not offered authority for the proposition that a temporary "lost ability to communicate" is cognizable under the CFAA. *See, e.g., Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 485 (N.D. Cal. 2021) (concluding alleged "loss of use and control" of financial information was insufficient to meet the "loss" element of the CFAA); *see also Andrews*, 932 F.3d at 1263 (emphasizing that "loss" must meet the "limited parameters of the CFAA's definition").

The court concludes that TST has not plausibly alleged "loss" arising from its "lost ability to communicate."

Defendant further argues that the loss of members represents a "lost business opportunity" or "damaged reputation" that is not actionable under the CFAA. (Mot. at 14; *see also* Reply at 5.) Rather, according to Defendants, loss of members could only be actionable if Defendants' actions caused an interruption of service on the Facebook page that prevented members from donating. (*See* Reply at 5.) It is true that lost revenue is only cognizable under the CFAA if it occurred "because of [an] interruption of service." 18 U.S.C. § 1030(e)(11). Defendants do not, however, provide the court with authority that supports the proposition that a plaintiff's loss of access to its computer, during which the defendant exerts control over that computer, cannot constitute an "interruption of service." TST contends that it meets the "interruption of service" requirement: it alleges that it lost members (and the revenue associated with them) because Defendants "stole" its website, thus interrupting the service Facebook provided to TST. (Resp. at 7.) The court concludes that TST has plausibly alleged that it suffered "loss" due to the loss of its members, which in turn was caused by Mr. Johnson's actions. TST, however, leaves the court no basis to allocate its alleged losses between those due to a temporary "lost ability to communicate" (which are not cognizable) and the loss of its members. *See Domain Name Comm'n*, 449 F. Supp. 3d at 1030 (finding plaintiff did not plausibly allege "loss" where court could not allocate between losses attributed to periods before and after the revocation of authority). Accordingly, the court GRANTS Defendants' motion to dismiss TST's CFAA claim based on Mr. Johnson's "hacking" of the Chapter page.

## C.     Tortious Interference with Business Expectancy

Under Washington law, to plead a claim for tortious interference with a business expectancy, a plaintiff must allege "(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage." *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997). In its prior order, the court held that although TST had sufficiently pleaded the first, third, and fifth elements of the claim, it had failed to do so with respect to the second and fourth elements. (2/26/21 Order at 13-15.) Specifically, the court held that TST had failed to sufficiently plead the second element because it did not allege that Defendants were "aware of some kind of business arrangement" between Facebook and TST. (*Id.* at 15 (quoting *Topline Equip., Inc. v. Stan Witty Land, Inc.*, 639 P.2d 825, 830 (Wash. Ct. App. 1982)).) With respect to the fourth element, the court held that TST had failed to allege that Defendants' interference was "wrongful by some measure beyond the fact of the interference itself, such as a statute, regulation, recognized rule of common law, or an established standard of trade or profession." (*Id.* (quoting *Moore v. Commercial Aircraft Interiors, LLC*, 278 P.3d 197, 200 (Wash. Ct. App. 2012)).)

In an attempt to cure the deficiencies the court identified in its prior order, TST now alleges that "Defendants had subjective knowledge of the business relationship between Facebook and TST" and "were aware that the social media accounts had an

economic value to TST." (2d Am. Compl. ¶¶ 85, 87.) It further alleges that "Defendants' interference with TST's social media presence was wrongful beyond the interference itself" because Defendants "abused TST's social media presence as a channel to publish derogatory messages directly to TST's intended audience and to falsely suggest that the Washington Chapter was replaced by Defendants' competitor organization" with the purpose of "diminish[ing] TST's membership and donation base." (*Id.* ¶ 88.)

Defendants argue that TST still fails to satisfy the second and fourth elements of a tortious interference claim with respect to the Chapter page. (Mot. at 16-17.) With respect to the second element, Defendants contend that TST's allegations remain too conclusory with respect to Defendants' knowledge of a business relationship between Facebook and TST. (*Id.*) With respect to the fourth element, Defendants contend that TST has not alleged a violation of a "statute, regulation, common law rule, or professional standard." (*Id.* at 17 (quoting *Moore*, 278 P.3d at 200).) Defendants further argue that TST fails to satisfy the fifth element of a tortious interference claim— damages—with respect to the Allies page. (*Id.*)

The court concludes that TST has, with its second amended complaint, plausibly alleged that Defendants had knowledge of the business relationship between Facebook and TST. (*See, e.g.*, 2d Am. Compl. ¶¶ 85, 87; *see also id.* ¶ 17 (alleging Defendants were members of TST's advisory council and were "entrusted with management of the Chapter's social media presence"); *id.* ¶ 36 (alleging Defendants "were entrusted with administrative rights to" the social media accounts, including Facebook).) With respect

to the fourth element, the court concludes that TST has sufficiently pleaded that Defendants acted with an improper purpose—to harm the Chapter, create a competitor organization, and divert donations to that competitor. (*See id.* ¶¶ 87-88; *see also id.* ¶ 45 (alleging Defendants had the "twin goals of forming a competitor organization and harming TST").) Although Defendants are correct that the "improper means" prong of the fourth element requires a violation of a "statute, regulation, common law rule, or professional standard," the "improper purpose" prong bears no such requirement. *See, e.g.*, *Pleas v. City of Seattle*, 774 P.2d 1158, 1163 (Wash. 1989) (noting that a cause of action for tortious interference can arise from "*either* the defendants' pursuit of an improper objective of harming the plaintiff *or* the use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships" (emphasis added)).

With respect to the fifth element, damages, TST alleges that, "[a]s a direct and proximate result of Defendants' wrongful conduct, TST has suffered substantial economic injury and loss of business opportunity and has incurred attorney's fees and other costs in attempting to remedy the situation." (2d. Am. Compl. ¶ 89.) It also alleges reputational damages flowing from the "misappropriation" of the Facebook pages. (*Id.* ¶ 80.) The alleged "wrongful conduct" includes Defendants' interference with both the Chapter page and Allies page. (*Id.* ¶ 83.) The court concludes that at this stage of the proceedings, it can "reasonably infer that TST has sustained damages from the alleged interference" with TST's Facebook pages. *See Kische USA, LLC v. Simsek*, No. C16-0168JLR, 2016 WL 6273261, at *10 (W.D. Wash. June 29, 2016) (noting Defendants' failure to direct the court to any "authority for the position that a plaintiff

must plead specifically how and to what extent it was damaged by the interference"). Because TST has now plausibly alleged facts to support each element of its tortious interference with business expectancy claim, the court DENIES Defendants' motion to dismiss the claim.

**D.      Trespass to Chattels and Conversion**

Claims for trespass to chattels and conversion are very closely related.  Indeed, as TST recognizes, "trespass to chattels differs from conversion as a matter of degree."  (2d Am. Compl. ¶ 104 (first citing *Intel Corp. v. Hamidi*, 71 P.3d 296, 2003 (Cal. 2003); and then citing *Damiano v. Lind*, 163 Wash. App. 1017, 2011 WL 3719682, at *5 (Wash. Ct. App. 2011) (unpublished[9]) (observing that "[t]respass to chattels is something less than a conversion").)  Accordingly, the court discusses those claims together below.

1.      Governing Law

Trespass to chattels "is the intentional interference with a party's personal property without justification that deprives the owner of possession or use."  *Sexton v. Brown*, 147 Wash. App. 1005, 2008 WL 4616705, at *5 (Wash. Ct. App. Oct. 20, 2008) (unpublished) (citing Restatement (Second) of Torts § 217 (1965)). It "may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another."  Restatement (Second) of Torts § 217. "Generally, there are three types of cognizable harms for a trespass to chattels claim:  '(1)

---

[9] The court "may consider unpublished state decisions, even though such opinions have no precedential value."  *Emp'rs Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

actual dispossession, which implies that the plaintiff's access to the chattel is barred or substantially limited for something more than a few moments; (2) physical harm to the chattel; or (3) physical harm to the plaintiff or to someone or something in which the plaintiff had a legal interest.'" *G&G Closed Cir. Events, LLC v. Single, LLC*, No. C18-1295JLR, 2020 WL 5815050, at *4 (W.D. Wash. Sept. 30, 2020) (quoting D. Dobbs, P. Hayden, & E. Bublick, The Law of Torts § 60 (2d ed. 2015) (citations omitted).) Conversion involves three elements: (1) willful interference with chattel belonging to the plaintiff, (2) by either taking or unlawful retention, and (3) thereby depriving the owner of possession. *Burton v. City of Spokane*, 482 P.3d 968, 970 (Wash. Ct. App. 2021) (citing *Judkins v. Sadler-Mac Neil*, 376 P.2d 837, 838 (Wash. 1962)).

    2.    <u>TST's Allegations</u>

    TST alleges trespass to chattel claims based on Defendants' acts of intentionally dispossessing it of (1) "Facebook's computer network which manifested through the internet as the Chapter page and the Allies page" "by logging in to Facebook's computer network and replacing Defendants for TST's authorized administrators of the pages" (2d Am. Compl. ¶¶ 93-95) and (2) TST's membership-related documents "by maintaining exclusive control over the documents despite the termination of [Mr.] Sullivan's role as custodian of records" (*id.* ¶¶ 97-98). TST does not allege that it is entitled to damages; rather, it seeks "injunctive relief in the form of a permanent injunction enjoining Defendants from accessing any of TST's 'protected computers' under threat of contempt, an order to return TST's membership related documents and destroy any copies thereof, and costs and attorney's fees to be computed after entry of the decree." (*Id.* ¶ 99.) For its

conversion claim, it states that the "same chattels are at issue . . . as the Trespass to Chattels claim," and that it includes both claims in its complaint "because Washington courts tend to discuss the two claims in tandem." (*Id.* ¶ 105 (first citing *Damiano*, 2011 WL 3719682; and then citing *Sexton*, 2008 WL 4616705).)

      3.    Claims Based on the Chapter Page

Defendants argue that TST's trespass and conversion claims as to the Chapter page are moot because Facebook returned that page to TST's control; TST has remained in control of the page ever since; and TST seeks only prospective injunctive relief for these claims, rather than damages. (*See* Mot. at 17-18 (citing 2d Am. Compl. ¶¶ 4, 66, 99, Ex. 2).) It points out that TST has not alleged any facts that would justify prospective injunctive relief as to the Chapter page. (*Id.* at 18 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); *id.* at 19 (arguing that there "is not a single allegation that Defendants' conduct while they were administrators of the Chapter Facebook page could reoccur now that they have been removed as administrators").) Thus, according to Defendants, TST has failed to allege a live controversy for which the injunctive relief TST seeks would be an appropriate remedy, and the trespass and conversion claims based on Defendants' interference with the Chapter page are moot and must be dismissed. (*Id.* at 18-19.)

TST responds that Defendants "offer no legal support for the notion that the eventual restoration of the Chapter page operates as a bar to either (1) recovery of damages for the past deprivation of this page; or (2) prospective injunctive relief to prevent Defendants from engaging in future similar conduct." (Resp. at 13.) But that is

not Defendants' position.  Rather, Defendants contend that TST has failed to allege either (1) damages flowing from Defendants' trespass to or conversion of the Chapter page, or (2) facts supporting its entitlement to prospective injunctive relief.  (*See* Mot. at 18-19.) The court agrees with Defendants.  To state a claim for prospective injunctive relief, a plaintiff must plausibly allege an imminent future injury.  *See Elsharkawi v. United States*, 830 F. App'x 509, 512 (9th Cir. 2020) (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 564 (1992) and affirming dismissal of claim seeking prospective injunction against future border searches for lack of Article III standing where plaintiff failed to allege imminent future injury).  Because TST has not done so here, the court DISMISSES its trespass and conversion claims based on Defendants' interference with the Chapter page.

    4.    Claims based on the Allies Page and Documents

Defendants argue that TST's trespass and conversion claims based on the Allies page and TST's business documents must be dismissed because, although TST alleges that Defendants originally had authorized access to and control over the page and documents by virtue of their roles on the advisory council, TST has not pleaded (1) that it demanded Defendants return the Allies page and documents after they were removed from the council and (2) that Defendants refused to do so.  (Mot. at 19-20 (citing *Burton*, 482 P.2d at 970 (noting that "[a] bailee who, on demand, refuses to return property to its owner is liable for conversion").)  Although Defendants contend that the plaintiff's express demand for the property and the defendant's refusal to do so are necessary elements of the torts of both conversion and trespass to chattels, the court concludes that Defendants read too much into their cited cases.  Rather, the court concludes that

Defendants' cited cases stand for the proposition that the plaintiff's demand for return of originally lawfully held property and the defendant's refusal to do so are sufficient—but not required—to prove the "taking or unlawful retention" element of a conversion claim. *See Guar. Nat'l Ins. Co. v. Mihalovich*, 435 P.2d 648, 652 (Wash. 1967) (noting that "the refusal of a demand to surrender possession is a customary way of proving conversion" but conceding that "there are other ways in which a conversion can be established"); *see also Burton*, 482 P.3d at 970-71 (analyzing whether the City's continued possession of decedent's property was authorized by statute); *Judkins*, 376 P.2d at 839 (holding that it was "clear that when [defendants] refused to surrender [the property's] possession to the plaintiff, who was entitled to its immediate possession, there was a conversion"); *Shaffer v. Walther*, 232 P.2d 94, 97-99 (Wash. 1951) (discussing multiple fact patterns in which courts found (or did not find) conversion). Because Defendants' motion to dismiss TST's claims for trespass to or conversion of the Allies page and documents is based solely on the erroneous contention that TST was required to specifically plead a demand to return and a refusal to return (*see* Mot. at 19-20; Reply at 8-9), the court DENIES the motion to dismiss TST's trespass and conversion claims on that basis.

## E.    FTDRA

To prevail on a trademark dilution claim, "a plaintiff must show that:  (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." *Lochirco Fruit & Produce Co., Inc. v. Tarukino Holdings, Inc.*, No. C18-0763RAJ, 2019 WL

157939, at *3 (W.D. Wash. Jan. 9, 2019) (quoting *Jada Toys, Inc. v. Mattel, Inc.*, 518

F.3d 628, 634 (9th Cir. 2008)); *see* 15 U.S.C. § 1125(c)(1).  The mark must be "widely

recognized by the general consuming public of the United States as a designation of

source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).

The requisite level of fame is that of "a household name"—that is, in a "select class" of

the "truly prominent and renowned" and "part of the collective national consciousness."

*Id.* at 870 (citing *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911-12 (9th Cir.

2002)).  The statute expressly exempts "[a]ny noncommercial use of a mark" from its

coverage.  15 U.S.C. § 1125(c)(3)(C).

     Defendants first argue that TST's FTDRA claim must be dismissed because TST

has not alleged "any supporting facts relating to a purported use of TST's mark, or that

the alleged use was commercial" as required to satisfy the second element of the claim

and negate the statutory exemption.  (Mot. at 20.)  TST has a registered trademark in the

trade name "The Satanic Temple" but it makes no allegation that it owns trademarks in

any other names.  (2d Am. Compl. ¶ 12; *see generally id.*)  TST alleges that the

"provisional" names of Defendants' alleged "competitor organization," "'The Satanic

Temple 2:  Electric Boogaloo' and 'Satanic Washington – Archived Temple Chapter'"

"directly cop[y] 'The Satanic Temple'" and "directly suggest[] that the Washington

Chapter has been replaced by Defendants' competitor organization."  (2d Am. Compl.

¶ 111.)  It further alleges that "Defendants' competitor group is also selling merchandise

which features Defendants' derivative marks and which Defendants are advertising on

TST's Allies page."  (*Id.* ¶ 117.)

Defendants are correct that TST has failed to allege any commercial use by Defendants of its trademark. Indeed, the only mentions of the phrase "The Satanic Temple 2: Electric Boogaloo" in the second amended complaint are in paragraphs alleging that Defendants "provisionally" used that phrase as the name for their alleged competitor organization; it makes no factual allegations that would allow the court to draw the plausible inference that such an organization exists. (*See id.* ¶¶ 78, 87, 111; *see generally id.*) And the only mention of the phrase in TST's exhibits to its second amended complaint is what appears to be a third-party comment on Mr. Sullivan's Facebook page proposing possible names, including "The Satanic Temple 2: The Second One" and "S2: The Mighty Satanists." (*See id.*, Ex. 5 at 4.[10]) Although TST asserts that Defendants are selling merchandise that "features Defendants' derivative marks," TST does not identify the "derivative marks" Defendants are allegedly featuring, let alone provide support for the contention that the unidentified "derivative marks" are subject to protection under the FTDRA. (*See id.* ¶ 117 (citing https://www.redbubble.com/people/QueerSatanic/shop).) Finally, TST argues that Defendants "are using TST's trademark (the website formerly named 'TST WA Allies')" to advertise this merchandise, but it does not allege or argue that "TST" is a famous and distinctive mark within the meaning of the FTDRA. (*See generally* 2d Am. Compl.; Resp.) Because TST fails to plausibly allege that Defendants are making a commercial

---

[10] Mr. Sullivan responds with the comment, "Satanism Reloaded actually." (*Id.*)

use of TST's famous or distinctive mark, its FTDRA claim cannot survive. The court GRANTS Defendants' motion to dismiss TST's FTDRA claim.

## F.    Leave to Amend

"Normally, when a viable case may be pled, a district court should freely grant leave to amend." *Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002)). This liberal policy toward amendment, however, is subject to limitations including undue prejudice to the opposing party, bad faith by the movant, futility, and undue delay. *Id.* (citing *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989)). A "'district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.'" *Id.* (quoting *Ascon Props.*, 866 F.2d at 1160).

Here, the court finds that amendment of TST's CFAA claim—to the extent it is based on its Twitter and Google accounts, its Allies page, and conduct by Mr. Meehan, Ms. Fishbaugh, and Mr. Sullivan—would be futile, and DENIES leave to amend those portions of its claim. The court, however, GRANTS TST leave to amend its CFAA claim against Mr. Johnson based on the Chapter page to address the deficiencies in its allegations relating to suffered loss. The court finds that amendment of the loss allegations would not be futile, and although TST has amended its complaint twice, it has not yet had the benefit of this court's view of the law governing actionable losses under the CFAA. Similarly, the court GRANTS TST leave to amend its FDTRA claim because

it does not appear that amendment would be futile and because it has not previously amended this claim.[11]

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Defendants' motion to dismiss (Dkt. # 27).  Specifically, the court:

1.    GRANTS Defendants' motion to dismiss TST's CFAA claim and (a) DISMISSES with prejudice TST's claims based on its Twitter account, Google account, and Allies page; (b) DISMISSES with prejudice TST's CFAA claim with respect to Mr. Meehan, Ms. Fishbaugh, and Mr. Sullivan; and (c) DISMISSES TST's CFAA claim with respect to Mr. Johnson and the Chapter page, with leave to amend its loss allegations;

2.    DENIES Defendants' motion to dismiss TST's tortious interference with business expectancy claim;

3.    GRANTS Defendants' motion to dismiss TST's trespass to chattels and conversion claims with respect to the Chapter page;

4.    DENIES Defendants' motion to dismiss TST's trespass to chattels and conversion claims with respect to the Allies page and business documents; and

4.    GRANTS Defendants' motion to dismiss TST's FTDRA claim, with leave to amend.

---

[11] Because the court grants TST leave to amend its FTDRA claim and part of its CFAA claim, the court does not address Defendants' argument that it should decline to exercise supplemental jurisdiction over TST's state-law claims.  (*See* Mot. at 23-24.)

TST shall file its amended complaint, if any, within 14 days after the filing date of this order.

Dated this 15th day of April, 2022.

_Richard A. Jones_

The Honorable Richard A. Jones
United States District Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED FEDERATION OF CHURCHES, LLC, | CASE NO. C20-0509RAJ |
| Plaintiff, | ORDER DENYING MOTION FOR RECONSIDERATION |
| v. | |
| DAVID ALAN JOHNSON, et al., | |
| Defendants. | |

## I.     INTRODUCTION

Before the court is Plaintiff United Federation of Churches, LLC's (d/b/a "The Satanic Temple") ("TST")) motion for reconsideration of the court's February 26, 2021 order granting Defendants David Alan Johnson, Leah Fishbaugh, Mickey Meeham, and Nathan Sullivan's (collectively, "Defendants") motion to dismiss.  (MFR (Dkt. # 21); *see* 2/26/21 Order (Dkt. # 20).)  Specifically, TST asks the court to reconsider (1) its dismissal without prejudice of TST's claim for violation of the Anti-Cybersquatting

Consumer Protection Act, 15 U.S.C. § 1125 ("ACPA") and (2) its dismissal with prejudice of TST's defamation claim. (*See generally* MFR.) Defendants oppose TST's motion. (Resp. (Dkt. # 23); *see also* 3/15/21 Dkt. Entry (requesting a response to TST's motion).) The court has carefully reviewed all of the foregoing, along with the record in this case and the governing law. Being fully advised, [1] the court DENIES TST's motion for reconsideration.

## II.     ANALYSIS[2]

"Motions for reconsideration are disfavored," and the "court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence." Local Rules W.D. Wash. LCR 7(h)(1). The court first applies these standards to TST's motion to reconsider the dismissal of its ACPA claim, then turns to TST's motion to reconsider the dismissal of its defamation claim.

## A.     ACPA Claim

The ACPA "establishes civil liability for 'cyberpiracy' where a plaintiff proves that (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted 'with bad faith intent to profit from that mark.'" *DSPT Int'l, Inc.*

---

[1] Neither party requests oral argument (*see* MFR at 1; Resp. at 1), and the court finds that oral argument would not be helpful to its disposition of the motion, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[2] Because the court detailed TST's factual allegations in its February 26, 2021 order, it does not repeat that background here. (*See* 2/26/21 Order at 1-4.)

*v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010); *see also* 15 U.S.C. § 1125(d).  The

ACPA defines "domain name" as "any alphanumeric designation which is registered with

or assigned by any domain name registrar, domain name registry, or other domain name

registration authority as part of an electronic address on the Internet."  15 U.S.C. § 1127.

TST alleges that Defendants violated the ACPA by "hijacking" its Facebook

business page, which has the URL

"https://www.facebook.com/TheSatanicTempleWashington/".  (Compl. (Dkt. # 1) ¶¶ 47,

67-63.[3])  The court concluded that TST failed to state an ACPA claim because the

"TheSatanicTempleWashington" portion of the URL is part of a post-domain path (or

"vanity URL") and thus does not qualify as a "domain name" within the meaning of the

ACPA.  (2/26/21 Order at 9-13.)  Rather, the "domain name" in the Facebook business

URL is "facebook.com," which TST does not (and cannot) claim to own.  (*Id.* at 11-13.)

The court declined TST's invitation to "stretch the ACPA to cover trademarks appearing

in vanity URLs or post-domain paths."  (*Id.* at 13.)

TST now argues that the post-domain path is a protected "domain name" because

Facebook is an "other domain registration authority" within the meaning of the ACPA.

(MFR at 2-5.)  Specifically, it contends that Facebook allows users to "register with

Facebook to obtain an account associated with a unique electronic address comprised of

an alphanumeric string chosen by the user" and is "in a position of authority over these

---

[3] TST amended its complaint twice since the court entered its February 26, 2021 order.
(*See* Am. Compl. (Dkt. # 22); 2d Am. Compl. (Dkt. # 26).)  Because Defendants' motion to
dismiss addressed TST's original complaint, the court cites that original complaint in this order.

accounts pursuant to is Terms of Use agreement." (*Id.* at 2.) It further asserts that legislative history, in the form of Senate Report No. 106-140, supports its interpretation of the statute. (*Id.* at 4-5 (citing *id.* Ex. 1 (S. Rep. No. 106-140 (1999))).)

Defendants respond that the court correctly determined that the ACPA applies only to second-level domain names, such as the "facebook" portion of "www.facebook.com," that have been registered by a domain name registry (such as Verisign, Inc.) in accordance with a Registry Agreement with the Internet Corporation for Assigned Names and Numbers ("ICANN"). (MFR Resp. at 3-4 (first citing *Vizer v. VIZERNEWS.COM*, 869 F. Supp. 2d 75, 77-78 (D.D.C. 2012); and then citing *Domain Name System*, National Telecommunications & Information Administration, U.S. Dep't of Commerce, http://www.ntia.doc.gov/category/domain-name-system).) It further directs the court to additional legislative history that supports the conclusion that the term "domain name" in the ACPA refers only to second-level domain names and not portions of a post-domain path. (*Id.* at 5-6 (quoting 145 Cong. Rec. 14986, 15025 (1999) (comments of ACPA co-sponsor Senator Patrick Leahy)).)

The court agrees with Defendants that TST's novel argument that Facebook should be considered a "domain name registry" is not supported by existing caselaw or by the ACPA's legislative history. Because TST has not met its burden to show either manifest error in the prior ruling or new facts or legal authority which could not have been brought to the court's attention earlier with reasonable diligence, *see* Local Rules W.D. Wash. 7(h)(1), the court DENIES TST's motion to reconsider the dismissal of its ACPA claim.

## B.  Defamation Claim

TST also urges the court to reconsider its dismissal of the defamation claim.  TST alleges that certain of the Defendants made public statements about TST through Facebook posts which "falsely ascrib[ed] extremist ideologies and affiliations to" TST. (Compl. ¶¶ 36, 92.)  The court held that the defamation claim was barred by ecclesiastical abstention because resolving the claim would require the court to violate the First Amendment by "delving into doctrinal matters" in order to "define the beliefs held by [TST] and to determine that ableism, misogyny, racism, fascism, and transphobia fall outside those beliefs."  (2/26/21 Order at 18 (first citing *Hyung Jin Moon v. Hak Ja Han Moon*, 431 F. Supp. 3d 394, 413 (S.D.N.Y. 2019), *aff'd*, 833 F. App'x 876 (2d Cir. 2020); and then citing *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 250 (S.D.N.Y.), *aff'd*, 578 F. App'x 24 (2d Cir. 2014)).)

TST argues that the court erred because there are at least two ways for the court to address the defamation claim without delving into doctrinal matters.  (MFR at 5 (citing *Puri v. Khalsa*, 844 F.3d 1152, 1164 (9th Cir. 2017)).)  First, according to TST, the court must "accept as a given" TST's own determination of its doctrine—for example, that TST does not promote fascism.  (*Id.* at 5-6 (citing *Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987)).)  Second, TST contends that the court can resolve the dispute based on "purely secular rules" by "treating [it] like it would any other organization."  (*Id.* at 6 (citing *Puri*, 844 F.3d at 1164).)

As Defendants point out, however, the principle that a court must "accept as a given" a church's own determination of its doctrine applies where the plaintiff challenges

a church tribunal's application of its own rules—not where the church is the plaintiff suing another party. (Resp. at 7 (first citing *Paul*, 819 F.2d at 878 n.1; and then citing *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 724-25 (1976)).) Moreover, nothing in the cases TST cited in its motion for reconsideration causes the court to question its prior decision that deciding the defamation claim will require the court or the jury to impermissibly "delve into" TST's doctrine to determine the falsity of Defendants' statements. (*See* MFR at 5-6.) Thus, because TST has shown neither manifest error in the court's prior ruling or new facts or legal authority that could not have been brought to the court's attention sooner, *see* Local Rules W.D. Wash. LCR 7(h)(1), the court DENIES TST's motion to reconsider the dismissal of its defamation claim.

### III. CONCLUSION

For the foregoing reasons, the court DENIES TST's motion for reconsideration of the court's February 26, 2021 order granting Defendants' motion to dismiss (Dkt. # 21).

Dated this 12th day of April, 2022.

The Honorable Richard A. Jones
United States District Judge

Hon. Richard A. Jones

1

2

3

4

5

6

7
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

8

9
United Federation of Churches, LLC (dba
"The Satanic Temple")

Case No. 2:20-cv-00509-RAJ

10
Plaintiff,

SECOND AMENDED
COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

11
v.

