**Case No. 23-35060**

---

## IN THE UNITED STATE COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

UNITED FEDERATION OF CHURCHES LLC, DBA The Satanic Temple,

*Plaintiff-Appellant,*

v.

DAVID ALAN JOHNSON, AKA ADJ; LEAH FISHBAUGH; MICKEY MEEHAM; NATHAN SULLIVAN,

*Defendants-Appellees.*

On Appeal from the United States District Court
for Western Washington, Seattle
Case No. 2:20-cv-00509-RAJ
The Honorable Richard A. Jones

---

## APPELLEES' ANSWERING BRIEF

---

Jeremy E. Roller, WSBA No. 32021
Lisa Herb, WSBA No. 23161
Arete Law Group PLLC
1218 Third Avenue, Suite 2100
Seattle, WA 98101
(206) 428-3250
jroller@aretelaw.com

*Attorneys for David Alan Johnson, Leah Fishbaugh, Mickey Powell, and Nathan Sullivan*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

STATEMENT OF JURISDICTION ......................................................... 5

STATEMENT OF THE ISSUES ............................................................... 6

STATUTORY AUTHORITIES ................................................................. 7

STATEMENT OF THE CASE ................................................................... 7

   I.   The Satanic Temple ...................................................................... 7

   II.   The Expelled Members ................................................................ 8

   III.   The Satanic Temple Files Suit Against the Expelled Members Based on Their Critical Posts ................................................................. 13

   IV.   This Appeal .................................................................................. 15

SUMMARY OF THE ARGUMENT ...................................................... 15

   I.   The District Court Properly Dismissed The Satanic Temple's ACPA Claim ................................................................................. 15

   II.   The District Court Properly Dismissed The Satanic Temple's Defamation Claim ...................................................................... 17

STANDARD OF REVIEW ..................................................................... 18

ARGUMENT .......................................................................................... 18

   I.   The Satanic Temple Failed to State a Cyberpiracy Claim under the ACPA ..................................................................................... 18

       A.   The ACPA .............................................................................. 19

       B.   The District Court Correctly Found that The Satanic Temple's ACPA Claim Fails Because it Does not Involve a Domain Name ................. 20

       C.   Facebook is not an "Other Domain Registration Authority" ............. 23

       D.   The Satanic Temple's ACPA Claim Also Fails as a Matter of Law Because The Satanic Temple did not Allege That the Expelled Members Were the Domain Name Registrants ................................ 28

       E.   The Satanic Temple Failed to Plead a Bad Faith Intent to Profit ....... 29

   II.   The District Court Correctly Dismissed the Defamation Claim ................ 30

A.  The District Court Correctly Applied the Ecclesiastical Abstention Doctrine to Dismiss the Defamation Claim ........................................30

B.  In the Alternative, Dismissal of the Defamation Claim Should be Upheld for Lack of Subject Matter Jurisdiction..................................38

C.  The Satanic Temple Failed to State a Defamation Claim against Fishbaugh and Sullivan ........................................................39

CONCLUSION..............................................................................................40

STATEMENT OF RELATED CASES ..................................................................42

CERTIFICATE OF COMPLIANCE......................................................................43

CERTIFICATE OF SERVICE .............................................................................44

# TABLE OF AUTHORITIES

## Cases

*1-800-411-I.P. Holdings, LLC v. Georgia Injury Centers, LLC*
  71 F. Supp. 3d 1325 (S.D. Fla. 2014) ....................................................29

*Bird v. Parsons*
  289 F.3d 865 (6th Cir. 2002) .................................................................28

*Burgert v. Lokelani Bernice Pauahi Bishop Tr.*
  200 F.3d 661 (9th Cir. 2000) .................................................................18

*Carl v. BernardJcarl.Com*
  409 F. App'x 628 (4th Cir. 2010) ..........................................................30

*City of Seattle v. Monsanto Company*
  387 F. Supp. 3d 1141 (W.D. Wash. 2019) .............................................39

*Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers*
  296 F. Supp. 2d 1159 (C.D. Cal. 2003) .................................................25

*DSPT Int'l, Inc. v. Nahum*
  624 F.3d 1213 (9th Cir. 2010) ...............................................................19

*Dudley v. HealthSource Chiropractic, Inc.*
  585 F. Supp. 2d 433 (W.D.N.Y. 2008) ..................................................29

*Fifth Ave. of Long Island Realty Assocs. v. Caruso Mgmt. Co.*
  718 F. Supp. 2d 292 (E.D.N.Y. 2010) ...................................................29

*Hartwig v. Albertus Magnus Coll.*
  93 F. Supp. 2d 200 (D. Conn. 2000) ......................................................33

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*
  565 U.S. 171, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012) .....................32

*Hubbard v. J Message Grp. Corp.*
  325 F. Supp. 3d 1198 (D.N.M. 2018) .....................................................34

*Hyung Jin Moon v. Hak Ja Moon*
   431 F. Supp. 3d 394 (S.D.N.Y. 2019), *aff'd,* 833 F. App'x 876 (2d Cir. 2020) ..33

*Jolly v. Fossum*
   59 Wn. 2d 20, 365 P.2d 780 (1961) ....................................................................30

*Jones v. Hollywood Unlocked, Inc.*
   No. 2:21-cv-07929-MEMF(PVCx), 2022 WL 18674459 (C.D. Cal. Nov. 22,
   2022) ...................................................................................................................21

*Kavanaugh v. Zwilling*
   997 F. Supp. 2d 241 (S.D.N.Y. 2014), *aff'd*, 578 F. App'x 24 (2d Cir. 2014) ....33

*Klagsbrun v. Va'ad Harabonim of Greater Monsey*
   53 F. Supp. 2d 732 (D.N.J. 1999), *aff'd sub nom. Klagsbrun v. Vaad Harabonm
   of Greater Monsey*, 263 F.3d 158 (3d Cir. 2001) ................................................34

*Lamparello v. Falwell*
   420 F.3d 309 (4th Cir. 2005) ...............................................................................19

*MGIC Indem. Corp. v. Weisman*
   803 F.2d 500 (9th Cir. 1986) .................................................................................3

*Murtagh v. Pardo*
   No. CV1505204MMMFFMX, 2015 WL 13828625 (C.D. Cal. Aug. 17, 2015) .26

*Office Depot, Inc. v. Zuccarini*
   596 F.3d 696 (9th Cir. 2010) ...............................................................................25

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*
   ___ U.S. ___, 140 S. Ct. 2049, 207 L. Ed. 2d 870 (2020) ...................... 31, 32, 33

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*
   442 F.3d 741 (9th Cir. 2006) .................................................................................3

*Sabin v. Curt Mfg. Co.*
   No. CV-08-1852-PHX-SRB, 2009 WL 10673588 (D. Ariz., May 4, 2009) .......30

*Satanic Temple, Inc. v. Newsweek Mag. LLC*
   No. 1:22-CV-1343 (MKV), 2023 WL 2403136 (S.D.N.Y., Mar. 8, 2023) ........38

iv

*Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*
  426 U.S. 696, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976) .......................................33

*Sporty's Farm, LLC v. Sportsman's Mkt., Inc.*
  202 F.3d 489 (2d Cir. 2000) ...................................................................................29

*United States Mission Corp. v. KIRO TV, Inc.*
  172 Wn. App. 767, 292 P.3d 137 (Wash. Ct. App. 2013)...................................40

*Walz v. Tax Comm'n of City of New York*
  397 U.S. 664, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970) .......................................36

**Statutes**

15 U.S.C. § 1125(d) .......................................................................................... passim

15 U.S.C. § 1125(d)(1)(A) .......................................................................... 16, 19, 29

15 U.S.C. § 1125(d)(1)(A)(ii) .........................................................................16

15 U.S.C. § 1125(d)(1)(D) ........................................................................... 20, 28

15 U.S.C. § 1127.........................................................................................7, 26

28 U.S.C. § 1291 ............................................................................................6

U.S. Const. amend I. .................................................................................. 4, 17, 31

**Other Authorities**

145 Cong. Rec. 15025 (1999) ................................................................... 7, 22, 27

**Rules**

Fed. R. Evid. 201 ...........................................................................................3

## INTRODUCTION

This case arises from a dispute between a religious organization and its former members regarding the religious organization's ability to live up to its own tenets, beliefs, and professed practices. Appellant United Federation of Churches LLC d/b/a The Satanic Temple ("The Satanic Temple" or "TST") is a self-proclaimed religious organization. Appellees David Johnson, Leah Fishbaugh, Micky Powell,[1] and Nathan Sullivan (the "Expelled Members") are its former members. On March 12, 2020, The Satanic Temple removed the Expelled Members from their volunteer positions with The Satanic Temple's local chapter due to internal disagreements. Later in March of 2020, one of the Expelled Members, Appellee David Johnson ("Johnson"), posted critical views about The Satanic Temple's adherence to its purported religious beliefs, tenets, and practices on a Facebook page used by The Satanic Temple's local Washington chapter (the "Chapter Facebook Page"). The Satanic Temple had given Johnson administrative control of the Chapter Facebook Page in his role as a volunteer social media manager for The Satanic Temple. When Johnson did not return administrative control of the Chapter Facebook Page to The Satanic Temple, The Satanic Temple requested and received administrative control

---

[1] The Satanic Temple named "Mickey Meeham" as a defendant in the district court case from which this appeal arises. "Mickey Meeham's" name was "Mickey Meehan" when the district court case was filed. Mickey Meehan has since changed his name to Mickey Powell, which the Expelled Members use in this brief.

1

from Facebook in May of 2020, when Facebook also removed the Expelled Members as authorized administrators of the page. To date, The Satanic Temple retains exclusive control of the Chapter Facebook Page.

Some Expelled Members also posted critical content to a secondary Facebook page referred to as the "Allies Facebook Page" or the "Memes Facebook Page." Unlike the Chapter Facebook Page, The Satanic Temple did not ask the Expelled Members to return the Memes Facebook Page. Nor did it ask Facebook to remove the Expelled Members as administrators of the Memes Facebook Page.

Not content with having ejected the Expelled Members for their critical views (or merely their presumed proximity to those who held critical views), The Satanic Temple sued, seeking to further punish its former members for their criticisms, alleging through three different complaints a spaghetti splatter of multiple federal and state law claims tossed against the court's walls, all stemming from the Expelled Members' Chapter Facebook Page posts in March of 2020. The federal claims included a "hacking" claim under the Computer Fraud and Abuse Act ("CFAA"), a "cyberpiracy" claim under the Anticybersquatting Consumer Protection Act ("ACPA"), and claims for federal trademark dilution. The state law claims included defamation, violation of Washington's Consumer Protection Act ("CPA"), tortious

interference, conversion, and trespass to chattels.[2]

Through multiple motions to dismiss, the District Court dismissed The Satanic Temple's state law claims for defamation, violation of the CPA, and the conversion and trespass to chattels claims relating to the Chapter Facebook Page. The District Court also dismissed all of the federal claims. After dismissing the last of the federal claims, the District Court dismissed the remaining state law claims for tortious interference, conversion, and trespass to chattels for lack of subject matter jurisdiction.[3]

Through its appeal, The Satanic Temple seeks to revive two of the dismissed claims—the federal cyberpiracy/ACPA claim and the state defamation claim. The Satanic Temple provides no viable grounds for reversing the District Court's appropriate dismissal of these claims. The cyberpiracy claim fails as a matter of law

---

[2] More than three years after the alleged conduct, The Satanic Temple asserted yet another state law claim—this time for breach of fiduciary duty—against the Expelled Members in King County Superior Court. *See United Federation of Churches v. Johnson, et al.*, No. 23-2-06120-9 SEA (King County Superior Court).