12
David Alan Johnson (AKA "ADJ"),

13
Leah Fishbaugh, Mickey Meeham, and
Nathan Sullivan,

14
Defendants.

15

16
In support of its claims, Plaintiff United Federation of Churches (dba "The Satanic Temple")

17
(abbreviated "**TST**") alleges as follows:

18
## I.     PREAMBLE

19
1.     This case is about two hacked social media accounts and failed attempts at

20
hacking a different social media account and an email account.  TST is suing Defendants for

21
misappropriating two of TST's Facebook business pages by replacing all approved

22
administrators with themselves.  Shortly after the misappropriation, Johnson started posting

23
content critical of TST from TST's own webpage while retaining the original branding.  Later,

24
Johnson modified the name of the website, ostensibly to create a competitor organization, while

25
appending the suffix "Archive Temple Chapter."

26
2.     Since entry of the original complaint, the Court entered an order dismissing parts

SECOND AMENDED COMPLAINT - 1

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255   Fax 206-230-7791

ER_49

1    of this case without prejudice and parts with prejudice.  Dkt. # 20.  The parts dismissed without

2    prejudice are the subject of the amendments in this complaint.

3         (1) As to Count 1 (CFAA), the facts are further developed to state when the

4              revocation occurred, how that revocation was communicated, and what

5              actions Defendants undertook afterwards.  Compare Dkt. # 20 at pp. 7-9.

6         (2) As to former Count 3 (tortious interference with business expectancy), the

7              facts are further developed to state the factual underpinnings for how

8              Defendants knew about the Facebook pages' pecuniary value and how the

9              interference was wrongful beyond the interference itself.  Compare Dkt. # 20

10             at p. 15.  This count is renumbered to Count 2 in light of the order of dismissal

11             with prejudice of former Count 2 (Cyberpiracy).

12        (3) As to former Count 4 (Washington Consumer Protection Act), that claim is

13             replaced with a trespass to chattel claim (Count 3) and a conversion claim

14             (Count 4).  Compare Dkt. # 20 at pp. 16-17.

15        3.      The Cyberpiracy and Defamation counts have been removed from this First

16   Amended Complaint in compliance with the orders of dismissal with prejudice.  To the extent

17   the Court may grant Plaintiff's now-pending Motion for Reconsideration, Dkt. # 21, Plaintiff

18   reserves the right to file a second amended complaint to reassert whichever claims the order of

19   reconsideration may revive.

20        4.      Since the filing of the original complaint, the rightful Washington Chapter

21   leadership has reclaimed the Chapter page through Facebook.  This moots the need of injunctive

22   relief to return the Chapter website to its rightful owners.  This controversy is still live, however,

23   because TST still needs: injunctive relief for Defendants to return the Allies page, to preclude

24   Defendants from future unauthorized access of TST's electronic materials, to return TST's

25   wrongfully detained membership documents, and as otherwise appropriate to prevent the creation

26   of other counterfeit materials; money damages; and attorney's fees and costs of this action.

SECOND AMENDED COMPLAINT - 2

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

## II.    JURISDICTION AND VENUE

5.    This Court has original jurisdiction over the federal claim arising under the CFAA. 28 U.S.C. § 1331 (federal question); 18 U.S.C. § 1030(g) (CFAA).  The Court has supplemental jurisdiction over the state common law claims arising from the same facts. 28 U.S.C. § 1367.

6.    The Court can properly exercise general personal jurisdiction over each Defendant because they live in Seattle, Washington which is in this District.  The Court can properly exercise specific personal jurisdiction over each Defendant because their actions took place in Seattle, Washington which is in this District.

7.    Venue properly lies with this Court because the hacking took place in Seattle, Washington.  28 U.S.C. § 1391.

## III.    PARTIES

8.    TST is a religious organization.  See generally "About us," available at https://www.thesatanictemple.org/about-us.html

9.    TST subscribes and advances seven fundamental tenets:

(1) One should strive to act with compassion and empathy toward all creatures in accordance with reason.

(2) The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions.

(3) One's body is inviolable, subject to one's own will alone.

(4) The freedoms of others should be respected, including the freedom to offend. To willfully and unjustly encroach upon the freedoms of another is to forgo one's own.

(5) Beliefs should conform to one's best scientific understanding of the world. One should take care never to distort scientific facts to fit one's beliefs.

(6) People are fallible. If one makes a mistake, one should do one's best to rectify it and resolve any harm that might have been caused.

(7) Every tenet is a guiding principle designed to inspire nobility in action and thought. The spirit of compassion, wisdom, and justice should always prevail over the written or spoken word.

SECOND AMENDED COMPLAINT - 3

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

ER_51

1   See "Our tenets" available at https://www.thesatanictemple.org/our-tenets.html.

2       10.     TST's mission is to "encourage benevolence and empathy among all people,

3   reject tyrannical authority, advocate practical common sense and justice, and be directed by the

4   human conscience to undertake noble pursuits guided by the individual will."  See "Our mission"

5   available at https://www.thesatanictemple.org/our-mission.html.

6       11.     TST was the subject of the recent documentary "Hail Satan?" (2019), directed by

7   Penny Lane and distributed by Magnolia Pictures.

8       12.     TST maintains sole title to the trade name "The Satanic Temple" in the context of

9   religious organizations.  See **Exhibit 1** (registration of trademark).

10      13.     TST has adherents in each of the 50 States, importantly to include Washington.

11  At the relevant time, TST was organized at local levels in "Chapters," which are largely

12  autonomous but are subject to centralized control to ensure faithfulness to organizational

13  principles and purposes.

14      14.     TST had a Washington State Chapter which, at the relevant time, was led by two

15  individuals: one serving as Chapterhead and the other serving as Media Liason.

16      15.     The Chapterhead has administrative authority over the Washington Chapter and,

17  until March 12, 2020, was assisted by an advisory council.

18      16.     The Media Liaison promotes the Washington Chapter's activities to the general

19  public.

20      17.     Defendants were councilors on the advisory council to the Chapterhead.   On

21  March 12, 2020, the advisory council consisted of 16 positions, of which Defendants held four.

22  Attendant to their positions on the council, Defendants were entrusted with management of the

23  Chapter's social media presence along with the other councilors.

24      18.     On March 12, 2020, Defendants were removed from their positions on the council

25  because of interpersonal conflicts with Chapter leadership and other councilors.

26      19.     Defendant David Alan Johnson is an individual residing in Seattle, which is within

SECOND AMENDED COMPLAINT - 4

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

ER_52

1    this Court's district. Johnson is a former associate of TST who misappropriated TST's

2    Washington Chapter Facebook website from within this Court's district and is using it and its

3    audience in an effort to undermine TST and to create a competitor organization.

4          20.    Defendant Nathan Sullivan is an associate of Johnson, and former associate of

5    TST, who aided and abetted the hacking. Sullivan also lives in Seattle. TST entrusted Sullivan

6    as the custodian of various documents which constitute trade secrets. Examples include original

7    signed membership agreements, internal policies and procedures, and a listing of members with

8    contact information. Sullivan now wrongfully maintains exclusive control over these sensitive

9    documents. On information and belief, Johnson has wrongfully given Sullivan administrative

10    privileges to TST's Washington Chapter page.

11          21.    Defendant Leah Fishbaugh is an associate of Johnson, and former associate of

12    TST, who aided and abetted the hacking and who separately attempted to hack the Google

13    account. Fishbaugh also lives in Seattle. Fishbaugh changed the account credentials to the

14    Washington Chapter's email account in a failed attempt to usurp control over the email account.

15    On information and belief, Johnson has wrongfully given Fishbaugh administrative privileges to

16    TST's Washington Chapter page.

17          22.    Defendant Mickey Meeham is an associate of Johnson, and former associate of

18    TST, who aided and abetted the hacking. Meeham also lives in Seattle. On information and

19    belief, Johnson has wrongfully given Fishbaugh administrative privileges to TST's Washington

20    Chapter page. Meeham misappropriated the Affiliate page.

21                 **IV.**    **FACTUAL BACKGROUND**

22          23.    Facebook is a ubiquitous internet social medium which permits users to create and

23    share content including without limitation links, commentary, and written conversations. Content

24    can be shared by individuals on personal pages or by organizations on business pages.

25          24.    Twitter is also a ubiquitous internet social medium which permits users to create and

26    share substantially similar content as Facebook.

SECOND AMENDED COMPLAINT - 5

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
206-230-4255 Fax 206-230-7791

ER_53

25.     Google is a ubiquitous internet-based information platform.  Among its many services, Google provides an email platform ("gmail") and a cloud-based document creation and storage platform ("Google Drive.")

26.     At the relevant time, Facebook was the Washington Chapter's primary platform of communicating with its membership.

27.     At the relevant time, Twitter was the Washington Chapter's secondary platform of communicating with its membership.

28.     TST's Washington Chapter has a Google account to generally facilitate its organizational purposes by creating and storing documents.

29.     In October of 2014, the Washington Chapter business page was created exclusively for the benefit of TST in its efforts to disseminate information for what was then the Seattle Chapter. See id., in its current state, available at https://www.facebook.com/thesatanictemplewashington. See also **Exhibit 2** (Chapter page history, updated since original complaint).

30.     Over the next several years, the Washington Chapter has grown the Facebook page to an audience exceeding 17,000 followers.  Ibid.

31.     In January of 2015, the Washington Chapter created a Twitter account for the organization.  See id. available at https://twitter.com/TST_Washington.  Currently, the Twitter account has an audience of about 4,000 followers.  Id.

32.     In September of 2018, the Washington Chapter created a secondary Facebook page, named "TST WA Allies," to facilitate communications with individuals who were interested in TST but did not want to identify as a member.  Since the original complaint, Defendants renamed the Allies page to "Evergreen Memes for Queer Satanic Fiends."  **Exhibit 3**; see also https://www.facebook.com/queersatanic (Last visited April 26, 2021).

33.     Until the hacking, both Facebook pages were maintained and controlled exclusively by administrators approved by TST.

34.     Administrators are given a written Code of Conduct, which instruct requirements for

SECOND AMENDED COMPLAINT - 6

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255   Fax 206-230-7791

ER_54

1   permissible activity on behalf of TST.  In relevant part, the instructions pertaining to online conduct

2   follow:

3   Public statements & interactions with media

4   All public actions and statements must be approved and vetted by the TST National Council

5   and the TST Executive Council. If a member is approached by media or asked for any

6   official statement regarding an action or belief relating to TST all members must refrain

7   from comment and refer the inquiring party to the Chapter Head.

8   . . .

9   Confidentiality

10   Members should respect confidentiality, including documentation. Internal information

11   should not be shared beyond members of the local chapter. Members' names, contact

12   information, and meeting locations are also considered confidential. If you are ever unsure,

13   don't share.

14   . . .

15   Copyright

16   Material produced by The Satanic Temple is the property of the organization. Consent for

17   use of logo, name or other identity materials may be approved for use for certain projects.

18   You may not use any official materials without prior approval. Approval may also be

19   withdrawn at any time.

20   . . .

21   Online code of conduct

22   As a member of TST, your interactions with others, both online and off, will be held to the

23   TST Code of Conduct. As an individual, we support your freedom of speech and freedom

24   to hold your opinions. Members' behavior, however, reflects on the organization as whole

25   and also builds the internal culture of TST. Therefore, we have a code of conduct specifically

26   for the internet.

SECOND AMENDED COMPLAINT - 7

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

ER_55

Respect the diversity of opinions you find online and respond in a courteous manner. All TST members' online conduct must be free of harassment, stalking, threats, abuse, insults, defamation, or humiliation. This includes, but is not limited to, demeaning comments of an ethnic, religious, sexist, or racist nature; and unwanted sexual advances or intimidation by email or online. Such behavior will result in termination from the organization.

As a member of TST, always assume that what you publish on the web is permanent. Anyone can easily print out a comment or save it as a screenshot. Remember, that TST is often engaged in legal suits and exchanges online, or via text have the right to be exposed in the case of a deposition. Think before you hit "send".

Using TST in connection with surveys, contests, pyramid schemes, chain letters, junk email, spamming or any duplication or unsolicited messages is prohibited and will result termination from the organization.

Any public disagreements between TST members should be taken to a private conversation. If mediation is needed, it will be provided.

See form agreement, available as **Exhibit 4**. Sullivan has the only known copies of the agreement which was signed by Defendants.

35. The above written instructions form the contours of administrators' authorization to access TST's social media accounts.

36. Defendants, each, were entrusted with administrative rights to the above-described social media accounts, subject to the requirements set forth in the written instructions.

37. Until the hacking, Defendant Sullivan had exclusive access of the original copies of each Defendants' signature, acknowledging and agreeing to be bound by the above terms in return for access to the social media accounts.

38. On information and belief, Sullivan still has exclusive access to these documents, among other highly sensitive materials including membership listings, internal policies and procedures, and meeting notes.

SECOND AMENDED COMPLAINT - 8

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
206-230-4255 Fax 206-230-7791

ER_56

39.     Defendants were each well aware of the Code of Conduct because it served as a source of friction leading up to the events giving rise to this litigation.  For example, on March 2, 2020, Johnson shared the following post on the Allies page outside of his authority:



40.     The ensuing deletion and reiteration of the expectation that Johnson adhere to the Code of Conduct as a condition of continued social media access would serve as foreshadowing for the misappropriation of the Allies page.

41.     Between March 2 and March 12, TST's Washington leadership became increasingly frustrated with Defendants' organizational failures and inflammation of interpersonal conflicts within the advisory council.

42.     "Organizational failures," as used above, particularly included:

(1) Repeatedly operating TST's social media to endorse leftist politics as opposed

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255   Fax 206-230-7791

ER_57

1               to Satanism, despite repeated reminders that this was unacceptable;

2          (2) Failing to attend a particular meeting to address the above issue; and

3          (3) Failing to initiate, conceive, or execute any publicity for the Washington

4               Chapter's Prayer for Plurality event, which was a matter of organizational

5               significance.

6      43.     On March 12, 2020, TST's Washington leadership removed Defendants from their

7 advisory positions.

8      44.     Defendants' positions on the advisory council entailed the authorization to manage

9 the Chapter's social media activity.  By removing Defendants from their advisory positions, the

10 Washington Chapter leadership revoked Defendants' authorization to manage the Chapter's social

11 media activity and revoked Defendants' authorization to serve as custodians of records.

12      45.     At some point between March 12 and March 14, 2020, Defendants entered into an

13 unlawful agreement to misappropriate and shut down substantially all the internet presence of TST's

14 Washington Chapter toward the twin goals of forming a competitor organization and harming TST.

15

16

17

18

19

20

21

22

23

24

25

26

SECOND AMENDED COMPLAINT - 10

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255   Fax 206-230-7791

46.     On March 14, 2020, Meeham exceeded authorization for the Allies page by removing all TST-approved administrators except the other named Defendants, changing the name to "Evergreen Memes for Queer Satanic Friends," and posting the following manifesto:



**Evergreen Memes for Queer Satanic Fiends**
March 14 at 7:59 PM · 

\*\*This page is no longer affiliated with The Satanic Temple.\*\*

Ave Satanas!

I was recently notified that talking about transphobes and ableism was considered not to be relevant to The Satanic Temple's "International Council" in Salem or to the local chapter in Washington State.

So by talking about leftist politics like how "The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions," this page wasn't being Satanic.

Specifically:

"(IC is aware of how badly the allies page is fucking up), isn't worried about being labelled a criminal (and endorses negative and unrelated leftist politics on TST-affiliated social media). TST WA Allies should be about Satanism. On March 4th, this was told to you and ADJ, but just as recently as two days ago, there is a post about ableism. (this as a post from an individual is great - as TST WA not acceptable)."

So to be clear, this page thinks ableism, misogyny, and racism are superstitions, fascists are bad, transphobes can shut the fuck up, and the only good bootlickers do it for a kink and not because they love making excuses for cops killing people.

No gods, no masters.

Be gay, do crime, hail Satan

47.     Meeham, in conjunction with the other named Defendants, then began posting material in violation of the Code of Conduct and in disregard of the revocation of authority entailed in being removed from the position on the advisory council.

48.     Sullivan explicitly recognized that Defendants had no authorization to access the Allies page. On March 15, 2020, Sullivan publicly stated that he was no longer affiliated with TST. **Exhibit 5**. A commentator suggested "Time to found your own," to which Sullivan responded "three steps ahead of you" and "we have a meme page here that we stole from TST: Evergreen Memes for Queer Satanic Friends." **Id.** at pp. 3-4.

49.     Following Meeham's usurpation of the Allies page, the Washington Chapterhead removed all defendants from administrative access privileges to the remaining social media accounts. More specifically, the Chapterhead removed all administrative privileges of Johnson,

SECOND AMENDED COMPLAINT - 11

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
206-230-4255  Fax 206-230-7791

ER_59

1    Fishbaugh, Meeham, and Sullivan to the Facebook Chapter account and the Twitter and Google

2    accounts referenced herein.

3         50.    On or around March 18, 2020, Johnson hacked the TST's Twitter account, removed

4    all of TST's approved administrators, replaced the approved administrators with his co-Defendants,

5    followed a number of extremist groups, and changed the description from "Washington State

6    Chapter of the Satanic Temple" to "Satan stands as the ultimate icon for selfless revolt. We oppose

7    irrational, unjust hierarchies like white supremacy, patriarchy, ableism, & cishet normality."

8    Johnson took these actions despite having a subjective awareness that he no longer had authorization

9    to use TST's Twitter account.

10        51.    On March 20, 2020, despite having a subjective awareness that he no longer had

11   authorization to use TST's Facebook Chapter page, Johnson took control of the Chapter page by

12   removing all TST-approved administrators, modifying the cover page without approval, and posting

13   a three-page manifesto. The manifesto, as it looked as of the original complaint, is attached and

14   incorporated as **Exhibit 6** (the archive reflects Central time). Originally, the manifesto was posted

15   with the original trade dress of TST.

16        52.    Broadly, the manifesto levied false claims that TST leadership is cozy with the alt-

17   right, are white supremacists, are generally insufficiently leftist for Johnson's preference, and does

18   not conform to Johnson's impression of Satanism. Posting the manifesto exceeded Johnson's grant

19   of authority as defined in the Code of Conduct, disregarded the revocation of authority entailed in

20   being removed from the position on the advisory council, and disregarded the explicit revocation of

21   authority entailed in having his administrative access to the Chapter page removed.

22        53.    On March 20 at 11:29 pm, the Chapter's media liaison emailed Johnson a cease and

23   desist instruction, stating "I'd like you to return the Facebook page back to us please." **Exhibit 7**

24        54.    Johnson ignored the email and did not return the Facebook page to TST.

25        55.    Instead, Johnson spent the next couple of days posting links and commentary from

26   the Chapter page, all with the general, and false, theme that TST leaders are incompetent fascists.

SECOND AMENDED COMPLAINT - 12

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
206-230-4255  Fax 206-230-7791

ER_60

See **Exhibit 8** (posts and commentary in excess of authorization). The links and commentary all exceeded Johnson's grant of authority as defined in the Code of Conduct, disregarded the revocation of authority entailed in being removed from the position on the advisory council, disregarded the explicit revocation of authority entailed in having his administrative access to the Chapter page removed, and disregarded the explicit cease and desist demand referenced in ¶ 53

56.     On March 20 at 11:36 pm, Fishbaugh attempted to change the password to the Chapter's Google-based email account by changing the recovery email and changing the phone number. This ignored the revocation of authority entailed in being removed from the position on the advisory council and disregarded the explicit withdrawal of authority entailed in removing her administrative access.

57.     On March 22 at 3:08 pm, Johnson modified the name of the Chapter page from "The Satanic Temple Washington" to "Satanic Washington State – Archived Temple Chapter" and modified the profile picture to replace TST-specific iconography with "antifa" symbolism. These modifications disregarded the revocation of authority entailed in being removed from the position on the advisory council, disregarded the explicit revocation of authorization entailed in having his social media administrative access revoked, and disregarded the explicit cease and desist demands referenced in ¶ 53.

58.     By operation of his removal as a member of the advisory council, Sullivan's control over original signed copies of membership agreements, cloud-based trade secret documentation, became unauthorized.

59.     Of importance to this action, Sullivan had, and continues to have, exclusive control over membership enrollment and application documents and background check documents for prospective new members (to exclude felons from membership), both of which are paper documents. Sullivan also had, and continues to have, an electronic database of the membership, as well as their contact information.

60.     TST opposes the use or threat of violence as a mechanism for control.

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255   Fax 206-230-7791

61.    The    Chapter    page    maintains    its    original    URL: https://www.facebook.com/TheSatanicTempleWashington/.

62.    As of the original complaint, TST's Washington Chapter lost between 20 and 30 members because of Johnson's false claims published to the Chapter page.  The precise number since then is currently unknown to TST.

63.    Facebook refused to correct the matter, mislabeling the issue as a "Page admin issue" to the exclusion of "infringements of your legal rights."

64.    One week prior to the original complaint, this time through counsel, TST reiterated the legal theories at play to Facebook and to Johnson.  More particularly, On March 23, 2020, Matthew Kezhaya (TST's outside general counsel) issued a demand letter to Johnson which threatened this very litigation unless he "permanently relinquish[ed] full control" of the Chapter page "by 4:00 PM Central Time on March 24, 2020."  **Exhibit 9**

65.    Johnson ignored the letter and, together with his co-Defendants, continued to maintain exclusive control over the Chapter page.  In so doing, Johnson and his co-Defendants disregarded the revocation of authority entailed in being removed from their positions on the advisory council, disregarded the explicit revocation of authorization entailed in having their social media administrative access revoked, and disregarded the explicit cease and desist demands referenced in ¶¶ 53 and 64.

66.    Facebook did not respond and did not return control of the Chapter page until after the original complaint.  See Exhibit 2.

67.    Defendants simply ignored all communications, from counsel and TST alike.

68.    TST was able to recover the Twitter account and the email account through Twitter and Google, respectively.

### III.    CAUSES OF ACTION

### Count 1:

### CFAA violation

SECOND AMENDED COMPLAINT - 14

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

ER_62

1     69.    TST re-alleges and incorporates by reference the foregoing allegations.

2     70.    The CFAA provides a civil cause of action when a Defendant knowingly accesses a

3 "protected computer" by "exceeding authorized access," which causes a cumulative "loss" of at

4 least $5,000. See 18 U.S.C. § 1030(g), (c)(4)(A)(i)(I). Or, in the case of an attempted violation, the

5 successful violation would cause at least $5,000 in "loss." Ibid.

6     71.    A "computer," is broadly defined as any device for processing or storing data. 18

7 U.S.C. § 1030(e)(1).

8     72.    A "protected computer" is a "computer" which is "used in or affecting interstate or

9 foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B).

10    73.    Websites have been recognized as a "protected computer" within the meaning of the

11 CFAA. See United States v. Drew, 259 F.R.D. 449, 457-58 (C.D. Cal. 2009).

12    74.    A defendant "exceeds authorized access" by accessing a computer "with

13 authorization and to use such access to obtain or alter information in the computer that the accesser

14 is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

15    75.    A "loss" is "any reasonable cost to any victim, including the cost of responding to

16 an offense, conducting a damage assessment, and restoring the data, program, system, or

17 information to its condition prior to the offense, and any revenue lost, cost incurred, or other

18 consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

19    76.    As described above, Defendants wrongfully and intentionally by exceeding their

20

21    **Pete Reeves** I'm confused as to why a TST Facebook page is being

22 used to attack TST... Shouldn't that be left to the Evangelical
Christians?

23 Like · Reply · 1w    👍 2

24

25    **Pete Reeves** I'm confused as to why a TST Facebook page is being
used to attack TST... Shouldn't that be left to the Evangelical

26 Christians?    Saturday, March 21, 2020 at 1:59 PM
Like · Reply · 1w    👍 2

SECOND AMENDED COMPLAINT - 15

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
206-230-4255 Fax 206-230-7791

ER_63

authorized access, perpetrated fraud upon TST and its membership, as well as any who happened upon the offending posts, by posting under the misappropriated identity of TST. Perfectly encapsulating the issue, one commenter expressed confusion on March 21, stating:

See https://www.facebook.com/TheSatanicTempleWashington/posts/2908426992513671

77.     There is a cognizable dollar value to social media accounts. Preliminary estimates of the "loss" related to the misappropriation of the Chapter page is $33,689.70, plus $1,037.52 for the Allies page. The Twitter page, if successfully misappropriated, would have lost $8,246.70. The aggregate sum being $42,973.92—well in excess of the $5,000 jurisdictional requirement.

78.     Defendants were aware that the social media accounts had an economic value to TST. The social media accounts were the primary means for TST to communicate with the general public and TST's supporters, and that those communications help to foster the kind of relationship which results in charitable donations to support TST's organizational purposes. By depriving TST of its social media accounts, Defendants intended to diminish those donations and divert donations to their competitor organization, provisionally named "The Satanic Temple 2: Electric Boogaloo." Exhibit 5 at p. 4.

79.     Further compounding the losses are TST's attorney's fees for investigating this matter, entering futile demands for corrective action: both of Facebook and from Defendants, and drafting this complaint. TST will continue to incur losses in the costs and fees related to this lawsuit. TST's costs and attorney's fees well exceed the $6,000 incurred in researching and drafting the original complaint.

80.     TST has incurred, and continues to incur, reputation losses from the misappropriation of its Facebook pages. These reputation losses are quantifiable in monetary terms, but are irreparable by money damages alone.

81.     Based on the foregoing, TST is entitled to injunctive relief in the form of a permanent injunction enjoining Defendants from accessing any of TST's "protected computers" (i.e. any internet-based media) under threat of contempt, economic damages of at least $48,973.92, and costs

SECOND AMENDED COMPLAINT - 16

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
206-230-4255  Fax 206-230-7791

1 and attorney's fees to be computed after entry of the decree.

2 **Count 2:**

3 **Tortious interference**

4     82.     TST re-alleges and incorporates by reference the foregoing allegations.

5     83.     TST maintains ongoing business relationships with Facebook, importantly to
6 include the Chapter page and Allies page.

7     84.     There is an economic benefit for TST in having a ubiquitous platform to interact
8 with members and prospective members in the convenience of their homes and wherever they carry
9 their smartphones. Namely, with increased awareness comes increased membership and donations
10 which create a positive feedback loop.

11     85.     At the relevant time, Defendants had subjective knowledge of the business
12 relationship between Facebook and TST. Facebook is well-known as a separate company from the
13 organizations that have profiles on its proprietary network.

14     86.     Defendants intentionally and with an improper motive acted to sever the Washington
15 Chapter's relationships with Facebook by misappropriating the two websites for the twin goals of
16 harming the Washington Chapter, and TST at large, and creating a competitor organization.

17     87.     Defendants were aware that the social media accounts had an economic value to
18 TST. The social media accounts were the primary means for TST to communicate with the general
19 public and TST's supporters and Defendants personally used those social media accounts for the
20 purpose of assisting TST in creating the kind of communications that help to foster the kind of
21 relationship which results in charitable donations to support TST's organizational purposes. By
22 depriving TST of its social media accounts, Defendants intended to diminish those donations and
23 divert donations to their competitor organization, provisionally named "The Satanic Temple 2:
24 Electric Boogaloo." Exhibit 5 at p. 4.

25     88.     Defendants' interference with TST's social media presence was wrongful beyond
26 the interference itself. Defendants abused TST's social media presence as a channel to publish

SECOND AMENDED COMPLAINT - 17

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
206-230-4255 Fax 206-230-7791

ER_65

1   derogatory messages directly to TST's intended audience and to falsely suggest that the Washington

2   Chapter was replaced by Defendants' competitor organization.  The contemplated and intentional

3   purpose of so doing was to diminish TST's membership and donation base.

4       89.    As a direct and proximate result of Defendants' wrongful conduct, TST has suffered

5   substantial economic injury and loss of business opportunity and has incurred attorney's fees and

6   other costs in attempting to remedy the situation.

7       90.    Based on the foregoing, TST is entitled to injunctive relief in the form of a permanent

8   injunction enjoining Defendants from accessing any of TST's "protected computers" under threat

9   of contempt, and costs and attorney's fees to be computed after entry of the decree.

10                              **Count 3:**

11                          **Trespass to chattels**

12      91.    TST re-alleges and incorporates by reference the foregoing allegations.

13      92.    Trespass to chattels is the intentional interference with a party's personal property

14  without justification that deprives the owner of possession or use.  G&G Closed Cir. Events, LLC

15  v. Single, LLC, No. C18-1295JLR, 2020 WL 5815050, at *4 (W.D. Wash. Sept. 30, 2020) (citing

16  Restatement (Second) of Torts § 217).

17      93.    The first chattel at issue is TST's possessory interest in Facebook's computer

18  network which manifested through the internet as the Chapter page and the Allies page.