[3] The Court may take judicial notice that The Satanic Temple has refiled the state law claims that were dismissed for lack of jurisdiction (in addition to the new claim for breach of fiduciary duty) in state court, No. 23-2-06120-9 SEA (King County Superior Court). Fed. R. Evid. 201; *see also, e.g.*, *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (finding matters of public record outside the proceeding, such as motions filed in other cases, proper subjects of judicial notice); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of briefs, transcripts, and various other court filings from a related case).

3

because it only applies to domain names registered by an authorized domain name registrar. It does not apply to unregistered post-domain paths such as that for the Chapter Facebook Page. The cyberpiracy claim also fails as a matter of law because The Satanic Temple did not plead that the Expelled Members had a bad faith intent to profit from their alleged use of the purported domain name (which is, in fact, not a domain name under the ACPA).

The Satanic Temple's defamation claim fares no better. The First Amendment's Free Exercise Clause forbids courts from delving into and defining the beliefs and tenets of any religious organization. The First Amendment's Establishment Clause also prohibits a government (including the courts) from supporting or endorsing a religion. The District Court correctly dismissed the defamation claim because the Free Exercise Clause prohibits it from interpreting and defining The Satanic Temple's religious beliefs, tenets, and practices, as the District Court would be required to resolve the defamation claim. In its appeal, The Satanic Temple does not dispute that it would be improper for a court to define or interpret its beliefs. Instead, it proposes a solution that would violate the Establishment Clause. Specifically, The Satanic Temple proposes that for its defamation claim, it should be the sole arbiter of the truth or falsity of the Expelled Members' statements—like a Satanic theocracy punishing blasphemers. The First Amendment forbids allowing The Satanic Temple to step into the District Court's shoes in this

manner and to turn the court into its own enforcement arm in The Satanic Temple's quest to silence dissenting members. The District Court correctly dismissed the defamation claim.

For these reasons and the reasons set forth below, this Court should uphold the District Court's dismissal of The Satanic Temple's cyberpiracy and defamation claims.

## STATEMENT OF JURISDICTION

Prior to the District Court's dismissal of the CFAA, ACPA, and trademark dilution claims, the District Court had federal question jurisdiction under 28 U.S.C. § 1331 for those three claims and supplemental jurisdiction for the state law claims under 28 U.S.C. § 1367. Following dismissal of the federal claims, the District Court lacked subject matter jurisdiction over the remaining state law claims. The District Court also found to a legal certainty that The Satanic Temple's remaining claims were for less than the jurisdictional amount to satisfy diversity jurisdiction requirements under 28 U.S.C. § 1332(a). ER 5-9. The Satanic Temple has not appealed that finding.[4]

---

[4] In their Reply in Support of Motion to Dismiss, the Expelled Members argued that The Satanic Temple's assertion that it satisfied the amount in controversy requirement was not in good faith. The Expelled Members submitted evidence that The Satanic Temple's counsel had admitted that The Satanic Temple did not have claimed damages sufficient for diversity jurisdiction. SER 121-22 at ¶ 2. The Satanic Temple's counsel also made public statements admitting that he had to "come up with" $75,000 in damages, suggesting that the subsequently alleged damages were

This Court has jurisdiction under 28 U.S.C. § 1291, which provides the Court of Appeals with jurisdiction of appeals from all final decisions of the district courts of the United States.

## STATEMENT OF THE ISSUES

(A)     Whether the District Court correctly dismissed The Satanic Temple's ACPA/cyberpiracy claim where the claim does not involve a domain name and The Satanic Temple did not allege that the Expelled Members had a bad faith intent to profit.

(B)     Whether the District Court correctly dismissed The Satanic Temple's defamation claim where the claim would have required the court to make

---

feigned. SER 123 at ¶ 5; SER 136. He further publicly explained that the reason he wanted to be in federal court with the now-dismissed federal claims was to maximize damages and collect attorneys' fees. SER 123 at ¶ 4; SER 132 ("I wanted some federal statutes to apply because that would maximize TST's damages, would keep us in Federal court (as opposed to State court), and provided the option to collect attorney's fees for having to litigate this."). This, too, suggests that The Satanic Temple's damage contentions were merely pretextual for the purpose of trying to remain in federal court.

The same counsel revealed The Satanic Temple's and his bad faith motives by publicly calling Expelled Members "morons" and "pathetic" and stating his hope that this lawsuit would cause them to incur an unsustainable amount of attorneys' fees in defending against this matter. SER 122 at ¶ 3; SER 127 ("I hope he [the Expelled Members' attorney] squeezes every last penny from you living corpses, and anyone that gives you the time of day."). Although the District Court did not address The Satanic Temple's bad faith assertion of the amount in controversy, this too supports the District Court's determination that The Satanic Temple failed to plead the required amount in controversy.

6

ecclesiastical religious determinations regarding The Satanic Temple's tenets, beliefs, and practices in violation of the First Amendment.

## STATUTORY AUTHORITIES

Review of the District Court's dismissal of The Satanic Temple's ACPA/cyberpiracy claim requires analysis of 15 U.S.C. § 1125(d) and 15 U.S.C. § 1127, which are attached as **Addendum A**. The Court's analysis also requires reviewing legislative history for 15 U.S.C. § 1125(d) and the definition of "domain name" in 15 U.S.C. § 1127, found at 145 Cong. Rec. 14986, 15025 (1999), the relevant portions of which are attached hereto as **Addendum B**.

## STATEMENT OF THE CASE

Because this appeal arises from decisions on motions to dismiss, the allegations included in The Satanic Temple's complaint will be taken as true (though many are vigorously disputed).

## I.    The Satanic Temple

The Satanic Temple is a self-proclaimed religious organization that advances seven fundamental tenets. ER 131-32 at ¶¶ 7-9; ER 51-52 at ¶¶ 8-10. At the relevant time, The Satanic Temple was organized at local levels in "Chapters," which were largely autonomous, but were subject to centralized control to ensure faithfulness to organizational principles and purposes. ER 132 at ¶ 12; ER 52 at ¶ 13. At the relevant times, The Satanic Temple had a Washington State Chapter ("the Chapter"), which

was led by two individuals: one serving as "Chapter Head" and the other serving as "Media Liaison." ER 52 at ¶ 14.

The Satanic Temple claims to use social media accounts, such as Facebook, to communicate with its members. ER 134 at ¶ 25; ER 54 at ¶ 29. The Satanic Temple's Washington Chapter created the Chapter Facebook Page in 2014 to disseminate information for what was then the "Seattle Chapter." *Id.* In September of 2018, the Washington Chapter created a secondary Facebook page named "TST WA Allies" (the "Allies Facebook Page" or the "Memes Facebook Page") to facilitate communications with individuals who were interested in The Satanic Temple but did not want to identify as members. ER 134 at ¶ 26; ER 54 at ¶ 32.[5]

## II. The Expelled Members

In early 2020, the Expelled Members were members of The Satanic Temple and served as volunteers on The Satanic Temple's Washington Chapter's advisory council. ER 134-36 at ¶¶ 27-30; ER 52 at ¶ 17; 54-56 at ¶¶ 33-36. In connection with their positions, some of the Expelled Members managed the Chapter's social media with other councilors and had administrative rights to The Satanic Temple's social

---

[5] The Satanic Temple's Complaint and Second Amended Complaint include alleged facts relating to its Google and Twitter accounts. In its brief, The Satanic Temple alleges that the Expelled Members unsuccessfully attempted to "hack" these accounts. Opening Brief at 12. However, none of the claims on appeal relate to the Google or Twitter accounts. Accordingly, those allegations are irrelevant to this appeal.

media accounts. ER 52, 54 at ¶¶ 17, 36. Specifically, The Satanic Temple gave some of the Expelled Members administrative rights to both Facebook pages. ER 56 at ¶ 36; ER 136 at ¶ 30. The Satanic Temple alleges that it maintained a code of conduct for activity on behalf of The Satanic Temple, including, allegedly, use of social media. ER 134-36 at ¶¶ 28-29; ER 54-56 at ¶¶ 34-35. The Satanic Temple alleges that its Code of Conduct "form[ed] the contours of administrators' authorization to access [its] social media accounts." ER 136 at ¶ 29; ER 56 at ¶ 35.

On March 12, 2020, The Satanic Temple allegedly removed the Expelled Members from its advisory council and allegedly revoked their authorization to manage the Chapter's social media activity. ER 58 at ¶¶ 43-44.

On March 14, 2020, Ex-Member Mickey Powell (then known as Mickey Meehan), who had been managing the Memes Facebook Page, removed other administrators from that Memes Page and changed the name to "Evergreen Memes for Queer Satanic Fiends.[6]" ER 137-38 at ¶¶ 36-37; ER 59 at ¶ 46. Powell then allegedly began posting material allegedly in violation of The Satanic Temple's Code of Conduct. ER 138 at ¶ 37; ER 59 at ¶ 47.[7]

---

[6] Before any of this controversy arose, Powell had removed himself from The Satanic Temple and was only involved with the Memes Facebook Page. Powell has not been involved with the Memes Facebook Page for approximately three years.

[7] The Expelled Members object to The Satanic Temple's disrespectful and untruthful use of the term "thieves" to refer to them throughout its brief. *See, e.g.*, Opening Brief at 13 ("The thieves again moved for Rule12(b)(6) dismissal."). Not only does

this reflect a lack of decorum required in judicial proceedings, as The Satanic Temple is fully aware, but also the term is untrue.

In the District Court proceedings, the Expelled Members provided irrefutable evidence that The Satanic Temple relinquished any interest in the Memes Facebook Page to the Expelled Members. Specifically, as The Satanic Temple is well aware, on March 14, 2020, after Appellee Powell posted critical content on the Memes Facebook Page and changed its name, The Satanic Temple's Chapter leadership acknowledged that activity and then expressly abandoned any The Satanic Temple interest in the Memes Facebook Page for the Expelled Members to use "free and clear:"

> Hi Lenore [the pseudonym for Powell],
>
> I saw that you made some changes to the TST WA State Allies FB group. **I just wanted to let you know that it's yours free and clear and we've no desire to claim it.** You and ADJ [Johnson] built it and have done a great job doing so. I'm confident you'll both continue doing awesome work.
>
> I'm sorry the way things panned out, and I do mean all of it. I wish you and your family well, and respect your need to fight the fight your way.
>
> Rock on, Tarkus Claypool
> Media Liaison, The Satanic Temple of Washington
> (he/him)

SER 17; SER 36 at ¶ 14; SER 52; SER 70-71 at ¶ 10; SER 76 (emphasis added).