19      94.    Defendants intentionally dispossessed TST of the Chapter page and the Allies page

20  by logging in to Facebook's computer network and replacing Defendants for TST's authorized

21  administrators of the pages.

22      95.    Defendants had no justification to remove all of TST's approved administrators or

23  to usurp the pages at issue.  Their authorization to use the pages were revoked by virtue of the

24  removal of their positions on the advisory council and was explicitly revoked as to the Chapter page

25  by the revocation of their administrative access.

26      96.    Although Washington has not squarely addressed the question, California courts

SECOND AMENDED COMPLAINT - 18

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

ER_66

1    have resolved that dispossession of access to a computer system is an actionable trespass to chattels.

2    See Synopsys, Inc. v. Ubiquiti Networks, Inc., 313 F. Supp. 3d 1056, 1080 (N.D. Cal. 2018) and

3    Intel Corp. v. Hamidi, 30 Cal. 4th 1342, 1351, 71 P.3d 296, 303 (2003); see also JLM Couture, Inc.

4    v. Gutman, No. 20 CV 10575-LTS-SLC, 2021 WL 827749 (S.D.N.Y. Mar. 4, 2021) (granting a

5    preliminary injunction to restrain a former employee's use of an employer's social media accounts

6    post-termination–albeit while explicitly declining to address the ultimate trespass to chattel and

7    conversion claims, id. at *19).

8    97.    The second chattel at issue is TST's membership-related documents, whether in

9    physical or electronic format.

10   98.    Defendants, particularly Sullivan, intentionally dispossessed TST of these

11   membership-related documents by maintaining exclusive control over the documents despite the

12   termination of Sullivan's role as custodian of records.

13   99.    Based on the foregoing, TST is entitled to injunctive relief in the form of a permanent

14   injunction enjoining Defendants from accessing any of TST's "protected computers" under threat

15   of contempt, an order to return TST's membership related documents and destroy any copies

16   thereof, and costs and attorney's fees to be computed after entry of the decree.

17   **Count 4:**

18   **Conversion**

19   100.    TST re-alleges and incorporates by reference the foregoing allegations.

20   101.    Conversion is the act of "willfully interfering with any chattel, without lawful

21   justification, whereby any person entitled thereto is deprived of the possession of it. In re Mastro,

22   No. 09-16841-MLB, 2017 WL 2889659, at *13 (Bankr. W.D. Wash. July 6, 2017) (citing Public

23   Util. Dist. No. 1 v. Wash. Public Power Supply Sys., 104 Wn.2d 353, 378 (Wash. 1985)).

24   102.    "Willful" means "intentional" but not necessarily "malicious." Id. (citing Schilling

25   v. Radio Holdings, Inc., 136 Wn.2d 152, 159–60 (Wash. 1998)) (citations omitted).

26   103.    Malicious intent is not an element of conversion and good faith is not a defense. Id.

SECOND AMENDED COMPLAINT - 19

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
206-230-4255 Fax 206-230-7791

**ER_67**

1    (citing Brown v. Brown, 157 Wn. App. 803, 818, (2010)).

2        104.    Trespass to chattels differs from conversion as a matter of degree.  See Intel Corp.

3    v. Hamidi, 30 Cal. 4th 1342, 1350, 71 P.3d 296, 302 (2003) ("Dubbed by Prosser the 'little brother

4    of conversion,' the tort of trespass to chattels allows recovery for interferences with possession of

5    personal property 'not sufficiently important to be classed as conversion, and so to compel the

6    defendant to pay the full value of the thing with which he has interfered'); see also Damiano v. Lind,

7    163 Wash. App. 1017 at *5 (2011) ("Trespass to chattels is something less than a conversion.")

8    (unpublished opinion, but the Court "may consider unpublished state decisions, even though such

9    opinions have no precedential value." Emps. Ins. of Wausau v. Granite State Ins. Co., 330 F.3d

10   1214, 1220 (9th Cir. 2003)).

11       105.    The same chattels are at issue in this Conversion claim as the Trespass to Chattels

12   claim.  Both claims are included because Washington courts tend to discuss the two claims in

13   tandem.  E.g. Damiano, above; see also Sexton v. Brown, 147 Wash. App. 1005 (2008).

14                                   **Count 5:**

15                      **Dilution under 15 USC § 1125(c)**

16       106.    TST re-alleges and incorporates by reference the foregoing allegations.

17       107.    15 USC § 1125(c) provides for trademark remedies when one or more defendants

18   uses a famous or distinctive mark or trade name in commerce which is likely to cause dilution by

19   blurring or dilution by tarnishment of the famous mark.  See 15 USC § 1125(c)(1) and (5).

20       108.    A mark is "famous" if it is widely recognized by the general consuming public.  15

21   USC § 1125(c)(2)(A).

22       109.    "The Satanic Temple" is a famous mark because it is commonly referenced in the

23   general media.  For recent references, see e.g. Penny Lane, *Magnolia Films*, "Hail Satan?" (2019);

24   Cameron Sheppard, *WNPA News Service*, "Amid Pious Protesters, Satanists Conduct a Ritual on

25   the Capitol Steps" (March 6, 2020) (reposted by *The Chronicle*, available at

26   https://www.chronline.com/stories/amid-pious-protesters-satanists-conduct-a-ritual-on-the-capitol-

SECOND AMENDED COMPLAINT - 20

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

ER_68

1    steps,4905) (last visited April 23, 2021); David S. Cohen, Rolling Stone, "How the Satanic Temple

2    Could Bring Abortion Rights to the Supreme Court" (August 24, 2020) (available at

3    https://www.rollingstone.com/culture/culture-features/satanic-temple-abortion-rights-supreme-

4    court-1048833/) (last visited April 23, 2021); Erik Larson, *Bloomberg News*, "Satanic Temple's

5    lawyers try Christian-right tactics" (March 22, 2021) (reposted by the Seattle Times, available at

6    https://www.seattletimes.com/nation-world/satanic-temples-lawyers-try-christian-right-tactics/)

7    (last visited April 23, 2021).

8         110.    Dilution by blurring is an association arising from the similarity between a mark or

9    trade name and a famous mark which impairs the distinctiveness of the famous mark.  15 USC §

10   1125(c)(2)(B).

11        111.    Defendants' competitor organization, which was provisionally entitled "The Satanic

12   Temple 2: Electric Boogaloo" and "Satanic Washington – Archived Temple Chapter" had a

13   likelihood of impairing the distinctiveness of TST as a famous mark.  To-wit:

14                    (1) "The Satanic Temple 2: Electric Boogaloo" directly copies "The Satanic

15                        Temple;" and "Satanic Washington – **Archived Temple Chapter**" (emphasis

16                        added) directly suggests that the Washington Chapter has been replaced by

17                        Defendants' competitor organization.

18                    (2) TST has an inherently distinctive mark because there is only one "The Satanic

19                        Temple," Plaintiff, which has acquired distinctiveness as a mark through years

20                        of effort.

21                    (3) There is only one "The Satanic Temple" because TST jealously guards its

22                        intellectual property rights.

23                    (4) As addressed in ¶ 109, above, there is wide public recognition of The Satanic

24                        Temple.

25                    (5) Defendants intended to create an association between their competitor

26                        organization with TST by stealing TST's Facebook pages, falsely suggesting

SECOND AMENDED COMPLAINT - 21

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

ER_69

1    that TST's Washington Chapter was no more ("Archived"), and redirecting all
2    internet traffic away from TST's Washington Chapter and toward Defendants'
3    competitor organization.

4    (6) There is an actual association between Defendants' mark and TST because
5    Defendants were former TST associates, who intended to create a competitor
6    organization by using TST's own intellectual property (both the name and the
7    Facebook pages), and advertising their competitor organization through the
8    Facebook pages.

9    Compare 15 USC § 1125(c)(2)(B)(i)-(vi).

10    112.    Alternatively, dilution by tarnishment is an association arising from the similarity
11    between a mark and a famous mark that harms the reputation of the famous mark.  15 USC §
12    1125(c)(2)(C).

13    113.    TST's membership base tends to be repelled by organizations which promote
14    ableism, misogyny, racism, fascism, transphobia, and the endorsement of police brutality.

15    114.    Defendants' competitor organization broadcasted statements, directly to current and
16    potential members of TST through TST's Facebook pages, that TST promotes ableism, misogyny,
17    racism, fascism, transphobia, and the endorsement of police brutality.  Defendants broadcasted these
18    statements for the purpose of diverting away from TST both current members and interested
19    potential members of the public.

20    115.    Defendants' competitor organization also publicly affiliated itself (and TST, to an
21    uninformed public) with politically extremist organizations by having the Twitter page follow
22    various politically extremist organizations (¶ 50, above) and by modifying the Chapter page's profile
23    picture to suggest that TST is associated with Antifa (¶ 57 above).

24    116.    These actions harmed TST–which is a religious organization–by suggesting that
25    TST is not a religious organization, but is instead an extremist political organization.   This
26    jeopardizes TST's tax exempt status as a "church;" jeopardizes the tax exempt status of donations

SECOND AMENDED COMPLAINT - 22

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

ER_70

1  to TST; jeopardizes the civil rights of TST's membership base ("religion" is a protected class under

2  Title VII, but "politics" is not); and diverts TST's membership base, which is interested in joining a

3  religion and not an extremist political group.

4      117.    Defendants' competitor group is also selling merchandise which features

5  Defendants' derivative marks and which Defendants are advertising on TST's Allies page.  See

6  generally https://www.redbubble.com/people/QueerSatanic/shop (last visited April 26, 2012).

7      118.    Based upon the foregoing, TST is entitled to recover monetary damages up to three

8  times the sum of: (1) Defendants' profits; (2) TST's reputational damages; and (3) the costs of this

9  action (15 USC § 1125(c)(5), referencing 15 USC § 1117(a) and (b)); an order to destroy all means

10  of making Defendants' counterfeit materials (id., referencing 15 USC § 1118); and orders to seize

11  any goods bearing Defendants' counterfeit marks, any records related to the sale thereof, and other

12  such appropriate orders to prevent the violation of TST's rights as a registered mark holder.  (id.,

13  referencing 15 USC § 1116).

14      IV.    **PRAYER FOR RELIEF**

15      **WHEREFORE**, in addition to all other relief to which the Court finds TST entitled,

16  TST prays for orders as follows:

17      (1)    Defendants shall, jointly and severally, immediately return full control to counsel for

18  Plaintiff under threat of contempt: control of the Allies page, all TST materials, whether in paper or

19  electronic format, including without limitation: all signed agreements, all membership listings, all

20  internal policies and procedures, all governance documentation, any branding materials, and any

21  other document created by or for the benefit of TST.

22      (2)    Defendants shall, jointly and severally, permanently refrain from accessing any

23  administrative function of any internet-based medium, including without limitation any social media

24  accounts, email accounts, or document storage accounts, created by or for the benefit of TST.

25      (3)    Defendants shall, jointly and severally, pay economic to Plaintiff in the amount of

26  $42,973.92 (the sum value of the social media accounts), or such other sum of the numbers identified

SECOND AMENDED COMPLAINT - 23

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

ER_71

1  in ¶ 118, above.

2      (4)     Defendants shall, jointly and severally, pay statutory damages to Plaintiff in the

3  amount of $100,000, or such other amount to be determined at trial.

4      (5)     Defendants shall, jointly and severally, pay costs and attorney's fees to Plaintiff in

5  an amount to be determined after trial.

6      (6)     Defendants shall, jointly and severally, pay prejudgment and postjudgment interest

7  until paid in full.

8

   Respectfully submitted this 24th day of May, 2021.
9

10                         LYBECK PEDREIRA & JUSTUS, PLLC

11
                          By: */s/ Benjamin Justus*
12                        Benjamin Justus (#38855)
                          Attorneys for Plaintiff
13                        Chase Bank Building
                          7900 SE 28th St., Fifth Floor
14                        Mercer Island, WA 98040
                          206.230.4255 /ph  206.230.7791 /fax
15                        ben@lpjustus.com / email Justus

16
                          And: */s/ Matthew A. Kezhaya*
17                        Matthew A. Kezhaya (AR#2014161), admitted pro hac
                          vice Attorney for Plaintiff
18                        Kezhaya Law PLC
                          1202 NE McClain Rd
19                        Bentonville, AR 72712
                          479.431.6112 /ph  479.282.2892 /fax
20                        matt@kezhaya.law / email Kezhaya

21

22

23

24

25

26

SECOND AMENDED COMPLAINT - 24

No. 20-cv-509

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

ER_72

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of May, 2021, I electronically filed the SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties of record.

Dated at Seattle, Washington, the 24th day of May, 2021.

By: ___*/s/ Benjamin Justus*___
Benjamin Justus



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

**Trademarks > Trademark Electronic Search System (TESS)**

*TESS was last updated on Tue Mar 31 04:37:22 EDT 2020*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [        ]  OR  Jump  to record: [        ]   **Record 3 out of 3**

TSDR | ASSIGN Status | TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*

# THE SATANIC TEMPLE

| | |
|---|---|
| **Word Mark** | THE **SATANIC TEMPLE** |
| **Goods and Services** | IC 045. US 100 101. G & S: Religious services, namely, information and news relating to religious and philosophical beliefs by providing information; providing a web site featuring information about religion; Charitable outreach services, namely, providing counseling services in the field of religion; Counseling in the field of religion and spiritual services. FIRST USE: 20130101. FIRST USE IN COMMERCE: 20130101 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 86221887 |
| **Filing Date** | March 14, 2014 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Date Amended to Current Register** | December 17, 2014 |
| **Registration Number** | 4686134 |
| **Registration Date** | February 10, 2015 |
| **Owner** | (REGISTRANT) United Federation of Churches, LLC DBA The Satanic Temple LIMITED LIABILITY COMPANY MASSACHUSETTS 519 Somerville Ave. No. 288 Somerville MASSACHUSETTS 02143 |

| **Attorney of Record** | Daryl Abbas |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SATANIC" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | SUPPLEMENTAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

**Exhibit 2**

TST's Washington Chapter Facebook page history as of March 29, 2021

## Page History  

**Changed name to The Satanic Temple - Washington State Chapter**
May 27, 2020

**Changed name to Satanic Washington State - Archived Temple Chapter**
March 22, 2020

**Changed name to The Satanic Temple - Washington State Chapter**
January 1, 2020

**Page created - The Satanic Temple - Seattle Chapter**
October 19, 2014

**Exhibit 3**

Allies Facebook Page Transparency as of April 26, 2021





# The Satanic Temple of Washington

Membership Agreement and Code of Conduct

As a member of The Satanic Temple of Washington, I, _____, agree to abide by the following Code of Conduct:

## I. INTRODUCTION

This code of conduct describes the values that inform the work and activities of The Satanic Temple of WA. It also sets out guidelines for the kind of behavior that we expect of each other, and outlines procedural steps to file a complaint or allegation if a member has not lived up to our values or reasonable expectations of behavior.

The Code of Conduct describes our values and behaviors in broad terms. It is not exhaustive and a "common sense" test will apply to complaints about conduct not covered here.

## II. MEMBERS

This guide applies to all individuals who affiliate with The Satanic Temple of WA in any approved, official capacity. Members must abide by our Seven Tenets.:

ER_78

## III. THE SEVEN TENETS

One should strive to act with compassion and empathy towards all creatures in accordance with reason.

The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions.

One's body is inviolable, subject to one's own will alone.

The freedoms of others should be respected, including the freedom to offend. To willfully and unjustly encroach upon the freedoms of another is to forgo your own.

Beliefs should conform to our best scientific understanding of the world. We should take care never to distort scientific facts to fit our beliefs.

People are fallible. If we make a mistake, we should do our best to rectify it and resolve any harm that may have been caused.

Every tenet is a guiding principle designed to inspire nobility in action and thought. The spirit of compassion, wisdom, and justice should always prevail over the written or spoken word.

## IV. VALUES

*Action:* The goal of TST is to facilitate the communication and mobilization of politically aware Satanists, secularists, and advocates for individual liberty and participate in public affairs wherever issues might benefit from rational satanic insights.

*Solidarity:* We are enmeshed in overlapping systems of power rooted in a history of unchallenged theocracy. As individuals, it is our responsibility to acknowledge those systems, and make alliances with the dispossessed. Collectively, it is our task to liberate ourselves and others via positive assertion of our values, rather than attacking the opposition.

*Liberty:* Physical integrity and emotional safety are basic human rights. TST will revoke membership and end any affiliation with any members who assault, degrade, or cause harm to any other individual within the organization or outside. Violence or threat of violence upon a person, property, or institution shall also not be tolerated.

*Character:* Political resistance is a serious undertaking that requires loyalty, commitment, integrity, and courage. Members must always strive to enact these values in both our political organizing and our personal lives.

ER_79

*Respect & Equal Opportunity:* We believe that everyone is entitled to respect and should have an equal opportunity to contribute to our work. We will treat everyone with respect, including those who oppose us. Members have the right to disagree with one another. We encourage all to listen to the thoughts of our comrades and understand that we all have a diversity of experiences and beliefs. Additionally, values of dignity and respect encompass recognition of different roles within the movement, including those of other activists, volunteers and staff. These different roles imply differing constraints and authority.

*Social Conscience:* Members undertake their work in the interests of The Satanic Temple and the wider international movement. They do not seek to gain financial or other material benefit for themselves, their family or friends through this work.

## V. ADDITIONAL GUIDELINES FOR BEHAVIOR

This section provides guidelines to inform the conduct of members in specific situations. These guidelines are not exhaustive but are provided to help negotiate dilemmas that can arise.

*Public statements & interactions with media*:
All public actions and statements must be approved and vetted by the TST International Council and the TST Executive Council. If a member is approached by media or asked for any official statement regarding an action or belief relating to TST all members must refrain from comment and refer the inquiring party to the Chapter Head.

*Public actions: Protestors and law enforcement:*
Members must refrain from confronting protesters, both verbally and physically. We must never show disrespect to the opposition, regardless of slander and attacks on reason. If a member feels physically threatened at any point or uncomfortable, leave the area. Discuss a plan of action prior to any public demonstration if you expect a potential run in with the police. It is encouraged to peacefully record any interactions with the public. Report any threats of violence to the Chapter Head.

*Confidentiality:*
Members should respect confidentiality, including documentation. Internal information should not be shared beyond members of the local chapter. Members' names, contact information, and meeting locations are also considered confidential. If you are ever unsure, don't share. Members may use a pseudonym in the Chapter to preserve their confidentiality.

*Copyright Material produced by The Satanic Temple is the property of the organization:*
Consent for use of logo, name or other identity materials may be approved for use for certain projects. You may not use any official materials without prior approval. Approval may also be withdrawn at any time.

ER_80

*Health & Safety:*

Members are expected to take responsibility for their own health and safety and the health and safety of others when undertaking work or organizing events on behalf of TST. The TST National Council is able to provide advice and risk assessment if necessary. We cannot stress the importance of confidentiality as our best safety defense.

*Public Harassment:*

If members ever feel harassed, bullied or uncomfortable as a result of an interaction with outsiders we encourage you to remove yourself from the situation. Understanding that TST participation is often considered a highly controversial affiliation, members should be cautious of sharing this information with others. If placed in an uncomfortable situation, treat others with respect and refrain from behavior that may be construed as bullying or harassing, including malicious gossip. Bullying and harassment may be by an individual against an individual, or involve groups of people. It may be obvious or it may be insidious. Whatever form it takes, it is unwarranted and unwelcome to the individual. Bullying and harassment may or may not be deliberate.

*General Decorum:*

While members may make close friends and comrades as a result of being a part of The Satanic Temple, we encourage all to remember that we are dedicated to action, which requires a dedication of time, work, and resources. We expect all members to behave professionally and to uphold the code of conduct whenever affiliating with TST or its members.


## VI. ONLINE CODE OF CONDUCT

As a member of TST, your interactions with others, both online and off, will be held to the TST Code of Conduct. As an individual, we support your freedom of speech and freedom to hold your opinions. Members' behavior, however, reflects on the organization as a whole and also builds the internal culture of TST. Therefore, we have a code of conduct specifically for the internet.

Respect the diversity of opinions you find online and respond in a courteous manner. All TST members' online conduct must be free of harassment, stalking, threats, abuse, insults, defamation, or humiliation. This includes, but is not limited to, demeaning comments of an ethnic, religious, sexist, or racist nature; and unwanted sexual advances or intimidation by email or online. Such behavior will result in termination from the organization.

As a member of TST, always assume that what you publish on the web is permanent. Anyone can easily print out a comment or save it as a screenshot. Remember, that TST is often engaged in legal suits and exchanges online, or via text have the right to be exposed in the

ER_81

case of a deposition. Think before you hit "send".

Using TST in connection with surveys, contests, pyramid schemes, chain letters, junk email, spamming or any duplication or unsolicited messages is prohibited and will result in termination from the organization.

Any public disagreements between TST members should be taken to a private conversation. If mediation is needed, it will be provided.

## VII. FILING A COMPLAINT

It is preferable that problems are addressed informally and locally. When a complaint is made or an allegation received about the conduct of a member, it should be drawn to the attention of the local Chapter Head. If this is not an option, or if you require further assistance you may also contact the TST International Council via the TST Complaint Form.

Informal Process Informal action will involve the Chapter Head having a conversation with the member(s) concerned describing the complaint and listening to their version of events. If the grounds for complaint seem reasonable then recommendations may be provided in writing to avoid a recurrence of the incident. If, during discussion, it appears that informal action will not satisfactorily address the complaint or allegation, the formal procedure may be used.

## b. Formal Process

*i) Investigation:* Formal complaints can be submitted to the National Council via the TST Complaint Form. A formal process will be used where a complaint or allegation is serious, or where repeated concerns about behavior have arisen. A decision to investigate an incident does not indicate support for a complaint, merely that further enquiry is necessary.

After determining that grounds for an investigation are merited, the member will be notified in writing about the complaint, about the decision to investigate.
The aim will be to complete an investigation within 30 working days, although this may not always be possible. The purpose of the investigation is to establish whether there are reasonable grounds for believing that a breach of the Code of Conduct has occurred. If no reasonable grounds are found to exist, the member will be notified and the matter will be closed.

*ii) Outcome:* If the complaint is felt to be justified and a member has fallen short of the standards expected in the Code, then the National Council will determine the action that is required. In some circumstances, this may involve a loss of membership or title within the organization.

ER_82

*iii) Confidentiality:* Confidentiality is of the utmost importance and should be regarded as binding by everyone concerned. An allegation, and any subsequent information will only be disclosed in the interests of an effective investigation, ensuring a fair Code of Conduct meeting (or review) and to the extent clearly required for the implementation of recommendations or instructions

I have read and understood this code in full and I agree to abide by the terms presented here,

_____     _____

*Member Signature*                                                    *Date*


_____

*Print member name*


_____     _____

*New Member Team Signature*                                    *Date*

ER_83

 

Search

 Synner-gy    Home    Create     2   16

**Nathan Von Sullivan**
March 15

Well, apparently I'm no longer affiliated with TST-WA. I always knew that there was an expiration date on my membership, of course, but somehow I kinda expected it to go out with something better than being accused as a co-conspirator of attacking leadership, on the basis of conversations I was no part of and hadn't even seen until after they had resolved (and of course, cannot see any records of now); on the basis of investigations that never contacted me to even attempt to verify either my knowledge, intent, investment, or participation; on the basis of the idea that being CC'd as a witness to a formal complaint, relating to interpersonal conflicts during the proceeding of said conversations, is the same as being party to an intent to cause an internal schism via targeted bullying of particular members (something that can barely be reasonably concluded of the formal complaint itself). There will be probably be more posts as I process this, but for right now I'm speaking solely for myself.

All of this has been decided and executed in the possibly-conscious absence of any kind of opportunity made for me to speak in my own defense. I've been on hiatus from TST-WA operations for the last few months while I get some mental health and personal affairs in order - there's nothing like getting into a sleep-deprived fender bender to make you question what your long-term goals are - and so I'd had basically all of our internal comms muted short of being directly tagged. I wouldn't even have known about my removal were it not for one of the other "conspirators" messaging me to ask if I'd *also* been kicked out, prompting me to check and find out that of course I've been removed from said communications, groups, and emails.

I understand that there was a town hall meeting where the leadership "discussed" the issue with the rest of the general membership, smoothing over a purge as the necessary handling of a "rogue faction." Personally, I'm curious as to how multiple people can just go rogue without ever realizing it, but I'm sure the Official Message clarified things in a way that suggests that everything will be fine as long as you accept the official TST-WA theory of leadership that "we are a democracy, but to a point."

If there is a central tension these events and conflicts revolve around, it is in the question, "What do we owe to our former members? And what do we owe to our current members such that they don't become former members?" And the official answer to that keeps consistently being, "Nothing, because we didn't do anything wrong and you just need to trust that we have the best intentions on the basis of our mission against religious overreach, even as our internal culture increasingly fosters an environment where people are afraid to make systemic critiques and cannot trust that their reports won't be immediately castigated as proof of malicious intent and punished unilaterally." Don't complain, don't speak up, don't "give the right more ammunition," don't be one more example of how ThE LeFt Is EaTiNg ItSeLf, and for the love of Cthulhu don't ever suggest that the call is coming from inside the house, via people whose primary models for organization seem to be the same authoritarian structures that we are all forced to survive in under late capitalism. If you cannot be reaped for social capital then you are chaff - but never question the morality of the scythe, which is merely being pragmatic.

I've been fielding messages from the general membership for the last day or so, asking what the fuck is going on. You know what the fucking gross thing is? There are multiple people who have since come forward, telling me about reports they've made of sexual harassment within TST-WA. They didn't report them to me, a glorified middle-manager, and that is absolutely both their right and the right decision. They entrusted it directly to the top leadership, leadership who is empowered by our national coordinators to act quickly and unilaterally in a crisis - leadership who then did nothing with those reports, even as they came in repeatedly, and who sat by as the perpetrators continued to attend meetings in, as far as the rest of us knew, good standing. Leadership who is even now telling the remaining members to trust them as they purge the calls to do better, because TST-WA is "a democracy, but to a point." These people WERE members in good standing – up until the point they realized their reports would never be taken seriously,

**Friend Requests**    See All

 **Lillith Allstar**
30 mutual friends
[Confirm] [Delete]

**Suggested Pages**    See All

 **Satanic Temple of Myrtle Beach**
David and 24 other friends like this.
[Like]

**The Satanic Temple - Arizona Chapter - North**
Ashema and 21 other friends like this.
[Like]

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Facebook © 2020



Search           Synner-gy    Home    Create                    2      16

of the Second, nor the nobility of action and thought of the Seventh.

TST-WA is and has always been a volunteer organization, but that means leadership must be MORE sensitive to the morale and the lived experience of both its current and former membership, more willing to err on the side of making amends - not less. Which of the tenets, exactly, would be violated by doing so? How is the grand mission against arbitrary authority compromised by an internal culture that gives the benefit of the doubt to someone who is already marginalized by society in so many other contexts? One of the guiding principles of Satanism is that religion and morality do not occur in a vacuum that only opens from the top – you will forget this at your peril.

I will not be appealing my removal. I will not aid in facilitating a half-assed coverup that has the end result of normalizing a power structure that has made a habit of shooting first and then telling the victims that they're free to ask questions later, maybe. This purge was not a mistake whose harm needs to merely be resolved. This was a statement of intent, a statement of what social arrangement is considered normal by those in power, and what will be done to defend it – and what will be ignored in the process of defending it. And supposing that I "won" the appeal and cleared my name, we all know exactly that the price of returning would be the expectation of silence about what happened, how it happened, and most importantly, whether the environment that exists might cause it to happen again.

Another of the guiding principles that drives Satanic activism is the idea that silence is consent. And I, being a Satanist, do not consent.

"For the master's tools will never dismantle the master's house. They may allow us to beat him temporarily at his own game, but they will never enable us to bring about genuine change."
– Audre Lorde

Phoenix Knormalle, Verona Cruz and 50 others    42 Comments  1 Share

| Like | Comment |
|------|---------|

 **Nathan Von Sullivan** Addendum: I've been informed that the party line is now no longer "we're a democracy, but to a point," but rather seems to alternate between "TST never was and never will be a democracy" and "technically our chapter is the most democratic one."

lmao do words even mean anything

Like · Reply · 8w                                                           7

 **A David Johnson** Nathan: It's definitely not a dictatorship unaccountable to membership, and I understand the error of my ways and the hurtfulness of that statement now.