The next day, in a March 15, 2020 online town hall meeting via Zoom, The Satanic Temple's Media Liaison, Paul Case/Tarkus Claypool, again publicly reiterated in front of The Satanic Temple's Washington members, including the Washington Chapter Head, that The Satanic Temple had no interest in claiming the Memes page:

> I do want to say that **we're not going to, you know, ask Lenore to give the page back in any way.** I wish them well, and I hope they continue growing that and make it a great success. Because they're going to fight their fight, their way. And so, let them do what they want to, and I wish them well, because both Lenore and ADJ [Johnson] did

10

Following Powell's posts, the Washington Chapter Head claims to have revoked the Expelled Members' authority to its remaining social media accounts. ER 59-60 at ¶ 49. However, Johnson still had administrative access to the Chapter Facebook Page. On March 20, 2020, Johnson allegedly removed other administrators from the Chapter Facebook Page and posted content on that page regarding his and others' ejections from The Satanic Temple, criticism of the organization, and descriptions of its failure to live up to its own stated values. ER 138-39 at ¶¶ 38-41; ER 60 at ¶¶ 51-52; ER 89-91. The Chapter's media liaison, Paul Case (who goes by the name Tarkus Claypool), emailed Johnson and asked him to return the Chapter Facebook Page, but Johnson did not respond. ER 60-61 at ¶¶ 53-54. That night Johnson re-posted articles that were critical of The Satanic Temple on the Chapter Facebook Page. ER 139 at ¶ 41; ER 60-61 at ¶ 55; ER 93-109. On March 22, 2020, Johnson changed the name of the Chapter Facebook Page from

---

a wonderful job in their roles that they had. It just wasn't within the TST guidelines that we are beholden to. So I want to give them due credit, and just you know, wish them well with what they're going to plan to do with it in the future.

SER 17; SER 36-37 at ¶ 15; SER 71 at ¶ 14; SER 77 at ¶ 2; SER 103-04.

Despite being fully aware of this irrefutable and exculpatory evidence, The Satanic Temple continues falsely to publicly assert in its Opening Brief to this Court that the Expelled Members are "thieves," pointing to a sole offhand, joking comment by Appellee Sullivan that he had "stolen" the page—an obviously glib comment made after The Satanic Temple had already relinquished all interest in the page. SER 22; SER 72 at ¶ 15.

"The Satanic Temple Washington" to "Satanic Washington State—Archived Temple Chapter" and modified the profile picture. ER 139 at ¶ 43; ER 61 at ¶ 57. The Satanic Temple's attorney sent a letter to Johnson asking him to relinquish control of the Chapter Facebook Page, but Johnson did not respond. ER 62 at ¶¶ 64-65. The Satanic Temple claims to have lost between 20 and 30 members due to allegedly false claims about The Satanic Temple that Johnson published to the Chapter Facebook Page in March of 2020. ER 139 at ¶ 48; ER 62 at ¶ 62.

The Satanic Temple subsequently requested administrative control of the Chapter Facebook Page from Facebook. Facebook initially refused and stated that it was a "Page admin issue" not involving "infringements of [The Satanic Temple's] legal rights." ER 139-40 at ¶¶ 50-52. However, at The Satanic Temple's request, on May 27, 2020, Facebook removed the Expelled Members as administrators and gave administrative control of the Chapter Facebook Page to The Satanic Temple. ER 62 at ¶¶ 4, 66; ER 76. The Satanic Temple does not allege that the Expelled Members have accessed, attempted to access, or have had any means of accessing the Chapter Facebook Page since then.

The Satanic Temple does not allege that it ever sought return of the Memes Page from either the Expelled Members or Facebook.

**III.    The Satanic Temple Files Suit Against the Expelled Members Based on Their Critical Posts**

The Satanic Temple filed its original Complaint on April 3, 2020, in which it asserted claims against the Expelled Members for defamation, "hacking" under the CFAA, cyberpiracy under the ACPA, tortious interference with business expectancy, and violation of the Washington's Consumer Protection Act, RCW 19.86. *See* ER 130-77. On February 26, 2021, the District Court dismissed all claims for failure to state a claim upon which relief could be granted. ER 111-29. The District Court dismissed the defamation claim with prejudice and dismissed the remaining claims without prejudice and with leave to amend. ER 129. The Satanic Temple moved for reconsideration of the dismissal of the ACPA and defamation claims. SER 214-21. The District Court denied The Satanic Temple's Motion for Reconsideration on April 12, 2022. ER 43-48.

While the motion for reconsideration was pending, The Satanic Temple filed a First Amended Complaint. The parties subsequently filed a stipulated motion for leave to file a Second Amended Complaint ("SAC"), which the District Court granted on May 10, 2021. In the SAC, The Satanic Temple reasserted its CFAA "hacking" claim and a state law tortious interference claim. ER 49-73. The Satanic Temple did not try to salvage its dismissed ACPA/cyberpiracy or CPA claims. Instead, it asserted a new array of claims based on the Expelled Members' March 2020 Chapter Facebook Page postings, specifically, new federal trademark dilution

claims under the Federal Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125(c) ("FTDRA"), and new state law claims for trespass to chattels and conversion. *Id.*

On April 15, 2022, in response to the Expelled Members' Motion to Dismiss the SAC, SER 172-99; SER 157-71, the District Court dismissed the two remaining federal claims, *i.e.*, the CFAA "hacking" claim and the FTDRA trademark dilution claim. ER 10, 18-29, 37-40. Dismissal of the CFAA claim was without leave to amend as to the portions relating to the Twitter and Google accounts, the Memes Facebook Page, and Expelled Members Powell, Fishbaugh, and Sullivan, but was with leave to amend as to the portions of the claim relating to the Chapter Facebook Page and Johnson. ER 40-42. The District Court also granted leave to amend the FDTRA claim. *Id.* However, The Satanic Temple did not attempt to amend these claims. Accordingly, the District Court's April 15, 2022 order resulted in dismissal of all federal claims. The District Court also dismissed the state law conversion and trespass to chattels claims as to the Chapter Facebook Page, without granting leave to amend. ER 33-37, 41.

The District's Court's order left only three surviving state law claims: the tortious interference claim and the conversion/trespass to chattels claims as to only the Memes Facebook Page and the alleged membership documents. On May 13, 2022, the Expelled Members moved to dismiss these remaining state law claims for

lack of subject matter jurisdiction. SER 145-56.[8] On January 6, 2023, the District Court dismissed the remaining state law claims for lack of subject matter jurisdiction. ER 5-9. The Satanic Temple filed a timely notice of appeal on January 24, 2023.

## IV.    This Appeal

The Satanic Temple filed its Opening Brief on April 26, 2023, seeking review of two issues: (1) the District Court's dismissal of the ACPA/cyberpiracy claim, and (2) the District Court's dismissal of the defamation claim. Opening Brief at 9.

### SUMMARY OF THE ARGUMENT

## I.    The District Court Properly Dismissed The Satanic Temple's ACPA Claim

The Satanic Temple's claim for cyberpiracy under the ACPA fails for four independent reasons, each of which is fatal to The Satanic Temple's claim.

---

[8] On November 23, 2022, over *two and a half years* after filing its original complaint, The Satanic Temple filed a Motion for Preliminary Injunction seeking, for the first time, return of the Memes Facebook Page. As the Expelled Members set forth in their response, The Satanic Temple's true purpose in filing the very belated, half-hearted motion was to continue to cause the Expelled Members to incur as many legal fees and costs as possible, as The Satanic Temple's attorney had publicly stated was his hope. SER 10-102. The Satanic Temple's motivation was underscored by the fact that it did not even bother to file a reply to its Motion for Preliminary Injunction, presumably satisfied that it had achieved its aim of causing the Expelled Members to incur substantial legal fees in responding to the Motion. The District Court ultimately dismissed the Motion for Preliminary Injunction as moot when it dismissed the remaining state law claims for lack of subject matter jurisdiction. ER 5-9.

First, The Satanic Temple's cyberpiracy claim fails because it does not involve a "domain name" as required by the ACPA. Rather, The Satanic Temple's claim arises from the post-domain portion of the Chapter Facebook Page's uniform resource locator ("URL"), which is not actionable under the ACPA.

Next, The Satanic Temple's ACPA claim fails because, even if the post-domain portion of the Chapter Facebook Page's URL could serve as grounds to invoke the ACPA, Facebook is not a "domain registration authority." For a URL to constitute a "domain," it must be registered by a domain name registrar. No such registrar having registered the Chapter Facebook Page URL, The Satanic Temple's ACPA claim fails.

The Satanic Temple's ACPA claim also fails because The Satanic Temple has not (and cannot) alleged that the Expelled Members were the domain name registrant or the registrant's authorized licensee, which is required to state a claim under 15 U.S.C. § 1125(d)(1)(A), as The Satanic Temple has attempted here.

Finally, the Satanic Temple failed to plead that the Expelled Members had a bad faith intent to profit from their alleged use of the Chapter Facebook Page. A bad faith intent to profit is an element of an ACPA cyberpiracy claim. 15 U.S.C. § 1125(d)(1)(A)(ii).

16

## II. The District Court Properly Dismissed The Satanic Temple's Defamation Claim

The First Amendment's Free Exercise Clause forbids courts from delving into and defining the beliefs, tenets, and practices of any religious organization. The First Amendment's Establishment Clause prohibits a government (including the courts) from supporting or endorsing a religion. The Satanic Temple agrees that, because it is a self-professed religious organization, the Free Exercise Clause prohibits courts from interpreting and defining its beliefs, tenets, and practices, as the District Court held would be required to resolve the defamation claim. The Satanic Temple proposes a radical and unsupported alternative that would require courts to violate the Establishment Clause by supporting its beliefs. Specifically, and without any supporting authority, The Satanic Temple argues that when a religious organization such as The Satanic Temple asserts a defamation claim against dissenting members, the religious organization should be the sole arbiter of the truth or falsity of the dissenting members' statements. The First Amendment forbids The Satanic Temple from stepping into the shoes of the court and jury, turning courts into The Satanic Temple's enforcement arm in its quest to silence dissenting members. In addition to offending the First Amendment, The Satanic Temple's proposal would violate established defamation law by denying defendants the ability to assert truth as a defense. It would also unjustly guarantee that The Satanic Temple, as the sole arbiter of truth and falsity, would succeed on all defamation claims asserted against

17

dissenting members or others, including the press. The Court must reject this unsupported and inequitable approach and uphold the District Court's correct application of the law in dismissing the defamation claim.