Like · Reply · 8w                                          4

 **Nathan Von Sullivan** ThAt Is An InSuLt

Like · Reply · 8w                                    2

**A David Johnson** Nathan Von Sullivan



TENOR
                                                                    2
Like · Reply · 8w

Write a reply...

Search

Synner-gy    Home    Create

whole TST mess too.

Like · Reply · 8w                                                    7

Sabrina Bratsch replied · 2 Replies

**Wylie Duffy** It is so hard to read and hear constant and worsening
lies about oneself when you know you can't defend yourself. I'd even
venture to say it's slightly worse when you have a few screenshots
(or 286) that vindicate you and disprove every single one of
t… See More

Like · Reply · 8w · Edited                                          6

**Jim Kirk**



TENOR

Like · Reply · 8w                                                    3

**Lucille Ferrin**

2

Like · Reply · 8w

**Kitty Piersing** This sounds oddly familiar...    I'm sorry this
happened, though.

Like · Reply · 8w                                                    4

Kitty Piersing replied · 2 Replies

**Martin Bleeblespoot Rosenberg** Welp

Time to found your own

Like · Reply · 8w                                                    4

**Nathan Von Sullivan** three steps ahead of you

Like · Reply · 8w                                                    2

**Martin Bleeblespoot Rosenberg**

TENOR

Like · Reply · 8w                                                    1

**Nathan Von Sullivan** we have a meme page here that we
stole from TST:
Evergreen Memes for Queer Satanic Fiends

and a small group of regional satanists that we're using as a
sort of safe space and social club. I imagine i'll be setting up
another Discord for us too

Like · Reply · 8w                                                    4

Search
Synner-gy    Home    Create
2    16

The Satanic Temple 2: Electric Boogaloo?
The Satanic Temple 2: The Second One?
S2: The Mighty Satanists?

Like · Reply · 8w                                             2

**Nathan Von Sullivan** Satanism Reloaded actually

Like · Reply · 8w                         8

**Maehem** Nathan Von Sullivan keep me updated on this pls!

Like · Reply · 8w                                    2

Write a reply...

**Inguma Six** I don't know exactly what's going on. Just think that
there could definitely be a more conducive approach to addressing
conflicts without suddenly terminating a handful of members. It's
unfortunate.

Like · Reply · 8w                                             4

**Nathan Von Sullivan** there definitely could be, but that
assumes that the point *is* to address those conflicts rather
than simply kicking them down the road for later.

Like · Reply · 8w                                    5

**Wylie Duffy** I find it no coincidence that the people kicked out
were CC'd as witnesses on a formal email complaint about
Tarky, which none of you were told about and instead it was
characterized as an attack on Angel, and then the people cc'd
were accused of formi… See More

Like · Reply · 8w · Edited                         2

Write a reply...

**Tim Pearson** Ya'll motherfuckers need Eris. Just sayin'...

Like · Reply · 8w                                             3

Tim Pearson replied · 2 Replies

**Gretchen Koch** Sorry to hear this. While I'm not at all acquainted
with the organization in question, the machinations sound very
familiar.

Like · Reply · 8w                                             2

**June Bug** For the sake of my own self-preservation, would it be ok
to message you for details on the accused? I live in Tacoma, and as
a multiple-abuse survivor the thought of potentially being assaulted
again scares the shit out of me.

If you dont know or dont feel at liberty to share names with me, I will
understand.… See More

Like · Reply · 8w                                             5

**Meredith Allen** Time to create your own charity-doing, hypocrisy-
highlighting political activism group -- with blackjack, and hookers.



Like · Reply · 8w                                             6



Search

Synner-gy Home Create 2 16

Like · Reply · 8w 1

**Verona Cruz** I don't know WTF happened but am considering removing myself from the chapter. There seems to be a transparency issue. Being cc'd on an email? What am I missing?

Like · Reply · 8w 7

Verona Cruz replied · 3 Replies

**Katherine Bourque** I'm disappointed, but not surprised given the way things have been going since the change in leadership. Please let me know how you move forward with Satanism. You were the first person I met in TST and that carries a lot of weight with me.

Like · Reply · 8w 4

**Aztrid Nova Fay** Wow. Honestly I'm not surprised by all of this. I didn't stay long because I had a feeling that the group wasn't what it seemed.

Like · Reply · 8w 3

**Lori Erickson** Whoa. I have been inactive for ages due to personal life/mental health issues and am really shocked by this.

Like · Reply · 8w 1

Lori Erickson replied · 2 Replies

**Alex Marvin** Wow really? Wtf happened? I remember my first meeting and you of all the ppl you made me the most comfortable with just your attitude. You were accepting and I didn't sense you projecting anything onto me. It was much appreciated and how leaders in any… See More

Like · Reply · 7w · Edited 4

Nathan Von Sullivan replied · 1 Reply

**Kirstin DeWeese** Wow. Just wow. You know how I feel about you and Kat—this is truly sad—the way you were treated. I would like to think that if I was going to be booted from some group they would warn me first with the opportunity to self correct. Sure some behavior is… See More

Like · Reply · 7w 1

Write a comment...

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:34 AM ·

Well, I think I gave them long enough.

- - -

Hail Satan! This is ADJ.

Until recently, social media for TST WA was my responsibility. Although no one has told me so directly, I don't think that's still actually the case, and I don't think I'm a member of TST anymore whatsoever.

Now, I say "I don't think" because I never got a phone call, email, or text message telling me that I have been removed, and as you can see, I didn't get my FB admin privileges revoked.

But I *did* get denied access to the group Discord server about a week ago, along with several other people, and I've been told there was Zoom meeting (that I still haven't watched) where the "senior leaders" who kicked us out without notice talked about us to the rest of the membership without us being able to be present.

Our violation, ironically enough, was not trusting our leadership. This is ironic because we're Satanists, and you'd think a healthy distrust of leadership would be assumed, if not a prerequisite.

It's also ironic because we were asked to trust people who couldn't be bothered to remove me or the others they kicked out from all the stuff we as active members had access to. Just yesterday, another person who got kicked out tweeted accidentally from the official account because they were still logged in (then undid). Heck, the same person saved the Memes page from getting deleted by removing everyone else as an admin before that could happen.

Actually, that's a great segue. Because apparently the first thing "Senior Leadership" did once they remembered we have a Twitter is change the description in the profile. Now, it's "Washington State Chapter of the Satanic Temple". Nothing wrong with that. But until a few days ago it was: "Satan stands as the ultimate icon for selfless revolt. We oppose irrational, unjust hierarchies like white supremacy, patriarchy, ableism, and cishet normality."

That's not a coincidence.

The reason the Memes page was going to get axed was because it was "fucking up" by talking about transphobia too much, instead of being only "about Satanism" like, I guess, saying "Hail Satan" when people sneeze or something. So remember that the next time the Mormon church calls your gender identity a work of the devil or TST WA goes out to a pride event: it's actually got nothing to do with you.

The messaging isn't the only thing.

The only reason I didn't let my morbid curiosity about how long I'd stay an admin run indefinitely is that after a bunch of us got kicked out for questioning leadership on a different issue (whether we should apologize to a former prominent member for continuing—consciously, subconsciously, and accidentally—to use their image to promote chapter after they left due to months of unaddressed sexual harassment three years ago), after *that*, former and inactive members came out of the woodwork describing how, for example, still-active member Pockets made their partner feel uncomfortable by refusing to use their pronouns, or how member Angel said her pronouns should be obvious if she spread her legs. Tarkus Claypool, who has one of two official positions that exist in the chapter as "Media Liaison" personally told us to take down an image of TERFs being bootlickers to patriarchy, apparently due to transphobia, although he denied that was the case when asked to his face.

We'd known that at higher levels in TST's pyramid, there was disrespect or outright hostility to trans people and queer issues based on Lucien Greaves / Doug Misicko opposition to including trans education as part of our curriculum for Tacoma's After School Satan. But LG Doug is a garbage person in so many ways, that's not a surprise. It was only after being made to leave that this pattern of years of behavior locally became more obvious, and a lot of us found out we weren't the only ones to feel this way or to have been treated this way.

Other people were lied to, lied about, or otherwise mistreated and isolated over the years, and it's real shitty to find out that Barrett, who you thought was your friend was coming to check on you and see how your mental health was doing but actually only there because Tarkus sent him to feel you out about how you felt about Tarkus

ER_89

so Tarkus could kick you out of everything without telling any other members he'd done it, then lie and say you wanted to quit.

If it sounds incredible that all of this could be going on in what is The Satanic Temple's Oldest Continuous Chapter™, you may want to go peruse some of the group photos from years past. The world is full of coincidences, but the fact that very few of people continue to show up year after year makes sense when you notice that a lot of those people who show up every year really like to make excuses for police brutality, disrespect trans people, and/or care more about protecting hierarchy of an organization than protecting the people who make up that organization.

TST WA is volunteers. When you treat people like shit, they'll leave. So, literally, hundreds of people have. And those that remain and who cling on to leadership are baffled why in the world no one sticks around or why they have to keep kicking people out who read the Seven Tenets and the sales pitch of the tenets and want to actually follow through on pursuing justice ahead of laws or institutions without understanding what Satanism is really about: making sure that LG Doug and Malcolm Jarry / Cevin Soling get to keep wetting their beaks in Salem without actually stirring up too much trouble.

I'll make a separate post about LG Doug and his history of virulent antisemitism, defense of literal spouse-beating Neo-Nazis, and weird coziness with the alt-right in general. There's a ton of documentation out there already, and to a lesser extent MJ Cevin's defense of school segregation, being interviewed by white supremacist Stegan Moleneaux a couple of times, and making a documentary about trying to fulfill a prophecy of a cargo cult because they're so easy to control. (No, really: https://www.imdb.com/title/tt5465690/).

But until recently, a lot of us who worked very hard thought maybe we were getting one over on the Lords of Salem by taking their progressive grift and taking it sincerely instead of cynically to be able to help people. What we learned instead was that actually trying to live up to principles like the #SixthTenet ("People are fallible. If one makes a mistake, one should do one's best to rectify it and resolve any harm that might have been caused.") could lead to a member of five years being kicked out without warning for saying in a Facebook comment that someone deserved an apology. We learned that you could be kicked out for being cc'd on an email. And we learned that you could be kicked out for dating someone that was cc'd on an email.

We also learned that, wouldn't you know it "petty organizational autocracy" and "rigid centralized authority" is actually the entire business plan of TST, as helpfully drawn for us all by chapter head Siri Sanguine and then confirmed with a flowchart afterward.

We learned that all of the problems we thought we were trying to fix were features, not bugs, of the structure, using volunteer labor and talent to funnel resources toward people so they could get nudes sent to them on Twitter and fuss about not getting a Blue Checkmark, lose every legal case they take to court, and launch an internet TV service that would probably already pivoted to goth aesthetic porn if coronavirus hadn't made that less feasible.

Anyway, here we are. It's Friday night. The world is ending, we're quarantined, so strap in and read some articles about why The Satanic Temple chooses to suck so bad and can't help but mistreat people who want to be fight unjust hierarchy and arbitrary tyranny.

(I bet they'll try to get in touch with me now.)

 **Evergreen Memes for Queer Satanic Fiends**
March 14 at 9:59 PM · 

**This page is no longer affiliated with The Satanic Temple.**

Ave Satanas!

I was recently notified that talking about transphobes and ableism was considered not to be relevant to The Satanic Temple's "International Council" in Salem or to the local chapter in Washington State.

So by talking about leftist politics like how "The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions," this page wasn't being Satanic.

Specifically:
"(IC is aware of how badly the allies page is fucking up), isn't worried about being labelled a criminal (and endorses

negative and unrelated leftist politics on TST-affiliated social media). TST WA Allies should be about Satanism. On March 4th, this was told to you and ADJ, but just as recently as two days ago, there is a post about ableism. (this as a post from an individual is great - as TST WA not acceptable)."

So to be clear, this page thinks ableism, misogyny, and racism are superstitions, fascists are bad, transphobes can shut the fuck up, and the only good bootlickers do it for a kink and not because they love making excuses for cops killing people.

No gods, no masters.

Be gay, do crime, hail Satan

---

52                                               92 Comments  6 Shares

3/31/2020
Case 3:20-cv-00509-BHS Document 106-4 Filed 05/24/21 Page 1 of 1
Gmail - You were removed from your role on The Satanic Temple - Washington State Chapter on March 20, 2020,...

 **Gmail**

Tarkus Claypool <tarkus.claypool@gmail.com>

## You were removed from your role on The Satanic Temple - Washington State Chapter on March 20, 2020,...

**Tarkus Claypool** <tarkus.claypool@gmail.com>                          Fri, Mar 20, 2020 at 11:29 PM
To: David Johnson <somedavidjohnson@gmail.com>
Cc: Siri Sanguine <sirisanguine@gmail.com>, Chalice Blythe <chaliceblythe@gmail.com>, Lilith Starr <lilithxstarr@gmail.com>

Hi ADJ,

I'd like you to return the Facebook page back to us please. Please re-add me and Siri as admins.

Ave Satanas,
-Tarkus Claypool
Media Liaison, The Satanic Temple of Washington
(he/him)
--
CONFIDENTIALITY NOTICE

The content of this email is confidential and intended only for those parties who received the email directly from the tarkus.claypool@gmail.com address. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender.

[Quoted text hidden]

**ER_92**

**Satanic Washington State - Archived Temple Chapter**
March 21 at 1:40 AM ·

"There is a revisionist movement in TST about how and why it was founded: it was founded as a prank by an opportunistic filmmaker hoping to make a mockumentary about "nice" Satanists as a joke."



VILLAGEVOICE.COM
**Trolling Hell: Is the Satanic Temple a Prank, the Start of a New Religious Movement — or Both? | The Village Voice**

16                                          10 Comments  2 Shares

### Satanic Washington State - Archived Temple Chapter
March 21 at 12:22 AM ·

"Ultimately, what it comes down to for me is I can no longer ignore the obvious evidence that my goals and those of The Satanic Temple have diverged. "



MEDIUM.COM
### Why I'm Leaving The Satanic Temple
I've been involved in the New York City chapter of The Satanic Temple for…

| 44 | 60 Comments  10 Shares |
|---|---|

Case: 2:20-cv-00509-RAJ    Document 2-4    Filed 05/24/21    Page 53 of 187

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:24 AM · 

"Over the years, members and chapter heads have requested and proposed the implementation of a gender, sexual, and racial diversity policy to ensure equity within TST leadership and alignment to the mission. The demand was not simply ignored but completely dismissed. The demand was not hollow; there was a clear and pressing need for this policy. While I was part of the organization, I witnessed male members of the organization exploit their position and influence to behave inappropriately and disrespectfully towards women."



MEDIUM.COM
**"The Struggle for Justice is Ongoing"**
On my departure from The Satanic Temple

12                                    1 Comment  1 Share

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:25 AM ·

"The Los Angeles Chapter of The Satanic Temple is hereby withdrawing from The Satanic Temple. All active members have agreed to this decision."

> For all who like and follow The Satanic Temple Los Angeles have come to our events, thank you for all of your support:
>
> The Los Angeles chapter of The Satanic Temple is hereby withdrawing from The Satanic Temple. All active members have agreed to this decision. This decision was reached after months of deliberation in the wake of The Satanic Temple Executive Ministry's decision to pursue a religious discrimination claim against Twitter for temporarily banning Lucien Greaves from their platform and for denying Lucien Greaves blue check verification. Our disappointment with the unilateral decision by Executive Ministries to expend resources pursuing this claim is only compounded by their choice to retain the law firm of

Instagram Post by HelLA: A Satanic Collective • August 4, 2018 at 11:59PM CDT

 via instagram.com

31                                           12 Comments

Case: 2:20-cv-00509-RAJ    Document 3-2    Filed 05/24/21    Page 5 of 185

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:27 AM ·

"It has been almost two years since our schism with TST, yet it was as the tumbling of small stones which precipitates a landslide. Recently a series of dominoes has fallen because of the unchecked hubris of TST's National Council and Doug Messner. The UK Chapter announced its separation from TST merely a week ago now. They were closely followed by the LA Chapter, then Portland Chapter; both of which held deep contempt for Doug's position on white supremacists and the newest wave of neo-Nazism to grip our nation. We have been told by TST insiders with whom we have remained friendly, that these will not be the last to depart… that others have had similar experiences to our own. Their dissatisfaction with the National Council's treatment of their proposals and the unique situations they deal with in their various regions has lead to the realization that the Temple serves mostly as a vehicle for Doug's personal vendettas. Most notable is his longstanding feud with Jason Rapert; a rabid theist in the Arkansas Legislature."



MEDIUM.COM
**Rise, Decline, and Fall: My Time in The Satanic Temple and Beyond**

12                                    1 Comment  3 Shares

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:29 AM ·

"Mary: I was ignored at first. I was banished and not allowed to speak to anyone else in TST. Doug (Lucien) and I had a falling out. Following that I talked to the attorney to withdraw. He convinced me to stay on board. I still believe in the case, but I don't want TST in my life."



MEDIUM.COM
**Mary Doe Speaks: Her Story—The Satanic Temple, a Case Experience**

| 11 | 1 Share |
|---|---|

Case: 2:20-cv-00509-RAJ Document 32-2 Filed 05/24/21 Page 99 of 183

### Satanic Washington State - Archived Temple Chapter
March 21 at 12:36 AM ·

The Satanic Temple managed to clatter into the story. A widely shared Slate.com article declared confidently, and wrongly, that Missouri's flash-renaissance of abortion access was "thanks to Planned Parenthood and Satanists." (Breitbart carried the error into the realm of fantasy, suggesting Planned Parenthood was "teaming up" with the worshipers of the child-sacrifice-demanding Moloch.)

In reality, the Temple's lawsuits were irrelevant, though the Satanists did their best to spin to the contrary.



ER_99

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:38 AM ·

"I also found it peculiar the Satanic Temple TV Instagram had a post which seemed to promote or glamorize August Sol Invictus; a left hand Path Individual that wants to restart the civil war, and eliminate Jewish individuals. I thought this would be something that needed to be addressed so brought it up to our group admin Ash. The post is still up."



MEDIUM.COM
**HOW I WAS EXCOMMUNICATED FROM THE SATANIC TEMPLE… IN A FEW NONTROVERSIAL STEPS.**

10

**Satanic Washington State - Archived Temple Chapter**

March 21 at 12:40 AM ·

"This is white liberalism with a goat's head: with the lack of diverse representation at the national level, the national initiatives address things that filter through biases of an all white, mostly male, governing body. "



MEDIUM.COM

**What Would Satan Do: Knowing When to Pull Anchor and Sail Away.**

The cat has been out of the bag for a hot minute now: the members of The Los Angeles chapter of The Satanic Temple (TST) left and formed…

21              2 Comments   6 Shares

**Satanic Washington State - Archived Temple Chapter**

March 21 at 12:46 AM ·

"It should be noted that TST has done good and legitimate work on these fronts in the past, and credit should be given where it is due. But the unfortunate reality is that, from the top-down, TST is a crypto-fascist organization with some members being outright neo-nazis. Of course, it must be mentioned that TST has some members who aren't neo-nazis or neo-fascists and some are even antifascist; that said, we encourage those who are antifascists within TST to take a hard look at the reality of the organization they're involved with and consider exiting the group."

https://tridentantifascism.blackblogs.org/tag/doug-misicko/



31                                                          74 Comments  5 Shares

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:50 AM ·

Poke around the original version of the site, cattle skull logo and all. Nine tenets, expressions of appreciation for the apparently literal King of Hell, but of course the merch was always there.

$130 for a robe. Wild.
^ADJ
--
"We believe that the Family is the most basic core unit of each individual's Circle of Compassion. Broken, dysfunctional families breed broken, dysfunctional individuals who withdraw the reach of their compassion, often to the point of becoming brutal, cruel, and irreparably self-interested. For this reason, the Satanic Temple is firmly committed to supporting traditional, long-recognized Family Values, and we recognize and respect varied individual notions of families."



WEB.ARCHIVE.ORG
**The Satanic Temple's Position on Contemporary Issues**
The Satanic Temple's Position on Contemporary Issues The Satanic Temple supports the rights of individuals to live their lives as they choose as…

10                        1 Comment  2 Shares

### Satanic Washington State - Archived Temple Chapter
March 21 at 12:55 AM ·

In addition to being a Holocaust denier and white supremacist slated to be a headline speaker at the "Unite the Right Rally" in Charlottesville, Augustus Invictus' wife says he's also a spousal abuser.

"Last month, a woman who said she was Invictus' wife reported that he held her at gunpoint in front of their children and forced her to accompany him to Jacksonville, Florida, according to documents obtained from the Rock Hill Police Department in South Carolina. She told police that she was able to escape while in Florida and return to South Carolina."

https://www.splcenter.org/…/augustus-invictus-charged-kidna…
^ADJ

 **Lucien Greaves**
March 14, 2016 ·

I regret to announce that I have withdrawn from my role as a scheduled speaker at the forthcoming Left Hand Path Consortium to take place in Atlanta early next month. When it was announced that I was to speak at the Consortium, I received a few emails from concerned observers who asked why I would appear at an event alongside a "fascistic" character like Augustus Sol Invictus, who was also scheduled to speak. While I'm not intimately familiar with the works and philosophy of the man in question, I also did not feel that my speaking at the conference constituted an endorsement of his, or anybody else's, point of view. Further, his perspective, from what I know, legitimately falls somewhere on a broad spectrum of recognized "Left Hand Path" philosophies, whether I find that perspective tenable, consistent, and reasonable, or not (just as Fascism legitimately has a place in discussions upon political philosophies without fear that such a discussion lends undue credibility to its contemporary implementation. Do we truly know what we're for if we refuse to discuss what we're against?). From what I know, he's part of a larger dialogue regarding the Left Hand Path that I feel is worth engaging in.

I am not withdrawing from speaking because Invictus was invited to speak, but rather because he was recently dis-invited. Protesters have harangued the organizers, and the organizers have expressed concerns for the security of their attendees were Invictus to remain on the speaker's list. I have no reason to doubt the sincerity of the organizers, however, I feel that the dis-invitation sends a harmful message in support of censorship.

I, too, find some of my speaking events besieged by (religious) protesters, and I hope that civil protest can take place without silencing my voice, or anybody else's.

One might rightly ask if there were any situation in which I might consider not speaking at a conference due to another speaker's point-of-view. Of course, If I were going to a Science conference and there was scheduled a Creationist lecturer, I would likely find the conference hardly worth attending, much less speaking at. This is because Creationism isn't taken seriously by around 100% of credible scientists. If, however, Creationism were, against all reason, taken seriously by some 30% or more of scientists, and the conference were going to contain lectures by Evolutionary Biologists who were to offer a rational view, I would think it the duty of those Evolutionary Biologists to attend, share their knowledge, and confront the poor science with hard empiricism.

I do not think that Invictus's views are in such a disappearingly small minority as to imagine that confronting his opinions give them unwarranted exposure. I think his views are prevalent enough within Left Hand Path communities that it is worth our time to argue them and delineate how and where we differ in the Satanic Reformation of The Satanic Temple.

It's easy to stand up for Free Speech when you are fighting for your own voice, or for the voice of those you agree with. It's a completely different fight and, arguably, your loyalty to Free Speech only means anything at all, when you're willing to fight for the Free Speech of those with whom you disagree.

I'm sorry to those for whom my bowing out will cause any type of inconvenience. Thank you.

15                              1 Comment   1 Share

**Satanic Washington State - Archived Temple Chapter**
March 21 at 1:29 AM · 

Another diagram for better clarity



| **Evergreen Memes for Queer Satanic Fiends** added a new photo to the album: Artisanal Locally Sourced Satanic Memes.
March 21 at 1:18 AM · 

<div align="right">

**Like Page**

</div>

20          6 Comments   1 Share

   Like          Comment          Share

Most Relevant

   Write a comment...

   ✏️ **Author**
**Satanic Washington State - Archived Temple Chapter** For those who were wondering, the cover photo is an actual human quote from an actual human person, who for some strange reason wants to go on a #DeusVolt #SatanicCrusade to #FreePalestine

He also "jousts for real", mind you
^ADJ

## Satanic Washington State - Archived Temple Chapter

March 21 at 1:55 AM ·

For the record, yes, LG Doug did illustrate a copy of the proto-fascist book "Might Is Right", later cited by the Gilroy Garlic Fest shooter as inspiration (https://www.stuff.co.nz/…/white-supremacists-satanists-and-…).

So he wasn't just dabbling in a bit of drunken "Aryan King" Jew-hatred, and no, it's still something LG Doug has never been able to actually speak honestly about, which is why the decision to defend Neo-Nazis and utilize their lawyers in the name of "free speech" rings a bit hollow.

(The deeply antisemitic, racist, and misogynistic book "Might Is Right" by Ragnar Redbeard / Arthur Desmon was also the basis for many parts of Anton LaVey's book "The Satanic Bible, so modern Satanism comes by it at least two-fold.)
^ADJ
- - -
From the official media training guide:
[Don't answer] Yes or no questions.
Question:
"This is a simple yes or no: "Didn't Lucien illustrate a copy of Might is Right. Isn't that a white supremacist book?"

Here's why they're so insidious: They almost always have an obvious answer, and everyone watching the interview knows it. But if you answer with a direct "yes or no," the resulting quote will be awful.

Never say "Yes" or "No" to a question like this. It is always a way to trap yourself.

Let's say you answer the question by saying, "Yes" in any way The resulting news story will almost certainly read, "When asked whether

Lucien Greaves illustrated a White Suprememcist book, the TST spokesperson said 'yes.'"

You don't have to answer on their terms. Instead, say something like: "I can't speak to something that happened almost 20 years ago.

What we do know is that TST is incredibly inclusive and we welcome members from all walks of life."


s or no: "Didn't Lucien illustrate a copy of Might is Right. Isn't that a white supr

us: They almost always have an obvious answer, and everyone watching the i
no," the resulting quote will be awful.

question like this. It is always a way to trap yourself.
stion by saying, "Yes" in any way The resulting news story will almost certainly
White Suprememcist book, the TST spokesperson said 'yes.'"

their terms. Instead, say something like: "I can't speak to something that ha
is incredibly inclusive and we welcome members from all walks of life."





20                                                    8 Comments  2 Shares

**Satanic Washington State - Archived Temple Chapter**
March 21 at 2:07 AM · 

Finally (I think), here's some background on the 2018 departure of many chapters who decided that TST was what it was and never would change, given all of its structure and history.

So, what have we learned?

No matter how much you think your own chapter is different and disconnected from what happens in Salem, it isn't. If you go against the company line, you'll be thwarted, expelled, undermined, or your chapter as a whole will have to leave.

We've learned that authoritarian management structures of volunteers isn't actually a very effective one, especially if you don't remember that eventually, like, within a week, you should remove them from all of the permissions they had to help build and grow the organization. Or even bother to talk to any of them. That this is something that will help membership just shut up and trust your leadership and competence in the future.

We've learned, I hope, that rather than trying to get everyone to sign NDAs and sign away the rights to their photos, you ought to try to treat people decently and, you know, like people. "One should strive to act with compassion and empathy toward all creatures in accordance with reason."

And maybe we've even learned that organizations aren't separable from the people in them. If you have an org and you think it's worth sacrificing respect for the people who are in it or have been in it for some higher cause.

There are still plenty of great people in TST. Good work still is done. And it's never too late to build something new. But, many people before you have tried, and it always seems to come to this if you go too far saying "fascists are bad" or "trans people are people" or even "we need to have a meeting space that's accessible, even if no wheelchair users are members yet."

So be prepared for that.

Ave Satanas, wash your hands, and take care of each other. Good night.
^ADJ



VOX.COM
**The Satanic Temple is divided over its leader's decision to hire Alex Jones's lawyer**

Greg Thompson and 43 others      37 Comments   14 Shares

**Satanic Washington State - Archived Temple Chapter** updated
their profile picture.
March 22 at 5:08 PM ·

Satanism should be against fascism:
https://twitter.com/heresysquad/status/1121923401973559296

That which will not bend must break, and that which can be destroyed by truth should never be spared its demise.