## STANDARD OF REVIEW

The Expelled Members agree that the standard of review of the District Court's decisions dismissing The Satanic Temple's claims is *de novo*. *Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000).

## ARGUMENT

### I.    The Satanic Temple Failed to State a Cyberpiracy Claim under the ACPA

The District Court's well-reasoned dismissal of The Satanic Temple's ACPA cyberpiracy claim should be affirmed. As the District Court correctly found, The Satanic Temple's ACPA claim contains a fundamental flaw—it is not based on a domain name and thus is not covered by the ACPA. ER 119-23; ER 43-46. The Satanic Temple has no cure for this fatal defect.

Dismissal of the ACPA claim is required for three additional reasons.[9] First, the URL that is the subject of The Satanic Temple's claim was not registered with a domain name authority. Accordingly, it does not meet the definition of "domain" under the ACPA. Next, The Satanic Temple does not allege that the Expelled

---

[9] Although not relied upon by the District Court, a "reviewing count may affirm . . . dismissal upon any basis fairly supported by the record." *Burgert*, 200 F.3d at 663.

Members were registrants of the "domain" at issue (or the registrant's authorized licensee) as required by the ACPA. Finally, The Satanic Temple failed to allege that the Expelled Members had a bad faith intent to profit from their use of the Chapter Facebook Page. Any one of these reasons require dismissal. All apply.

### A.     The ACPA

"The paradigmatic harm that the ACPA was enacted to eradicate" is "the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark." *Lamparello v. Falwell*, 420 F.3d 309, 318-19 (4th Cir. 2005) (quoting *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004)). "The Act was also intended to stop the registration of multiple marks with the hope of selling them to the highest bidder." *Id.* To prevail on an ACPA claim, a plaintiff must establish: (1) defendants registered, trafficked in, or used a domain name; (2) that was identical or confusingly similar to plaintiff's mark; (3) plaintiff's mark, at the time defendants registered their domain name, was distinctive; and (4) defendants committed these acts with a bad faith intent to profit from plaintiff's mark. 15 U.S.C. § 1125(d)(1)(A); *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010) ("To prevail on a cyberpiracy claim, a plaintiff must prove that '(1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acts with 'bad faith

intent to profit from that mark.'") (quoting 15 U.S.C. § 1125(d)(1)(A)). Under the ACPA, "[a] person shall be liable for using a domain name under subparagraph (A) only if that person is the domain name registrant or that registrant's authorized licensee." 15 U.S.C. § 1125(d)(1)(D).

### B. The District Court Correctly Found that The Satanic Temple's ACPA Claim Fails Because it Does not Involve a Domain Name

The District Court correctly found that The Satanic Temple's ACPA claim failed as a matter of law because it does not involve a domain name as required by the ACPA. ER 44-46. Relying solely on its own interpretation of the ACPA, The Satanic Temple argues that the District Court erred and should have found that the term "domain name" includes the alphanumeric address for a Facebook page. Opening Brief at 17. However, The Satanic Temple's interpretation is not supported by the ACPA, its legislative history, or case law. As the District Court correctly found and as argued by the Expelled Members (SER 200-13), numerous courts have defined a "domain name" as consisting of only two parts: a "top-level" domain and a "second-level" domain. *Id.* (quoting *Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 698 (9th Cir. 2010)). The top-level domain ("TLD") includes the portion of the domain name to the right of the period, such as .com, .gov, .net, etc. *Id.* Each TLD is divided into second-level domains identified by the designation to the left of the period, such as "example" in "example.com" or "example.net." *Id.* The Court further correctly found that *only* these two domain levels are covered by the ACPA, and no

20

court has found that the ACPA applies to any URL component beyond top-level and second-level domains. ER 45 (citing *GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F. Supp. 2d 712, 725 (N.D. Tex. 2010) ("The court has found no case, and [plaintiff] has cited none, that holds that a portion of a web address other than a second or top level domain constitutes a 'domain name' within the meaning of the ACPA.")); *see also, e.g.*, *Jones v. Hollywood Unlocked, Inc.*, No. 2:21-cv-07929-MEMF(PVCx), 2022 WL 18674459, at *25 (C.D. Cal., Nov. 22, 2022) (dismissing ACPA claim based on the post-domain portion of a Twitter handle) ("As previously stated, a domain name signifies a source of origin. Analyzing the website in question—www.twitter.com/themahnetea—the domain name is restricted to the TLD or 'twitter.com.' The 'themahnetea' instead qualifies as the 'post-domain name path' or as a 'vanity URL.'") (internal footnotes and citations omitted).

The District Court also noted that, as argued by the Expelled Members (SER 200-13), the ACPA's legislative history supports the conclusion that the term "domain name" in the ACPA refers only to second-level domain names and not portions of a post-domain path. ER 46; SER 212-13. The legislative history upon which the District Court relied includes comments by the ACPA's co-sponsor Senator Patrick Leahy:

> Domain names are narrowly defined to mean alphanumeric designations registered with or assigned by domain name registrars or registries, or other domain name registration authority as part of an electronic address on the Internet. *Since registrars only register second*

*level domain names, this definition effectively excludes file names, screen names, and e-mail addresses and, under current registration practice, applies only to second level domain names.*

SER 212-13 (145 Cong. Rec. 14986, 15025 (1999) (emphasis added)).

Applying this authority here, the District Court correctly found that The Satanic Temple's claim is not actionable under the ACPA because it is based on a *post*-domain portion of its Facebook URL. The URL at issue is https://www.facebook.com/**TheSatanicTempleWashington**/"). The bolded portion of the URL is the post-domain path at issue. ER 45. This part of the URL was not issued by a Domain Name System ("DNS") registry or included on a DNS registry and is not part of the top-level or second-level domain. ER 45-46. The District Court held that because the ACPA does not apply to this post-domain alphanumeric electronic address that designates a Facebook page, The Satanic Temple's ACPA claim fails as a matter of law. *Id.* Because The Satanic Temple offers no substantive authority that suggests a different result, the District Court's correct decision must be upheld.[10]

---

[10] The Satanic Temple cites to *H-D U.S.A., LLC v. SunFrog, LLC*, No. 17-CV-711-JPS, 2017 WL 3261709, at *1 (E.D. Wis., July 31, 2017) on page 21 of its Opening Brief. This case provides no guidance here because it does not involve a cyberpiracy claim under the ACPA, but rather trademark infringement claims ("This is a trademark infringement case brought by Plaintiffs, collectively referred to as 'Harley-Davidson,' against Defendants, collectively referred to as 'SunFrog.'"). Although The Satanic Temple asserted a trademark infringement claim in its Second Amended Complaint, that claim was dismissed (ER 37-42) and The Satanic Temple has not appealed it.

## C.     Facebook is not an "Other Domain Registration Authority"

The Satanic Temple notes that to qualify as a domain name, a domain name must be registered by a domain name registrar. Opening Brief at 22 (citing 15 U.S.C. § 1127) ("The term 'domain name' means any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet."). The Satanic Temple then argues that Facebook should be considered an "other domain registration authority." *Id.* The District Court correctly rejected this argument. ER 45-46. First, the argument is a red herring as, even if it had merit (which it does not), it would not save The Satanic Temple's ACPA claim because that claim relates to a post-domain path and not a domain name. *See* Section I.B, *supra*. Second, Facebook is not an "domain registration authority."

The Satanic Temple's argument that Facebook should be deemed a domain registration authority reflects its fundamental misunderstanding of how the Domain Name System ("DNS") works. In summary, the DNS is overseen by an entity called the Internet Corporation for Assigned Names and Numbers ("ICANN").[11] SER 200-

---

[11] "The Court may take judicial notice of a fact, such as the role of ICANN, which is not subject to 'reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Vizer v. VIZERNEWS.COM*, 869 F. Supp. 2d 75, 77 n.3 (D.D.C. 2012) (citing Fed. R. Evid. 201(b) and *United States v. Philip Morris USA, Inc.*, No. 99-2496, 2004 WL 5355971, at *1-*2 (D.D.C., Aug. 2, 2004)).

13. ICANN is a not-for-profit corporation formed in 1998 and selected by the U.S. Department of Commerce to administer the internet DNS with input from a governmental advisory committee, in which the Department of Commerce participates. *Vizer v. VIZERNEWS.COM*, 869 F. Supp. 2d 75, 77-78 (D.D.C. 2012) (citing *ICANN*, National Telecommunications & Information Administration, U.S. Department of Commerce, http://www.ntia.doc.gov/category/icann). The DNS links user-friendly names, such as "uscourts.gov," to unique numeric addresses that identify servers connected to the internet. *Id.* at 78 (citing *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1159 (9th Cir. 2010) and *Domain Name System*, National Telecommunications & Information Administration, U.S. Department of Commerce, http://www.ntia.doc. gov/category/domain-name-system (describing the domain name system and ICANN)). SER 203-06.

ICANN itself is not a registrar. Instead, it coordinates the DNS by entering into registry agreements with Internet registries. *Vizer*, 869 F. Supp. 2d at 78. Each top-level domain—such as .com, .net, or .org—is operated by one of the authorized registries that maintains information on each registered domain name and ensures that each name registered in its domain is unique. Registries also offer a variety of services, such as permitting consumers to check if a particular name within its domain has been registered and, if so, the expiration date for such registration. *Id.* For example, Verisign, Inc. ("Verisign") is the registry for ".com" and ".net"

domains and is responsible for registering names on these domains in accordance with its Registry Agreement with ICANN. *Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers*, 296 F. Supp. 2d 1159, 1160 (C.D. Cal. 2003). Because Verisign is prohibited from accepting requests for domain names directly from consumers, Verisign only accepts and registers domain names received from registrars. *Id.* at 1160; *Vizer,* 869 F. Supp. 2d at 78 (citing *What Does ICANN Do?,* ICANN, http://www.icann.org/en/about/participate/what); *see also Office Depot, Inc. v. Zuccarini,* 596 F.3d 696, 699 (9th Cir. 2010).