It is Done.

Hail Satan!



# KEZHAYA LAW PLC



**MATTHEW A. KEZHAYA**
1202 NE MCCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

March 23, 2020

Mr. David Alan Johnson
  By email only to somedavidjohnson@gmail.com

Re: Demand letter – misappropriation of facebook.com/TheSatanicTempleWashington

Mr. Johnson,

  I represent The Satanic Temple in a budding dispute surrounding the misappropriation of the facebook.com webpage located at the URL facebook.com/TheSatanicTempleWashington.  As you may know, United Federation of Churches LLC (dba "The Satanic Temple" and abbreviated "TST") holds the exclusive rights to the name "The Satanic Temple" and the contents of the TST-Washington website.

  My understanding is that you were, until recently, responsible for managing social media for the Washington Chapter of TST.  It is legally irrelevant whatever caused that change, but shortly thereafter you and a group in tandem with you misappropriated TST's website and its contents.  To my understanding, you have also removed the approved administrators from and replaced them with yourself and possibly others.  You then renamed the website "Archived Temple Chapter" and have been posting content under the guise of creating a new organization.

  By hijacking my client's copyrights to the content and trademark rights to the name, my client is entitled to substantial statutory damages from you and all who have acted in tandem with you.  For example, a copyright infringement case entitles my client to a minimum of $750 and up to $150,000 if the Court finds the infringement is willful.  17 USC § 504(c).  A trademark infringement case entitles my client to a minimum of $1,000 and up to $100,000. 15 USC § 1117(d).  In addition to monetary damages, my client is entitled to costs and attorneys fees and an order for you to permanently return full control of the above facebook page.

  I am authorized and ordered to initiate litigation if you do not permanently relinquish full control of the above facebook page by 4:00 PM Central Time on March 24, 2020.

Sincerely,

Matthew A. Kezhaya

**ER_110**

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

United Federation of Churches, LLC d/b/a The
Satanic Temple,

        Plaintiff,

    v.

David Alan Johnson *et al.*,

        Defendants.

Case No. 2:20-cv-00509-RAJ

**ORDER GRANTING MOTION
TO DISMISS**

## I.  INTRODUCTION

This matter comes before the Court on Defendants' Motion to Dismiss. Dkt. # 11. Having considered the submissions of the parties, the relevant portions of the record, and the applicable law, the Court finds that oral argument is unnecessary. For the reasons below, the Court **GRANTS** the motion.

## II.  BACKGROUND

The Satanic Temple has its own Facebook page. In fact, it has two. It also has a Twitter page and a Google E-mail account. Former members of The Satanic Temple, as approved administrators, took control of the accounts, and The Satanic Temple is now bringing suit.

Plaintiff United Federation of Churches, LLC ("The Satanic Temple") is a

religious organization.  Dkt. # 1 ¶ 7.  As such, its mission is to "encourage benevolence and empathy among all people, reject tyrannical authority, advocate practical common sense and justice, and be directed by the human conscience to undertake noble pursuits guided by the individual will."  *Id.* ¶ 9.  To that end, it espouses "seven fundamental tenets."  *Id.* ¶ 8.  Among them are beliefs such as, "[o]ne's body is inviolable, subject to one's own will alone," and "[o]ne should take care never to distort scientific facts to fit one's beliefs."  *Id.* (tenets 3 and 5).

There are Satanists throughout the country, comprising groups denominated as "Chapters."  *Id.* ¶ 12.  The State of Washington has its own Chapter ("Washington Chapter").  *See id.*

In 2014, the Washington Chapter created a "business page" on Facebook to disseminate information about The Satanic Temple.  *Id.* ¶ 23.  Facebook is a social media website that "permits users to create and share content," such as "links, commentary, and written conversations," either as individuals on personal pages or as organizations on business pages.  *Id.* ¶ 17.  Since creating the Facebook page, the Washington Chapter has garnered over 17,000 followers.  *Id.* ¶ 24.  Besides its primary Facebook page, the Washington Chapter has a few other online accounts.  *Id.* ¶¶ 22, 25-26.  For example, it has a Twitter account with about 4,000 followers, it has a secondary Facebook page named "TST WA allies" with about 500 followers, and it has a Google account.  *Id.*

Initially, the two Facebook pages were "maintained and controlled exclusively by approved administrators."  *Id.* ¶ 27.  Administrators were subject to a written Code of Conduct.  *Id.* ¶ 28.  The Code of Conduct outlines the permissible online activity for Satanists, including the "administrators' authorization to access [The Satanic Temple]'s social media accounts."  *Id.* ¶¶ 28-29.  Defendants are all former members of The Satanic Temple, *id.* ¶¶ 13-16, and they had all been "entrusted with administrative rights" to the social media accounts "subject to the requirements set forth in the Code of Conduct," *id.* ¶ 30.

In March 2020, Defendant David Alan Johnson and Defendant Mickey Meeham "hacked" the Facebook pages. *Id.* ¶¶ 1, 36, 39. For the Washington Chapter's secondary Facebook page, Defendant Meeham "exceeded authorization" by "removing all [The-Satanic-Temple]-approved administrators except the other named Defendants." *Id.* ¶ 36. Defendant Meeham also changed the name of the secondary page to "Evergreen Memes for Queer Satanic Friends" and posted a manifesto. *Id.* In that manifesto, Defendant Meeham wrote that the page was "no longer affiliated with The Satanic Temple." *Id.* Defendant Meeham suggested that the Washington Chapter had supported "ableism, misogyny, and racism," transphobia, and police brutality. *Id.*

Days later, Defendant Johnson did something similar with the Washington Chapter's primary Facebook page. *Id.* ¶ 39. Defendant Johnson "exceeded authorization" by "removing all [The-Satanic-Temple]-approved administrators," modifying the Facebook cover page, and posting yet another manifesto. *Id.*; *see also* Dkt. # 1-5. According to The Satanic Temple, Defendant Johnson "levie[d] false claims that [The Satanic Temple] leadership is cozy with the alt-right, are white supremacists, [and] are generally insufficiently leftist." Dkt. # 1 ¶ 40. Two days after that, Defendant Johnson changed the name of the primary Facebook page from "The Satanic Temple Washington" to "Satanic Washington State – Archived Temple Chapter." *Id.* ¶ 43.

As to Washington Chapter's other online accounts, Defendant Johnson "exceeded authorization" for the Twitter account by changing the account's profile description and by "following a number of extremist groups to create a false impression of affiliation between T[he Satanic Temple] and extremism." *Id.* ¶ 38. Likewise, Defendant Leah Fishbaugh "exceeded authorization" by changing the password to the Google accounts, changing the recovery email, and changing the phone number associated with the account. *Id.* ¶ 42. The Satanic Temple has since been able to recover the Twitter and Google accounts. *Id.* ¶ 54.

But The Satanic Temple has not been able to recover the two Facebook accounts.

**ER_113**

*Id.* ¶ 55.  Despite "repeatedly demand[ing] the return of the Facebook pages from both Facebook and Defendants," The Satanic Temple has not regained access.  *Id.* ¶¶ 49, 55.  Facebook asserts that the issue is a "[p]age admin issue," rather than an "infringement of [The Satanic Temple's] legal rights."  *Id.* ¶ 50.

The Satanic Temple now seeks relief in federal court.  *Id.* ¶ 55.  On April 3, 2020, The Satanic Temple filed the instant complaint.  Dkt. # 1.  Two months later, Defendants moved to dismiss.  Dkt. # 11.  The motion is ripe for adjudication.

## III.  LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for failure to state a claim.  The court must assume the truth of the complaint's factual allegations and credit all reasonable inferences arising from those allegations.  *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007).  The court "need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Instead, the plaintiff must point to factual allegations that "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007).  If the plaintiff succeeds, the complaint avoids dismissal if there is "any set of facts consistent with the allegations in the complaint" that would entitle the plaintiff to relief.  *Id*. at 563; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On a motion to dismiss, a court typically considers only the contents of the complaint.  However, a court is permitted to take judicial notice of facts that are incorporated by reference in the complaint.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials documents attached to the complaint, documents incorporated by reference in the complaint."); *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988) ("[I]t is proper for the district court to 'take judicial notice of matters of public record outside the pleadings' and consider them for purposes of the motion to dismiss.") (quoting *MGIC Indem. Corp. v. Weisman*, 803

F.2d 500, 504 (9th Cir. 1986)).

## IV.  DISCUSSION

The Satanic Temple asserts five causes of action: (1) violation of the Computer Fraud and Abuse Act ("CFAA"), (2) violation of the Anti–Cybersquatting Consumer Protection Act ("ACPA"), (3) tortious interference with business expectancy, (4) violation of Washington's Consumer Protection Act ("CPA"), and (5) defamation. The Court addresses each in turn.

### A.    Computer Fraud and Abuse Act

The Satanic Temple's first cause of action is for a "CFAA Violation."  Dkt. # 1 ¶¶ 56-66.  The complaint does not specify what subsection of the statute the claim is brought under.  *Id.*  Defendants assume that it is brought under 18 U.S.C. § 1030(a)(4). Dkt. # 11 at 9.  The Satanic Temple, on the other hand, suggests that it is relying on 18 U.S.C. § 1030(a)(2)(C).  Dkt. # 12 at 4.  For purposes of this order, the specific subsection is not important.  Either applies only if someone accesses a computer "without authorization" or "exceeds authorized access."

The CFAA creates criminal and civil liability for "acts of computer trespass by those who are not authorized users or who exceed authorized use."  *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065 (9th Cir. 2016).  A protected computer may be improperly accessed in one of two ways, (1) by "obtaining access without authorization" or (2) by "obtaining access with authorization but then using that access improperly."  *Id.* (quoting *Musacchio v. United States*, 136 S. Ct. 709, 713 (U.S. 2016)). Summarizing the Ninth Circuit's historical application of the CFAA, the court in *Facebook v. Power Ventures* explained "two general rules."  *Id.* at 1067.

> First, a defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked explicitly. Once permission has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability. Second, a violation of the terms of use of a website—without more— cannot establish liability under the CFAA.

*Id.* at 1067.

Of the two rules, The Satanic Temple says Defendants violated the second. Dkt. # 12 at 4-8. It does not currently allege or argue that Defendants' actions were done "without authorization." In fact, it alleges the opposite. In its complaint, The Satanic Temple claims that each Defendant had authorization, each having been "entrusted with administrative rights" to its social media accounts. Dkt. # 1 ¶ 30.

Instead, The Satanic Temple's argument is that Defendants "exceeded their authority." Dkt. # 12 at 4. It says that Defendants' authority "to access the administrative privileges of the Facebook account" was "predicated on the Code of Conduct." *Id.* at 7; Dkt. # 1 ¶¶ 28-30. According to The Satanic Temple, Defendant Johnson's and Defendant Meeham's actions on Facebook—posting links and commentary, posting a manifesto, and removing previously-approved administrators except Defendants—violated the Code of Conduct and therefore exceeded the authority granted to them. *Id.* ¶¶ 30, 33, 36-44.

This circuit has already considered and rejected that argument. Violating a company's terms of use (here, the Code of Conduct) is insufficient to state a CFAA claim. The Ninth Circuit made that clear in *United States v. Nosal*, 676 F.3d 854, 857, 863 (9th Cir. 2012) (en banc). There, the court held that, under the CFAA, the phrase "exceeds authorized access" applies only to "violations of restrictions on *access* to information, and not restrictions on its *use*." *Id.* at 863-64 (emphasis in original). Thus, it held that the CFAA "does not extend to violations of [a company's computer] use restrictions." *Id.*

Here, Defendants had authority. Each was granted administrative privileges to The Satanic Temple's Facebook accounts. Dkt. # 1 ¶¶ 28-30. The Code of Conduct limited Defendants' *use* of those accounts, but it did not limit their *access* to the accounts. *Id.* ¶¶ 30, 33, 36-44. Defendants allegedly violated that Code of Conduct. *Id.* Yet, under *Nosal*, violation of that Code of Conduct does not itself amount to "exceeding authority"

and is insufficient to state a claim under the CFAA.

The *Nosal* court gave an example of when authority may have been "exceeded." 676 F.3d at 856-57. "[A]ssume an employee is permitted to access only product information on [a] company's computer but accesses customer data: He would 'exceed[] authorized access' if he looks at the customer lists." *Id.* (third alteration in original). That is simply not what is alleged here. The Satanic Temple does not claim that it prohibited Defendants from accessing its Facebook accounts altogether, yet they accessed it anyway. Nor does it claim that it restricted Defendants' access to certain features of those accounts, yet Defendants wandered where they were not allowed. Instead, it claims that it restricted Defendants' *use* of those accounts through its Code of Conduct, which Defendants violated, an argument squarely rejected in *Nosal*.

At most, The Satanic Temple alleges that Defendants have misappropriated the authority granted to them. Dkt. # 1 ¶¶ 30, 35. But the CFAA is an "anti-hacking statute," not a "misappropriation statute." *Nosal*, 676 F.3d at 857. Defendants may have very well abused their authority, but The Satanic Temple has not alleged that they exceeded it.

For its part, The Satanic Temple argues that the Court must look beyond *Nosal*. Other cases, it says, suggest that companies may place "explicit limits on authorization." Dkt. # 12 at 5. It cites several decisions after *Nosal* but mostly explores two district court cases: *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 968 (N.D. Cal. 2013) and *Ticketmaster L.L.C. v. Prestige Entm't W., Inc.*, 315 F. Supp. 3d 1147 (C.D. Cal. 2018). Dkt. # 12 at 4-8.

Neither case is applicable: unlike the plaintiffs there, The Satanic Temple does not allege that it ever explicitly revoked Defendants' authority. *Craigslist* and *Ticketmaster* share a few common features. In both cases, defendants initially had authority to access plaintiffs' websites, defendants violated plaintiffs' terms of use, plaintiffs revoked defendants' access to their websites by sending defendants cease and desist letters, and defendants ignored the revocations. The decisions turned not on defendants' initial

violation of plaintiffs' terms of use; they turned on defendants' continued access of plaintiffs' websites after authority was revoked. *Craigslist*, 942 F. Supp. 2d at 969-70 ("Defendants' *continued use* of [plaintiff's website] *after the clear statements regarding authorization in the cease and desist letters* and the technological measures to block them constitutes unauthorized access under the [CFAA]." (emphasis added)); *Ticketmaster*, 315 F. Supp. 3d at 1171 ("To be clear, it is the violation of the terms of the [cease and desist l]etter, *not of [plaintiff]'s Terms of Use*, on which the Court bases its finding of a well-pled CFAA claim." (emphasis added)).

Following *Craigslist* and *Ticketmaster*, the Court makes two observations. First, the holdings in both cases are consistent with circuit authority. *See, e.g.*, *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067-68 (9th Cir. 2016) ("[Plaintiff] expressly rescinded [] permission when [it] issued its written cease and desist letter to [defendant] . . . . We therefore hold that, after receiving written notification . . ., [defendant] accessed [plaintiff]'s computers 'without authorization' within the meaning of the CFAA and is liable under that statute."); *United States v. Nosal*, 844 F.3d 1024, 1029 (9th Cir. 2016) ("*Nosal II*") ("[A] person uses a computer 'without authorization' under [the CFAA] . . . when the employer has rescinded permission to access the computer and the defendant uses the computer anyway." (internal quotation marks omitted) (quoting *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009)).

Second, unlike those cases, The Satanic Temple has not alleged that it revoked Defendants' authority. At most, it has pled in conclusory fashion that "it demanded the return of the Facebook pages" from Defendants. Dkt. # 1 ¶ 49. This is insufficient. Apart from being conclusory, this allegation does not state when the revocation occurred, how that revocation was communicated, and what actions Defendants undertook afterwards. Without such allegations, The Satanic Temple's comparison to *Craigslist* and *Ticketmaster* is strained and unpersuasive.

The Satanic Temple has failed to allege a violation under the CFAA. Its theory

that Defendants "exceeded authorized access" by violating The Satanic Temple's Code of Conduct has been expressly rejected by the Ninth Circuit. The Court **DISMISSES** this claim.

### B.      Anti–Cybersquatting Consumer Protection Act

"The Anti–Cybersquatting Consumer Protection Act establishes civil liability for 'cyberpiracy' where a plaintiff proves that (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted 'with bad faith intent to profit from that mark.'" *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010); *see also* 15 U.S.C. § 1125. "ACPA applies to all domain names, whether registered before or after the enactment of the statute." *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1030 (9th Cir. 2011).

In October 2014, The Satanic Temple created a business page on Facebook. Dkt. # 1 ¶ 23. Since then, the Facebook page has amassed more than 17,000 followers. *Id.* ¶ 24. The page has a corresponding uniform resource locator ("URL"), "https://www.facebook.com/**TheSatanicTemple**Washington/." *Id.* ¶¶ 47, 71 (emphasis in original). And The Satanic Temple owns the trademark, "The Satanic Temple," contained in the URL. *Id.* ¶¶ 11, 70. Because Defendants have "hijacked" the Facebook page, by removing all approved administrators except Defendants and by refusing to return control, The Satanic Temple claims that Defendants are "trafficking in" the trademark. *Id.* ¶¶ 67-73. To that end, The Satanic Temple asserts a claim for "cyberpiracy." *Id.*

Defendants argue, however, that the claim is deficiently pled. Dkt. # 11 at 9-13; Dkt. # 17 at 8-12. It is deficient, they argue, for two reasons. The Satanic Temple fails to allege that Defendants had a "bad faith intent to profit" from the trademark and that The Satanic Temple does not own the domain name at issue. Dkt. # 11 at 9-13; Dkt. # 17 at 8-12.

As explained below, the trademark here is contained in the URL's "post-domain path," not the "domain name."  This case presents an issue of first impression: Are vanity URLs, or "post-domain paths" generally, considered "domain names" under the ACPA?  The Court holds they are not.  Statute and precedent define the term "domain name"; post-domain paths do not fit that definition.

<p style="text-align:center">i.      "Domain Name"</p>

The ACPA itself defines the term "domain name."  It means "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet."  15 U.S.C. § 1127.

The Ninth Circuit has provided additional clarity.  *Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 698 (9th Cir. 2010).  It explained that a domain name consists of two parts, a "top-level" domain and a "second-level" domain, and is ultimately registered with a registry operator:

> The hierarchy of each domain name is divided by periods. Thus, reading a domain name from right to left, the portion of the domain name to the right of the first period is the top-level domain ("TLD"). TLDs include .com, .gov, .net., and .biz. Each TLD is divided into second-level domains identified by the designation to the left of the first period, such as "example" in "example.com" or "example.net." . . . *Each domain name is unique and thus can only be registered to one entity . . . .*

> A domain name is created when it is registered with the appropriate registry operator. A registry operator maintains the definitive database, or registry, that associates the registered domain names with the proper IP numbers for the respective domain name servers. The domain name servers direct Internet queries to the related web resources. A registrant can register a domain name only through companies that serve as registrars for second level domain names. Registrars accept registrations for new or expiring domain names, connect to the appropriate registry operator's TLD servers to determine whether the name is available, and register available domain names on behalf of registrants . . . .

*Id.* (alteration in original) (emphasis added) (quoting *Coalition for ICANN Transparency,*

<p style="text-align:center">**ER_120**</p>

*Inc. v. VeriSign, Inc.*, 464 F. Supp. 2d 948, 951-52 (N.D. Cal. 2006)).

### ii.    Vanity URLs and Post-Domain Paths

Each web page within a website has its own URL, for example "a2zsolutions.com/desks/floor/laptraveler/dkfl-lt.htm." *Interactive Prod. Corp. v. a2z Mobile Office Sols., Inc.*, 326 F.3d 687, 691 (6th Cir. 2003). A URL consists of a domain name (a2zsolutions.com) and a "post-domain path" (/desks/floor/laptraveler/dkfl-lt.htm). *Id.* As one court put it, the post-domain path is "the text that comes after the slash." *Patmont Motor Werks, Inc. v. Gateway Marine, Inc.*, No. 3:96-cv-02703-TEH, 1997 WL 811770, at *4 n.6 (N.D. Cal. Dec. 18, 1997) ("goped" in "www.idiosync.com/goped").

What is more, some social media websites, such as Facebook, permit a user to create a unique, personalized URL known as a "vanity URL." Natalma M. McKnew, *Post-Domain Infringement: In Search of a Remedy*, Am. B. Ass'n (Mar. 22, 2010), https://www.americanbar.org/groups/business_law/publications/blt/2010/03/08_mcknew/ ; *see also* Natalma M. McKnew, *The Easy and the Not-Easy Pieces: Trademarks and Internet Advertising*, 14 J. Internet L. 1, 15 (2010). For example, Facebook user John Doe might be reached at www.facebook.com/johndoe. The vanity URL, "/johndoe," is thus contained in the post-domain path. *See, e.g.*, *Wilens v. Doe Defendant No. 1*, No. 3:14-cv-02419-LB, 2015 WL 4606238, at *17 (N.D. Cal. July 31, 2015), *report and recommendation adopted*, No. 5:14-cv-02419-LHK, 2015 WL 5542529 (N.D. Cal. Sept. 18, 2015) (providing example of vanity URL, "twitter.com/Jeffrey_Wilens," for Twitter user Jeffrey Wilens).

Some courts have held that, though trademark law clearly applies to domain names, it does not apply to trademarks contained in post-domain paths. *See, e.g.*, *Interactive*, 326 F.3d at 696-98 (6th Cir. 2003) ("The post-domain path of a URL, however, does not typically signify source. . . . Because post-domain paths do not typically signify source, *it is unlikely that the presence of another's trademark in a post-domain path of a URL would ever violate trademark law*." (emphasis added)); *Patmont*,

1997 WL 811770, at *4 n.6 ("Nothing in the post-domain path of a URL indicates a website's source of origin, and [plaintiff] has cited no case in which the use of a trademark within a URL's path formed the basis of a trademark violation. Therefore, the fact that the Go–Ped mark appeared in the path of [defendant]'s website's URL— 'www.idiosync.com/goped'—does not affect the Court's conclusion that the website does not imply [plaintiff]'s sponsorship or endorsement."); *Wilens*, 2015 WL 4606238, at *17 ("The ACPA says nothing about social media profiles, and the mark JEFFREY WILENS is found within the post-domain name path, and not the domain name itself, for twitter.com/Jeffrey_Wilens.").

### iii.  facebook.com/TheSatanicTempleWashington

The Satanic Temple owns the trade name "The Satanic Temple."  Dkt. # 1 ¶ 11. The "domain in question," it says, is "facebook.com/**TheSatanicTemple**Washington." Dkt. # 12 at 9 (emphasis in original).  According to The Satanic Temple, Defendants have commandeered its social media profile and are holding it "hostage."  *Id.* at 8-12.  It now seeks the ACPA's protection.

This claim fails for one reason.  The "domain in question" is not in fact "facebook.com/TheSatanicTempleWashington."  The "domain name" is "facebook.com." And The Satanic Temple does not claim to own it.  Its trademark lies in the post-domain path, which does not constitute a "domain name" under the ACPA.  As explained above, the statute defines the term "domain name," and the case law provides further clarification.  The Satanic Temple's claim fails under both.

In reverse order, cases in this circuit explain that there are two parts to a domain name, a top-level and a second-level.  Post-domain paths are not included in that combination.  Here, the top-level is ".com," and the second-level is "facebook."  The Satanic Temple's trademark is contained in neither.  Rather, "/TheSatanicTempleWashington" is a vanity URL.  It comes "after the slash" and is thus contained in the post-domain path.

The outcome is no different under the statutory definition. Under 15 U.S.C. § 1127, to be considered a "domain name," an "alphanumeric designation" must be registered with a "domain name registrar, domain name registry, or other domain name registration authority." The domain "facebook.com" may well be registered. But nowhere in the complaint does The Satanic Temple allege that the term "/TheSatanicTempleWashingtion" itself is also registered.

The ACPA protects against the unauthorized use of a trademark in a domain name. According to the complaint, the trademark here is being used not in a domain name, but in a post-domain path. Those are not the same. The Court has found no authority suggesting that the ACPA extends to any URL component beyond top-level and second-level domains. Indeed, the Court has found the opposite. *See GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F. Supp. 2d 712, 725 (N.D. Tex. 2010) ("The court has found no case, and [plaintiff] has cited none, that holds that a portion of a web address other than a second or top level domain constitutes a 'domain name' within the meaning of the ACPA.").

The Court declines to stretch the ACPA to cover trademarks appearing in vanity URLs or post-domain paths. Because the ACPA is inapplicable, the Court need not address each claim element. The Court **DISMISSES** the ACPA claim.

### C. Tortious Interference with Business Expectancy

Under Washington law, to plead a claim for tortious interference with a business expectancy, a plaintiff must allege "(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage." *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997).

For this claim, neither party offers serious argument. Neither addresses all five

elements of the claim. Instead, both offer the Court their own hypotheticals without any supporting authority. In Defendants' world, The Satanic Temple is a "customer," Facebook is a "merchant who sells widgets," and Defendants are former members who stole a widget from The Satanic Temple. Dkt. # 11 at 13-14. This roleplay supposedly shows that the theft of the widget "in no way effects [sic] the organization's ongoing relationship with the merchant" because the organization could always buy more widgets. *Id.* The Satanic Temple counters with its own hypothetical. Dkt. # 12 at 12-13. It likens Facebook to a sculptor and The Satanic Temple's Facebook page to "a work of art." *Id.* It says that Defendants, as former "employees," "convince[d] Facebook to give the employee exclusive access to the now-ornate sculpture, deface[d] it, and falsely represent[ed] the defaced sculpture as [their] own work." *Id.*

These arguments are unhelpful. They are not only unsupported; they are also incomplete. They only address one element of the tortious interference claim, whether a "breach or termination of the relationship or expectancy" occurred. Analyzing each element, the Court concludes that the first, third, and fifth are adequately pled and that the second and fourth are not.

The first, third, and fifth elements are sufficiently pled because the complaint alleges that The Satanic Temple's Facebook page had pecuniary value. According to the complaint, the Facebook page has an audience of more than 17,000 followers. Dkt. # 1 ¶ 24. Those followers provide The Satanic Temple with a monetary benefit. *Id.* ¶ 75. Having more followers increases awareness, increasing membership and increasing donations. *Id.* Thus, The Satanic Temple pleads that the Facebook page has a "cognizable dollar value" of nearly $35,000. *Id.* ¶ 75. This is a "valid business expectancy" that satisfies the first element. *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 52 P.3d 30, 33 (Wash. 2002) ("A valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value."). Defendants allegedly brought an end to those benefits by hacking the Facebook

account and removing The Satanic Temple as administrators.  Dkt. # 1 ¶ 39.  This satisfies the third and fifth elements.  Defendants suggest, however, that The Satanic Temple could simply "continu[e] to use Facebook products," presumably by creating a new page and re-building its following.  Dkt. # 11 at 14.  That argument is unconvincing.  The Satanic Temple had a business expectancy in the specific Facebook accounts at issue, one with more than 17,000 followers, not a general expectancy to be able to use the Facebook website in the future.

Turning to the remaining two elements, for the second, The Satanic Temple must allege that Defendants "had knowledge of facts giving rise to the existence of the relationship."  *Calbom v. Knudtzon*, 396 P.2d 148, 153 (Wash. 1964).  It must allege that Defendants were "aware of some kind of business arrangement" between The Satanic Temple and Facebook.  *Topline Equip., Inc. v. Stan Witty Land, Inc.*, 639 P.2d 825, 830 (Wash. Ct. App. 1982).  For the fourth element, the interference "must be wrongful by some measure beyond the fact of the interference itself, such as a statute, regulation, recognized rule of common law, or an established standard of trade or profession." *Moore v. Commercial Aircraft Interiors, LLC*, 278 P.3d 197, 200 (Wash. 2012).

As to these elements, The Satanic Temple's allegations fall short.  It does not allege that Defendants knew about the Facebook pages' pecuniary value or knew that there was some business arrangement between Facebook and The Satanic Temple.  At best, it alleges that "Defendants had subjective knowledge of the business relationship." Dkt. # 1 ¶ 76.  This conclusory recitation of the second element is insufficient to state a claim.  Likewise, The Satanic Temple does not allege that the interference was wrongful beyond the interference itself—no alleged violation of a statute, regulation, common law rule, or professional standard.