The Satanic Temple argues that Facebook, in its role as a social media company, should be considered an "other domain name registration authority" because Facebook users register their Facebook accounts with Facebook. Opening Brief at 22-23. This argument fails to acknowledge or understand that a "registration authority" means something very specific in the DNS context: it is a registry under a registry agreement with ICANN or an authorized registrar for that registry that registers domain names with the registry. The Satanic Temple has alleged no facts that Facebook, as a social media provider, operates as an authorized DNS registration authority, *i.e.*, that Facebook has entered a registry agreement with ICANN or that it registers domain names with an authorized DNS registry, much less that it has registered the particular URL at issue here. That Facebook's users register their Facebook accounts with Facebook is irrelevant—that has nothing to do

with the registration of domain names under the DNS process overseen by ICANN. In other words, without any supporting authority, The Satanic Temple is proposing an entirely new and different system from the DNS, whereby social media companies who do not provide any DNS services—but instead provide social media accounts to their users—should somehow be considered "domain name registration authorities" under the ACPA. As the District Court found, this proposition is entirely unsupported. ER 46 ("The court agrees with Defendants that TST's novel argument that Facebook should be considered a 'domain name registry' is not supported by existing caselaw or by the ACPA's legislative history.").[12]

Indeed, the ACPA's legislative history underscores that 15 U.S.C. § 1127 refers only to authorized DNS registries who register second-level domain names. Again, ACPA co-sponsor Senator Patrick Leahy's comments on the bill are illuminating:

---

[12] The Satanic Temple's misunderstanding of how domain names work is reflected in its citation on page 21 of its Opening Brief to *Wilens v. Doe Defendant No. 1,* 2015 WL 5542529 (N.D. Cal. 2018). The Satanic Temple argues that because the WordPress websites in *Wilens* can be grounds for cyberpiracy liability then Facebook pages should qualify, too. However, The Satanic Temple fails to address that unlike Facebook pages, WordPress registers domain names (*i.e.*, the alphanumeric designations that are listed before the ".com") with ICANN. *See, e.g., Murtagh v. Pardo,* No. CV1505204MMMFFMX, 2015 WL 13828625, at *1 (C.D. Cal. Aug. 17, 2015) (noting that WordPress was the ICANN registrar for the website at issue); *see also* https://wordpress.com/support/domains/domain-registration-agreements/. Nowhere does The Satanic Temple allege (nor could it) that Facebook is an authorized DNS registration authority with ICANN.

Domain names are narrowly defined to mean alphanumeric designations registered with or assigned by domain name registrars or registries, or other domain name registration authority as part of an electronic address on the Internet. *Since registrars only register second level domain names, this definition effectively excludes file names, screen names, and e-mail addresses and, under current registration practice, applies only to second level domain names.*

*The terms "domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name" in Section 3002(a) of the Act, amending 15 U.S.C. 1125(d)(2)(a), is intended to refer only to those entities that actually place the name in a registry, or that operate the registry,* and would not extend to other entities such as the ICANN or any of its constituent units, that have some oversight or contractual relationship with such registrars and registries. *Only these entities that actually offer the challenged name, placed it in a registry, or operate the relevant registry are intended to be covered by those terms.*

SER 212-13 (145 Cong. Rec. 14986, 15025 (1999) (emphases added)).

If The Satanic Temple's unsupported proposal to expand the ACPA to social media companies were accepted, the ACPA would suddenly expand well beyond the DNS and registered domain names. Under The Satanic Temple's framework, the ACPA would apply to potentially billions[13] of social media accounts that are not registered with the DNS. Such a vast shift in the scope of the ACPA should be left to Congress, not the courts. The District Court correctly held that Facebook is not a domain registration authority and The Satanic Temple offers no valid grounds why this correct decision should not be affirmed.

---

[13] The Court may take judicial notice that Facebook alone has over three billion users. https://about.fb.com/company-info/. SER 206 at n.3.

**D.    The Satanic Temple's ACPA Claim Also Fails as a Matter of Law Because The Satanic Temple did not Allege That the Expelled Members Were the Domain Name Registrants**

In addition to the fatal flaw of not involving a domain name, The Satanic Temple's failure to allege that the Expelled Members were domain name registrants provides further grounds for affirming dismissal of the claim. The ACPA provides that "[a] person shall be liable for using a domain name under subparagraph (A) only if *that person is the domain name registrant or that registrant's authorized licensee.*" 15 U.S.C. § 1125(d)(1)(D) (emphasis added). The Satanic Temple brings its cyberpiracy claim under 15 U.S.C. § 1125(d)(1)(A), so this requirement applies. ER 142. In its Complaint, The Satanic Temple did not allege that the Expelled Members were "the domain name registrant or that registrant's authorized licensee." *See* ER 142. Rather, The Satanic Temple alleged that "[i]n October of 2014, the Washington Chapter business page was created exclusively for the benefit of TST in its efforts to disseminate information for what was then the Seattle Chapter." ER 134 at ¶ 23. Because The Satanic Temple failed to allege that the Expelled Members were "the domain name registrant or that registrant's authorized licensee," The Satanic Temple failed to state a claim upon which relief could be granted. *Bird v. Parsons*, 289 F.3d 865, 881 (6th Cir. 2002) ("liability for *using* a domain name can only exist for the registrant or that person's authorized licensee") (emphasis in original); *see also 1-800-411-I.P. Holdings, LLC v. Georgia Injury Centers, LLC*,

28

71 F. Supp. 3d 1325, 1328-29 (S.D. Fla. 2014). For this reason, too, this Court should affirm the District Court's dismissal of the ACPA claim.

### E. The Satanic Temple Failed to Plead a Bad Faith Intent to Profit

Yet one more ground mandates dismissal of The Satanic Temple's ACPA claim—The Satanic Temple failed to plead that the Expelled Members had a bad faith intent to profit from their use of the Chapter Facebook Page. *See* ER 142. A plaintiff can only prevail on an ACPA claim if it can prove, *inter alia*, a bad faith intent to *profit* on the part of the defendant in the registration of its domain names, and that the parties' domain names are confusingly similar. 15 U.S.C. § 1125(d)(1)(A); *see also, e.g.*, *Fifth Ave. of Long Island Realty Assocs. v. Caruso Mgmt. Co.*, 718 F. Supp. 2d 292, 313 (E.D.N.Y. 2010); *Sporty's Farm, LLC v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 497-99 (2d Cir. 2000); *Dudley v. HealthSource Chiropractic, Inc.*, 585 F. Supp. 2d 433, 438 (W.D.N.Y. 2008). The Satanic Temple did not plead that the Expelled Members had a bad faith intent to profit from their use of the Chapter Facebook Page. The Satanic Temple alleges that the Expelled Members used the allegedly misappropriated Facebook page to post critical commentary about The Satanic Temple. *See, e.g.,* ER 139 at ¶ 41. Nowhere, however, does The Satanic Temple allege that the Expelled Members had any intent to use the Facebook page for any commercial gain or had any intent to obtain a profit of any sort from the Facebook page. Absent the element of a bad faith intent to profit,

The Satanic Temple's cyberpiracy claim fails as a matter of law and dismissal of the claim was required on this ground as well. *See, e.g. Carl v. BernardJcarl.Com*, 409 F. App'x 628, 630 (4th Cir. 2010) (upholding dismissal of cyberpiracy claim where the defendant did not use the disputed domain name with intent to profit); *Sabin v. Curt Mfg. Co.*, No. CV-08-1852-PHX-SRB, 2009 WL 10673588, at *7 (D. Ariz., May 4, 2009) (dismissing cyberpiracy claim for failing to adequately allege bad faith intent to profit).

## II. The District Court Correctly Dismissed the Defamation Claim

### A. The District Court Correctly Applied the Ecclesiastical Abstention Doctrine to Dismiss the Defamation Claim

The District Court correctly found that The Satanic Temple's defamation claim, which asserts that the Expelled Members "falsely ascrib[ed] extremist ideologies and affiliations to T[he Satanic Temple]," would require the District Court to delve into The Satanic Temple's tenets, beliefs, and practices. ER 127-29; ER 47-48. A defamation claim necessarily requires a court or jury to determine if the alleged defamatory statement is false as a required element of defamation. *Id.* (citing *Herron v. KING Broad. Co.*, 112 Wn. 2d 762, 768, 776 P.2d 98 (Wash. 1989). Similarly, it has long been established in Washington that truth is a complete defense to a claim for defamation, thus requiring a court to consider the defendant's defense that the statements were true. *Jolly v. Fossum*, 59 Wn. 2d 20, 24, 365 P.2d 780 (Wash. 1961) ("Truth, as we have said too often to require citation, is a complete

defense in an action of this type [defamation].”). Therefore, as the District Court correctly found, to determine if the Expelled Members' statements in the Chapter Facebook Page posts about The Satanic Temple's beliefs, tenets, and practices were true or false, as required in a defamation claim, the court could not avoid delving into and defining The Satanic Temple's beliefs, tenets, and practices.

The District Court could not engage in this analysis without running afoul of the First Amendment: “That would require the Court or jury to define the beliefs held by The Satanic Temple and to determine that ableism, misogyny, racism, fascism, and transphobia fall outside those beliefs. The Court cannot do that without violating the First Amendment.” ER at 128-29; ER 47-48. The District Court's holding is correct and, as discussed below, well supported by law.

The First Amendment includes two clauses that separate the government from religion: the Establishment Clause and the Free Exercise Clause. “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.” *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, ___ U.S. ___, 140 S. Ct. 2049, 2060-61, 207 L. Ed. 2d 870 (2020) (summarizing both the Establishment Clause and the Free Exercise Clause). Among other things, the First Amendment's religion clauses protect the right of churches and other religious institutions to decide matters “of faith and doctrine” without government intrusion. *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 186, 132 S. Ct.

694, 181 L. Ed. 2d 650 (2012) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952)). "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion. The First Amendment outlaws such intrusion." *Id.*

One way that courts uphold the Free Exercise Clause is through the ecclesiastical or ministerial abstention doctrine, pursuant to which courts defer to religious organization's internal management decisions that are essential to the institution's central mission. *Our Lady of Guadalupe*, 140 S. Ct. at 260. The doctrine does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to challenges to their internal management decisions that are essential to the institution's central mission. *Id.* The ecclesiastical abstention doctrine is a defensive doctrine. Religious organizations may use the doctrine against plaintiffs seeking to challenge the church's authority to manage its internal affairs, such as hiring and firings of its ministers or employees. *Id.* For example, the ecclesiastical abstention doctrine prevents courts from interfering in a challenge to a church's decision to remove a bishop or minister pursuant to the church's internal rules and policies. *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 709, 96 S. Ct. 2372, 2380, 49

L. Ed. 2d 151 (1976) (religious controversy surrounding a church's removal of its bishop was not proper subject of civil court inquiry, and the civil court must accept ecclesiastical decisions of church tribunals as it finds them). Similarly, the doctrine can be used defensively *against claims* brought against a church. *Our Lady of Guadalupe*, 140 S. Ct. at 2060-61 (abstention doctrine can be used defensively to prevent employment law claims by employees of a Catholic school).