In sum, The Satanic Temple fails to state a claim for tortious interference, and the claim is therefore **DISMISSED**.

### D.     Washington Consumer Protection Act

"Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  RCW § 19.86.020.  To plead a CPA claim, a plaintiff must allege "(1) an unfair or deceptive act (2) in trade or commerce (3) that affects the public interest, (4) injury to the plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive act complained of and the injury suffered."  *Trujillo v. Nw. Tr. Servs., Inc.*, 355 P.3d 1100, 1107 (Wash. 2015) (citing *Klem v. Wash. Mut. Bank*, 295 P.3d 1179 (Wash. 2013)).  "A plaintiff alleging injury under the CPA must establish all five elements."  *Michael v. Mosquera-Lacy*, 200 P.3d 695, 699 (Wash. 2009).

As to the third prong, the Washington Supreme Court has held, "[i]n a private action, a plaintiff can establish that the lawsuit would serve the public interest by showing a likelihood that other plaintiffs have been or will be injured in the same fashion."  *Trujillo*, 355 P.3d at 1108.  Courts may also consider four more factors to assess the public interest element: "(1) whether the defendant committed the alleged acts in the course of his/her business, (2) whether the defendant advertised to the public in general, (3) whether the defendant actively solicited this particular plaintiff, and (4) whether the plaintiff and defendant have unequal bargaining positions."  *Id.*

The parties argue only a few of the CPA elements.  Defendants say that The Satanic Temple has failed to allege that the unfair or deceptive acts here occurred "in trade or commerce," given that neither party sells assets or services.  Dkt. # 11 at 15.  The Satanic Temple, on the other hand, argues that "[c]ommerce is implicated by the stolen Facebook pages because they have an economic value" to The Satanic Temple.  Dkt. # 12 at 13-14.

The Court need not settle that dispute.  To state a CPA claim, The Satanic Temple must allege all five elements.  One element, unaddressed by either the parties' briefing or the complaint, is that an unfair or deceptive act must "affect the public interest."  On this

score, all The Satanic Temple alleges is that Defendants "deceive[d] the public with a deliberate, willful intent to disparage or pass off competitor services as those of T[he Satanic Temple]." Dkt. # 1 ¶¶ 84, 87. This conclusory allegation fails to satisfy the third CPA prong. It fails to allege that "other plaintiffs have been or will be injured in the same fashion." *Trujillo*, 355 P.3d at 1108. And the other four public interest facts are equally unaddressed. For that reason, The Satanic Temple fails to state a claim under the CPA, and this claim is **DISMISSED**.

> ### E. Defamation

The First Amendment limits the role of civil courts in resolving "religious controversies that incidentally affect civil rights." *Puri v. Khalsa*, 844 F.3d 1152, 1162 (9th Cir. 2017) (quoting *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 710 (1976)). Known in this circuit as the "doctrine of ecclesiastical abstention," the doctrine maintains that "civil courts may not []determine the correctness of an interpretation of canonical text or some decision relating to government of the religious polity." *Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987). That said, there are "two principal approaches to deciding church disputes without 'jeopardiz[ing] values protected by the First Amendment.'" *Puri*, 944 F.3d 1162 (quoting *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969)). Still, those approaches only apply if the dispute "involves no consideration of doctrinal matters." *Id.* (quoting *Jones v. Wolf*, 443 U.S. 595, 602 (1979)).

This claim asserts that certain Defendants made false public statements about The Satanic Temple, a religious organization. Dkt. # 1 ¶¶ 7, 36, 92. The Satanic Temple alleges that Defendants have maligned the organization through public Facebook posts. *Id.* ¶¶ 36, 92; Dkt. # 1-5. In those posts, Defendants have "falsely ascrib[ed] extremist ideologies and affiliations to T[he Satanic Temple]." Dkt. # 1 ¶ 92. Based on the complaint and its attachments, the Court presumes that those "ideologies" include

ableism, misogyny, racism, fascism, transphobia, and endorsement of police brutality, *id.* ¶ 36, and those "affiliations" include Neo-Nazis and the "alt-right," Dkt. # 1-5 at 2.

Defendants argue that these statements are not actionable. The defamation claim, they say, is barred by the First Amendment because resolving the claim would "require the Court or jury to delve into the tenets and beliefs of The Satanic Temple to determine whether or to what extent The Satanic Temple's practices or beliefs are in line with or oppose [those ideologies or affiliations]." Dkt. # 11 at 17. The Satanic Temple, on the other hand, argues that this case does not require "judicial interference into ecclesiastical affairs." Dkt. # 12 at 14. Rather, it says, "T[he Satanic Temple] simply asks the Court to find that [it] and its principals are not neo-Nazis, as Defendants falsely claimed." *Id.*

The Court agrees with Defendants. The doctrine of ecclesiastical abstention applies. The Court may not resolve the defamation claim without delving into doctrinal matters. To determine whether Defendants' statements were defamatory, the Court or jury must inevitably determine that the statements were false. *Herron v. KING Broad. Co.*, 776 P.2d 98, 101 (Wash. 1989) ("The plaintiff alleging defamation must show four elements: *falsity*, an unprivileged communication, fault and damage." (emphasis added)). That would require the Court or jury to define the beliefs held by The Satanic Temple and to determine that ableism, misogyny, racism, fascism, and transphobia fall outside those beliefs. That the Court cannot do without violating the First Amendment. *Hyung Jin Moon v. Hak Ja Han Moon*, 431 F. Supp. 3d 394, 413 (S.D.N.Y. 2019), *aff'd*, 833 F. App'x 876 (2d Cir. 2020) ("Because the Court may not, consistent with the First Amendment, pass upon the truth or falsity of statements concerning plaintiff's or Mrs. Moon's purported religious standing, plaintiff's remaining defamation claim must be dismissed."); *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 250 (S.D.N.Y.), *aff'd*, 578 F. App'x 24 (2d Cir. 2014) ("[W]here a court or jury would have to determine the truth of the defendants' statements . . . and, in doing so, would examine and weigh competing views of church doctrine, the result is entanglement in a matter of ecclesiastical concern

that is barred by the First Amendment." (internal quotation marks omitted)).

Because this claim could not be cured by additional allegations, the Court **DISMISSES it with prejudice**.

## V.  CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion to Dismiss. Dkt. # 11.[1]  The Satanic Temple's CFAA, ACPA, tortious interference, and CPA claims are **DISMISSED with leave to amend**.  Its defamation claim, however, is **DISMISSED with prejudice**.  The Court grants The Satanic Temple leave to file an amended complaint **within thirty days** of the entry of this Order.

DATED this 26th day of February, 2021.

_Richard A Jones_
_____

The Honorable Richard A. Jones
United States District Judge

---

[1] Because each claim, at bottom, is deficiently pled and because none survives the motion to dismiss, the Court need not address each Defendant's individual actions.  Hence, the Court need not reach the parties' civil conspiracy arguments.  Dkt. # 12 at 7-8; Dkt. # 17 at 7-8.  That said, the Court observes that the original complaint hardly addresses the coordination between the Defendants, casting doubt on the Court's ability to impute one Defendant's actions to all.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED FEDERATION OF CHURCHES, LLC (DBA "THE SATANIC TEMPLE"), | ) ) ) | No. 20-cv-509 |
| | ) | COMPLAINT FOR DAMAGES |
| Plaintiff, | ) | AND INJUNCTIVE RELIEF |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID ALAN JOHNSON (AKA "ADJ"), LEAH FISHBAUGH, MICKEY MEEHAM, AND NATHAN SULLIVAN, | ) ) ) ) | |
| Defendants. | ) | |

In support of its claims, Plaintiff United Federation of Churches, LLC (dba "The Satanic Temple") (abbreviated as "TST") alleges as follows:

## I.    **PREAMBLE**

1.      This case is about two hacked social media accounts and failed attempts at hacking a social media account and an email account.   TST is suing Defendants for misappropriating two of TST's Facebook business pages by replacing all approved administrators with themselves.   Shortly after the misappropriation, Johnson started posting content critical of TST from TST's own webpage while retaining the original branding.   Later, Johnson modified the name of the website, ostensibly to create a competitor organization, while appending the suffix "Archive Temple Chapter."   Defendants now wrongfully maintain exclusive control of over five years of content, all created by and for TST, on websites with more than 17,500 followers.   Because of Defendants' defamatory commentary, unfairly aimed directly at

**ER_130**

TST's audience, the Washington Chapter has lost members and has had its reputation harmed.

2.      The questions presented by this case are whether the above constitutes (1) cyber fraud and abuse under the Computer Fraud and Abuse Act ("CFAA"); (2) cyberpiracy under the Lanham Act; (3) tortious interference with business expectancy under Washington common law; (4) unfair competition; or (5) defamation.

3.      If so, the Court should find Defendants liable for permanent injunctive relief to return the websites to TST as their rightful owner and to refrain from accessing any TST materials, statutory damages, punitive damages, attorney's fees, and the costs of litigation.  In aggregate, Defendants should be ordered to pay $142,973.92 or more in statutory and economic damages.

## II.      JURISDICTION AND VENUE

4.      This Court has original jurisdiction over the federal claims arising under the CFAA and the Lanham Act. 28 U.S.C. § 1331 (federal question); 18 U.S.C. § 1030(g) (CFAA); 15 U.S.C. § 1121 (trademark).  The Court has supplemental jurisdiction over the state common law claims arising from the same facts. 28 U.S.C. § 1367.

5.      The Court can properly exercise personal jurisdiction over each Defendant because they live within this District.

6.      Venue properly lies with this Court because the hacking took place in Seattle, Washington. 28 U.S.C. § 1391.

## III.      PARTIES

7.      TST is a religious organization.  See generally "About us," available at https://www.thesatanictemple.org/about-us.html

8.      TST subscribes and advances seven fundamental tenets:

(1) One should strive to act with compassion and empathy toward all creatures in accordance with reason.

(2) The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions.

(3) One's body is inviolable, subject to one's own will alone.

(4) The freedoms of others should be respected, including the freedom to offend. To willfully and unjustly encroach upon the freedoms of another is to forgo one's own.

(5) Beliefs should conform to one's best scientific understanding of the world. One should take care never to distort scientific facts to fit one's beliefs.

(6) People are fallible. If one makes a mistake, one should do one's best to rectify it and resolve any harm that might have been caused.

(7) Every tenet is a guiding principle designed to inspire nobility in action and thought. The spirit of compassion, wisdom, and justice should always prevail over the written or spoken word.

*See* "Our tenets" available at https://www.thesatanictemple.org/our-tenets.html.

9.    TST's mission is to "encourage benevolence and empathy among all people, reject tyrannical authority, advocate practical common sense and justice, and be directed by the human conscience to undertake noble pursuits guided by the individual will." *See* "Our mission" available at https://www.thesatanictemple.org/our-mission.html.

10.    TST was the subject of the recent documentary "Hail Satan?" (2019), directed by Penny Lane and distributed by Magnolia Pictures.

11.    TST maintains sole title to the trade name "The Satanic Temple" in the context of religious organizations. *See* **Exhibit 1** (registration of trademark).

12.    TST has adherents in each of the 50 States, importantly to include Washington. Groups of adherents are commonly denominated "Chapters." Chapters are largely autonomous but are subject to centralized control to ensure faithfulness to organizational principles and purposes.

13.    Defendant David Alan Johnson is an individual residing in Seattle, which is within this Court's District. Johnson is a former associate of TST who misappropriated TST's Washington Chapter Facebook website from within this Court's District and is using it and its audience in an effort to undermine TST and to create a competitor organization.

14.    Defendant Leah Fishbaugh is an associate of Johnson, and former associate of

TST, who aided and abetted the hacking. Fishbaugh also lives in Seattle. Fishbaugh changed the account credentials to the Washington Chapter's email account in a failed attempt to usurp control over the email account. On information and belief, Johnson has wrongfully given Fishbaugh administrative privileges to TST's Washington Chapter page.

15. Defendant Mickey Meeham is an associate of Johnson, and former associate of TST, who aided and abetted the hacking. Meeham also lives in Seattle. On information and belief, Johnson has wrongfully given Fishbaugh administrative privileges to TST's Washington Chapter page. Meeham misappropriated the Affiliate page.

16. Defendant Nathan Sullivan is an associate of Johnson, and former associate of TST, who aided and abetted the hacking. Sullivan also lives in Seattle. TST entrusted Sullivan as the custodian of various documents which constitute trade secrets. Examples include original signed membership agreements, internal policies and procedures, and a listing of members with contact information. Sullivan now wrongfully maintains exclusive control over these sensitive documents. On information and belief, Johnson has wrongfully given Sullivan administrative privileges to TST's Washington Chapter page.

## IV. FACTUAL BACKGROUND

17. Facebook is a ubiquitous internet social medium which permits users to create and share content including without limitation links, commentary, and written conversations. Content can be shared by individuals on personal pages or by organizations on business pages.

18. Twitter is also a ubiquitous internet social medium which permits users to create and share substantially similar content as Facebook.

19. Google is a ubiquitous internet-based information platform. Among its many services, Google provides an email platform ("Gmail") and a cloud-based document creation and storage platform ("Google Drive.")

20. Facebook is TST's primary platform of communicating with its membership.

21. Twitter is TST's secondary platform of communicating with its membership.

22.     TST's Washington Chapter has a Google account to generally facilitate its organizational purposes by creating and storing documents.

23.     In October of 2014, the Washington Chapter business page was created exclusively for the benefit of TST in its efforts to disseminate information for what was then the Seattle Chapter. This page, in its current state, is available at https://www.facebook.com/thesatanictemplewashington (content predating March 20, 2020). *See also* **Exhibit 2** (Chapter page history)

24.     Over the next several years, the Washington Chapter grew the Facebook page to an audience exceeding 17,000 followers. *Id.*

25.     In January of 2015, the Washington Chapter created a Twitter account for the organization. *See* https://twitter.com/TST_Washington. Currently, the Twitter account has an audience of about 4,000 followers. *Id.*

26.     In September of 2018, the Washington Chapter created a secondary Facebook page, named "TST WA Allies," to facilitate communications with individuals who were interested in TST but did not want to identify as a member. This page., in its current state, is available at https://www.facebook.com/queersatanicmemes; *see also* **Exhibit 3** (Allies page history).  The Allies page has about 500 followers.

27.     Until the hacking by Defendants, both Facebook pages were maintained and controlled exclusively by approved administrators.

28.     Administrators are subject to a written Membership Agreement and Code of Conduct, which instruct requirements for permissible activity on behalf of TST.  In relevant part, the instructions pertaining to online conduct follow:

> Public statements & interactions with med
>
> All public actions and statements must be approved and vetted by the TST National Council and the TST Executive Council. If a member is approached by media or asked for any official statement regarding an action or belief relating to TST all members must refrain

from comment and refer the inquiring party to the Chapter Head.

. . .

Confidentiality

Members should respect confidentiality, including documentation. Internal information should not be shared beyond members of the local chapter. Members' names, contact information, and meeting locations are also considered confidential. If you are ever unsure, don't share.

. . .

Copyright

Material produced by The Satanic Temple is the property of the organization. Consent for use of logo, name or other identity materials may be approved for use for certain projects. You may not use any official materials without prior approval. Approval may also be withdrawn at any time.

. . .

Online code of conduct

As a member of TST, your interactions with others, both online and off, will be held to the TST Code of Conduct. As an individual, we support your freedom of speech and freedom to hold your opinions. Members' behavior, however, reflects on the organization as whole and also builds the internal culture of TST. Therefore, we have a code of conduct specifically for the internet.

Respect the diversity of opinions you find online and respond in a courteous manner. All TST members' online conduct must be free of harassment, stalking, threats, abuse, insults, defamation, or humiliation. This includes, but is not limited to, demeaning comments of an ethnic, religious, sexist, or racist nature; and unwanted sexual advances or intimidation by email or online. Such behavior will result in termination from the organization.

As a member of TST, always assume that what you publish on the web is permanent.

Anyone can easily print out a comment or save it as a screenshot. Remember, that TST is
often engaged in legal suits and exchanges online, or via text have the right to be exposed in
the case of a deposition. Think before you hit "send".

Using TST in connection with surveys, contests, pyramid schemes, chain letters, junk email,
spamming or any duplication or unsolicited messages is prohibited and will result
termination from the organization.

Any public disagreements between TST members should be taken to a private conversation.
If mediation is needed, it will be provided.

*See* Membership Agreement and Code of Conduct (abbreviated as "Code of Conduct"), available
as **Exhibit 4**.

29.    The above terms of the Code of Conduct form the contours of administrators'
authorization to access TST's social media accounts.

30.    Defendants, each, were entrusted with administrative rights to the above-described
social media accounts, subject to the requirements set forth in the Code of Conduct.

31.    Until the hacking, Defendant Sullivan had exclusive access to the original copies of
each Defendants' signature, acknowledging and agreeing to be bound by the above terms in return
for access to the social media accounts.

32.    On information and belief, Sullivan still has exclusive access to these documents,
among other highly sensitive materials including membership listings, internal policies and
procedures, and meeting notes.

33.    Defendants were each well aware of the Code of Conduct because it served as a
source of friction leading up to the events giving rise to this litigation.  For example, on March 2,
2020, Johnson shared the following post on the Allies page outside of his authority:



34.     The ensuing deletion and reiteration of the expectation that Johnson adhere to the Code of Conduct as a condition of continued social media access would serve as foreshadowing for the misappropriation of the Allies page.

35.     Some time before March 14, 2020, Defendants entered into an unlawful agreement to misappropriate and shut down substantially all the internet presence of TST's Washington Chapter. Defendants sought to advance the twin goals of forming a competitor organization and harming TST.

36.     On March 14, 2020, Meeham exceeded authorization for the Allies page by removing all TST-approved administrators except the other named Defendants, changing the name to "Evergreen Memes for Queer Satanic Friends," and posting the following manifesto:



37.    Meeham, in conjunction with the other named Defendants, has since been posting material in violation of the Code of Conduct.

38.    On or around March 18, 2020, Johnson exceeded authorization for the Twitter account by following a number of extremist groups to create a false impression of affiliation between TST and extremism, and changing the description from "Washington State Chapter of the Satanic Temple" to "Satan stands as the ultimate icon for selfless revolt.  We oppose irrational, unjust hierarchies like white supremacy, patriarchy, ableism, & cishet normality."

39.    On March 20, 2020 beginning at 10:11 pm, Johnson exceeded authorization for the Chapter page by removing all TST-approved administrators, modifying the cover page without approval, and posting a three-page manifesto.  The manifesto, as it looks today, is attached and incorporated as **Exhibit 5** (the archive reflects Central time).  Originally, the manifesto was posted with the original trade dress of TST.

40.    Broadly, the manifesto levies false claims that TST leadership is cozy with the alt-right, are white supremacists, are generally insufficiently leftist for Johnson's preference, and does

not conform to Johnson's impression of Satanism. Posting the manifesto exceeded Johnson's grant of authority as defined in the Code of Conduct.

41.     Johnson then spent the next couple days posting links and commentary from the Chapter page, all with the general, and false, theme that TST leaders are incompetent fascists. See **Exhibit 6** (posts and commentary in excess of authority). The links and commentary all exceeded Johnson's grant of authority as defined in the Code of Conduct.

42.     On March 20 at 11:36 pm, Fishbaugh exceeded authorization by changing the password to the Chapter's Google-based email account, changing the recovery email, and changing the phone number.

43.     On March 22 at 3:08 pm, Johnson modified the name of the Chapter page from "The Satanic Temple Washington" to "Satanic Washington State – Archived Temple Chapter" and modified the profile picture to replace TST-specific iconography with "antifa" symbolism. These modifications exceeded Johnson's grant of authority as defined in the Code of Conduct.

44.     As a result of the foregoing conduct, Sullivan's control over original signed copies of membership agreements and cloud-based trade secret documentation, became unauthorized. Sullivan's continued control over these materials exceeds the authority granted by the Code of Conduct.

45.     "Antifa" is a left-wing political movement with a penchant for violence.

46.     TST opposes the use or threat of violence as a mechanism for control.

47.     The        Chapter        page        maintains        its        original        URL: https://www.facebook.com/TheSatanicTempleWashington/.

48.     As of  the date of  filing, TST's Washington Chapter has lost between 20 and 30 members because of Johnson's false claims published to the Chapter page.

49.     TST's Washington leadership have repeatedly demanded the return of the Facebook pages from both Facebook and Defendants.

50.     Facebook refused to correct the matter, mislabeling the issue as a "Page admin

issue" to the exclusion of "infringements of your legal rights."

51.　　One week ago, this time through counsel, TST reiterated to Facebook and to Johnson the unlawful nature of the foregoing conduct of Defendants.

52.　　Facebook did not respond and did not correct the issue.

53.　　Defendants simply ignored all communications, from counsel and TST alike.

54.　　TST was able to recover the Twitter account and the email account through Twitter and Google, respectively.

55.　　TST is unable to recover the Facebook account without relief from this Court.

### III.　CAUSES OF ACTION

### Count 1:

### CFAA violation

56.　　The CFAA provides a civil cause of action when a Defendant knowingly accesses a "protected computer" by "exceeding authorized access," which causes a cumulative "loss" of at least $5,000. *See* 18 U.S.C. § 1030(g), (c)(4)(A)(i)(I). Or, in the case of an attempted violation, the successful violation would cause at least $5,000 in "loss." *Id.*

57.　　A "computer," is broadly defined as any device for processing or storing data. 18 U.S.C. § 1030(e)(1).

58.　　A "protected computer" is a "computer" which is "used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B).

59.　　Websites have been recognized as a "protected computer" within the meaning of the CFAA. See United States v. Drew, 259 F.R.D. 449, 457-58 (C.D. Cal. 2009).

60.　　A defendant "exceeds authorized access" by accessing a computer "with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

61.　　A "loss" is "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or

information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

62.     As described above, Defendants wrongfully and intentionally by exceeding their authorized access, perpetrated fraud upon TST and its membership, as well as any who happened upon the offending posts, by posting under the misappropriated identity of TST.   Perfectly encapsulating the issue, one commenter expressed confusion on March 21, stating:



*See* https://www.facebook.com/TheSatanicTempleWashington/posts/2908426992513671

63.     There is a cognizable dollar value to social media accounts.  Preliminary estimates of the "loss" related to the misappropriation of the Chapter page is $33,689.70, plus $1,037.52 for the Allies page.  The Twitter page, if successfully misappropriated, would have lost $8,246.70.  The aggregate sum being $42,973.92—well in excess of the $5,000 jurisdictional requirement.

64.     Further compounding the losses are TST's attorney's fees for investigating this matter, entering futile demands for corrective action to both Facebook and Defendants, and preparing this legal action.  TST will continue to incur losses in the costs and fees related to this lawsuit.  TST's costs and attorney's fees already exceed $6,000 for dealing with this matter.

65.     TST has incurred, and continues to incur, reputation losses from the misappropriation of its Facebook pages.  These reputation losses are irreparable by money damages.

66.     Based on the foregoing, TST is entitled to injunctive relief in the form of an order requiring Defendants surrender control of the Facebook pages, a permanent injunction enjoining

Defendants from accessing any of TST's "protected computers" (i.e. any internet-based media) under threat of contempt, and economic damages of at least $48,973.92.

## Count 2:

## Cyberpiracy

67.     The Lanham Act makes cyberpiracy an actionable trademark violation.  15 U.S.C. § 1125(d).

68.     The Lanham Act provides for a statutory award of not less than $1,000 and not more than $100,000.  15 U.S.C. § 1117(d).  A plaintiff is also entitled to the costs of the litigation and, in the Court's discretion, a reasonable attorney's fee.  15 U.S.C. § 1117(a).

69.     Injunctive relief is also available to a successful plaintiff.  15 U.S.C. § 1116.

70.     TST holds the exclusive rights to the name "The Satanic Temple."  **Exhibit 1**.

71.     Defendants are trafficking in the name "The Satanic Temple" by misappropriating the website located at the URL "facebook.com/**TheSatanicTemple**Washington" (emphasis added).

72.     Bad faith is established by the manner in which Defendants hijacked the webpages, attempted to hijack the Twitter and email accounts, removed all approved administrators, gloated about the matter, and refused to return control of the websites to their rightful owners.

73.     Based on the foregoing, TST is entitled to injunctive relief in the form of an order requiring Defendants surrender control of the Facebook pages, a permanent injunction enjoining Defendants from accessing any of TST's "protected computers" under threat of contempt, statutory damages between $1,000 and $100,000, costs, and a reasonable attorney's fee.

## Count 3:

## Tortious interference with business expectancy

74.     TST maintains ongoing business relationships with Facebook, importantly to include the Chapter page and Allies page.

75.     There is an economic benefit for TST in having a ubiquitous platform to interact with members and prospective members in the convenience of their homes and wherever they carry

their smartphones. Namely, with increased awareness comes increased membership and donations which create a positive feedback loop.

76. At the relevant time, Defendants had subjective knowledge of the business relationship.

77. Defendants intentionally and with an improper motive acted to sever the Washington Chapter's relationships with Facebook by misappropriating the two websites for the twin goals of harming the Washington Chapter, and TST at large, and creating a competitor organization.

78. As a direct and proximate result of Defendants' wrongful conduct, TST has suffered substantial economic injury and loss of business opportunity and has incurred attorney's fees and other costs in attempting to remedy the situation.

79. Based on the foregoing, TST is entitled to injunctive relief in the form of an order requiring Defendants surrender control of the Facebook pages, a permanent injunction enjoining Defendants from accessing any of TST's "protected computers" under threat of contempt and punitive damages.

## Count 4:

### Violations of the Consumer Protection Act

80. Washington's Consumer Protection Act prohibits unfair, unconscionable, or deceptive methods in the conduct of trade or commerce. *See* Chapter 19.86 RCW.

81. TST has protected, registered trade names and common law trade dress for the services it provides to the community. Of importance to this case, the name "The Satanic Temple" is a registered mark; and the symbolism and content included in the Chapter page and Allies page at the time substantially all of the offending material was posted are trade dress.

82. Further, TST has a protected interest in its trade secret materials including membership listings, membership agreements, internal policies and procedures, other governance materials, and access to a hard-won social media following.

83. Defendants' unauthorized use of TST's protected intellectual property are intended

to unlawfully aid in the creation of a competitor organization by diverting the recognition arising from TST's reputation and goodwill.

84.     Defendants' unauthorized use of TST's protected intellectual property is intended to deceive the public with a deliberate, willful intent to disparage or pass off competitor services as those of TST, for the end-goal of harming TST's goodwill.

85.     The harm to TST's goodwill cannot be adequately remedied at law.

86.     The unfair or deceptive acts or practices occurred in the conduct of Defendants' trade or commerce.

87.     The unfair or deceptive acts or practices impact the public interest.

88.     As a result of Defendants' unfair or deceptive acts or practices Plaintiff suffered injury to its business or property.

89.     Defendants' acts or practices are the proximate cause of damages suffered by Plaintiff.

90.     Based on the foregoing, TST is entitled to injunctive relief in the form of an order requiring Defendants surrender control of the Facebook pages, surrender control of all TST materials, a permanent injunction enjoining Defendants from accessing any of TST's "protected computers" under threat of contempt, a permanent injunction enjoining Defendants from making use of any information obtained during their association with TST under threat of contempt, and actual and treble damages.

## Count 5:

### Defamation

91.     Defendants owed and continue to owe a duty to TST to refrain from publishing false and defamatory statements about TST and its employees.

92.     By falsely ascribing extremist ideologies and affiliations to TST, Defendants published and republished false and defamatory statements about TST and TST's employees.

93.     The false and defamatory statements published by Defendants regarding TST and

its employees, as reasonably understood by outside observers, impugns the integrity and competence of TST and its employees, discredits TST's activities, undermines confidence of the public in TST's role in the community, and drives away current and prospective members from TST.

94. The false and defamatory statements published by Defendants, when considered alone, tends to subject TST and its employees to hatred, distrust, ridicule, contempt, or disgrace, and tends to injure TST's reputation.

95. By carrying out the foregoing conduct, Defendants acted maliciously and with reckless indifference to the consequences of their actions and the rights of TST.