Pursuant to these principles, case law is clear that when presented with a defamation claim involving a religious organization's beliefs, tenets, or practices, the ecclesiastical abstention doctrine requires the court to dismiss the claim, as the District Court did here. *See, e.g., Hyung Jin Moon v. Hak Ja Moon,* 431 F. Supp. 3d 394, 413 (S.D.N.Y. 2019), *aff'd,* 833 F. App'x 876 (2d Cir. 2020) ("Because the Court may not, consistent with the First Amendment, pass upon the truth or falsity of statements concerning plaintiff's or Mrs. Moon's purported religious standing, plaintiff's remaining defamation claim must be dismissed."); *Kavanaugh v. Zwilling*, 997 F. Supp. 2d 241, 250 (S.D.N.Y. 2014), *aff'd*, 578 F. App'x 24 (2d Cir. 2014) ("[W]here a court or jury would have to determine the truth of the defendants' statements . . . and, in doing so, would examine and weigh competing views of church doctrine, the result is entanglement in a matter of ecclesiastical concern that is barred by the First Amendment.") (internal quotation marks omitted); *Hartwig v. Albertus Magnus Coll.*, 93 F. Supp. 2d 200, 219 (D. Conn. 2000) (dismissing

defamation claim where review of the claim would require the court to delve into and weigh competing views of church doctrine); *Hubbard v. J Message Grp. Corp.*, 325 F. Supp. 3d 1198, 1221 (D.N.M. 2018) (plaintiff's defamation claim against religious organization barred by the First Amendment); *Klagsbrun v. Va'ad Harabonim of Greater Monsey*, 53 F. Supp. 2d 732, 741 (D.N.J. 1999), *aff'd sub nom. Klagsbrun v. Vaad Harabonm of Greater Monsey*, 263 F.3d 158 (3d Cir. 2001) (plaintiff's defamation claim against association of Orthodox Jewish rabbis barred by First Amendment).

The Satanic Temple offers no viable grounds for disturbing the District Court's decision that the ecclesiastical abstention doctrine prevented it from deciding the defamation claim. The Satanic Temple does not dispute that its defamation claim turns on interpretation of The Satanic Temple's religious beliefs, tenets, and practices. Opening Brief at 25 ("The original complaint asserted defamation liability for Defendants' provably false statements about TST's tenets . . .."). The Satanic Temple also agrees that "[u]nder the Free Exercise Clause, church doctrine is to be resolved by the church, not by the government (courts included)." *Id.* (citing *Our Lady of Guadalupe*, 140 S. Ct. at 2055). Thus, The Satanic Temple agrees that the First Amendment prohibited the District Court from delving into its beliefs, tenets, and practices, despite that its defamation claim turns on exactly those

issues. *Id.* at 25 (stating that allegedly defamatory statements are "about TST's tenets").

The Satanic Temple proposes to overcome the First Amendment's bar to its defamation claim by creating a novel, unsupported, and self-serving new doctrine. The Satanic Temple suggests that it be allowed to step into the shoes of the court and jury to become the sole arbiter of defamation claims against its expelled members. Specifically, without any supporting authority, The Satanic Temple proposes that it—and it only—decide whether the Expelled Members' statements abouts its beliefs or tenets were true or false:

> When a defamation claim turns on application of church doctrine, courts and juries are bound to apply the definition given by the church and may *not* consider a competing definition.

Opening Brief at 28 (emphasis in original). In other words, The Satanic Temple proposes that when it invokes a court's power against dissenting members by filing a defamation claim based on their views of the church's beliefs, The Satanic Temple should be the sole arbiter of the truth or falsity of the statements at issue, without allowing the defendants to challenge its assertions. For example, if a dissenting member asserts that The Satanic Temple's fundamental tenets, including "freedom to offend," favor racism or misogyny and The Satanic Temple sues the dissenting member for defamation, The Satanic Temple believes that it should be allowed to simply assert that its beliefs do not favor these ideologies. The analysis would end

there. Under The Satanic Temple's proposed new doctrine, the dissenting member would not be allowed to offer any evidence that the statements were actually true. Instead, the court would be bound to simply accept The Satanic Temple's characterization of its beliefs and rule accordingly, ensuring that The Satanic Temple would always succeed in defamation claims—or any claim relating to religious doctrine—it brings against dissenting members.

The District Court correctly rejected this argument. ER 47-48. The Satanic Temple's proposal would turn First Amendment law on its head, requiring courts to blindly accept a religious organization's fiat on its own defamation claims, resulting in the court becoming a de facto enforcement arm the church. The First Amendment's Establishment Clause prohibits such government support of a religion. *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 668, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970) (The First Amendment's Establishment Clause bars all government "sponsorship, financial support, [or] active involvement . . . in religious activity," while the second Clause, the Free Exercise Clause, bars all "governmental restraint on religious practice.").

The Satanic Temple's proposal also improperly turns the ecclesiastical abstention doctrine from a shield into a sword. Rather than using the doctrine defensively to protect its internal management decisions from a court's interference as envisioned by the Free Exercise Clause, The Satanic Temple asserts that it should

be allowed to use the doctrine as a sword by which it employs courts to affirmatively impose its views of its beliefs, tenets, and practices on dissenting members. In other words, instead of asking courts to step aside from matters involving a religious organization's beliefs, tenets, or practices, The Satanic Temple is inviting courts to become directly involved in religious disputes by imposing The Satanic Temple's views of its beliefs and practices on dissenting members. The Satanic Temple cites no authority in support of this novel concept and the Expelled Members have found no cases in which a court allowed a religious organization to affirmatively wield the ecclesiastical abstention doctrine as a sword—essentially establishing a de facto blasphemy law.[14] Whether the religious organization is a plaintiff or defendant, the law must be applied consistently.[15] Pursuant to well-established First Amendment

---

[14] The Satanic Temple appears to be unique among religious organizations in its affirmative use of the court system as a method of trying to silence dissenting religious views through defamation claims. The Expelled Members have been unable to find a similar defamation case involving religious beliefs asserted by another religious organization against former members.

[15] The Satanic Temple asserts that the trial court created a "religious organization exemption" to defamation claims. Opening Brief at 27-28. To the contrary, the District Court applied the First Amendment consistently to The Satanic Temple's claim in the same way other courts have applied the First Amendment to bar defamation claims brought against religious organizations. The Satanic Temple is proposing a separate rule for religious organizations by suggesting that when the religious organization is the plaintiff and asserts a defamation claim against a dissenting member, the religious organization should be allowed to control the truth/falsity analysis, while dissenting members would not receive that same benefit. There is no such special privilege for religious organizations under the First Amendment or defamation law.

case law, the Court must uphold the District Court's well-reasoned and correct

decision to dismiss the defamation claim.[16]

### B.  In the Alternative, Dismissal of the Defamation Claim Should be Upheld for Lack of Subject Matter Jurisdiction

The District Court's dismissal of the defamation claim pursuant to the First

Amendment was correct and should be affirmed. Alternatively, The Satanic

---

The Satanic Temple also cites a defamation case it brought against a Newsweek Magazine reporter for allegedly defamatory statements in an article, including a statement regarding The Satanic Temple's harassment of the Expelled Members in this suit through its assertion of its defamation claim against Expelled Members. The Southern District of New York dismissed the defamation claim against the reporter. *Satanic Temple, Inc. v. Newsweek Mag. LLC*, No. 1:22-CV-1343 (MKV), 2023 WL 2403136, at *9-*10 (S.D.N.Y., Mar. 8, 2023) (The Satanic Temple failed to plausibly allege that statements in a magazine article were defamatory by implying that the organization harassed dissenting former members by bringing frivolous lawsuits against them, and thus failed to state a claim against the magazine and journalist for libel under New York law). While this case illustrates that The Satanic Temple frequently brings defamation claims, it contains no First Amendment issues or analysis and thus offers no guidance here.

[16] The Satanic Temple also argues that the District Court should have applied the mixed opinion framework for the defamation claim. Opening Brief at 29 (citing Restatement (Second) of Torts § 566 (1977)). According to this Restatement section, "[a] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." In other words, the mixed opinion analysis still involves delving into the implied facts behind the statement. It is unclear how this argument changes the analysis. Even if the court had applied a mixed opinion framework, it would still be required to delve into the implied facts relating to The Satanic Temple's beliefs, tenets, and practices to determine if the actionable factual statements contained false, defamatory statements about the beliefs, tenets or practices. As discussed above, the First Amendment bars the court from doing so.

Temple's defamation claim is subject to dismissal for lack of subject matter jurisdiction. After the District Court dismissed the federal claims, it found it lacked jurisdiction over the remaining state law claims because The Satanic Temple failed to satisfy the amount in controversy threshold for diversity jurisdiction. ER 5-9. The Satanic Temple asserted no additional damage from the Expelled Members' alleged defamation. Indeed, The Satanic Temple did not even plead it had suffered monetary damages from those alleged defamatory statements. ER 144-45 (seeking injunctive relief and punitive damages,[17] but no actual damages). Had the defamation claim not been dismissed for failure to state a claim, it would also be subject to dismissal for lack of subject matter jurisdiction. Thus, as an alternative ground, in the event the Court does not uphold the District Court's dismissal, it should affirm dismissal of the defamation claim for lack of subject matter jurisdiction.

### C. The Satanic Temple Failed to State a Defamation Claim against Fishbaugh and Sullivan

If this Court concludes that the First Amendment does not bar The Satanic Temple's defamation claim and that subject matter jurisdiction is available for that claim, The Satanic Temple has failed to state a defamation claim against Fishbaugh and Sullivan.

---

[17] Punitive damages are unavailable under Washington law, absent statutory authorization. *City of Seattle v. Monsanto Company*, 387 F. Supp. 3d 1141, 1163 (W.D. Wash. 2019) (citing *Steele v. Johnson*, 76 Wn. 2d 750, 751-52, 458 P.2d 889 (Wash. 1969)).

To establish a prima facie claim of defamation under Washington law, a private plaintiff must show (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages.[18] *United States Mission Corp. v. KIRO TV, Inc.*, 172 Wn. App. 767, 772, 292 P.3d 137 (Wash. Ct. App. 2013). The Satanic Temple alleged no communication by Fishbaugh or Sullivan at all, much less an unprivileged communication. ER 130-77. Accordingly, even if this Court finds that a court can entertain The Satanic Temple's defamation claim without running afoul of the First Amendment, dismissal of the defamation claim must be upheld as to Fishbaugh and Sullivan for failure to state a claim upon which relief can be granted.

## CONCLUSION

For the reasons set forth above, the Expelled Members respectfully request that the Court affirm the District Court's dismissal of The Satanic Temple's ACPA and defamation claims.

---

[18] The Expelled Members do not concede that The Satanic Temple should be considered a private plaintiff for purposes of its defamation claim.

Respectfully Submitted,

Dated:  June 26, 2023.                    **ARETE LAW GROUP PLLC**

By:     */s/ Jeremy E. Roller*
        Jeremy E. Roller, WSBA No. 32021
        Lisa Herb, WSBA No. 23161
        Arete Law Group PLLC
        1218 Third Avenue, Suite 2100
        Seattle, WA 98101
        (206) 428-3250
        jroller@aretelaw.com

        *Attorneys for David Alan Johnson,*
        *Leah Fishbaugh, Mickey Powell, and*
        *Nathan Sullivan*

41

## STATEMENT OF RELATED CASES

The undersigned counsel for Appellees David Alan Johnson, Leah Fishbaugh, Mickey Powell, and Nathan Sullivan certifies under Ninth Circuit Rule 28-2.6 that he is unaware of any related cases pending in this Court.