96. Based on the foregoing, TST is entitled to injunctive relief in the form of an order requiring Defendants surrender control of the Facebook pages, surrender control of all TST materials, a permanent injunction enjoining Defendants from publishing false statements about TST or any of its membership, and punitive damages.

### IV. PRAYER FOR RELIEF

WHEREFORE, in addition to all other relief to which the Court finds TST entitled, TST prays for orders providing as follows:

(1) Defendants shall, jointly and severally, immediately return full control of the following to Plaintiff, under threat of contempt:

(a) The Chapter Facebook page

(b) The Allies Facebook page; and

(c) All TST materials, whether in paper or electronic format, including without limitation: all signed agreements, all membership listings, all internal policies and procedures, all governance documentation, any branding materials, and any other document created by or for the benefit of TST.

(2) Defendants shall, jointly and severally, permanently refrain from the following under threat of contempt:

(a) Accessing any administrative function of any internet-based medium, including

without limitation any social media accounts, email accounts, or document storage accounts, created by or for the benefit of TST

(b) Publishing or republishing false statements about TST or any of its membership or causing or permitting third parties to publish or republish false statements about TST or any of its membership.

(3)    Defendants shall, jointly and severally, pay economic damages to Plaintiff in an amount to be determined by the Court, to meet or exceed $42,973.92.

(4)    Defendants shall, jointly and severally, pay statutory damages to Plaintiff in an amount to be determined by the Court, to meet or exceed $100,000.

(5)    Defendants shall, jointly and severally, pay treble damages to Plaintiff in an amount to be determined at trial.

(6)    Defendants shall, jointly and severally, pay attorney's fees and costs to Plaintiff in an amount to be determined after trial.

(7)    Defendants shall, jointly and severally, pay pre-judgment and post-judgment interest until paid in full.

Respectfully submitted this 3rd day of April, 2020.

LYBECK PEDREIRA & JUSTUS, PLLC

By: */s/ Benjamin Justus*
Benjamin Justus (#38855)
Attorneys for Plaintiff
Chase Bank Building
7900 SE 28th St., Fifth Floor
Mercer Island, WA 98040
206.687.7805 /ph  206.230.7791 /fax
ben@lpjustus.com / email Justus

And: */s/ Matthew A. Kezhaya*
Matthew A. Kezhaya (AR#2014161), pro hac vice pending
Attorney for Plaintiff
Kezhaya Law PLC

1202 NE McClain Rd
Bentonville, AR 72712
479.431.6112 /ph  479.282.2892 /fax
matt@kezhaya.law / email Kezhaya



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Tue Mar 31 04:37:22 EDT 2020*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout    Please logout when you are done to release system resources allocated for you.

Start   **List At:** [         ] OR Jump **to record:** [         ]   **Record 3 out of 3**

---

TSDR   ASSIGN Status   TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*

# THE SATANIC TEMPLE

| | |
|---|---|
| **Word Mark** | THE **SATANIC TEMPLE** |
| **Goods and Services** | IC 045. US 100 101. G & S: Religious services, namely, information and news relating to religious and philosophical beliefs by providing information; providing a web site featuring information about religion; Charitable outreach services, namely, providing counseling services in the field of religion; Counseling in the field of religion and spiritual services. FIRST USE: 20130101. FIRST USE IN COMMERCE: 20130101 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 86221887 |
| **Filing Date** | March 14, 2014 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Date Amended to Current Register** | December 17, 2014 |
| **Registration Number** | 4686134 |
| **Registration Date** | February 10, 2015 |
| **Owner** | (REGISTRANT) United Federation of Churches, LLC DBA The Satanic Temple LIMITED LIABILITY COMPANY MASSACHUSETTS 519 Somerville Ave. No. 288 Somerville MASSACHUSETTS 02143 |

| | |
|---|---|
| **Attorney of Record** | Daryl Abbas |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SATANIC" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | SUPPLEMENTAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

| .HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

**Exhibit 2**

TST's Washington Chapter Facebook page history



**Exhibit 3**

TST's Washington Chapter Allies Facebook page history





# The Satanic Temple of Washington

Membership Agreement and Code of Conduct

As a member of The Satanic Temple of Washington, I, _____, agree to abide by the following Code of Conduct:

## I. INTRODUCTION

This code of conduct describes the values that inform the work and activities of The Satanic Temple of WA. It also sets out guidelines for the kind of behavior that we expect of each other, and outlines procedural steps to file a complaint or allegation if a member has not lived up to our values or reasonable expectations of behavior.

The Code of Conduct describes our values and behaviors in broad terms. It is not exhaustive and a "common sense" test will apply to complaints about conduct not covered here.

## II. MEMBERS

This guide applies to all individuals who affiliate with The Satanic Temple of WA in any approved, official capacity. Members must abide by our Seven Tenets.:

## III. THE SEVEN TENETS

One should strive to act with compassion and empathy towards all creatures in accordance with reason.

The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions.

One's body is inviolable, subject to one's own will alone.

The freedoms of others should be respected, including the freedom to offend. To willfully and unjustly encroach upon the freedoms of another is to forgo your own.

Beliefs should conform to our best scientific understanding of the world. We should take care never to distort scientific facts to fit our beliefs.

People are fallible. If we make a mistake, we should do our best to rectify it and resolve any harm that may have been caused.

Every tenet is a guiding principle designed to inspire nobility in action and thought. The spirit of compassion, wisdom, and justice should always prevail over the written or spoken word.

## IV. VALUES

*Action:* The goal of TST is to facilitate the communication and mobilization of politically aware Satanists, secularists, and advocates for individual liberty and participate in public affairs wherever issues might benefit from rational satanic insights.

*Solidarity:* We are enmeshed in overlapping systems of power rooted in a history of unchallenged theocracy. As individuals, it is our responsibility to acknowledge those systems, and make alliances with the dispossessed. Collectively, it is our task to liberate ourselves and others via positive assertion of our values, rather than attacking the opposition.

*Liberty:* Physical integrity and emotional safety are basic human rights. TST will revoke membership and end any affiliation with any members who assault, degrade, or cause harm to any other individual within the organization or outside. Violence or threat of violence upon a person, property, or institution shall also not be tolerated.

*Character:* Political resistance is a serious undertaking that requires loyalty, commitment, integrity, and courage. Members must always strive to enact these values in both our political organizing and our personal lives.

*Respect & Equal Opportunity:* We believe that everyone is entitled to respect and should have an equal opportunity to contribute to our work. We will treat everyone with respect, including those who oppose us. Members have the right to disagree with one another. We encourage all to listen to the thoughts of our comrades and understand that we all have a diversity of experiences and beliefs. Additionally, values of dignity and respect encompass recognition of different roles within the movement, including those of other activists, volunteers and staff. These different roles imply differing constraints and authority.

*Social Conscience:* Members undertake their work in the interests of The Satanic Temple and the wider international movement. They do not seek to gain financial or other material benefit for themselves, their family or friends through this work.

## V. ADDITIONAL GUIDELINES FOR BEHAVIOR

This section provides guidelines to inform the conduct of members in specific situations. These guidelines are not exhaustive but are provided to help negotiate dilemmas that can arise.

*Public statements & interactions with media*:
All public actions and statements must be approved and vetted by the TST International Council and the TST Executive Council. If a member is approached by media or asked for any official statement regarding an action or belief relating to TST all members must refrain from comment and refer the inquiring party to the Chapter Head.

*Public actions: Protestors and law enforcement:*
Members must refrain from confronting protesters, both verbally and physically. We must never show disrespect to the opposition, regardless of slander and attacks on reason. If a member feels physically threatened at any point or uncomfortable, leave the area. Discuss a plan of action prior to any public demonstration if you expect a potential run in with the police. It is encouraged to peacefully record any interactions with the public. Report any threats of violence to the Chapter Head.

*Confidentiality:*
Members should respect confidentiality, including documentation. Internal information should not be shared beyond members of the local chapter. Members' names, contact information, and meeting locations are also considered confidential. If you are ever unsure, don't share. Members may use a pseudonym in the Chapter to preserve their confidentiality.

*Copyright Material produced by The Satanic Temple is the property of the organization:*
Consent for use of logo, name or other identity materials may be approved for use for certain projects. You may not use any official materials without prior approval. Approval may also be withdrawn at any time.

*Health & Safety:*

Members are expected to take responsibility for their own health and safety and the health and safety of others when undertaking work or organizing events on behalf of TST. The TST National Council is able to provide advice and risk assessment if necessary. We cannot stress the importance of confidentiality as our best safety defense.

*Public Harassment:*

If members ever feel harassed, bullied or uncomfortable as a result of an interaction with outsiders we encourage you to remove yourself from the situation. Understanding that TST participation is often considered a highly controversial affiliation, members should be cautious of sharing this information with others. If placed in an uncomfortable situation, treat others with respect and refrain from behavior that may be construed as bullying or harassing, including malicious gossip. Bullying and harassment may be by an individual against an individual, or involve groups of people. It may be obvious or it may be insidious. Whatever form it takes, it is unwarranted and unwelcome to the individual. Bullying and harassment may or may not be deliberate.

*General Decorum:*

While members may make close friends and comrades as a result of being a part of The Satanic Temple, we encourage all to remember that we are dedicated to action, which requires a dedication of time, work, and resources. We expect all members to behave professionally and to uphold the code of conduct whenever affiliating with TST or its members.


## VI. ONLINE CODE OF CONDUCT

As a member of TST, your interactions with others, both online and off, will be held to the TST Code of Conduct. As an individual, we support your freedom of speech and freedom to hold your opinions. Members' behavior, however, reflects on the organization as a whole and also builds the internal culture of TST. Therefore, we have a code of conduct specifically for the internet.

Respect the diversity of opinions you find online and respond in a courteous manner. All TST members' online conduct must be free of harassment, stalking, threats, abuse, insults, defamation, or humiliation. This includes, but is not limited to, demeaning comments of an ethnic, religious, sexist, or racist nature; and unwanted sexual advances or intimidation by email or online. Such behavior will result in termination from the organization.

As a member of TST, always assume that what you publish on the web is permanent. Anyone can easily print out a comment or save it as a screenshot. Remember, that TST is often engaged in legal suits and exchanges online, or via text have the right to be exposed in the

case of a deposition. Think before you hit "send".

Using TST in connection with surveys, contests, pyramid schemes, chain letters, junk email, spamming or any duplication or unsolicited messages is prohibited and will result in termination from the organization.

Any public disagreements between TST members should be taken to a private conversation. If mediation is needed, it will be provided.

## VII. FILING A COMPLAINT

It is preferable that problems are addressed informally and locally. When a complaint is made or an allegation received about the conduct of a member, it should be drawn to the attention of the local Chapter Head. If this is not an option, or if you require further assistance you may also contact the TST International Council via the TST Complaint Form.

Informal Process Informal action will involve the Chapter Head having a conversation with the member(s) concerned describing the complaint and listening to their version of events. If the grounds for complaint seem reasonable then recommendations may be provided in writing to avoid a recurrence of the incident. If, during discussion, it appears that informal action will not satisfactorily address the complaint or allegation, the formal procedure may be used.

## b. Formal Process

*i) Investigation:* Formal complaints can be submitted to the National Council via the TST Complaint Form. A formal process will be used where a complaint or allegation is serious, or where repeated concerns about behavior have arisen. A decision to investigate an incident does not indicate support for a complaint, merely that further enquiry is necessary.

After determining that grounds for an investigation are merited, the member will be notified in writing about the complaint, about the decision to investigate.
The aim will be to complete an investigation within 30 working days, although this may not always be possible. The purpose of the investigation is to establish whether there are reasonable grounds for believing that a breach of the Code of Conduct has occurred. If no reasonable grounds are found to exist, the member will be notified and the matter will be closed.

*ii) Outcome:* If the complaint is felt to be justified and a member has fallen short of the standards expected in the Code, then the National Council will determine the action that is required. In some circumstances, this may involve a loss of membership or title within the organization.

*iii) Confidentiality:* Confidentiality is of the utmost importance and should be regarded as binding by everyone concerned. An allegation, and any subsequent information will only be disclosed in the interests of an effective investigation, ensuring a fair Code of Conduct meeting (or review) and to the extent clearly required for the implementation of recommendations or instructions

I have read and understood this code in full and I agree to abide by the terms presented here,

_____  _____

*Member Signature*                                                               *Date*

_____

*Print member name*

_____  _____

*New Member Team Signature*                                              *Date*

### Satanic Washington State - Archived Temple Chapter

March 21 at 12:34 AM ·

Well, I think I gave them long enough.

- - -

Hail Satan! This is ADJ.

Until recently, social media for TST WA was my responsibility. Although no one has told me so directly, I don't think that's still actually the case, and I don't think I'm a member of TST anymore whatsoever.

Now, I say "I don't think" because I never got a phone call, email, or text message telling me that I have been removed, and as you can see, I didn't get my FB admin privileges revoked.

But I *did* get denied access to the group Discord server about a week ago, along with several other people, and I've been told there was Zoom meeting (that I still haven't watched) where the "senior leaders" who kicked us out without notice talked about us to the rest of the membership without us being able to be present.

Our violation, ironically enough, was not trusting our leadership. This is ironic because we're Satanists, and you'd think a healthy distrust of leadership would be assumed, if not a prerequisite.

It's also ironic because we were asked to trust people who couldn't be bothered to remove me or the others they kicked out from all the stuff we as active members had access to. Just yesterday, another person who got kicked out tweeted accidentally from the official account because they were still logged in (then undid). Heck, the same person saved the Memes page from getting deleted by removing everyone else as an admin before that could happen.

Actually, that's a great segue. Because apparently the first thing "Senior Leadership" did once they remembered we have a Twitter is change the description in the profile. Now, it's "Washington State Chapter of the Satanic Temple". Nothing wrong with that. But until a few days ago it was: "Satan stands as the ultimate icon for selfless revolt. We oppose irrational, unjust hierarchies like white supremacy, patriarchy, ableism, and cishet normality."

That's not a coincidence.

The reason the Memes page was going to get axed was because it was "fucking up" by talking about transphobia too much, instead of being only "about Satanism" like, I guess, saying "Hail Satan" when people sneeze or something. So remember that the next time the Mormon church calls your gender identity a work of the devil or TST WA goes out to a pride event: it's actually got nothing to do with you.

The messaging isn't the only thing.

The only reason I didn't let my morbid curiosity about how long I'd stay an admin run indefinitely is that after a bunch of us got kicked out for questioning leadership on a different issue (whether we should apologize to a former prominent member for continuing—consciously, subconsciously, and accidentally—to use their image to promote chapter after they left due to months of unaddressed sexual harassment three years ago), after *that*, former and inactive members came out of the woodwork describing how, for example, still-active member Pockets made their partner feel uncomfortable by refusing to use their pronouns, or how member Angel said her pronouns should be obvious if she spread her legs. Tarkus Claypool, who has one of two official positions that exist in the chapter as "Media Liaison" personally told us to take down an image of TERFs being bootlickers to patriarchy, apparently due to transphobia, although he denied that was the case when asked to his face.

We'd known that at higher levels in TST's pyramid, there was disrespect or outright hostility to trans people and queer issues based on Lucien Greaves / Doug Misicko opposition to including trans education as part of our curriculum for Tacoma's After School Satan. But LG Doug is a garbage person in so many ways, that's not a surprise. It was only after being made to leave that this pattern of years of behavior locally became more obvious, and a lot of us found out we weren't the only ones to feel this way or to have been treated this way.

Other people were lied to, lied about, or otherwise mistreated and isolated over the years, and it's real shitty to find out that Barrett, who you thought was your friend was coming to check on you and see how your mental health was doing but actually only there because Tarkus sent him to feel you out about how you felt about Tarkus

so Tarkus could kick you out of everything without telling any other members he'd done it, then lie and say you wanted to quit.

If it sounds incredible that all of this could be going on in what is The Satanic Temple's Oldest Continuous Chapter™, you may want to go peruse some of the group photos from years past. The world is full of coincidences, but the fact that very few of people continue to show up year after year makes sense when you notice that a lot of those people who show up every year really like to make excuses for police brutality, disrespect trans people, and/or care more about protecting hierarchy of an organization than protecting the people who make up that organization.

TST WA is volunteers. When you treat people like shit, they'll leave. So, literally, hundreds of people have. And those that remain and who cling on to leadership are baffled why in the world no one sticks around or why they have to keep kicking people out who read the Seven Tenets and the sales pitch of the tenets and want to actually follow through on pursuing justice ahead of laws or institutions without understanding what Satanism is really about: making sure that LG Doug and Malcolm Jarry / Cevin Soling get to keep wetting their beaks in Salem without actually stirring up too much trouble.

I'll make a separate post about LG Doug and his history of virulent antisemitism, defense of literal spouse-beating Neo-Nazis, and weird coziness with the alt-right in general. There's a ton of documentation out there already, and to a lesser extent MJ Cevin's defense of school segregation, being interviewed by white supremacist Stegan Moleneaux a couple of times, and making a documentary about trying to fulfill a prophecy of a cargo cult because they're so easy to control. (No, really: https://www.imdb.com/title/tt5465690/).

But until recently, a lot of us who worked very hard thought maybe we were getting one over on the Lords of Salem by taking their progressive grift and taking it sincerely instead of cynically to be able to help people. What we learned instead was that actually trying to live up to principles like the #SixthTenet ("People are fallible. If one makes a mistake, one should do one's best to rectify it and resolve any harm that might have been caused.") could lead to a member of five years being kicked out without warning for saying in a Facebook comment that someone deserved an apology. We learned that you could be kicked out for being cc'd on an email. And we learned that you could be kicked out for dating someone that was cc'd on an email.

We also learned that, wouldn't you know it "petty organizational autocracy" and "rigid centralized authority" is actually the entire business plan of TST, as helpfully drawn for us all by chapter head Siri Sanguine and then confirmed with a flowchart afterward.

We learned that all of the problems we thought we were trying to fix were features, not bugs, of the structure, using volunteer labor and talent to funnel resources toward people so they could get nudes sent to them on Twitter and fuss about not getting a Blue Checkmark, lose every legal case they take to court, and launch an internet TV service that would probably already pivoted to goth aesthetic porn if coronavirus hadn't made that less feasible.

Anyway, here we are. It's Friday night. The world is ending, we're quarantined, so strap in and read some articles about why The Satanic Temple chooses to suck so bad and can't help but mistreat people who want to be fight unjust hierarchy and arbitrary tyranny.

(I bet they'll try to get in touch with me now.)



**Evergreen Memes for Queer Satanic Fiends**
March 14 at 9:59 PM ·

**This page is no longer affiliated with The Satanic Temple.**

Ave Satanas!

I was recently notified that talking about transphobes and ableism was considered not to be relevant to The Satanic Temple's "International Council" in Salem or to the local chapter in Washington State.

So by talking about leftist politics like how "The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions," this page wasn't being Satanic.

Specifically:
"(IC is aware of how badly the allies page is fucking up), isn't worried about being labelled a criminal (and endorses

negative and unrelated leftist politics on TST-affiliated social media). TST WA Allies should be about Satanism. On March 4th, this was told to you and ADJ, but just as recently as two days ago, there is a post about ableism. (this as a post from an individual is great - as TST WA not acceptable)."

So to be clear, this page thinks ableism, misogyny, and racism are superstitions, fascists are bad, transphobes can shut the fuck up, and the only good bootlickers do it for a kink and not because they love making excuses for cops killing people.

No gods, no masters.

Be gay, do crime, hail Satan

---

52                                        92 Comments  6 Shares

**Satanic Washington State - Archived Temple Chapter**

March 21 at 1:40 AM ·

"There is a revisionist movement in TST about how and why it was founded: it was founded as a prank by an opportunistic filmmaker hoping to make a mockumentary about "nice" Satanists as a joke."



VILLAGEVOICE.COM

**Trolling Hell: Is the Satanic Temple a Prank, the Start of a New Religious Movement — or Both? | The Village Voice**

16                                          10 Comments  2 Shares

4/1/2020

Case: 23-35060, 04/26/2023, ID: 12703868, DktEntry: 10, Page 162 of 185
Case 2:20-cv-00509 Document 1-6 Filed 04/03/20 Page 2 of 17

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:22 AM ·

"Ultimately, what it comes down to for me is I can no longer ignore the obvious evidence that my goals and those of The Satanic Temple have diverged. "



MEDIUM.COM
**Why I'm Leaving The Satanic Temple**
I've been involved in the New York City chapter of The Satanic Temple for…

44                                         60 Comments  10 Shares

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:24 AM ·

"Over the years, members and chapter heads have requested and proposed the implementation of a gender, sexual, and racial diversity policy to ensure equity within TST leadership and alignment to the mission. The demand was not simply ignored but completely dismissed. The demand was not hollow; there was a clear and pressing need for this policy. While I was part of the organization, I witnessed male members of the organization exploit their position and influence to behave inappropriately and disrespectfully towards women."



MEDIUM.COM
**"The Struggle for Justice is Ongoing"**
On my departure from The Satanic Temple

12                                    1 Comment  1 Share

**Satanic Washington State - Archived Temple Chapter**

March 21 at 12:25 AM ·

"The Los Angeles Chapter of The Satanic Temple is hereby withdrawing from The Satanic Temple. All active members have agreed to this decision."

For all who like and follow The Satanic Temple Los Angeles have come to our events, thank you for all of your support:

The Los Angeles chapter of The Satanic Temple is hereby withdrawing from The Satanic Temple. All active members have agreed to this decision. This decision was reached after months of deliberation in the wake of The Satanic Temple Executive Ministry's decision to pursue a religious discrimination claim against Twitter for temporarily banning Lucien Greaves from their platform and for denying Lucien Greaves blue check verification. Our disappointment with the unilateral decision by Executive Ministries to expend resources pursuing this claim is only compounded by their choice to retain the law firm of

Instagram Post by HelLA: A Satanic Collective • August 4, 2018 at 11:59PM CDT

 via instagram.com

31                                                                12 Comments

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:27 AM ·

"It has been almost two years since our schism with TST, yet it was as the tumbling of small stones which precipitates a landslide. Recently a series of dominoes has fallen because of the unchecked hubris of TST's National Council and Doug Messner. The UK Chapter announced its separation from TST merely a week ago now. They were closely followed by the LA Chapter, then Portland Chapter; both of which held deep contempt for Doug's position on white supremacists and the newest wave of neo-Nazism to grip our nation. We have been told by TST insiders with whom we have remained friendly, that these will not be the last to depart… that others have had similar experiences to our own. Their dissatisfaction with the National Council's treatment of their proposals and the unique situations they deal with in their various regions has lead to the realization that the Temple serves mostly as a vehicle for Doug's personal vendettas. Most notable is his longstanding feud with Jason Rapert; a rabid theist in the Arkansas Legislature."



MEDIUM.COM

**Rise, Decline, and Fall: My Time in The Satanic Temple and Beyond**

12                                          1 Comment  3 Shares

**Satanic Washington State - Archived Temple Chapter**

March 21 at 12:29 AM ·

"Mary: I was ignored at first. I was banished and not allowed to speak to anyone else in TST. Doug (Lucien) and I had a falling out. Following that I talked to the attorney to withdraw. He convinced me to stay on board. I still believe in the case, but I don't want TST in my life."



MEDIUM.COM

**Mary Doe Speaks: Her Story—The Satanic Temple, a Case Experience**

| 11 | 1 Share |
|---|---|

**Satanic Washington State - Archived Temple Chapter**

March 21 at 12:36 AM ·

The Satanic Temple managed to clatter into the story. A widely shared Slate.com article declared confidently, and wrongly, that Missouri's flash-renaissance of abortion access was "thanks to Planned Parenthood and Satanists." (Breitbart carried the error into the realm of fantasy, suggesting Planned Parenthood was "teaming up" with the worshipers of the child-sacrifice-demanding Moloch.)

In reality, the Temple's lawsuits were irrelevant, though the Satanists did their best to spin to the contrary.



4/1/2020

Case: 23-35060, 04/26/2023, ID: 12702868, DktEntry: 10, Page 168 of 185
Case 2:20-cv-00509 Document 1-6 Filed 04/03/20 Page 8 of 17

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:38 AM ·

"I also found it peculiar the Satanic Temple TV Instagram had a post which seemed to promote or glamorize August Sol Invictus; a left hand Path Individual that wants to restart the civil war, and eliminate Jewish individuals. I thought this would be something that needed to be addressed so brought it up to our group admin Ash. The post is still up."



MEDIUM.COM
**HOW I WAS EXCOMMUNICATED FROM THE SATANIC TEMPLE… IN A FEW NONTROVERSIAL STEPS.**

10

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:40 AM ·

"This is white liberalism with a goat's head: with the lack of diverse representation at the national level, the national initiatives address things that filter through biases of an all white, mostly male, governing body. "



MEDIUM.COM

**What Would Satan Do: Knowing When to Pull Anchor and Sail Away.**

The cat has been out of the bag for a hot minute now: the members of The Los Angeles chapter of The Satanic Temple (TST) left and formed…

21                                        2 Comments  6 Shares

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:46 AM ·

"It should be noted that TST has done good and legitimate work on these fronts in the past, and credit should be given where it is due. But the unfortunate reality is that, from the top-down, TST is a crypto-fascist organization with some members being outright neo-nazis. Of course, it must be mentioned that TST has some members who aren't neo-nazis or neo-fascists and some are even antifascist; that said, we encourage those who are antifascists within TST to take a hard look at the reality of the organization they're involved with and consider exiting the group."

https://tridentantifascism.blackblogs.org/tag/doug-misicko/



31                                             74 Comments  5 Shares

4/1/2020

Case: 23-35060, 04/26/2023, ID: 12703869, DktEntry: 10, Page 171 of 185
Case 2:20-cv-00509 Document 1-6 Filed 04/03/20 Page 11 of 17

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:50 AM ·

Poke around the original version of the site, cattle skull logo and all. Nine tenets, expressions of appreciation for the apparently literal King of Hell, but of course the merch was always there.

$130 for a robe. Wild.
^ADJ
--
"We believe that the Family is the most basic core unit of each individual's Circle of Compassion. Broken, dysfunctional families breed broken, dysfunctional individuals who withdraw the reach of their compassion, often to the point of becoming brutal, cruel, and irreparably self-interested. For this reason, the Satanic Temple is firmly committed to supporting traditional, long-recognized Family Values, and we recognize and respect varied individual notions of families."



WEB.ARCHIVE.ORG
**The Satanic Temple's Position on Contemporary Issues**
The Satanic Temple's Position on Contemporary Issues The Satanic Temple supports the rights of individuals to live their lives as they choose as…

10                          1 Comment  2 Shares

4/1/2020

Case: 23-35060, 04/26/2023, ID: 12703868, DktEntry: 10, Page 172 of 185
Case 2:20-cv-00509 Document 1-6 Filed 04/03/20 Page 12 of 17

**Satanic Washington State - Archived Temple Chapter**
March 21 at 12:55 AM ·

In addition to being a Holocaust denier and white supremacist slated to be a headline speaker at the "Unite the Right Rally" in Charlottesville, Augustus Invictus' wife says he's also a spousal abuser.

"Last month, a woman who said she was Invictus' wife reported that he held her at gunpoint in front of their children and forced her to accompany him to Jacksonville, Florida, according to documents obtained from the Rock Hill Police Department in South Carolina. She told police that she was able to escape while in Florida and return to South Carolina."

https://www.splcenter.org/…/augustus-invictus-charged-kidna…
^ADJ

 **Lucien Greaves**
March 14, 2016 ·

I regret to announce that I have withdrawn from my role as a scheduled speaker at the forthcoming Left Hand Path Consortium to take place in Atlanta early next month. When it was announced that I was to speak at the Consortium, I received a few emails from concerned observers who asked why I would appear at an event alongside a "fascistic" character like Augustus Sol Invictus, who was also scheduled to speak. While I'm not intimately familiar with the works and philosophy of the man in question, I also did not feel that my speaking at the conference constituted an endorsement of his, or anybody else's, point of view. Further, his perspective, from what I know, legitimately falls somewhere on a broad spectrum of recognized "Left Hand Path" philosophies, whether I find that perspective tenable, consistent, and reasonable, or not (just as Fascism legitimately has a place in discussions upon political philosophies without fear that such a discussion lends undue credibility to its contemporary implementation. Do we truly know what we're for if we refuse to discuss what we're against?). From what I know, he's part of a larger dialogue regarding the Left Hand Path that I feel is worth engaging in.