Dated: June 26, 2023.

**ARETE LAW GROUP PLLC**

By:    */s/ Jeremy E. Roller*
Jeremy E. Roller, WSBA No. 32021
Lisa Herb, WSBA No. 23161
Arete Law Group PLLC
1218 Third Avenue, Suite 2100
Seattle, WA 98101
(206) 428-3250
jroller@aretelaw.com

*Attorneys for David Alan Johnson,*
*Leah Fishbaugh, Mickey Powell, and*
*Nathan Sullivan*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,349 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: June 26, 2023.

**ARETE LAW GROUP PLLC**

By: _/s/ Jeremy E. Roller_
Jeremy E. Roller, WSBA No. 32021
Lisa Herb, WSBA No. 23161
Arete Law Group PLLC
1218 Third Avenue, Suite 2100
Seattle, WA 98101
(206) 428-3250
jroller@aretelaw.com

*Attorneys for David Alan Johnson,*
*Leah Fishbaugh, Mickey Powell, and*
*Nathan Sullivan*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: June 26, 2023.

**ARETE LAW GROUP PLLC**

By: <u>*/s/ Jeremy E. Roller*</u>
Jeremy E. Roller, WSBA No. 32021
Lisa Herb, WSBA No. 23161
Arete Law Group PLLC
1218 Third Avenue, Suite 2100
Seattle, WA 98101
(206) 428-3250
jroller@aretelaw.com

*Attorneys for David Alan Johnson,*
*Leah Fishbaugh, Mickey Powell, and*
*Nathan Sullivan*

# ADDENDUM A

🚩 KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted Held Unconstitutional by College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., U.S.N.J., June 23, 1999

> United States Code Annotated
>    Title 15. Commerce and Trade
>       Chapter 22. Trademarks (Refs & Annos)
>          Subchapter III. General Provisions

15 U.S.C.A. § 1125

§ 1125. False designations of origin, false descriptions, and dilution
forbidden [Statutory Text & Notes of Decisions subdivisions I to III]

Effective: October 5, 2012
Currentness

<Notes of Decisions for 15 USCA § 1125 are displayed in multiple documents.>

**(a) Civil action**

**(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

**(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

**(2)** As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

**(3)** In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

**(b) Importation**

Any goods marked or labeled in contravention of the provisions of this section shall not be imported into the United States or admitted to entry at any customhouse of the United States. The owner, importer, or consignee of goods refused entry at any customhouse under this section may have any recourse by protest or appeal that is given under the customs revenue laws or may have the remedy given by this chapter in cases involving goods refused entry or seized.

**(c) Dilution by blurring; dilution by tarnishment**

**(1) Injunctive relief**

Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

**(2) Definitions**

**(A)** For purposes of paragraph (1), a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

**(i)** The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

**(ii)** The amount, volume, and geographic extent of sales of goods or services offered under the mark.

**(iii)** The extent of actual recognition of the mark.

**(iv)** Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

**(B)** For purposes of paragraph (1), "dilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:

**(i)** The degree of similarity between the mark or trade name and the famous mark.

**(ii)** The degree of inherent or acquired distinctiveness of the famous mark.

**(iii)** The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

**(iv)** The degree of recognition of the famous mark.

**(v)** Whether the user of the mark or trade name intended to create an association with the famous mark.

**(vi)** Any actual association between the mark or trade name and the famous mark.

**(C)** For purposes of paragraph (1), "dilution by tarnishment" is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark.

**(3) Exclusions**

The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection:

**(A)** Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with--

**(i)** advertising or promotion that permits consumers to compare goods or services; or

**(ii)** identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

**(B)** All forms of news reporting and news commentary.

**(C)** Any noncommercial use of a mark.

**(4) Burden of proof**

In a civil action for trade dress dilution under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that--

**(A)** the claimed trade dress, taken as a whole, is not functional and is famous; and

**(B)** if the claimed trade dress includes any mark or marks registered on the principal register, the unregistered matter, taken as a whole, is famous separate and apart from any fame of such registered marks.

**(5) Additional remedies**

In an action brought under this subsection, the owner of the famous mark shall be entitled to injunctive relief as set forth in section 1116 of this title. The owner of the famous mark shall also be entitled to the remedies set forth in sections 1117(a) and 1118 of this title, subject to the discretion of the court and the principles of equity if--

**(A)** the mark or trade name that is likely to cause dilution by blurring or dilution by tarnishment was first used in commerce by the person against whom the injunction is sought after October 6, 2006; and

**(B)** in a claim arising under this subsection--

**(i)** by reason of dilution by blurring, the person against whom the injunction is sought willfully intended to trade on the recognition of the famous mark; or

**(ii)** by reason of dilution by tarnishment, the person against whom the injunction is sought willfully intended to harm the reputation of the famous mark.

**(6) Ownership of valid registration a complete bar to action**

The ownership by a person of a valid registration under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register under this chapter shall be a complete bar to an action against that person, with respect to that mark, that--

**(A)** is brought by another person under the common law or a statute of a State; and

**(B)(i)** seeks to prevent dilution by blurring or dilution by tarnishment; or

**(ii)** asserts any claim of actual or likely damage or harm to the distinctiveness or reputation of a mark, label, or form of advertisement.

**(7) Savings clause**

Nothing in this subsection shall be construed to impair, modify, or supersede the applicability of the patent laws of the United States.

**(d) Cyberpiracy prevention**

**(1)(A)** A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person--

**(i)** has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

**(ii)** registers, traffics in, or uses a domain name that--

**(I)** in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

**(II)** in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

**(III)** is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

**(B)(i)** In determining whether a person has a bad faith intent described under subparagraph (A), a court may consider factors such as, but not limited to--

**(I)** the trademark or other intellectual property rights of the person, if any, in the domain name;

**(II)** the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

**(III)** the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

**(IV)** the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

**(V)** the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

**(VI)** the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

**(VII)** the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

**(VIII)** the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

**(IX)** the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

**(ii)** Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.

**(C)** In any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark.

**(D)** A person shall be liable for using a domain name under subparagraph (A) only if that person is the domain name registrant or that registrant's authorized licensee.

**(E)** As used in this paragraph, the term "traffics in" refers to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration.

**(2)(A)** The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if--

**(i)** the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c); and

**(ii)** the court finds that the owner--

**(I)** is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or

**(II)** through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) by--

**(aa)** sending a notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and

**(bb)** publishing notice of the action as the court may direct promptly after filing the action.

**(B)** The actions under subparagraph (A)(ii) shall constitute service of process.

**(C)** In an in rem action under this paragraph, a domain name shall be deemed to have its situs in the judicial district in which--

**(i)** the domain name registrar, registry, or other domain name authority that registered or assigned the domain name is located; or

**(ii)** documents sufficient to establish control and authority regarding the disposition of the registration and use of the domain name are deposited with the court.

**(D)(i)** The remedies in an in rem action under this paragraph shall be limited to a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark. Upon receipt of written notification of a filed, stamped copy of a complaint filed by the owner of a mark in a United States district court under this paragraph, the domain name registrar, domain name registry, or other domain name authority shall--

**(I)** expeditiously deposit with the court documents sufficient to establish the court's control and authority regarding the disposition of the registration and use of the domain name to the court; and

**(II)** not transfer, suspend, or otherwise modify the domain name during the pendency of the action, except upon order of the court.

**(ii)** The domain name registrar or registry or other domain name authority shall not be liable for injunctive or monetary relief under this paragraph except in the case of bad faith or reckless disregard, which includes a willful failure to comply with any such court order.

**(3)** The civil action established under paragraph (1) and the in rem action established under paragraph (2), and any remedy available under either such action, shall be in addition to any other civil action or remedy otherwise applicable.

**(4)** The in rem jurisdiction established under paragraph (2) shall be in addition to any other jurisdiction that otherwise exists, whether in rem or in personam.

### CREDIT(S)

(July 5, 1946, c. 540, Title VIII, § 43, 60 Stat. 441; Pub.L. 100-667, Title I, § 132, Nov. 16, 1988, 102 Stat. 3946; Pub.L. 102-542, § 3(c), Oct. 27, 1992, 106 Stat. 3568; Pub.L. 104-98, § 3(a), Jan. 16, 1996, 109 Stat. 985; Pub.L. 106-43, §§ 3(a)(2), 5, Aug. 5, 1999, 113 Stat. 219, 220; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title III, § 3002(a)], Nov. 29, 1999, 113 Stat. 1536, 1501A-545; Pub.L. 109-312, § 2, Oct. 6, 2006, 120 Stat. 1730; Pub.L. 112-190, § 1(a), Oct. 5, 2012, 126 Stat. 1436.)

### VALIDITY OF AMENDMENT TO SUBSEC. (A)

<The United States Supreme Court, in College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, U.S.N.J. 1999, 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed. 2d 605, 51 U.S.P.Q. 2d 1065, found that the Trademark Remedy Clarification Act, Pub.L. 102-542, which amended subsec. (a) of this section to subject states to suit under this section, did not validly abrogate a state's sovereign immunity.>

Notes of Decisions (3961)

15 U.S.C.A. § 1125, 15 USCA § 1125
Current through P.L.118-6. Some statute sections may be more current, see credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 15. Commerce and Trade
Chapter 22. Trademarks (Refs & Annos)
Subchapter III. General Provisions

15 U.S.C.A. § 1127

§ 1127. Construction and definitions; intent of chapter

Effective: October 6, 2006

Currentness

In the construction of this chapter, unless the contrary is plainly apparent from the context--

The United States includes and embraces all territory which is under its jurisdiction and control.

The word "commerce" means all commerce which may lawfully be regulated by Congress.

The term "principal register" refers to the register provided for by sections 1051 to 1072 of this title, and the term "supplemental register" refers to the register provided for by sections 1091 to 1096 of this title.

The term "person" and any other word or term used to designate the applicant or other entitled to a benefit or privilege or rendered liable under the provisions of this chapter includes a juristic person as well as a natural person. The term "juristic person" includes a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law.

The term "person" also includes the United States, any agency or instrumentality thereof, or any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States. The United States, any agency or instrumentality thereof, and any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

The term "person" also includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

The terms "applicant" and "registrant" embrace the legal representatives, predecessors, successors and assigns of such applicant or registrant.

The term "Director" means the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

The term "related company" means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used.

The terms "trade name" and "commercial name" mean any name used by a person to identify his or her business or vocation.

The term "trademark" includes any word, name, symbol, or device, or any combination thereof--

**(1)** used by a person, or

**(2)** which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

The term "service mark" means any word, name, symbol, or device, or any combination thereof--

**(1)** used by a person, or

**(2)** which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown. Titles, character names, and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor.

The term "certification mark" means any word, name, symbol, or device, or any combination thereof--

**(1)** used by a person other than its owner, or

**(2)** which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter,

to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.

The term "collective mark" means a trademark or service mark--

**(1)** used by the members of a cooperative, an association, or other collective group or organization, or

**(2)** which such cooperative, association, or other collective group or organization has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

and includes marks indicating membership in a union, an association, or other organization.

The term "mark" includes any trademark, service mark, collective mark, or certification mark.

The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce--

**(1)** on goods when--

**(A)** it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

**(B)** the goods are sold or transported in commerce, and

**(2)** on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

A mark shall be deemed to be "abandoned" if either of the following occurs:

**(1)** When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

**(2)** When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

The term "colorable imitation" includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive.

The term "registered mark" means a mark registered in the United States Patent and Trademark Office under this chapter or under the Act of March 3, 1881, or the Act of February 20, 1905, or the Act of March 19, 1920. The phrase "marks registered in the Patent and Trademark Office" means registered marks.

The term "Act of March 3, 1881", "Act of February 20, 1905", or "Act of March 19, 1920", means the respective Act as amended.

A "counterfeit" is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.

The term "domain name" means any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet.

The term "Internet" has the meaning given that term in section 230(f)(1) of Title 47.

Words used in the singular include the plural and vice versa.

The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide

rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.


### CREDIT(S)

(July 5, 1946, c. 540, Title X, § 45, 60 Stat. 443; Pub.L. 87-772, § 21, Oct. 9, 1962, 76 Stat. 774; Pub.L. 93-596, § 1, Jan. 2, 1975, 88 Stat. 1949; Pub.L. 98-620, Title I, § 103, Nov. 8, 1984, 98 Stat. 3335; Pub.L. 100-667, Title I, § 134, Nov. 16, 1988, 102 Stat. 3946; Pub.L. 102-542, § 3(d), Oct. 27, 1992, 106 Stat. 3568; Pub.L. 103-465, Title V, § 521, Dec. 8, 1994, 108 Stat. 4981; Pub.L. 104-98, § 4, Jan. 16, 1996, 109 Stat. 986; Pub.L. 106-43, §§ 4(c), 6(b), Aug. 5, 1999, 113 Stat. 219, 220; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title III, § 3005, Title IV, § 4732(b)(1)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A-550, 1501A-583; Pub.L. 109-312, § 3(e), Oct. 6, 2006, 120 Stat. 1733.)


Notes of Decisions (505)

15 U.S.C.A. § 1127, 15 USCA § 1127
Current through P.L.118-6. Some statute sections may be more current, see credits for details.

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    4

# ADDENDUM B



# Congressional Record

**United States**
*of America*

PROCEEDINGS AND DEBATES OF THE *106th* CONGRESS, FIRST SESSION

| *Vol. 145* | WASHINGTON, FRIDAY, NOVEMBER 19, 1999 | *No. 165* |

## Senate

The Senate met at 10 a.m. and was called to order by the President pro tempore [Mr. THURMOND].

---

### REVISED NOTICE—NOVEMBER 17, 1999

If the 106th Congress, 1st Session, adjourns sine die on or before November 18, 1999, a final issue of the Congressional Record for the 106th Congress, 1st Session, will be published on December 3, 1999, in order to permit Members to revise and extend their remarks.

All material for insertion must be signed by the Member and delivered to the respective offices of the Official Reporters of Debates (Room HT–60 or S–123 of the Capitol), Monday through Friday, between the hours of 10:00 a.m. and 3:00 p.m. through December 1. The final issue will be dated December 3, 1999, and will be delivered on Monday, December 6, 1999.

If the 106th Congress does not adjourn until a later date in 1999, the final issue will be printed at a date to be announced.

None of the material printed in the final issue of the Congressional Record may contain subject matter, or relate to any event that occurred after the sine die date.

Senators' statements should also be submitted electronically, either on a disk to accompany the signed statement, or by e-mail to the Official Reporters of Debates at ''Records@Reporters''.

Members of the House of Representatives' statements may also be submitted electronically by e-mail or disk, to accompany the signed statement, and formatted according to the instructions for the Extensions of Remarks template at http://clerkhouse.house.gov. The Official Reporters will transmit to GPO the template formatted electronic file only after receipt of, and authentication with, the hard copy, signed manuscript. Deliver statements (and template formatted disks, in lieu of e-mail) to the Official Reporters in Room HT–60.

Members of Congress desiring to purchase reprints of material submitted for inclusion in the Congressional Record may do so by contacting the Congressional Printing Management Division, at the Government Printing Office, on 512–0224, between the hours of 8:00 a.m. and 4:00 p.m. daily.

By order of the Joint Committee on Printing.

WILLIAM M. THOMAS, *Chairman.*

---

### N O T I C E

Effective January 1, 2000, the subscription price of the Congressional Record will be $357 per year, or $179 for 6 months. Individual issues may be purchased for $3.00 per copy. The cost for the microfiche edition will remain $141 per year; single copies will remain $1.50 per issue. This price increase is necessary based upon the cost of printing and distribution.

MICHAEL F. DiMARIO, *Public Printer.*

---

● This ''bullet'' symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



Printed on recycled paper.

and child poisoner created by the movie.

There is a world of difference between these sorts of sites and those which use deceptive naming practices to draw attention to their site for example, whitehouse.com, or those who use domain names to misrepresent the goods or services they offer, for instance, dellmemory.com, which may be confused with the Dell computer company.

We must also recognize certain technological realities. For example, merely mentioning a trademark is not a problem. Posting a speech that mentions AOL on my web page and calling the page aol.html, confuses no one between my page and America Online's site. Likewise, we must recognize that while the Web is a key part of the Internet, it is not the only part. We simply do not want to pass legislation that may impose liability on Internet users with e-mail addresses, which may contain a trademarked name. Nor do we want to crack down on newsgroups that use trademarks descriptively, such as alt.comics.batman.

In short, it is important that we distinguish between the legitimate and illegitimate use of domain names, and the cybersquatting legislation that we pass today does just that.

Due to the significant flaws in S. 1255, the Senate Judiciary Committee reported and the Senate passed a complete substitute to that bill. On July 29, 1999, Senator HATCH and I, along with several other Senators, introduced S. 1461, the "Domain Name Piracy Prevention Act of 1999." This bill then provided the text of the Hatch-Leahy substitute amendment that the Senate Judiciary Committee reported unanimously to S. 1255 the same day. This substitute amendment, with three additional refinements contained in a Hatch-Leahy clarifying amendment, was passed by the Senate on August 5, 1999.

This Hatch-Leahy substitute provided a better solution than the original, S. 1255, in addressing the cybersquatting problem without jeopardizing other important online rights and interests.

Following Senate passage of the bill, the House passed a version of the legislation, H.R. 3208, the "Trademark Cyberpirvacy Prevention Act", which has been modified for inclusion in the FY 2000 Omnibus Appropriations bill.

This legislation, now called the "Anti-Cybersquatting Consumer Protection Act", would amend section 43 of the Trademark Act by adding a new section to make liable for actual or statutory damages any domain name registrant, who with bad-faith intent to profit from the goodwill of another's trademark, without regard to the goods or services of the parties, registers, traffics in or uses a domain name that is identical or confusingly similar to a distinctive trademark or dilutive of a famous trademark. The fact that the domain name registrant did not compete with the trademark owner would not be a bar to recovery. This legislation also makes clear that personal names that are protected as marks would also be covered by new section 1125.

Furthermore, this legislation should not in any way frustrate the global efforts already underway to develop inexpensive and expeditious procedures for resolving domain name disputes that avoid costly and time-consuming litigation in the court systems either here or abroad. In fact, the legislation expressly provides liability limitations for domain name registrars, registries or other domain name registration authorities when they take actions pursuant to a reasonable policy prohibiting the registration of domain names that are identical or confusingly similar to another's trademark or dilutive of a famous trademark. The ICANN and WIPO consideration of these issues will inform the development by domain name registrars and registries of such reasonable policies.

Uses of infringing domain names that support liability under the legislation are expressly limited to uses by the domain name registrant or the registrant's authorized licensee. This limitation makes clear that "uses" of domain names by persons other than the domain name registrant for purposes such as hypertext linking, directory publishing, or for search engines, are not covered by the prohibition.

Other significant sections of this legislation are discussed below:

Domain names are narrowly defined to mean alphanumeric designations registered with or assigned by domain name registrars or registries, or other domain name registration authority as part of an electronic address on the Internet. Since registrars only register second level domain names, this definition effectively excludes file names, screen names, and e-mail addresses and, under current registration practice, applies only to second level domain names.

The terms "domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name" in Section 3002(a) of the Act, amending 15 U.S.C. 1125(d)(2)(a), is intended to refer only to those entities that actually place the name in a registry, or that operate the registry, and would not extend to other entities, such as the ICANN or any of its constituent units, that have some oversight or contractual relationship with such registrars and registries. Only those entities that actually offer the challenged name, placed it in a registry, or operate the relevant registry are intended to be covered by those terms.

Liability for registering a trademark name as a domain name requires "bad faith intent to profit from that mark". The following non-exclusive list of nine factors are enumerated for courts to consider in determining whether such bad faith intent to profit is proven:

(i) the trademark or the intellectual property rights of the domain name registrant in the domain name;

(ii) whether the domain name is the legal name or the nickname of the registrant;

(iii) the prior use by the registrant of the domain name in connection with the bona fide offering of any goods or services;

(iv) the registrant's legitimate noncommercial or fair use of the mark at the site accessible under the domain name;

(v) the registrant's intent to divert consumers from the mark owner's online location in a manner that could harm the mark's goodwill, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the site;

(vi) the registrant's offer to sell the domain name for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of goods or services or the registrant's prior conduct indicating a pattern of such conduct;

(vii) the registrant's intentional provision of material, false and misleading contact information when applying for the registration of the domain name, intentions, failure to maintain accurate information, or prior conduct indicating a pattern of such conduct;

(viii) the registrant's registration of multiple domain names that are identical or similar to or dilutive of another's trademark; and

(ix) the extent to which the mark is or is not distinctive.

Significantly, the legislation expressly states that bad faith shall not be found "in any case in which the count determines that the person believed and had reasonable grounds to believe that the case of the domain name was a false use or otherwise lawful." In other words, good faith, innocent or negligent uses of a domain name that is identical or confusingly similar to another's mark or dilutive of a famous mark are not covered by the legislation's prohibition.

In short, registering a domain name while unaware that the name is another's trademark would not be actionable. Nor would the use of a domain name that contains a trademark for purposes of protest, complaint, parody or commentary satisfy the requisite scienter requirement.

Bad-faith intent to profit is required for a violation to occur. This requirement of bad-faith intent to profit is critical since, as Professor Litman pointed out in her testimony, our trademark laws permit multiple businesses to register the same trademark for different classes of products. Thus, she explains:

Although courts have been quick to impose liability for bad faith registration, they have been far more cautious in disputes involving a domain name registrant who has a legitimate claim to use a domain name and registered it in good faith. In a number of cases,