I am not withdrawing from speaking because Invictus was invited to speak, but rather because he was recently dis-invited. Protesters have harangued the organizers, and the organizers have expressed concerns for the security of their attendees were Invictus to remain on the speaker's list. I have no reason to doubt the sincerity of the organizers, however, I feel that the dis-invitation sends a harmful message in support of censorship.

I, too, find some of my speaking events besieged by (religious) protesters, and I hope that civil protest can take place without silencing my voice, or anybody else's.

One might rightly ask if there were any situation in which I might consider not speaking at a conference due to another speaker's point-of-view. Of course, If I were going to a Science conference and there was scheduled a Creationist lecturer, I would likely find the conference hardly worth attending, much less speaking at. This is because Creationism isn't taken seriously by around 100% of credible scientists. If, however, Creationism were, against all reason, taken seriously by some 30% or more of scientists, and the conference were going to contain lectures by Evolutionary Biologists who were to offer a rational view, I would think it the duty of those Evolutionary Biologists to attend, share their knowledge, and confront the poor science with hard empiricism.

I do not think that Invictus's views are in such a disappearingly small minority as to imagine that confronting his opinions give them unwarranted exposure. I think his views are prevalent enough within Left Hand Path communities that it is worth our time to argue them and delineate how and where we differ in the Satanic Reformation of The Satanic Temple.

It's easy to stand up for Free Speech when you are fighting for your own voice, or for the voice of those you agree with. It's a completely different fight and, arguably, your loyalty to Free Speech only means anything at all, when you're willing to fight for the Free Speech of those with whom you disagree.

I'm sorry to those for whom my bowing out will cause any type of inconvenience. Thank you.

15                                      1 Comment   1 Share

4/1/2020

Case: 23-35060, 04/26/2023, ID: 12708862, DktEntry: 10, Page 173 of 185
Case 2:20-cv-00509 Document 1-6 Filed 04/03/20 Page 13 of 17

**Satanic Washington State - Archived Temple Chapter**
March 21 at 1:29 AM ·

Another diagram for better clarity



| **Evergreen Memes for Queer Satanic Fiends** added a new photo to the album: Artisanal Locally Sourced Satanic Memes.
March 21 at 1:18 AM ·

<span style="float:right">Like Page</span>

20                                          6 Comments  1 Share

Like                    Comment                    Share

Most Relevant

 Write a comment...

 🖊 **Author**

**Satanic Washington State - Archived Temple Chapter** For those who were wondering, the cover photo is an actual human quote from an actual human person, who for some strange reason wants to go on a #DeusVolt #SatanicCrusade to #FreePalestine

He also "jousts for real", mind you
^ADJ

**Satanic Washington State - Archived Temple Chapter**

March 21 at 1:55 AM ·

For the record, yes, LG Doug did illustrate a copy of the proto-fascist book "Might Is Right", later cited by the Gilroy Garlic Fest shooter as inspiration (https://www.stuff.co.nz/…/white-supremacists-satanists-and-…).

So he wasn't just dabbling in a bit of drunken "Aryan King" Jew-hatred, and no, it's still something LG Doug has never been able to actually speak honestly about, which is why the decision to defend Neo-Nazis and utilize their lawyers in the name of "free speech" rings a bit hollow.

(The deeply antisemitic, racist, and misogynistic book "Might Is Right" by Ragnar Redbeard / Arthur Desmon was also the basis for many parts of Anton LaVey's book "The Satanic Bible, so modern Satanism comes by it at least two-fold.)

^ADJ

- - -

From the official media training guide:

[Don't answer] Yes or no questions.

Question:

"This is a simple yes or no: "Didn't Lucien illustrate a copy of Might is Right. Isn't that a white supremacist book?"

Here's why they're so insidious: They almost always have an obvious answer, and everyone watching the interview knows it. But if you answer with a direct "yes or no," the resulting quote will be awful.

Never say "Yes" or "No" to a question like this. It is always a way to trap yourself.

Let's say you answer the question by saying, "Yes" in any way The resulting news story will almost certainly read, "When asked whether

Lucien Greaves illustrated a White Suprememcist book, the TST spokesperson said 'yes.'"

You don't have to answer on their terms. Instead, say something like: "I can't speak to something that happened almost 20 years ago.

What we do know is that TST is incredibly inclusive and we welcome members from all walks of life."

s or no: "Didn't Lucien illustrate a copy of Might is Right. Isn't that a white supr

us: They almost always have an obvious answer, and everyone watching the ir
no," the resulting quote will be awful.

question like this. It is always a way to trap yourself.
stion by saying, "Yes" in any way The resulting news story will almost certainly
White Suprememcist book, the TST spokesperson said 'yes.'"

their terms. Instead, say something like: "I can't speak to something that ha
is incredibly inclusive and we welcome members from all walks of life."






20                                          8 Comments  2 Shares

4/1/2020

Case: 23-35060, 04/26/2023, ID: 12703862, DktEntry: 40, Page 176 of 185
Case 2:20-cv-00509- Document 1-6  Filed 04/03/20  Page 16 of 17

**Satanic Washington State - Archived Temple Chapter**
March 21 at 2:07 AM ·

Finally (I think), here's some background on the 2018 departure of many chapters who decided that TST was what it was and never would change, given all of its structure and history.

So, what have we learned?

No matter how much you think your own chapter is different and disconnected from what happens in Salem, it isn't. If you go against the company line, you'll be thwarted, expelled, undermined, or your chapter as a whole will have to leave.

We've learned that authoritarian management structures of volunteers isn't actually a very effective one, especially if you don't remember that eventually, like, within a week, you should remove them from all of the permissions they had to help build and grow the organization. Or even bother to talk to any of them. That this is something that will help membership just shut up and trust your leadership and competence in the future.

We've learned, I hope, that rather than trying to get everyone to sign NDAs and sign away the rights to their photos, you ought to try to treat people decently and, you know, like people. "One should strive to act with compassion and empathy toward all creatures in accordance with reason."

And maybe we've even learned that organizations aren't separable from the people in them. If you have an org and you think it's worth sacrificing respect for the people who are in it or have been in it for some higher cause.

There are still plenty of great people in TST. Good work still is done. And it's never too late to build something new. But, many people before you have tried, and it always seems to come to this if you go too far saying "fascists are bad" or "trans people are people" or even "we need to have a meeting space that's accessible, even if no wheelchair users are members yet."

So be prepared for that.

Ave Satanas, wash your hands, and take care of each other. Good night.
^ADJ



VOX.COM
**The Satanic Temple is divided over its leader's decision to hire Alex Jones's lawyer**

Greg Thompson and 43 others                    37 Comments  14 Shares

**Satanic Washington State - Archived Temple Chapter** updated their profile picture.
March 22 at 5:08 PM ·

Satanism should be against fascism:
https://twitter.com/heresysquad/status/1121923401973559296

That which will not bend must break, and that which can be destroyed by truth should never be spared its demise.

It is Done.

Hail Satan!



1

2

3

4

5

6              UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF WASHINGTON
7

8   United Federation of Churches, LLC (dba
    "The Satanic Temple"),                          No. 2:20-cv-00509-RAJ
9
                    Plaintiff / Appellant
10                                                   NOTICE OF APPEAL
                v.
11
    David Alan Johnson (aka "ADJ"), Leah
12  Fishbaugh, Mickey Meeham, and Nathan
    Sullivan,
13
                    Defendants / Appellees
14

15      **NOTICE IS HEREBY GIVEN** that Plaintiff / Appellant United Federation of Churches, LLC (dba

16  "The Satanic Temple,") hereby appeal to the United States Court of Appeals for the Ninth Circuit

17
    from the final order and judgment entered in this action on January 9, 2023 (Dkt. # 49), and all
18
    previous orders subsumed therein, which particularly includes: the order denying reconsideration
19
    dated April 12, 2022 (Dkt. # 30), and the order granting motion to dismiss dated February 26,
20
21  2021 (Dkt. # 20).

22          Respectfully submitted this 28th day of January, 2023.

23

24

25

26

NOTICE OF APPEAL- 1

No. 2:20-cv-00509-RAJ

**ER_178**

LYBECK PEDREIRA & JUSTUS, PLLC

By: */s/ Benjamin Justus*
Benjamin Justus (#38855)
Attorneys for Plaintiff
Chase Bank Building
7900 SE 28th St., Fifth Floor
Mercer Island, WA 98040
206.687.7805 /phone  206.230.7791 /fax
ben@lpjustus.com / email Justus


And: */s/ Matthew A. Kezhaya*
Matthew A. Kezhaya (AR#2014161), admitted pro hac vice
Attorney for Plaintiff
Kezhaya Law PLC (dba "Crown Law")
1202 NE McClain Rd
Bentonville, AR 72712
479.431.6112 /ph
matt@crown.law / email Kezhaya


## **CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of January, 2023, I electronically filed this NOTICE

OF APPEAL with the Clerk of the Court using the CM/ECF system, which will send notification

of such filing to all parties of record.


Dated at Minneapolis, Minnesota, the 24th day of January, 2023.



By:    */s/ Matt Kezhaya*
Matt Kezhaya

NOTICE OF APPEAL- 2

No. 2:20-cv-00509-RAJ

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

ER_179

APPEAL,CLOSED

# U.S. District Court
# United States District Court for the Western District of Washington (Seattle)
# CIVIL DOCKET FOR CASE #: 2:20-cv-00509-RAJ

United Federation of Churches LLC v. Johnson et al
Assigned to: Judge Richard A. Jones
Case in other court:  9th Circuit Court of Appeals, 23-35060
                       9th Circuit Court of Appeals, 23-35105
Cause: 18:1030 Computer Fraud and Abuse Act

Date Filed: 04/03/2020
Date Terminated: 01/09/2023
Jury Demand: None
Nature of Suit: 840 Trademark
Jurisdiction: Federal Question

## Plaintiff

**United Federation of Churches LLC**
*doing business as*
The Satanic Temple

represented by **Matt Kezhaya**
CROWN LAW
121 N MAIN ST
4TH FL
MINNEAPOLIS, MN 55401
479-431-6112
Fax: 612-682-5277
Email: matt@crown.law
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin R Justus**
LYBECK PEDREIRA & JUSTUS PLLC
7900 SE 28TH ST. FL. 5
MERCER IS, WA 98040-6005
206-230-4255
Fax: 206-230-7791
Email: BEN@LPJUSTUS.COM
*ATTORNEY TO BE NOTICED*

V.

## Defendant

**David Alan Johnson**
*also known as*
ADJ

represented by **Jeremy E Roller**
ARETE LAW GROUP PLLC
1218 THIRD AVE STE 2100
SEATTLE, WA 98101
206-428-3250
Fax: 206-428-3251
Email: jroller@aretelaw.com
*ATTORNEY TO BE NOTICED*

## Defendant

**Leah Fishbaugh**

represented by **Jeremy E Roller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Defendant**

| Mickey Meeham | represented by | **Jeremy E Roller** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| Nathan Sullivan | represented by | **Jeremy E Roller** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 04/03/2020 | 1 | COMPLAINT against All Defendants (Receipt # AWAWDC-6251567) Attorney Benjamin R Justus added to party United Federation of Churches LLC (pty:pla), filed by United Federation of Churches LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Justus, Benjamin) (Entered: 04/03/2020) |
| 04/03/2020 | 2 | CIVIL COVER SHEET re 1 Complaint, filed by Plaintiff United Federation of Churches LLC. (Justus, Benjamin) (Entered: 04/03/2020) |
| 04/03/2020 | 3 | REPORT re 1 Complaint, *Report on the Filing or Determination of An Action Regarding a Patent or Trademark* by Plaintiff United Federation of Churches LLC. (Justus, Benjamin) (Entered: 04/03/2020) |
| 04/06/2020 | | Judge Richard A. Jones added. (ST) (Entered: 04/06/2020) |
| 04/06/2020 | 4 | REPORT on the filing or determination of an action. Emailed to the US Patent Office (ST) (Entered: 04/06/2020) |
| 04/06/2020 | 5 | CORPORATE DISCLOSURE STATEMENT indicating no Corporate Parents and/or Affiliates. Filed pursuant to Fed.R.Civ.P 7.1. Filed by United Federation of Churches LLC (Justus, Benjamin) (Entered: 04/06/2020) |
| 04/06/2020 | 6 | PRAECIPE TO ISSUE SUMMONS by Plaintiff United Federation of Churches LLC (Attachments: # 1 Summons [Proposed] D. Johnson, # 2 Summons [Proposed] L. Fishbaugh, # 3 Summons [Proposed] N. Sullivan, # 4 Summons [Proposed] M. Meeham) (Justus, Benjamin) (Entered: 04/06/2020) |
| 04/07/2020 | 7 | STANDING ORDER for Civil Cases Assigned to Judge Richard A. Jones. (VE) (Entered: 04/07/2020) |
| 04/07/2020 | 8 | Summons(es) Electronically Issued as to defendant(s) Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan (MW) (Entered: 04/07/2020) |
| 04/08/2020 | | **PLEASE DISREGARD, DOCKETED IN ERROR** ~~NOTICE Pursuant to Fed.R.Civ.P 7.1, Plaintiff United Federation of Churches LLC must file a Corporate Disclosure Statement by 4/15/2020 (if applicable). (KB)~~ Modified on 4/8/2020 (KB). (Entered: 04/08/2020) |
| 04/08/2020 | | NOTICE of Docket Text Modification re Corporate Disclosure Statement - Notice of Deadlines: Please disregard Notice to Plaintiff re Corporate Disclosure Statement - CDS is filed at docket 5 . Struck through notice on docket. (KB) (Entered: 04/08/2020) |
| 05/06/2020 | 9 | NOTICE of Appearance by attorney Jeremy E Roller on behalf of Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan. (Roller, Jeremy) (Entered: 05/06/2020) |

| 05/06/2020 | 10 | ORDER REGARDING FRCP 26(f) CONFERENCE, INITIAL DISCLOSURES, AND JOINT STATUS REPORT. FRCP 26(f) Conference Deadline is 5/20/2020, Initial Disclosure Deadline is 5/27/2020, Joint Status Report due by 6/3/2020, by Judge Richard A. Jones. (VE) (Entered: 05/06/2020) |
|---|---|---|
| 05/11/2020 | | Reset Deadlines -- Upon the joint request of the parties, the following deadlines are reset: FRCP 26(f) Conference Deadline is 6/3/2020, Initial Disclosure Deadline is 6/10/2020, Joint Status Report due by 6/17/2020. (VE) (Entered: 05/11/2020) |
| 06/01/2020 | 11 | MOTION to Dismiss , filed by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan. (Attachments: # 1 Proposed Order Granting Motion to Dismiss) Noting Date 6/26/2020, (Roller, Jeremy) (Entered: 06/01/2020) |
| 06/01/2020 | | ***Deadlines terminated. The Court notifies the parties that the initial case scheduling deadlines for FRCP 26(f) Conference, Initial Disclosures, and Joint Status Report are suspended pending the Court's ruling on Defendants' 11 MOTION to Dismiss. (VE) (Entered: 06/01/2020) |
| 06/22/2020 | 12 | RESPONSE, by Plaintiff United Federation of Churches LLC, to 11 MOTION to Dismiss . (Justus, Benjamin) (Entered: 06/22/2020) |
| 06/22/2020 | 13 | ACCEPTANCE OF SERVICE of Summons and Complaint by Counsel Jeremy Roller, on behalf of Mickey Meehan, on 5/11/2020. (Justus, Benjamin) (Entered: 06/22/2020) |
| 06/22/2020 | 14 | ACCEPTANCE OF SERVICE of Summons and Complaint by Counsel Jeremy Roller, on behalf of David Alan Johnson, on 5/11/2020. (Justus, Benjamin) (Entered: 06/22/2020) |
| 06/22/2020 | 15 | AFFIDAVIT of Service of Summons and Complaint on Nathan Sullivan on 4/16/2020, filed by Plaintiff United Federation of Churches LLC. (Justus, Benjamin) (Entered: 06/22/2020) |
| 06/22/2020 | 16 | AFFIDAVIT of Service of Summons and Complaint on Leah Fishabaugh on 4/30/2020, filed by Plaintiff United Federation of Churches LLC. (Justus, Benjamin) (Entered: 06/22/2020) |
| 06/26/2020 | 17 | REPLY, filed by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan, TO RESPONSE to 11 MOTION to Dismiss (Roller, Jeremy) (Entered: 06/26/2020) |
| 07/16/2020 | 18 | APPLICATION OF ATTORNEY Matthew A. Kezhaya FOR LEAVE TO APPEAR PRO HAC VICE for Plaintiff United Federation of Churches LLC (Fee Paid) Receipt No. AWAWDC-6469118 (Justus, Benjamin) (Entered: 07/16/2020) |
| 08/06/2020 | 19 | ORDER re 18 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney Matthew A Kezhaya for Plaintiff United Federation of Churches LLC, by Clerk William M McCool. No document associated with this docket entry, text only. *NOTE TO COUNSEL: Local counsel agrees to* **sign all filings** *and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d).*(DS) (Entered: 08/06/2020) |
| 02/26/2021 | 20 | ORDER granting Defendants' 11 Motion to Dismiss: The Satanic Temple's CFAA, ACPA, tortious interference, and CPA claims are DISMISSED with leave to amend. Its defamation claim, however, is DISMISSED with prejudice. The Court grants The Satanic Temple leave to file an amended complaint within thirty days of the entry of this Order. Signed by Judge Richard A. Jones.(MW) (Entered: 02/26/2021) |

| 03/12/2021 | 21 | MOTION for Reconsideration re 20 Order on Motion to Dismiss, , filed by Plaintiff United Federation of Churches LLC. (Attachments: # 1 Exhibit 1, # 2 Proposed Order) Noting Date 3/12/2021, (Justus, Benjamin) (Attachment 1 replaced to flatten malformed PDF on 3/12/2021) (STP). (Entered: 03/12/2021) |
| 03/15/2021 | | Set Deadline: Under Local Rule 7(h)(3), the Court requests a response to Plaintiff's 21 MOTION for Reconsideration. Defendants' response shall be limited to eight pages and shall be filed by 3/29/2021. (VE) (Entered: 03/15/2021) |
| 03/29/2021 | 22 | AMENDED COMPLAINT against All Defendants, filed by United Federation of Churches LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Justus, Benjamin) (Entered: 03/29/2021) |
| 03/29/2021 | 23 | RESPONSE, by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan, to 21 MOTION for Reconsideration re 20 Order on Motion to Dismiss, . (Attachments: # 1 Proposed Order Proposed Order Denying Motion for Reconsideration) (Roller, Jeremy) (Entered: 03/29/2021) |
| 05/10/2021 | 24 | Stipulated MOTION *for Leave to File Second Amended Complaint*, filed by Plaintiff United Federation of Churches LLC. (Attachments: # 1 Amended Complaint, # 2 Exhibit 3 to proposed Amended Complaint, # 3 Proposed Order) Noting Date 5/10/2021, (Justus, Benjamin) (Entered: 05/10/2021) |
| 05/11/2021 | 25 | MINUTE ORDER (text only) granting 24 Stipulated MOTION *for Leave to File Second Amended Complaint*. No later than 5/25/2021, Plaintiff shall file a second amended complaint in the form attached to the parties' Stipulated Motion. Authorized by Judge Richard A. Jones. (VE) (Entered: 05/11/2021) |
| 05/24/2021 | 26 | Second AMENDED COMPLAINT against All Defendants, filed by United Federation of Churches LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Justus, Benjamin) (Entered: 05/24/2021) |
| 06/07/2021 | 27 | MOTION to Dismiss *Second Amended Complaint*, filed by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan. (Attachments: # 1 Proposed Order Proposed Order Granting Motion to Dismiss) Noting Date 7/2/2021, (Roller, Jeremy) (Entered: 06/07/2021) |
| 06/08/2021 | | NOTICE TO THE PARTIES: The Court acknowledges the requirements of FRCP 16(b), but finds good cause to defer entry of an initial case scheduling order until after the Court enters its rulings on the pending motions. (VE) (Entered: 06/08/2021) |
| 06/28/2021 | 28 | RESPONSE, by Plaintiff United Federation of Churches LLC, to 27 MOTION to Dismiss *Second Amended Complaint*. (Justus, Benjamin) (Entered: 06/28/2021) |
| 07/02/2021 | 29 | REPLY, filed by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan, TO RESPONSE to 27 MOTION to Dismiss *Second Amended Complaint* (Roller, Jeremy) (Entered: 07/02/2021) |
| 04/12/2022 | 30 | ORDER denying Plaintiff's 21 MOTION for Reconsideration re 20 Order on Motion to Dismiss. Signed by Judge Richard A. Jones. (SR) (Entered: 04/12/2022) |
| 04/15/2022 | 31 | ORDER granting in part and denying in part Defendants' 27 Motion to Dismiss Second Amended Complaint. TST shall file its amended complaint, if any, within 14 days after the filing date of this order. Signed by Judge Richard A. Jones. (SR) (Entered: 04/15/2022) |
| 05/02/2022 | 32 | ORDER REGARDING FRCP 26(f) CONFERENCE, INITIAL DISCLOSURES, AND JOINT STATUS REPORT. FRCP 26(f) Conference Deadline is 5/9/2022, Initial |

| | | |
|---|---|---|
| | | Disclosure Deadline is 5/16/2022, Joint Status Report due by 5/23/2022, by Judge Richard A. Jones. (VE) (Entered: 05/02/2022) |
| 05/13/2022 | 33 | MOTION to Dismiss *for Lack of Subject Matter Jurisdiction*, filed by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan. (Attachments: # 1 Proposed Order) Noting Date 6/10/2022, (Roller, Jeremy) (Entered: 05/13/2022) |
| 05/15/2022 | | ***Deadlines terminated. The Court acknowledges the requirements of FRCP 16(b), but finds good cause to VACATE the deadlines contained in the 32 ORDER REGARDING FRCP 26(f) CONFERENCE, INITIAL DISCLOSURES, AND JOINT STATUS REPORT pending the Court's ruling on the 33 MOTION to Dismiss for Lack of Subject Matter Jurisdiction, filed by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, and Nathan Sullivan. (VE) (Entered: 05/15/2022) |
| 06/06/2022 | 34 | CORPORATE DISCLOSURE STATEMENT indicating no Corporate Parents and/or Affiliates. Filed pursuant to Fed.R.Civ.P 7.1. Filed by United Federation of Churches LLC (Justus, Benjamin) (Entered: 06/06/2022) |
| 06/06/2022 | 35 | RESPONSE, by Plaintiff United Federation of Churches LLC, to 33 MOTION to Dismiss *for Lack of Subject Matter Jurisdiction*. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Justus, Benjamin) (Entered: 06/06/2022) |
| 06/08/2022 | 36 | NOTICE of Unavailability of counsel Jeremy E Roller for Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan from 6/27/2022 - 7/8/2022. (Roller, Jeremy) (Entered: 06/08/2022) |
| 06/10/2022 | 37 | REPLY, filed by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan, TO RESPONSE to 33 MOTION to Dismiss *for Lack of Subject Matter Jurisdiction* (Roller, Jeremy) (Entered: 06/10/2022) |
| 06/10/2022 | 38 | DECLARATION of Jeremy Roller filed by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan re 33 MOTION to Dismiss *for Lack of Subject Matter Jurisdiction* (Roller, Jeremy) (Entered: 06/10/2022) |
| 06/14/2022 | 39 | NOTICE *of intent to file surreply (LCR 7(g))* re 37 Reply to Response to Motion, 38 Declaration ; filed by Plaintiff United Federation of Churches LLC. (Kezhaya, Matthew) (Entered: 06/14/2022) |
| 06/15/2022 | 40 | SURREPLY filed by Plaintiff United Federation of Churches LLC re 33 MOTION to Dismiss *for Lack of Subject Matter Jurisdiction* (Justus, Benjamin) (Entered: 06/15/2022) |
| 07/27/2022 | 41 | NOTICE of Unavailability of counsel Jeremy E Roller for Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan from 08/08 to 08/12. (Roller, Jeremy) (Entered: 07/27/2022) |
| 11/23/2022 | 42 | MOTION for Preliminary Injunction *(to return Allies page)*, filed by Plaintiff United Federation of Churches LLC. (Attachments: # 1 Exhibit declaration of Rachel Chambliss, # 2 Exhibit transcript of the podcast episode, # 3 Proposed Order proposed order - motion granted) Noting Date 12/16/2022, (Kezhaya, Matt) (Entered: 11/23/2022) |
| 12/12/2022 | 43 | RESPONSE, by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan, to 42 MOTION for Preliminary Injunction *(to return Allies page)*. (Attachments: # 1 Proposed Order)(Roller, Jeremy) (Entered: 12/12/2022) |
| 12/12/2022 | 44 | DECLARATION of David A. Johnson filed by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan re 42 MOTION for Preliminary Injunction *(to return Allies page)* (Roller, Jeremy) (Entered: 12/12/2022) |

| | | |
|---|---|---|
| 12/12/2022 | 45 | DECLARATION of Nathan Sullivan filed by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan re 42 MOTION for Preliminary Injunction *(to return Allies page)* (Roller, Jeremy) (Entered: 12/12/2022) |
| 12/12/2022 | 46 | DECLARATION of Jeremy Roller filed by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan re 42 MOTION for Preliminary Injunction *(to return Allies page)* (Roller, Jeremy) (Entered: 12/12/2022) |
| 12/12/2022 | 47 | NOTICE of Filing Thumb drive containing video in Paper or Physical Form with the Clerk's Office by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan re 46 Declaration. (Roller, Jeremy) (Entered: 12/12/2022) |
| 01/06/2023 | 48 | ORDER: The Court GRANTS Defendants' 33 Motion to Dismiss. Therefore, Plaintiff's 42 request for a preliminary injunction is rendered moot. The Court DENIES the motion on that basis. Signed by Judge Richard A. Jones. (SS) (Entered: 01/06/2023) |
| 01/09/2023 | | ***Civil Case Terminated by Clerk re dkt 48 Order on Motion to Dismiss, Order on Motion for Preliminary Injunction. (SS) (Entered: 01/09/2023) |
| 01/09/2023 | 49 | JUDGMENT BY COURT in favor of Defendants David Alan Johnson, Leah Fishbaugh, Mickey Meeham and Nathan Sullivan against Plaintiff United Federation of Churches LLC (VE) (Entered: 01/09/2023) |
| 01/24/2023 | 50 | NOTICE OF APPEAL to Ninth Circuit (23-35060) re 48 Order on Motion to Dismiss, Order on Motion for Preliminary Injunction, 20 Order on Motion to Dismiss, 30 Order on Motion for Reconsideration, 49 Judgment by Court by Plaintiff United Federation of Churches LLC. $505, receipt number AWAWDC-7860806 (cc: USCA) (Kezhaya, Matt) Modified on 1/27/2023 to add CCA#. (RE) (Entered: 01/24/2023) |
| 01/25/2023 | 51 | TIME SCHEDULE ORDER/ USCA CASE NUMBER (23-35060) as to 50 Notice of Appeal, filed by United Federation of Churches LLC. (RE) (Entered: 01/27/2023) |
| 02/07/2023 | 52 | NOTICE OF Cross APPEAL to Ninth Circuit (23-35060, 23-35105) re 31 Order on Motion to Dismiss, Set Deadlines/Hearings by Defendants Leah Fishbaugh, David Alan Johnson, Mickey Meeham, Nathan Sullivan. $505, receipt number AWAWDC-7879163 (cc: USCA) (Roller, Jeremy) Modified on 2/8/2023 to add CCA#. (RE) (Entered: 02/07/2023) |
| 02/08/2023 | 53 | TIME SCHEDULE ORDER/USCA CASE NUMBER (23-35060, 23-35105) as to 50 Notice of Appeal, filed by United Federation of Churches LLC, 52 Notice of Appeal, filed by Nathan Sullivan, Mickey Meeham, David Alan Johnson, Leah Fishbaugh. (RE) (Entered: 02/08/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/26/2023 13:21:36 | | |
| **PACER Login:** | mkezhaya | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-00509-RAJ |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |