**Case Nos. 23-35060**

---

**IN THE UNITED STATE COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

UNITED FEDERATION OF CHURCHES LLC, DBA The Satanic Temple,

*Plaintiff-Appellant,*

v.

DAVID ALAN JOHNSON, AKA ADJ; LEAH FISHBAUGH; MICKEY
MEEHAM; NATHAN SULLIVAN,

*Defendants-Appellees.*

On Appeal from the United States District Court
for Western Washington, Seattle
Case No. 2:20-cv-00509-RAJ
The Honorable Richard A. Jones

---

**APPELLEES'
SUPPLEMENTAL EXCERPTS OF RECORD
Volume 1 of 1**

---

Jeremy E. Roller, WSBA No. 32021
Lisa Herb, WSBA No. 23161
Arete Law Group PLLC
1218 Third Avenue, Suite 2100
Seattle, WA 98101
(206) 428-3250
jroller@aretelaw.com
lherb@aretelaw.com

*Attorneys for David Alan Johnson, Leah
Fishbaugh, Mickey Powell, and Nathan
Sullivan*

# INDEX OF SUPPLEMENTAL EXCERPTS OF RECORD

| Date Filed | Document | Docket No. | Page Numbers |
|---|---|---|---|
| 1/6/2023 | Order Granting Defendant's Motion to Dismiss and Denying Plaintiff's Motion for Preliminary Injunction | 48 | SER 5-9 |
| 12/12/2022 | Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction | 43 | SER 10-31 |
| 12/12/2022 | Declaration of David A. Johnson in Opposition to Plaintiff's Motion for Preliminary Injunction | 44 | SER 32-67 |
| 12/12/2022 | Declaration of Nathan Sullivan in Opposition to Plaintiff's Motion for Preliminary Injunction | 45 | SER 68-76 |
| 12/12/2022 | Declaration of Jeremy Roller In Opposition to Plaintiff's Motion for Preliminary Injunction | 46 | SER 77-102 |
| 12/12/2022 | Notice of Filing of Physical Materials with the Clerk | 47 | SER 103-105 |
| 6/10/2022 | Defendants' Reply in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction | 37 | SER 106-120 |
| 6/10/2022 | Declaration of Jeremy Roller In Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction | 38 | SER 121-144 |
| 5/13/2022 | Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction | 33 | SER 145-156 |
| 7/2/2021 | Defendants' Reply in Support of Motion to Dismiss Second Amended Complaint | 29 | SER 157-171 |
| 6/7/2021 | Defendants' Motion to Dismiss Second Amended Complaint | 27 | SER 172-199 |
| 3/29/2021 | Defendants' Opposition to Plaintiff's Motion for Reconsideration | 23 | SER 200-213 |
| 3/12/2021 | Plaintiff's Motion for Reconsideration | 21 | SER 214-221 |

Respectfully Submitted,

Dated:  June 26, 2023

**ARETE LAW GROUP PLLC**

By:  */s/ Jeremy E. Roller*
Jeremy E. Roller, WSBA No. 32021
Lisa Herb, WSBA No. 23161
Arete Law Group PLLC
1218 Third Avenue, Suite 2100
Seattle, WA 98101
(206) 428-3250
jroller@aretelaw.com
lherb@aretelaw.com

*Attorneys for David Alan Johnson,*
*Leah Fishbaugh, Mickey Powell, and*
*Nathan Sullivan*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  June 26, 2023

**ARETE LAW GROUP PLLC**

By:  */s/ Jeremy E. Roller*
Jeremy E. Roller, WSBA No. 32021
Lisa Herb, WSBA No. 23161
Arete Law Group PLLC
1218 Third Avenue, Suite 2100
Seattle, WA 98101
(206) 428-3250
jroller@aretelaw.com
lherb@aretelaw.com

*Attorneys for David Alan Johnson,*
*Leah Fishbaugh, Mickey Powell, and*
*Nathan Sullivan*

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED FEDERATION OF CHURCHES, LLC,

              Plaintiff,

     v.

DAVID ALAN JOHNSON, *et al.*,

              Defendants.

Case No. 20-cv-00509-RAJ

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## I.  INTRODUCTION

This matter comes before the Court on Defendants' Motion to Dismiss and Plaintiff's Motion for Preliminary Injunction. Dkt. ## 33, 42. For the reasons below, the Court **GRANTS** Defendants' Motion to Dismiss and **DENIES** Plaintiff's Motion for Preliminary Junction.

## II.  BACKGROUND

This case involves a dispute between Plaintiff United Federation of Churches and its former members, Defendants. Plaintiff alleges that Defendants hacked several social media accounts and began posting content critical of Plaintiff's organization. Two of the social media accounts at issue are located on Facebook—

ORDER – 1

the "Chapter" page and the "Allies" page. Dkt. # 26 at 6. Plaintiff brought federal law claims under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 and the Anti-Cybersquatting Consumer Protection Act ("ACPA"), and also brought associated state law claims.

Following two rounds of motions to dismiss, this Court dismissed Plaintiff's federal law claims and state law claims relating to the Chapter page on Facebook. Dkt. # 31 at 32. Plaintiff did not amend its complaint. Defendants now ask the Court to dismiss for lack of subject-matter jurisdiction. Dkt. # 33.

## III.   LEGAL STANDARD

### A.     FRCP 12(b)(1)

Federal courts are tribunals of limited jurisdiction and may only hear cases authorized by the Constitution or a statutory grant. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  The burden of establishing subject-matter jurisdiction rests upon the party seeking to invoke federal jurisdiction.  *Id*.  Once it is determined that a federal court lacks subject-matter jurisdiction, the court has no choice but to dismiss the suit.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## IV.   DISCUSSION

With the Court's dismissal of Plaintiff's federal claims, Defendants now argue that there is no federal question jurisdiction and the requirements for diversity jurisdiction have not been met. District courts have diversity jurisdiction over all civil actions between citizens of different states where the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a). Defendants argue that Plaintiff cannot establish either prong.

### A.     Complete diversity.

Plaintiff has established the "complete diversity" requirement. To establish

ORDER – 2

complete diversity, the citizenship of each plaintiff must be diverse from the citizenship of each defendant. LLCs, such as Plaintiff, are citizens "of every state of which its owners/members are citizens." *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). Defendants take issue with the fact that Plaintiff's Corporate Disclosure Statement failed to list the states of which its owners/members are citizens. Dkt. # 33 at 5. In response to Defendant's motion, Plaintiff filed a revised Corporate Disclosure Statement addressing this issue. Dkt. # 34. This late filing is a minor procedural mistake which does not affect this Court's subject matter jurisdiction. Neither the Court nor the parties were prejudiced by this late filing. The revised Corporate Disclosure Statement clears any ambiguity regarding complete diversity of the parties. Plaintiffs are citizens of Massachusetts, and Defendants are citizens of Washington.

## B. Amount in controversy.

Defendants facially attack Plaintiff's complaint, arguing that the complaint fails to plead facts establishing the amount in controversy. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) ("In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.").

The amount-in-controversy requirement is generally determined by the amount claimed in the complaint, and this amount controls if the complaint was made in good faith. *See St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938). Nonetheless, a district court may be justified in dismissing the action where it appears to a legal certainty that the actual claim is less than the jurisdictional amount. *Lowdermilk v. United States Bank Nat'l Assoc.*, 479 F.3d 994, 999 (9th Cir. 2007). Here, the surviving claims seek injunctive relief and common law damages relating to misappropriation of the "Allies" page on Facebook that promotes Plaintiff's organization to non-members. Dkt. # 26 at 16. The complaint specifically estimates the "loss" related to the misappropriation of the Allies page to be $1,037.52. Dkt. # 26 at 16. This is far below the required $75,000 to establish the amount in controversy. That Plaintiff also seeks

ORDER – 3

injunctive relief does not change this conclusion. *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 (9th Cir. 2002) (stating that "the amount in controversy is measured by the value of the object of the litigation" where the plaintiff seeks injunctive relief).

Nor do any other peripheral allegations nudge the complaint's stated amount-in-controversy into the realm of plausibility. Although the complaint seeks $100,000 in statutory damages, Plaintiff's statutory claims have already been dismissed. *See* Dkt. # 31 at 32. Same with Plaintiff's common law claims alleging damages for misappropriation of the "Chapter" page on Facebook. *Id*. Finally, Plaintiff's allegations regarding its losses for tortious interference with business relations are sparse. But in any event, the cumulative value of Plaintiff's lost business with Facebook does not exceed the jurisdictional minimum. *See* Dkt. # 26 at 16. Nor has Plaintiff established that punitive damages would be permitted under the applicable state law based on the conduct alleged. *See Davenport v. Mut. Ben. Health & Accident Ass'n*, 325 F.2d 785, 787 (9th Cir. 1963). For these reasons, the Court agrees with Defendants that the complaint fails to plead facts establishing the amount in controversy and **GRANTS** the Motion to Dismiss.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion to Dismiss. Dkt. # 33. Because the court lacks subject matter jurisdiction, Plaintiff's request for a preliminary injunction is rendered moot. The Court **DENIES** the motion on that basis. Dkt. # 42.

DATED this 6th day of January, 2023.

*Richard A Jones*

The Honorable Richard A. Jones
United States District Judge

ORDER – 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORDER – 5

The Honorable Richard A. Jones

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF WASHINGTON
9

10   UNITED FEDERATION OF CHURCHES,
     LLC d/b/a THE SATANIC TEMPLE,

11                                                No. 2:20-cv-00509-RAJ

12                    Plaintiff,                  **DEFENDANTS' OPPOSITION
                                                  TO PLAINTIFF'S MOTION FOR
13             v.                                 PRELIMINARY INJUNCTION**

     DAVID ALAN JOHNSON, an individual;
14   LEAH FISHBAUGH, an individual; MICKEY        NOTED ON MOTION
     MEEHAM, an individual; and NATHAN            CALENDAR:
15   SULLIVAN, an individual,                     December 16, 2022

16                    Defendants.

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ

## I. INTRODUCTION

As this Court is aware from pleadings and briefings over the last two and a half years, this case arises from a dispute between a religious organization, Plaintiff United Federation of Churches, LLC d/b/a The Satanic Temple ("The Satanic Temple" or "TST"), and four of its former members, Defendants, regarding TST's displeasure with Defendants' critical views about TST's tenets and practices. TST's Motion for Preliminary Injunction ("Motion") is part of its ongoing attempt to silence Defendants. As with many of TST's claims against Defendants that have been dismissed as a matter law, this Motion, too, lacks all merit. TST has not shown, and cannot show, the required elements for the extraordinary remedy of a preliminary injunction. For example, it cannot show that it will succeed on the merits of its common law claims that Defendants have wrongfully converted a Facebook page (the "Memes Page"[1]). Far to the contrary, TST expressly told Defendants over two and a half years ago that they could have and use the Memes Page "free and clear and we've [TST] no desire to claim it." Despite being fully aware of this fatal exculpatory evidence, TST does not even mention it in its Motion.

TST also can't show that it will suffer irreparable harm in the absence of preliminary relief. Not only did TST give Defendants express permission to have and use the Memes Page "free and clear," it waited for over **two and a half years** to bring this Motion, during which time it has been fully aware of Defendants' ongoing use of the Memes Page. This delay alone proves false any claim of imminent or irreparable harm. Moreover, TST does not assert any conversion-based damages for the alleged conversion of the Memes Page. Instead, it attempts improperly to relitigate its dismissed defamation claim by arguing that it is damaged by the content being posted on the Memes Page and in other social media.

The true purpose of TST's meritless Motion (filed the night before Thanksgiving after a two and a half year wait) is to harass Defendants and drive up their legal fees. TST knows the Defendants have limited resources to litigate this dispute and, as its attorney has publicly stated,

---

[1] In the Motion and its pleadings, TST refers to the Memes Page as the "Allies page."

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 1



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

TST is using this litigation with the hope that the attorneys' fees in this case "**squeeze[] every last penny from you living corpses**" [referring to Defendants]. Declaration of David Johnson in Opposition to Plaintiff's Motion for Preliminary Injunction ("Johnson Decl.") ¶ 18 & Ex. 6 (emphasis added). More recently, just days before filing this Motion, TST's attorney again publicly acknowledged using this litigation for the purpose of harassing Defendants, stating in a public Tweet:

> **Are these fuckwits still talking about me?** Grow up and file an answer so I can get at your financial records. **I'm coming for you.** Tell the judge on me again, I double dare you.

*Id.* ¶ 20 & Ex. 8 (emphases added).[2] Given TST's own blatant, public statements of an improper purpose, it is impossible to conclude other than that TST is improperly using this litigation to harass Defendants until they are bled dry through legal fees.

Finally, this Motion is improper because Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. No. 33) is currently pending. The Court should first determine if it will retain jurisdiction over this case before deciding whether it will issue an injunction.

For these reasons and the reasons set forth below, The Satanic Temple's Motion must be denied.

## II.    FACTS

### A.    Procedural History

The crux of this lawsuit is TST's unhappiness with Defendants for posting critical comments about TST's tenets and practices on various social media. TST has filed three complaints in this case. In its original Complaint, TST asserted federal question jurisdiction arising from federal claims and supplemental jurisdiction over state law claims, including claims for defamation, conversion, and tortious interference. Complaint (Dkt. No. 1). This Court granted

---

[2] The comment about "[t]ell the judge on me again" appears to be a reference to the fact that in its Reply in Support of Motion to Dismiss Defendants previously alerted the Court to TST's public statement of improper purpose through Mr. Kezhaya's statement regarding "squeez[ing] every last penny from you living corpses." Defendants' Reply in Support of Motion to Dismiss (Dkt. No. 37) at 1, 6, 12.



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

Defendants' motion to dismiss TST's Complaint for failure to state a claim upon which relief can be granted, dismissing all claims with leave to amend except for TST's defamation claim, which was dismissed with prejudice. Order Granting Motion to Dismiss (Dkt. No. 20). TST moved for reconsideration of the Court's dismissal of the defamation claim. Motion for Reconsideration (Dkt. No. 21). This Court denied that motion, reaffirming the dismissal of TST's defamation claim. Order Denying Motion for Reconsideration (Dkt. No. 30).

TST then filed a First Amended Complaint, which re-asserted certain federal claims and included three state law claims. First Amended Complaint (Dkt. No. 22). Following a pre-motion to dismiss conference, the parties stipulated to permitting TST to amend its complaint yet again, which this Court approved. *See* Stipulated Motion for Leave to File Second Amended Complaint (Dkt. No. 24); Minute Order (Dkt. No. 25). TST filed its Second Amended Complaint ("SAC") in May of 2021. *See* SAC (Dkt. No. 26). In its SAC, TST re-asserted certain federal claims and sought supplemental jurisdiction over its state law claims, including a state common law claim for conversion/trespass to chattels. *Id.* Defendants successfully moved to dismiss the remaining federal claims. Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Second Amended Complaint (Dkt. No. 31).

Because the operative complaint is now devoid of any claims under federal law and a sufficient amount is not in controversy to invoke diversity jurisdiction, on May 13, 2022, Defendants moved to dismiss the SAC for lack of subject matter jurisdiction, asking the Court to dismiss TST's remaining state law claims without prejudice and permitting TST to renew those claims (should it wish) against Defendants in King County Superior Court.[3] Dkt. No. 33. The Motion to Dismiss for Lack of Subject Matter Jurisdiction is still pending.

---

[3] Because the Court granted leave to file an amended complaint as to certain of the dismissed federal claims, *see* Dkt. No. 31 at 32-33, which TST did not do within the permitted time, Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction was timely under LCR 12(a)(1).

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 3

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**B.     Facts Relating to the Memes Page**

    **1.     Creation of the Memes Page**

       In November of 2019, TST-WA's Chapter Head (Leah Garvais, who goes by the name Siri Sanguine) and TST-WA's Media Liaison, Paul Case (who goes by the name Tarkus Claypool), expelled a TST member and Co-Chapter Head who had been leading an informal group called the South Sound Satanists. Johnson Decl. ¶ 4. The South Sound Satanists were an unofficial TST group that did not have official chapter status. *Id.* ¶ 5. The South Sound Satanists, led by the expelled member, used both a Facebook page and Facebook group that was originally called "South Sound Satanists: Friends of TST." *Id.* The South Sound Satanists page was largely inactive. *Id.* ¶ 7. For the period of July 2019 through November 2019, there were only three public posts on the page. *Id.* After the expulsion of the member who ran the page, from November 11 through December 24, 2019, there were no posts at all. *Id.* From November to December of 2019, TST-WA discussed what might be done with the page. *Id.*

       On December 21, 2019, Chapter Head Garvais/Siri Sanguine added Defendants David Johnson, Leah Fishbaugh, and Mickey Meehan (known at the time as Lenore Calavera) as editors of the South Sound Satanists page. *Id.* ¶ 8. The plan was to turn the largely abandoned page into a "memes page," focusing on short-form humor and provocative images, rather than use the page as a community. *Id.* The page was intended to include funny "memes" from places like Twitter and Tumblr. *Id.* It was supposed to be tonally comedic, light, and ironic. *Id.* On January 1, 2020, Garvais/Siri Sanguine changed the roles of Defendants Johnson and Meehan/Lenore Calavera to "admin" status, which gave them complete ability to manage the Memes Page, including deciding who else to add or remove as admins. *Id.* ¶ 9. Defendants Johnson and Meehan have been admins of the page ever since. *Id.* ¶ 16.

       Around that same time, Garvais/Siri Sanguine accidentally renamed the South Sound Page to "TST WA Allies." This change was a mistake. *Id.* ¶ 10. The change was supposed to take place on a related Facebook *group* called the South Sound Satanists Group, which facilitated semi-

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 4

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 14

1    private communications among people who were interested in TST but did not want to be
2    members. *Id.* Facebook *pages* are different than Facebook *groups*. A Facebook *page* can be
3    accessed by anyone in the public with a Facebook profile. *Id.* A Facebook *group* is used more for
4    building communities among those who share a common interest, such as employees or church
5    members. Unlike pages, groups can be set to private or semi-private.[4] *Id.* The plan at the time was
6    for the South Sound Satanists Facebook *Group,* which facilitated semi-private conversations, to
7    be turned into a place for people interested in supporting the local chapter's work without
8    becoming members themselves. *Id.* The Facebook *group* that had been associated with the South
9    Sound Satanists for their own organizing and socializing was scrubbed of identifying information
10   (such as addresses for meeting up to work on crafts), and was opened to applications from non-
11   chapter members. *Id.* ¶ 11. This Facebook group was re-named "The Satanic Temple - Washington
12   State (Allies)" on January 1, 2020. *Id.* However, on the same date, Garvais/Siri Sanguine
13   mistakenly renamed the South Sound Satanists *page* (the Memes Page) to "TST WA Allies." *Id.*
14   Because Facebook does not allow a name to be changed again too soon after a prior name change,
15   the mistake could not immediately be fixed. *Id.* However, at this same time, the page's
16   username/url was changed to be "facebook.com/queersatanicmemes" and the future intent was to
17   change the name of the Memes Page to something relating to the url, aligning the page with its
18   new "meme" content. *Id.*

19        On March 12, 2020, Chapter Head Leah Garvais/Siri Sanguine sent an email to the TST-
20   WA membership that stated that TST-WA had been investigating a complaint made by a member
21   (not the Defendants). Declaration of Nathan Sullivan in Opposition to Motion for Preliminary
22   Injunction ("Sullivan Decl.") ¶ 7. To the Defendants' shock, the email accused them and others of
23   having been involved in an alleged coalition ostensibly intended to attack and undermine TST-
24   WA's leadership. *Id.* The email announced Leah Garvais/Siri Sanguine's decision to address the

25   _____
26   [4] These differences are explained by Facebook in a short Facebook Help Center post called
     "Differences between Profiles, Pages and Groups on Facebook," available at
     https://www.facebook.com/help/337881706729661.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 5



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

issue by dissolving the advisory committee (upon which the Defendants served) and replace it with a smaller, handpicked group. *Id.* In another email, Leah Garvais/Siri Sanguine reiterated her plan to dissolve the existing advisory committee and create a smaller Strategy Council. *Id.* ¶ 8.

On March 14, 2020 at 5:31pm, Garvais/Siri berated Defendant Mickey Meehan/Lenore Calavera for his social media work (that he had been providing on a voluntary and complimentary basis) and was critical of the content he was posting on the Memes Page. *Id.* ¶ 9; Johnson Decl. ¶ 13 & Ex. 1. Meehan/Lenore Calavera then removed Garvais/Siri Sanguine and Case/Tarkus Claypool as admins from the Memes Page. Johnson Decl. ¶ 13 & Ex. 2. Afterward Meehan changed the name of the Memes Page to "Evergreen Memes for Queer Satanic Fiends." *Id.* ¶ 13 & Ex. 3. In an email at 7:48 pm that same day, Garvais/Siri Sanguine accused Meehan/Lenore Calavera of having "stolen" the former South Sound Facebook page. *Id.* ¶ 13 & Ex. 4. At 7:59 pm, Meehan/Lenore Calavera posted at the top of the Memes Page "This page is no longer affiliated with The Satanic Temple" and explained the reasons why it was no longer so affiliated. *Id.* ¶ 13 & Ex. 3.

That night, at 9:09 pm, <u>after</u> Meehan/Lenore Calavera had changed the Memes Page's name and posted the statement that the page was no longer affiliated with TST, TST-WA's Media Liaison, Case/Tarkus Claypool, sent Meehan/Lenore Calavera an email with the subject line "Evergreen Memes for Queer Satanic Fiends" in which Case/Tarkus Claypool told Meehan/Lenore Calavera that TST had no interest in claiming the page and that Defendants could have and use the page "free and clear:"

Hi Lenore,

I saw that you made some changes to the TST WA State Allies FB group. **I just wanted to let you know that it's yours free and clear and we've no desire to claim it.** You and ADJ built it and have done a great job doing so. I'm confident you'll both continue doing awesome work.

Sorry the way things panned out, and I do mean all of it. I wish you and your family well, and respect your need to fight the fight your way.

Rock on,



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 16

Tarkus Claypool
Media Liaison, The Satanic Temple of Washington
(he/him)

Sullivan Decl. ¶ 10 & Ex. 1; Johnson Decl. ¶ 14 & Ex. 5 (emphasis added).

The next day, in a March 15, 2020 online town hall meeting via Zoom, Media Liaison Case/Tarkus Claypool again publicly reiterated in front of TST-WA members, including TST-Chapter Head, Garvais/Sanguine, that TST-WA had no interest in claiming the Memes Page:

> I do want to say that **we're not going to, you know, ask Lenore to give the page back in any way.** I wish them well, and I hope that they continue growing that and make it a great success. Because they're going to fight their fight, their way. And so, let them do what they want to, and I wish them well, because both Lenore and ADJ [Johnson] did a wonderful job in the roles that they had. It just wasn't within the TST guidelines that we are beholden to. So I want to give them due credit, and just you know, wish them well with what they're going to plan to do with it in the future.

Sullivan Decl. ¶ 14; Johnson Decl. ¶ 15; Declaration of Jeremy Roller in Opposition to Motion for Preliminary Injunction ("Roller Decl.") Ex. 1 at time stamp 1:20:35.

Since Case/Tarkus Claypool's clear statements that TST-WA had no interest in the Memes Page and that Defendants could use it "free and clear," no one from TST asked Defendants to give TST control of the Memes Page. Sullivan Decl. ¶ 16; Johnson Decl. ¶ 16. Similarly, Defendants are not aware of TST ever asking Facebook to remove Defendants as admins from the Memes Page. Johnson Decl. ¶ 16.

In June of 2022, after Defendants filed their Motion to Dismiss the SAC, TST's attorney suddenly threatened to file a TRO application seeking control of the Memes Page, requesting for the first time that Defendants give TST administrative control of the Memes Page. *Id.* ¶ 16; Roller Decl. Ex. 2. In response to TST's threatened TRO, Defendants' attorney shared with TST's attorney Case/Claypool's March 14, 2020 email relinquishing any interest in the Memes Page and giving Defendants permission to use the Page "free and clear." Roller Decl. ¶ 3 & Ex. 2. TST did not file the TRO application. However, despite being aware of clear evidence defeating their claim,

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 7

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 17

TST has now inexplicably[5] filed its current Motion, in which it neglects to inform the Court of the key evidence that is fatal to its claim – *i.e.*, that TST expressly gave Defendants permission to use the Meme Page "free and clear."

**C.     TST's Attorney Has Publicly Stated His Intent to Use This Litigation to Harass Defendants.**

The reason that TST has brought its Motion despite the lack of any merit is to harass Defendants. On May 26, 2022, TST's lead counsel, Matt Kezhaya, publicly stated his improper motivation for pursuing this litigation against Defendants—referring to Defendants as "morons" and "pathetic" and stating his hope that they incur an unsustainable amount of attorneys' fees in defending against this matter. Johnson Decl. ¶ 18 & Ex. 6. ("I hope he [Defendants' attorney] squeezes every last penny from you living corpses, and anyone that gives you the time of day."). More recently, on November 16, 2022, TST's counsel again expressed improper motives against Defendants through a public Tweet, suggesting that this case is driven from a sense of vengeance rather than legitimate legal grounds:

> Are these fuckwits still talking about me? Grow up and file an answer so I can get at your financial records. I'm coming for you. Tell the judge on me again, I double dare you.

Johnson Decl. ¶ 19 & Ex. 8. Just days after posting this public taunt, TST followed through on the threat and filed the Motion the night before Thanksgiving, Wednesday, November 23, 2022.

## III.     ARGUMENT

**A.     TST's Pseudonymous Declaration Should Not Be Considered.**

Defendants object to TST's use of a pseudonymous declaration. In support of its Motion, TST submits only one declaration from an unidentified person in Canada using the pseudonym "Rachel Chambliss." Chambliss Declaration ¶¶ 1-2. This "person" states that she/he/they is using

---

[5] At the time TST filed this lawsuit, the Memes Page had only about 500 followers. Johnson Decl. ¶ 16. Since TST told Defendants it had no interest in the Memes Page and that they could use it "free and clear", the Memes Page has grown to approximately 24,000 followers. *Id.* In addition to harassing Defendants, it is likely that this growth is the reason TST has suddenly reversed course regarding the Memes Page and is now bringing this Motion in yet another attempt to silence the Defendants after its defamation claim failed.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 8



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

the pseudonym due to a general reluctance to be publicly affiliated with TST. *Id.* ¶ 2 ("I am submitting this affidavit under a pseudonym to protect myself from harassment due to my employment and membership with The Satanic Temple ('TST').")."). Only in "rare circumstances" may witnesses testify anonymously. *Doe v. Los Angeles Unified Sch. Dist.*, No. 216CV00305CASJEMX, 2017 WL 797152, at *9 (C.D. Cal. Feb. 27, 2017) ("Absent extraordinary circumstances, witnesses do not testify anonymously under our system of laws.") (quoting *Diamond Pleasanton Enter., Inc. v. City of Pleasanton*, No. 12-CV-00254-WHO, 2015 WL 74946, at *1 (N.D. Cal. Jan. 5, 2015)). Such rare circumstances are not present here. TST has not sought a protective order to keep its witness's name under seal, nor has TST filed any document identifying the signer of the supporting declaration. 28 U.S.C. § 1746 requires that unsworn declarations be signed by the declarant under penalty of perjury. Without any record whatsoever of a witness's identity or their signature, a declarant cannot be held to their statements under "penalty of perjury." *Id.* Because TST has not obtained permission or otherwise shown cause for filing a pseudonymous declaration, the Court should decline to consider the defective declaration offered in support of TST's Motion.

**B.    Injunction Standards**

    **1.    Preliminary Injunction Standard**

"The basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits." *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504, 1508–09 (W.D. Wash. 1988). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). "A party seeking a preliminary injunction must meet one of two variants of the same standard." *Zest Anchors, LLC v. Geryon Ventures, LLC*, No. 22-CV-230 TWR (NLS), 2022 WL 2811646, at *7 (S.D. Cal. July 18, 2022) (quoting *Ramos v. Wolf*, 975 F.3d 872, 887 (9th Cir. 2020)). Under the original standard, plaintiffs seeking a preliminary injunction must establish that: (1) they are likely to succeed on the

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 9

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* (citing *Winter*, 555 U.S. at 20). "The Ninth Circuit employs an alternative 'serious questions' standard, also known as the 'sliding scale' variant of the *Winter* standard." *Id.* (citing *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011)). Under the alternative standard, the court weighs the preliminary injunction factors on a sliding scale, such that where there are only serious questions going to the merits—that is, less than a likelihood of success on the merits—a preliminary injunction may still issue so long as the balance of hardships tips sharply in the plaintiff's favor and the other two factors are satisfied. *Id.* at 887–88. In other words, a preliminary injunction may be granted where the moving party demonstrates either (1) a combination of probable success on the merits *and* the possibility of irreparable injury or (2) the existence of serious questions going to the merits *and* that the balance of hardships tips sharply in its favor. *Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007).

### 2. Mandatory Injunction Standard

A mandatory injunction is one that goes beyond simply maintaining the status quo and orders a party to take action pending the determination of the case on its merits. *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). The standard for issuing a mandatory preliminary injunction is high. "In general, mandatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.'" *Id.* (quoting *Marlyn Nutraceuticals v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (2009)). Because mandatory injunctions go beyond maintaining the status quo, they are particularly disfavored unless the law clearly favors the moving party. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**C.     TST Falls far Short of Meeting the Requirements for a Preliminary Injunction for the Memes Page**

**1.     TST is Seeking a Mandatory Preliminary Injunction**

As set forth above, a preliminary injunction seeks to protect the status quo between the parties, while a mandatory injunction seeks an order requiring a party to take action pending a determination on the merits. The relief that TST seeks here is mandatory. The status quo vis-à-vis the Memes Page is that Defendants have been admins for the Memes Page since January of 2020, months before this litigation began. Johnson Decl. ¶ 16. Defendants have remained admins for the page since then – throughout the last two and a half years of this litigation. *Id.* Preserving the status quo means allowing Defendants to *remain in control* of the Memes Page while this case is litigated. What TST seeks is the opposite. Through its Motion, TST asks the Court for a mandatory injunction requiring Defendants to give control of the Memes Page to TST. Because TST is seeking a mandatory injunction, the Court must apply a higher level of scrutiny to this disfavored remedy. As discussed below, TST falls far short of meeting the requirements for showing that this extraordinary and disfavored remedy is appropriate. Even if the requested injunctive relief is not deemed mandatory, TST still fails to come close to meeting the requirements for a preliminary injunction.

**2.     TST Cannot Show It is Likely to Succeed on the Merits**

TST's Motion is based on its state common law claims for conversion and trespass to chattels, stemming from the false allegations that Defendants have intentionally and wrongfully dispossessed TST of its property. Motion at 5. Specifically, TST alleges in its Motion that Defendants wrongfully dispossessed TST of the Memes Page. *Id.* at 5-7. TST has not, and cannot, establish that it will succeed on this claim. To the contrary, the evidence, of which TST is fully aware, establishes the opposite.

To succeed on a claim for conversion, a plaintiff must establish: (1) willful interference with chattel belonging to the plaintiff, (2) by either taking or unlawful retention, (3) thereby depriving the owner of possession. *See Judkins v. Sadler-Mac Neil*, 61 Wn.2d 1, 3, 376 P.2d 837



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 21

1   (1962). Similarly, trespass to chattels requires showing the intentional dispossession of chattels.

2   Restatement (Second) of Torts § 217. At the core of both these related claims is the requirement

3   for proving the <u>wrongful</u> use or interference with the property. If a defendant has permission or

4   other lawful reason for retaining or using property, the claim fails. *See, e.g.*, *Revolutionar, Inc. v.*

5   *Gravity Jack, Inc.*, 13 Wn. App. 2d 1044 (2020) (unpublished; cited as persuasive authority)

6   (because defendants had permission to use the software code and platform at issue the conversion

7   claim failed). Stated yet another way, "[i]n order to constitute conversion, nonconsent to the

8   possession and disposition of the property by the defendant is indispensable." 90 C.J.S. Trover and

9   Conversion § 6; *see also* Restatement (Second) of Torts § 272 ("One who is entitled to the

10  immediate possession of a chattel is not liable to another for dispossessing him of it.").

11          In this case, TST cannot show that Defendants have wrongfully used or interfered with

12  property owned by TST. First, TST provides **no evidence** that it is the owner of or has any rights

13  to the Memes Page. The one pseudonymous declaration submitted in support of the Motion (which

14  should not be considered) offers no evidence that TST has any legal right to the Memes Page. The

15  pseudonymous declarant offers one conclusory assertion that the Memes Page is "TST's Facebook

16  page," but offers no factual support for that assumption. Tellingly, TST provides no explanation

17  as to why, if TST felt it had the legal right to control the Memes Page, it never sought the page

18  through Facebook over two and a half years ago, when Defendant Meehan changed its name and

19  posted that the page was not affiliated with TST. TST had an avenue available to it through

20  Facebook (the owner of the Page) to remove Defendants as the administrators if TST felt it was

21  the rightful party to control it. But TST does not allege that it even attempted that step. Instead,

22  TST simply points to one offhand statement that Defendant Sullivan made in a Facebook post in

23  which he says that they "stole" the page from TST. However, as Defendant Sullivan explains, the

24  comment was meant to be glib because at that point TST had already relinquished any interest in

25  the Memes Page and had told Defendants they could use it "free and clear." Sullivan Decl. ¶ 15.

26

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 12

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

In short, there is no credible evidence (or any evidence at all), that TST is the rightful party to control the Memes Page.

On the other hand, through the contemporaneously filed declarations, Defendants have provided proof that they do have the right to control the Memes Page. TST expressly acknowledged that right when its Media Liaison, Paul Case/Tarkus Claypool, told Defendant Meehan he could use the page "free and clear" and when Case/Claypool reiterated TST's relinquishment of any interest in the town hall meeting. Johnson Decl. ¶ 14 & Ex. 5; Sullivan Decl. ¶ 10 & Ex. 1. TST has acted consistently with these statements by never asking Facebook to remove Defendants as administrators from the Memes Page as TST did for another Facebook page that was at issue in this suit.[6] Nor did TST ever ask Defendants to give it control of the Memes Page until well over two years after bringing this lawsuit.

When made aware of the evidence that TST relinquished any interest in the Memes Page, TST's counsel suggested that TST's Media Liaison lacked the authority to speak on TST-WA's behalf. Roller Decl. Ex. 2. However, TST-WA itself has represented to its members that TST-WA's Chapter Head and Media Liaison have authority to run TST-WA. Sullivan Decl. ¶ 2; Johnson Decl. ¶ 3. Indeed, even in its SAC, TST refers to its Media Liaison, Paul Case/Tarkus Claypool, as a TST representative.[7] At the very most, TST's argument could potentially create an issue of fact (although a very weak one). But such an issue of fact would not help TST establish its clear legal right to the Memes Page or Defendants' wrongful use of the Memes Page as required to support a mandatory injunction, or even a preliminary injunction.

---

[6] See SAC ¶ 4, in which TST describes how it worked through Facebook to obtain the administrative control of TST's Washington Chapter Facebook Page.

[7] The individual who sent Defendant Mickey Meehan (a/k/a "Lenore Calavera") the March 15, 2020 email was known as "Tarkus Claypool." Sullivan Decl. ¶¶ 3, 10. Upon information and belief, the individual's name for government documents is Paul M. Case. Id. ¶ 3. In its SAC, TST refers to Tarkus Claypool as its Media Liaison and states that it was Tarkus Claypool who sought the return of the Washington Chapter Facebook Page on TST's behalf. SAC ¶ 53. Thus, TST itself has held out Tarkus Claypool as its agent.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 13



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 23

1        **3.      TST Fails to Show It Will Suffer Irreparable Harm.**

2        TST's Motion should also be denied because it has not made a showing of irreparable harm

3    if the preliminary injunction is not granted. First, TST's delay of over **two and a half years** weighs

4    heavily against finding the type of irreparable harm required for a preliminary injunction.

5    "A preliminary injunction is sought upon the theory that there is an urgent need for speedy action

6    to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need

7    for speedy action ...." *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213–14 (9th

8    Cir. 1984) (quoting *Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959)). Thus,

9    while not always dispositive by itself, a long delay in seeking a preliminary injunction (with the

10   delay usually measured in weeks and months) weighs very heavily against the plaintiff. *See,*

11   *e.g.*, *Valeo Intellectual Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash.

12   2005) ("A three-month delay in seeking injunctive relief is inconsistent with [the plaintiff's]

13   insistence that it faces irreparable harm."); *Barton & Assocs. Inc. v. Trainor*, No. CV-20-01560-

14   PHX-SPL, 2020 WL 6081496, at *6 (D. Ariz. Oct. 15, 2020) (denying preliminary injunction

15   where plaintiff waited three weeks after filing the complaint before seeking preliminary

16   injunction); *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 969 (2d Cir. 1995)

17   (reversing grant of preliminary injunction where plaintiff delayed four months from filing suit

18   before moving for preliminary injunction); *Citibank N.A. v. Citytrust*, 756 F.2d 273 (2d Cir.1985)

19   (reversing grant of preliminary injunction where plaintiff delayed ten weeks after receiving actual

20   notice of infringement before filing suit and several weeks further before moving for preliminary

21   injunction). Here the delay is extreme – over two and a half years. Given the long delay, it is clear

22   that TST is not facing irreparable harm if the injunction is not issued.

23       Second, even apart from the long delay, TST has made no showing of irreparable harm. To

24   establish irreparable harm, TST must do more than merely allege it, it must "*demonstrate*

25   immediate threatened injury as a prerequisite to preliminary injunctive relief." *Valeo*, 368 F. Supp.

26   2d at 1128 (quoting *Caribbean Marine Servs. Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir. 1988)

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 14



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

(emphasis in original)). Even the case upon which TST relies clearly makes this point. In *Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013), cited in TST's Motion at 7, the court reversed a preliminary injunction because the evidence upon which the injunction was based was conclusory and unsupported. *Id.* ("Marshak asserts that the district court abused its discretion by relying on 'unsupported and conclusory statements regarding harm [HRE] *might* suffer.' We agree."). The court admonished the district court that conclusory allegations of harm to business reputation or goodwill are not enough:

> Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm. . . . Here, however, the court's pronouncements are grounded in platitudes rather than evidence, and relate neither to whether "irreparable injury is *likely* in the absence of an injunction," . . . nor to whether legal remedies, such as money damages, are inadequate in this case. It may be that HRE could establish the likelihood of irreparable harm. But missing from this record is any such evidence.
> . . . .
> *Those seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm.*

*Id.* at 1250-51 (internal citations omitted) (emphasis in last sentence added).

In this case, as in *Herb Reed Enterprises*, TST offers nothing more than conclusory allegations of harm to goodwill and reputation. Even if the supporting pseudonymous declaration is considered (which it should not be), the unknown declarant provides only vague, conclusory, unsupported statements, with no actual evidence of any harm. While the pseudonymous declarant states in a conclusory fashion that he/she/they has firsthand knowledge of the harm TST has suffered (¶ 6), the declarant stops there and neglects to provide any details at all of evidence of such harm – *e.g.*, no statistics or proof about lost membership or a decline in donations or profits. Nothing. Similarly, in the Motion itself, TST simply makes vague, conclusory allegations that TST has been harmed without citing to any supporting evidence. Motion at 7 (stating in a conclusory manner that TST has lost current and potential members and public goodwill without providing any evidence). Lacking <u>any</u> evidence of harm, TST clearly cannot meet its burden of establishing irreparable harm.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 15

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 25

1    Third, TST's Motion shows that its true purpose is not to address alleged damages for

2    alleged lost property, but rather to use its state law conversion and trespass claims to try yet again

3    to relitigate its dismissed defamation claim and to try to prevent its former members from making

4    critical statements about TST's tenets and practices. Not only is the Motion devoid of any evidence

5    of actual harm stemming from the allegedly converted Memes Page, but its conclusory allegations

6    focus on the fact that Defendants make critical statements about TST on many _different_ social

7    media platforms. Motion at 6 (complaining that Defendants post critical content on other social

8    media platforms); Pseudonymous Decl. ¶ 5 ("Comments by and about Defendants are prolific on

9    those areas of social media where TST is discussed. One cannot view content about TST on social

10   media sites without encountering posts by Queer Satanic, or posts that share their talking points.

11   Those talking points are then shared by other social media users."); ¶ 12 ("Defendants, operating

12   under the name QueerSatanic, insert themselves into conversations about TST on Reddit and

13   disparage TST."). These are not complaints about damages caused by the loss of property, but are

14   simply complaints that Defendants are critical of TST. TST's Motion should be recognized for

15   what it is – a backdoor and improper attempt to revive its dismissed defamation claim – and should

16   be denied on this basis as well.

17   **4.     The Balance of Equities Favors Defendants, not TST**

18   In addition to failing to show likelihood of success or irreparable harm, TST also fails to

19   show that equities favor it. TST argues that this element is met because Defendants' conduct is

20   "illegal." Yet, as discussed above, TST falls far short of establishing it will succeed on the merits

21   of its conversion/trespass to chattels claims and thus cannot show that Defendants engaged in

22   "illegal" conduct. Further, where the plaintiff falls well short of showing that the Defendants are

23   wrongfully using a Facebook page, public policy will not be served by requiring Defendants to

24   give up control before liability has been established. This is especially so when the plaintiff has

25   waited over two and a half years to seek an injunction – thus demonstrating the lack of any

26   immediate harm while the dispute is resolved.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 16

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

While TST has failed to show any equitable grounds favoring a mandatory injunction, Defendants have clear equitable grounds for maintaining administration of the page. TST expressly represented to Defendants that they could use the Memes Page "free and clear." TST then acted consistently with that statement by not seeking the return of the Memes Page for over two years. Defendants relied on those statements to freely use the Memes Page. If TST were allowed to now contradict its own express statements and actions, Defendants would be inequitably harmed, not TST. Principles of equity and estoppel demand that TST not be permitted to do so.

### 5. TST's True Motive for Bringing this Motion is to Harass Defendants

Finally, as part of the equitable considerations in deciding whether to issue a preliminary injunction, the Court should take heed of evidence that shows that TST's true motive for bringing its Motion is not to address any imminent harm, but rather to harass Defendants.

On May 26, 2022, TST's counsel publicly expressed the motivation for pursuing this litigation against Defendants—referring to Defendants as "**morons**," "**pathetic**," and "**living corpses**" and stating his hope that they incur an unsustainable amount of attorneys' fees defending against this matter. Johnson Decl. ¶ 18 & Ex. 6. ("I hope he [Defendants' attorney] squeezes every last penny from you living corpses, and anyone that gives you the time of day.") (emphasis added). More recently, TST's counsel again expressed improper motives against Defendants through a public Tweet, suggesting that this case is driven more from a sense of vengeance than legitimate legal grounds:

> **Are these fuckwits still talking about me?** Grow up and file an answer so I can get at your financial records. **I'm coming for you.** Tell the judge on me again, I double dare you.

Johnson Decl. ¶ 20 & Ex. 8 (emphases added). Just a week after posting this public taunt, TST's counsel followed through on his threat to "com[e] for you" and filed the Motion the night before Thanksgiving, Wednesday, November 23, 2022. In addition to obviously being timed to impact Defendants' holiday, the substance of the fatally defective, slapdash Motion shows that it is not intended as a legitimate attempt to seek a preliminary injunction. The Motion includes only one,

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 17

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 27

vague declaration from a pseudonymous person that does not include basic, necessary facts to succeed on a request for a preliminary injunction, such as evidence that TST has any legal right to the Memes Page. The Motion also neglects to inform the Court of the most critical evidence that is fatal to the Motion – that TST represented to Defendants over two and a half years ago that they could use the Memes Page "free and clear" and that TST had no interest in it. The Motion does not even attempt to address any harm from the alleged loss of converted property, but rather is a blatant attempt to relitigate the dismissed defamation claim in an attempt to silence Defendants' religious views, which are critical of TST's tenets and practices. The Motion is really nothing more than a hollow shell, devoid of any valid grounds. But TST knows that even meritless motions require a response. TST also knows that Defendants are individuals with limited financial means for whom this lawsuit presents a true financial hardship. TST should not be allowed to continue leveraging its disproportionate power to harass Defendants to try to intimidate them into refraining from expressing their beliefs regarding TST.

Given this demonstrated bad faith and improper purpose, this Court would be justified in exercising its inherent power to sanction this contemptable conduct. *See Fisk v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001) (discussing a court's inherent power to sanction "for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose").

**D.    TST Fails to Allege any Facts or Provide any Argument Regarding "Documents"**

In the introduction to the Motion (Motion at 2), TST makes one vague reference to "business documents." However, nowhere else in either the Motion or the pseudonymous supporting declaration does TST provide any facts regarding any such documents. Nor does TST mention the "business documents" in the argument section or provide any grounds at all for obtaining a preliminary injunction as to the unidentified documents. Lacking any factual or legal

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 18



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1  support whatsoever for obtaining a preliminary injunction as to undefined "business documents,"

2  TST's Motion as to the documents must fail.[8]

3  **E.  TST Should Be Required to Post a Bond**

4    Although TST must not prevail on its request for a preliminary injunction given the

5  complete lack of factual or legal grounds, in the unlikely event an injunction is issued TST should

6  be required to post a bond pursuant to Rule 65(c). Rule 65(c) requires the moving party to post a

7  security bond to protect the adverse party from damages caused by a wrongfully granted

8  injunction and to deter frivolous claims. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d

9  797, 804 (3d Cir. 1989). Although attorneys' fees in setting aside a wrongfully issued injunction

10  are not normally part of the damages included by the bond, the Court has inherent power to

11  determine if attorneys' fees may be proper in light of bad faith conduct. *Chambers v. NASCO, Inc.*,

12  501 U.S. 32, 45–46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) (observing that court has inherent

13  power to assess attorney's fees "when a party has acted in bad faith, vexatiously, wantonly or for

14  oppressive reasons"); *Adams v. Gissell*, No. CV 20-11366-PBS, 2022 WL 2387881, at *2 (D.

15  Mass. Apr. 19, 2022), *report and recommendation adopted*, No. CV 20-11366-PBS, 2022 WL

16  16702407 (D. Mass. Aug. 24, 2022) ("It is beyond serious dispute that a district court may use

17  its inherent powers to  assess attorneys' fees against  a  party that  has 'acted  in  bad  faith,

18  vexatiously, wantonly, or for oppressive reasons.'") (quoting *Pan Am Grain Mfg. Co. v. P.R. Ports

19  *Auth.*, 295 F.3d 108, 117 (1st Cir. 2002)). Given the repeated public statements made by TST's

20  counsel indicating that this litigation and this Motion are brought in bad faith for the purpose of

21  harassing Defendants and trying to "squeeze every last penny from you [Defendants] living

22  corpses," it would be appropriate for the Court to exercise its inherent powers to require a

23  substantial bond to cover Defendants' attorneys' fees and costs in seeking to undo a wrongfully

24

---

25  [8] Because TST has not included any facts at all regarding documents, Defendants are unable to even guess what the alleged documents are. TST should not be allowed to improperly blindside

26  Defendants by including new facts and allegations in a reply brief, to which Defendants will not be able to respond.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 19

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 29

1   issued injunction.[9]

2                        **IV.    CONCLUSION**

3       The Satanic Temple cannot meet any of the elements of a preliminary injunction. The

4   purpose of The Satanic Temple's Motion is to harass and attempt to silence Defendants, driving

5   up their legal fees for purely vindictive reasons. The Satanic Temple's Motion must be denied.

6   DATED: December 12, 2022.

7                                   **ARETE LAW GROUP PLLC**

8                                 By: */s/ Jeremy Roller*

9                                 Jeremy E. Roller, WSBA No. 32021
                                1218 Third Avenue, Suite 2100

10                                 Seattle, WA 98101
                                Phone:  (206) 428-3250

11                                 Fax:  (206) 428-3251
                                jroller@aretelaw.com

12

13                                 *Attorneys for Defendants David Alan Johnson, Leah Fishbaugh, Mickey Meehan, and Nathan Sullivan*

14

15

16   [9] The Court may take judicial notice of the fact that TST, through the same counsel, has been sanctioned in other federal district courts for bad faith litigation tactics, establishing a pattern and

17   practice of using such tactics. *See, e.g., Satanic Temple, Inc. v. City of Belle Plaine, MN*, No. 21-CV-0336 (WMW/JFD), 2022 WL 1639514, at *2 (D. Minn. May 24, 2022) (upholding sanctions

18   against TST for bad faith litigation tactics in filing a second complaint after the court had clearly dismissed the claims in the first complaint); *Satanic Temple, Inc. v. City of Bos., MA*, No. 21-CV-

19   10102-AK, 2022 WL 1028925, at *6 (D. Mass. Apr. 6, 2022) (sanctioning TST for abusive subpoena practices). In the *City of Boston* case, the court rebuked TST's attorney for his

20   unabashedly improper litigation philosophy:

21       Independent of a potential deponent's profession or media exposure, it is in exceptionally bad faith to intentionally notice a deposition for a date and time when

22       a party knows the deponent will be unavailable or greatly inconvenienced. In his explanatory letter to the Court, Plaintiff's counsel states that he, as an attorney, has

23       "a sworn duty to do anything short of breaking the law to see to it that my client's goals are recognized." [Dkt. 38 at 2]. Yet this is not the case. Rules such as the

24       Massachusetts Rules of Professional Conduct (and other states' equivalents), various ethics rules and guidelines, and the Rules of Civil Procedure govern

25       attorney and litigant conduct in all sorts of ways that reach beyond conduct that is simply illegal—and they do so precisely to prevent the type of abuse of process

26       Plaintiff's counsel has employed here.

  *Id.* at *6; *see also* Johnson Decl. ¶ 19 n.5 & Ex. 9.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 20


ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1

## CERTIFICATE OF SERVICE

2      I, Janet Fischer, certify that on December 12, 2022, I electronically filed the foregoing

3 document with the Clerk of the Court using the CM/ECF system, thereby sending a notification of

4 such filing to the following parties:

5 **LYBECK PEDREIRA & JUSTUS, PLLC**

6

7 Benjamin Justus
  Chase Bank Building                              ☐ E-mail
8 7900 SE 28th Street, Fifth Floor                 ☐ U.S. Mail
  Mercer Island, WA 98040                          ☒ E-filing
  ben@lpjustus.com
9

10 **KEZHAYA LAW PLC**

11 Matthew A. Kezhaya                              ☐ E-mail
   1202 NE McClain Rd                              ☐ U.S. Mail
12 Bentonville, AR 72712                           ☒ E-filing
   matt@kezhaya.law
13

14 Dated this 12th day of December, 2022, at Seattle, Washington.

15

16                                    /s/ Janet Fischer
                                      Janet Fischer
17                                    Paralegal

18

19

20

21

22

23

24

25

26

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 21

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

UNITED FEDERATION OF CHURCHES,
LLC d/b/a THE SATANIC TEMPLE,

               Plaintiff,

        v.

DAVID ALAN JOHNSON, an individual;
LEAH FISHBAUGH, an individual;
MICKEY MEEHAM, an individual; and
NATHAN SULLIVAN, an individual,

               Defendants.

No. 2:20-cv-00509-RAJ

**DECLARATION OF DAVID A.
JOHNSON IN OPPOSITION TO
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

NOTED ON MOTION CALENDAR:
December 16, 2022

I, David A. Johnson, declare as follows:

    1.    I am a former member of The Satanic Temple's Washington State chapter (hereafter referred to as "TST-WA") and I am one of the defendants in the above captioned suit.

    2.    I became a member of what would become TST-WA in May of 2019. In August of 2019, I was added to TST-WA's "Media" team responsible for disseminating information, particularly on social media. In September of 2019, I was added to TST-WA's "Strategy Council," which consisted of approximately twenty guild heads (essentially, volunteer committee-leads) plus a TST-WA Chapter Head and a Media Liaison.

DECLARATION OF DAVID A. JOHNSON IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 1

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

3.    Through my roles with TST-WA, I learned that the ultimate local authority for TST-WA rested in TST-WA's Chapter Head and its Media Liaison. TST-WA's Chapter Head at the time was Leah Garvais, also known as "Siri Sanguine," and the Media Liaison was Paul Case, also known as "Tarkus Claypool."

4.    Members of the chapter observed the authority of the Chapter Head and Media Liaison being exercised on November 11, 2019, when Paul Case/Tarkus Claypool and Leah Garvais/Siri Sanguine unilaterally removed another "co-chapter head." The co-chapter head had been leading the "South Sound Satanists" group in Tacoma, Olympia, and unincorporated areas in the south Puget Sound region of Washington. After he was removed as co-chapter head, Garvais and Case then revoked the former co-chapter head's TST membership entirely because he told the rest of the chapter about the circumstances of his demotion.

5.    Before the co-chapter head was removed in November of 2019, a South Sound group (an unofficial group that did not have official TST chapter status) led by the co-chapter chair used a Facebook page that was originally called "South Sound Satanists: Friends of TST." The same day as the removal of the South Sound co-chapter head, Paul Case/Tarkus Claypool removed the other prior administrators of that Facebook page, replacing them with Leah Garvais/Siri Sanguine.

6.    After Case and Garvais effectively ex-communicated the co-chapter chair in November of 2019, they explained their reasons for doing so to other members. Their actions and explanation led to an exodus of many of the most active members of the "South Sound Satanists" group who stated openly that this behavior by Garvais and Case made them no longer want to be part of the Seattle group they were supposedly merging with to form a statewide TST-WA. At the time, I was not fully aware what was happening or why.

7.    Subsequently, internal discussions at TST-WA occurred about what might be done with the former co-chapter chair's Facebook page that was used for the South Sound Satanists, but which had largely been abandoned and silent. For the period of July 2019

DECLARATION OF DAVID A. JOHNSON IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 2

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1  through November 2019, there were only three public posts on the page. After the co-chapter

2  chair's removal, from November 11 through December 24, 2019, there were no posts at all.

3          8.     On December 21, 2019, Garvais/Siri Sanguine added me and co-defendants

4  Leah Fishbaugh and Mickey Meehan (known at the time as "Lenore Calavera") as editors of

5  the South Sound Satanists page. The plan was to turn the largely abandoned page into a

6  "memes page," focusing on short-form humor and provocative images, rather than use the

7  page as a community. The page was intended to include funny "memes" from places like

8  Twitter and Tumblr. It was supposed to be tonally comedic, light, and ironic.

9          9.     On January 1, 2020, Garvais/Siri Sanguine changed my role on the South

10  Sound Satanists page (now referred to as the "Memes Page"[1]) to "admin" along with my co-

11  defendant Meehan/Lenore Calavera. Pursuant to Facebook's policies, having an "admin"

12  status provides the admin with the ability to fully control the page and its content, including

13  the ability to fully control all other users' role assignments for the page.

14          10.    Around that same time, Garvais/Siri Sanguine made a mistake and

15  accidentally renamed the South Sound page to "TST WA Allies." This change was supposed

16  to take place on a related Facebook *group* for the South Sound Satanists, which had

17  previously facilitated semi-private communications among members in that region. It was

18  changed to open up to people statewide who were interested in supporting TST's work but

19  did not want to be members. Facebook *pages* are different from Facebook *groups*. A

20  Facebook *page* is more public and can be accessed by anyone in the public with a Facebook

21  profile. A Facebook *group* is used more for building communities among those who share a

22  common interest, such as employees or church members. Unlike pages, groups can be set to

23  private or semi-private.[2]

---

25  [1] In its motion and pleadings, TST refers to the Memes Page as the "Allies page."

26  [2] These differences are explained by Facebook in a short Facebook Help Center post called "Differences between Profiles, Pages and Groups on Facebook," available at https://www.facebook.com/help/337881706729661.

DECLARATION OF DAVID A. JOHNSON IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 3



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

11.     The Facebook *group* that had been associated with the South Sound Satanists for their own organizing and socializing was scrubbed of identifying information (such as addresses for meeting up to work on crafts) and was opened to non-chapter members statewide. This Facebook group was re-named "The Satanic Temple - Washington State (Allies)" on Jan. 1, 2020.[3] On the same date, Garvais/Siri Sanguine mistakenly renamed the South Sound Satanists *page* to "TST WA Allies." Because Facebook does not allow a name to be changed again too soon after a prior change, the page name could not immediately be fixed. However, at this same time, the page's username/url was changed to be "facebook.com/queersatanicmemes[4]" and the future intent was to change the name of the page to something relating to the url, aligning the page with its new "meme" content.

12.     On March 12, 2020, Garvais/Siri Sanguine sent an email out regarding a dispute relating to a former member who was upset about the chapter continuing to use their image for promoting the chapter and other public actions by the chapter even after that member had been driven out years before following months of unaddressed sexual harassment from another TST-WA member. Garvais/Siri Sanguine announced that the resolution of the dispute involved unilaterally dissolving TST-WA's guilds and naming a new strategy council of herself, Paul Case/Tarkus Claypool, and about a half dozen other hand-picked people.

13.     In an (at the time) private email on March 14, 2020, Garvais/Siri Sanguine berated Mickey Meehan/Lenore Calavera for his social media work (that he had been providing on a voluntary and complimentary basis) and was critical of the content he was posting on the Memes Page.  A true and correct copy of that March 14 email is attached

---

[3] It appears that TST or TST-WA at some point deleted this Facebook group, but I do not know the circumstances. TST or TST-WA later (in December of 2021) created a new Facebook group titled "Allies and Novitiates of The Satanic Temple Washington Facebook Group." *See* https://www.facebook.com/groups/1054323648698786.

[4] The username/url for this page has since been changed to "facebook.com/QueerSatanic."

DECLARATION OF DAVID A. JOHNSON IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 4

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

hereto as **Exhibit 1**. The same day, Meehan/Lenore Calavera removed Garvais/Siri Sanguine and Case/Tarkus Claypool as admins from the Memes Page. *See* **Exhibit 2**. Afterward, Meehan changed the name of the Memes Page to "Evergreen Memes for Queer Satanic Fiends," posted on the Memes Page "This page is no longer affiliated with The Satanic Temple," and explained the reasons why it was no longer so affiliated. *See* **Exhibit 3**, which is a screenshot of the March 14, 2020 post to the page. In another email to all local members the same evening, Garvais/Siri Sanguine publicly accused Meehan/Lenore Calavera of having "stolen" the former South Sound Facebook page (at the time mistakenly named "TST WA Allies") and said Meehan/Lenore Calavera was banned nationally for the "theft." **Exhibit 4**.

14. However, after Meehan/Lenore Calavera changed the Memes Page's name and posted the statement that the page was no longer affiliated with TST and after this chapter-wide email (Exhibit 4) from Garvais/Siri Sanguine, TST-WA's Media Liaison, Case/Tarkus Claypool, sent Meehan/Lenore Calavera an email with the subject line "Evergreen Memes for Queer Satanic Fiends" in which Case/Tarkus Claypool told Meehan/Lenore Calavera that TST had no interest in the page and that Meehan/Lenore Calavera could have and use the page "free and clear." *See* **Exhibit 5**, which is a true and correct copy of the March 14, 2020 email Case/Tarkus Claypool sent to Meehan/Lenore Calavera, and which Meehan/Lenore Calavera provided to me.

15. The next day, in a March 15, 2020 online (Zoom) town hall meeting, Media Liaison, Paul Case/Tarkus Claypool, again publicly reiterated in front of TST-WA members and TST-WA's Chapter Head that TST-WA had no interest in the Memes Page and that he wished us (the current defendants) all well. An electronic copy of a video of that town hall meeting is submitted as Exhibit 1 to the Declaration of Jeremy Roller in Opposition to Plaintiff's Motion for Preliminary Injunction. Paul Case/Tarkus Claypool's statement is at

DECLARATION OF DAVID A. JOHNSON IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 5

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 36

approximate timestamp 1:20:35 on the video. Garvais/Siri Sanguine spoke immediately after

Case at 1:21:10 of the same video, expressing personal enjoyment of the Memes Page.

16.     Since Case/Tarkus Claypool's clear, public statements that TST-WA had no

interest in the Memes Page and that we were free to use the Memes Page and Garvais/Siri

Sanguine's agreement, no one from TST ever asked us to give TST control of the Memes

Page. Similarly, I am not aware of TST ever asking Facebook to remove me or the other

defendants as admins from the Memes Page. The first time that TST asked for control of the

Memes Page was over two years later, in June of 2022, when TST's attorney notified our

attorney that he was planning on seeking an injunction forcing us to give TST control of the

Memes Page. At the time TST filed this lawsuit, the Memes Page had about 500 followers.

Since that time and under the administration of me and certain co-defendants, followership

of the Memes Page has grown to approximately 24,000.

**Plaintiff's Counsel's Harassing Statements**

17.     At times over the last two years, the Memes Page has included information

about various legal filings and doings of The Satanic Temple, such as when their cases in

other jurisdictions are dismissed, when their legal counsel is sanctioned, or when they

threaten other critics of TST with lawsuits.

18.     Perhaps because of these postings, TST's lead counsel in this case, Matt

Kezhaya, has publicly expressed personal animus toward me and fellow defendants in this

case. For example, on May 26, 2022, Kezhaya used an account on Reddit called

"u/stormsmcgee" to post the following:

> *I will not answer any questions related to the idiots that call themselves*
> *"QueerSatanic," or their idiot-conspiracy theories. My only comment on*
> *that topic is:*
>
> *I can't believe you morons have spent more than $80,000 fighting to keep*
> *TST's Facebook page. You are pathetic. You have no concept of civil*
> *liberties, or what is at stake by the ever-encroaching theocracy. Your*
> *lawyer is a gentleman and a scholar. I hope he squeezes every last penny*
> *from you living corpses, and anyone that gives you the time of day.*

DECLARATION OF DAVID A. JOHNSON IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 6

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

Kezyaha or someone else appears since to have edited this post to remove this insulting attack on me and my co-defendants. However, I located the post in a collection of websites archived by a non-profit organization called the Internet Archive, using the search feature at www.archive.org, known as the "Wayback Machine." Attached hereto as **Exhibit 6** is a true and correct copy of a portion of the webpage https://web.archive.org/web/20220527005507 /https://www.reddit.com/r/SatanicTemple_Reddit/comments/uym4sv/tst_court_update_may _26_2022_this_one_is_by_tsts/ as that site appeared on the Wayback Machine on December 11, 2022 (emphasis added). The individuals who Kezhaya referred to as "the idiots that call themselves 'QueerSatanic,'" "morons," and "living corpses" are me and my co-defendants in this case.

19. Later on the same day, Kezhaya commented on his own Reddit post as follows:

> *Plaintiffs always want to have as many options available because who is to say how the facts will shake out. Defendants always want to constrain the plaintiff's choices for the same reason. Litigation is zero-sum.[5] If Plaintiff wants something, that is generally bad for Defendant. And vice versa.*

> . . .

> *I wanted some federal statutes to apply because that would maximize TST's damages, would keep us in Federal court (as opposed to State court), and provided the option to collect attorney's fees for having to litigate this.*

---

[5] In response to a Court order to explain why TST had issued a harassing subpoena to a Boston City Councilor, who was elected Mayor of Boston, TST's counsel invoked the same litigation philosophy:

> I feel no remorse for the action I took. As an attorney, it is my sworn duty to do anything short of breaking the law to see to it that my client's goals are recognized. This business of litigation is zero-sum. Everything I do which can benefit my client will cause an equal and opposite effect on the other side. I serve my purpose with all the zealous advocacy which my oath commands. And I expect nothing less from my adversaries.

*See* Letter from Matthew Kezhaya to Hon. Arnold Pacho, United States District Court Judge for the District of Massachusetts in *Satanic Temple v. Boston*, No. 21-cv-10102 (Dkt. No. 38), a true and correct copy of which is attached hereto as **Exhibit 9**.

DECLARATION OF DAVID A. JOHNSON IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 7

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1     A true and correct copy of that comment, obtained from the Wayback Machine at webpage

2     https://web.archive.org/web/20220527211543/https://www.reddit.com/r/SatanicTemple

3     _Reddit/comments/uym4sv/tst_court_update_may_26_2022_this_one_is_by_tsts/ia7nt39/?

4     context=8&depth=9 on December 11, 2022, is attached hereto as **Exhibit 7** (emphasis

5     added).

6         20.    More recently, on November 16, 2022, in his public Twitter account, Kezhaya

7     wrote:

8           Are these fuckwits still talking about me? Grow up, and file an answer so I
           can get at your financial records. I'm coming for you. Tell the judge on me
9           again, I double dare you.

10

11    Attached as **Exhibit 8** is a true and correct copy Kezhaya's November 16, 2022 tweet.

12

13        I declare under penalty of perjury of the laws of the United States that the foregoing

14    is true and correct.

15

16

17    / /

18

19

20

21    / /

22

23

24

25    / /

26

---

DECLARATION OF DAVID A. JOHNSON IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 8

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1

2    DATED: December 12, 2022, at Seattle, Washington.

3                                    _____
                                     David A. Johnson
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1

## CERTIFICATE OF SERVICE

2        I certify that on this date I electronically filed the foregoing document with the Clerk

3   of the Court using the CM/ECF system, thereby sending a notification of such filing to the

4   following parties:

5

6   **LYBECK PEDREIRA & JUSTUS, PLLC**

7   Benjamin Justus
Chase Bank Building        ☐  E-mail

8   7900 SE 28th Street, Fifth Floor     ☐  U.S. Mail
Mercer Island, WA 98040      ☒  E-filing

9   ben@lpjustus.com

10  **KEZHAYA LAW PLC**

11  Matthew A. Kezhaya        ☐  E-mail
1202 NE McClain Rd        ☐  U.S. Mail

12  Bentonville, AR 72712      ☒  E-filing
matt@kezhaya.law

13

14

15

16  Dated this 12th day of December, 2022, at Seattle, Washington.

17

18                       */s/ Janet Fischer*
                        Janet Fischer

19                        Paralegal

20

21

22

23

24

25

26

DECLARATION OF DAVID A. JOHNSON IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 10

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

# EXHIBIT 1



---

### FINAL DECISION re:Investigation into former member complain

---

---------- Forwarded message ---------
From: **Siri Sanguine** <sirisanguine@gmail.com>
Date: Sat, Mar 14, 2020, 5:31 PM
Subject: Re: FINAL DECISION re:Investigation into former member complain
To: Lenore Calavera <lenorecalavera@gmail.com>

Hello Lenore,

Thank you for contacting me directly to fact-find versus speculating. I appreciate that very much.

You were included in the list of names because you were cc'd in Wylie's complaint. Pure and simple. All of the members cc'd were named as I have to assume the lot of you A.) read the email itself, B.) are in agreement with the complaint by virtue of your silence, C.) And that if I was earnest in defending myself I would be pointing out how my actions were to the contrary. For example,  "I wrote to Wylie appalled that they included me in their schemes. Here is a copy of that with their reply."

Ergo logic dictates that you were involved.

I can accept your thinking you were only there to bear witness - that is fine if you feel the need to distance yourself from it now. But the dissolution of Legion does not mean that your membership in the chapter has ended - just your role in leadership.

Now, let me assure you that this one incident is not the sole reason for you not being included in my strategy council going forward. There have been many incidences over your tenure of failing to follow through on tasks you agreed to complete and also not informing the other legion members in a timely fashion so that they could help. Here is some examples for you to consider:

*Cannot be held accountable for your own guild (IC is aware of how badly the allies page is fucking up), isn't worried about being labelled a criminal (and endorses negative and unrelated leftist politics on TST-affiliated social media). TST WA Allies should be about Satanism. On March 4th, this was told to you and ADJ, but just as recently as two days ago, there is a post about ableism.  (this as a post from an individual is great - as TST WA not acceptable).

*Failed to attend a meeting to specifically address concerns about your guild which you were notified of and agreed to be there weeks in advance, and left ADJ (a non-lead in that guild) to answer for your guild. Your failure to attend that meeting led us to not be able to implement fixes that could have avoided IC catching wind of it's off-mission abuse of the Tenets to push personal agendas.

*As Guild Head of Publicity, you did not initiate, conceive, nor execute ANY publicity campaign for our biggest action in two years.

*Failed to work with Evergreen for P4P despite being reminded for months and refused help from another member who also is an alum. Didn't tell anyone you were out of spoons until the day before a scheduled outing with Barrett (Barrett went alone to the campus in your place even though he is not an alum).

*Lupercalia- Made Crimson feel like her home was a hotel by asking for a separate room to be made up for you last minute. Spent the night and left without cleaning or informing someone else that cleaning needed to happen. When

SER 43

discussed in Legion, did not own up to your contribution of the problem for several days.

Personally, I do like you as a person and enjoy your company, but this is "business" and I have to set my personal feelings aside and create the best team possible for the chapter. I need people to actually do the things they commit to so no one person gets overloaded, and who can communicate their lack of ability to complete a task with enough time for the group to recover. You have proven yourself incapable of these behaviors so I have adjusted my expectations accordingly.

Thank you for your understanding,
Siri

On Fri, Mar 13, 2020 at 4:24 PM Lenore Calavera <lenorecalavera@gmail.com> wrote:

> Greetings!
>
> I'd really like to know what I did to undermine leadership? I was CCd on Wylie's email, but I did not read or sign off on it's content. These are not my words, I thought I was being CCd as a witness to a complaint. You called me out specifically. You know this chapter and community is important to me. Please. What did I do wrong?
>
> Sincerely,
> Lenore
> [Quoted text h dden]

# EXHIBIT 2

| | | |
|---|---|---|
| 👤 Claimed ownership of the Page | Q **Queer Satanic Memes** | May 6, 2020, 4:53 PM |
| 👤 Removed Faye Meehan as an editor | 🖼 **Faye Meehan** | Apr 29, 2020, 1:13 PM |
| 👤 Added Nathan Von Sullivan as an editor | 🖼 **A David Johnson** | Mar 30, 2020, 4:25 PM |
| 👤 Changed Faye Meehan from an admin to an editor | 🖼 **A David Johnson** | Mar 30, 2020, 4:24 PM |
| 👤 Changed Faye Meehan from an admin to an editor | 🖼 **A David Johnson** | Mar 30, 2020, 4:24 PM |
| 👤 Changed Faye Meehan from an editor to an admin | 🖼 **Joshua Calavera** | Mar 14, 2020, 6:55 PM |
| 👤 Removed Barret Daniels as an editor | 🖼 **Joshua Calavera** | Mar 14, 2020, 6:07 PM |
| 👤 Removed Leah Fishbaugh as an editor | 🖼 **Joshua Calavera** | Mar 14, 2020, 6:07 PM |
| 👤 Removed Tarkus Claypool as an admin | 🖼 **Joshua Calavera** | Mar 14, 2020, 6:07 PM |
| 👤 Removed Lilith Starr as an admin | 🖼 **Joshua Calavera** | Mar 14, 2020, 6:06 PM |
| 👤 Removed Siri Sanguine as an admin | 🖼 **Joshua Calavera** | Mar 14, 2020, 6:06 PM |
| 👤 Added Barret Daniels as an editor | 🖼 **Siri Sanguine** | Jan 6, 2020, 8:05 AM |
| 👤 Added Faye Meehan as an editor | 🖼 **Joshua Calavera** | Jan 5, 2020, 4:25 PM |
| 👤 Changed A David Johnson from an editor to an admin | 🖼 **Siri Sanguine** | Jan 1, 2020, 6:24 PM |
| 👤 Changed Joshua Calavera from an editor to an admin | 🖼 **Siri Sanguine** | Jan 1, 2020, 6:24 PM |
| 👤 Added Leah Fishbaugh as an editor | 🖼 **Siri Sanguine** | Dec 21, 2019, 11:09 AM |
| 👤 Added Joshua Calavera as an editor | 🖼 **Siri Sanguine** | Dec 21, 2019, 11:02 AM |
| 👤 Added A David Johnson as an editor | 🖼 **Siri Sanguine** | Dec 21, 2019, 10:41 AM |
| 👤 Added Siri Sanguine as an admin | 🖼 **Tarkus Claypool** | Nov 11, 2019, 7:28 PM |
| 👤 Removed Vapula Lix as an admin | 🖼 **Tarkus Claypool** | Nov 11, 2019, 7:04 PM |
| 👤 Removed Kitty Piersing as an admin | 🖼 **Tarkus Claypool** | Nov 11, 2019, 7:04 PM |
| 👤 Removed Derek Piersing as an admin | 🖼 **Tarkus Claypool** | Nov 11, 2019, 7:03 PM |

# EXHIBIT 3

 **Evergreen Memes for Queer Satanic Fiends**
Published by Joshua Calavera ● · March 14, 2020 · ●

\*\*This page is no longer affiliated with The Satanic Temple.\*\*

Ave Satanas!

I was recently notified that talking about transphobes and ableism was considered not to be relevant to The Satanic Temple's "International Council" in Salem or to the local chapter in Washington State.

So by talking about leftist politics like how "The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions," this page wasn't being Satanic.

Specifically:
"(IC is aware of how badly the allies page is fucking up), isn't worried about being labelled a criminal (and endorses negative and unrelated leftist politics on TST-affiliated social media). TST WA Allies should be about Satanism. On March 4th, this was told to you and ADJ, but just as recently as two days ago, there is a post about ableism. (this as a post from an individual is great - as TST WA not acceptable)."

So to be clear, this page thinks ableism, misogyny, and racism are superstitions, fascists are bad, transphobes can shut the fuck up, and the only good bootlickers do it for a kink and not because they love making excuses for cops killing people.

No gods, no masters.

Be gay, do crime, hail Satan

# EXHIBIT 4

 David Johnson <somedavidjohnson@gmail.com>

---

## [tst-washington] TST WA Allies group on Facebook

**Siri Sanguine** <sirisanguine@gmail.com>                    Sat, Mar 14, 2020, 7:48 PM
To: <tst-washington@googlegroups.com>

Good evening,

It has be brought to our attention that Lenore Calavera has stolen our FB page TST WA Allies and renamed it "evergreen memes for queer satanic fiends". I have informed our contacts at IC and are awaiting advice on next steps.

Due to this rogue behavior Lenore is not longer to be considered a member of TST WA and will be placed on the National list of banned members for their theft.

Thank you,
Siri
[Quoted text hidden]

# EXHIBIT 5



**Evergreen Memes for Queer Satanic Fiends**

1 message

**Tarkus Claypool** <tarkus.claypool@gmail.com>                                                       Sat, Mar 14, 2020 at 9:09 PM
To: Lenore Calavera <lenorecalavera@gmail.com>

Hi Lenore,

I saw that you made some changes to the TST WA State Allies FB group. I just wanted to let you know that it's yours free and clear and we've no desire to claim it. You and ADJ built it and have done a great job doing so. I'm confident you'll both continue doing awesome work.

Sorry the way things panned out, and I do mean all of it. I wish you and your family well, and respect your need to fight the fight your way.

Rock on,

-Tarkus Claypool
Media Liaison, The Satanic Temple of Washington
(he/him)
--
CONFIDENTIALITY NOTICE
The content of this email is confidential and intended only for those parties who received the email directly from the tarkus.claypool@gmail.com address. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender.

# EXHIBIT 6

Case 2:20-cv-00509-RAJ Document 44-1 Filed 12/11/22 Page 23 of 36
Case 2:20-cv-00509-RAJ Document 44-1 Filed 12/11/22 Page 23 of 36

# r/SatanicTemple_Reddit - TST Court Update! (May 26, 2022) -- this one is by TST's lawyer

Hello everyone! Thank you for your interest in TST's legal efforts. I'm Matt Kezhaya, TST's general counsel. I am recently the subject of a Federal Judge's ire, which is actually pretty normal in my law practice (TST cases and otherwise).

So I've been made aware that Mr. "Chip on my shoulder after Matt bailed out on a podcast taping because I misled him into believing I'm a TST supporter" Hail Satan Podcast guy is crowing about a sanctions order against me. I felt the community was entitled to know the other side of the story.

I'll start with the bottom line-upfront. Yes, I am ordered to pay about $17,000 of my own personal money because I have been a very naughty boy, or so the Judge says. I have a different take, of course. Basically this sanctions order is the product of a bait-and-switch scheme. TST was told that some of its claims were legally insufficient, and were to be dismissed from an ongoing lawsuit ("TST 1"). But, TST was assured that it was entitled to fix the claims and refile them. I asked the Court if I could fix the claims in the ongoing lawsuit ("TST 1") and a magistrate said "no." A magistrate is not allowed to preclude other lawsuits, and TST was told it could refile the dismissed claims, so I refiled the dismissed claims as "TST 2." The District Judge later affirmed the magistrate's then-six-month-old decision to tell me "no" and, since I already filed TST 2, TST 2 was to be dismissed without leave to refile and I owe the City's lawyers $17,000 for them having to get TST 2 dismissed. Again, bait-and-switch: "you can refile" turned into "how dare you refile."

That's the short version. If you're interested in the case, read on. If not, I'll be around to answer questions about TST's legal efforts. No promises on answering every question. If I think your question is harmful to the organization I'll probably ignore it, unless I feel like fucking with you. I'm TST's cheerleader, so please note that I am maximum biased in TST's favor. I will not answer any questions related to the idiots that call themselves "QueerSatanic," or their idiot-conspiracy theories. My only comment on that topic is:

> I can't believe you morons have spent more than $80,000 fighting to keep TST's Facebook page. You are pathetic. You have no concept of civil liberties, or what is at stake by the ever-encroaching theocracy. Your lawyer is gentleman and a scholar. I hope he squeezes every last penny from you living corpses, and anyone that gives you the time of day.

Not very "First Tenet," or whatever, but you can't teach an old war dog new tricks.

On with Belle Plaine.

This case arose from TST's efforts to get equal treatment to a "limited public forum" (a place where a government opens its private property for the purpose of accommodating expressive activity about a particular topic), which the City of Belle

Plaine opened, "basically so the cross could stay in the Park" (that's a verbatim quote from the mayor, follow this link to see him say it for yourself, it's at 1:15 - 1:20). The full meeting can be found here. The primary purpose of that meeting was to hear out the local Catholic priest's religious objection to the City granting TST equal access to the forum.

Rewind about four months, and the City Council had a meeting to hear out a proposal to open the Park to private monuments. The full meeting can be found here. The proposal was prepared by the ADF (a Christian legal advocacy group) and presented by the Veterans Group, who were proponents of putting this Christian monument in the park.

At that meeting, Councilor Stier, who would later become the tie-breaking vote asks for assurances there would be no competitor monuments by an Atheist or Satanic group:

> I've seen monuments that are going up in Detroit right now that

have [a] Satanic meaning to them. So, how can we up here, be

assured that, number one, these monuments won't go into that

Park?

The proponent of the proposal assured him that, indeed, the proposal is designed to allow in their good Christian monument to the contemplated exclusion of dirty Atheists or Satanists:

> There is [sic] specific criteria . . . [that] the monument would be

consistently seen in other memorial parks. A Satanic statute is

not consistently seen in other memorial parks. Your foxhole, for

an atheist foxhole thing, is not consistently seen in other

memorial parks.

The particularly astute among you might think "That's super illegal, they can't do that!" And you are correct. The City Attorney tells them as much:

> [T]his is illustrating my concern . . . The concern is that if the

intent is, or the effect of the criteria is, to eliminate certain

messages, that is constitutionally suspect–which is putting it

nicely. That is exactly what is not allowed: [which] is for the

government to establish rules which prevent certain religions

from speaking.

You can hear the above exchange for yourself by following this link.

Councilor Stier was also concerned about the FFRF having a monument, but the FFRF never did join in on the fun. They correctly figured that once we got involved, the Cross would go away.

The City attorney was very much against the proposal because, obviously, TST would be demanding equal access to this forum. We told them as much. Ultimately, the final policy was clear that everyone is allowed in, but your display would have to honor Belle Plaine veterans.

So, TST did what it is famous for and created a display that honors Belle Plaine veterans. It's beautiful. The artist even donated $40,000 worth of services, just because he supports the cause. But, once TST announced it was ready for some of that constitutionally-guaranteed equal access to the "free speech zone," the City delayed installation efforts until they closed the forum.

So, TST did what it is famous for and sued the government for a whole lot of constitutional violations. The problem is that this was before my involvement with TST, so the complaint not up to the task of overcoming judicial bias. Follow this link to see their complaint. Compare mine. See, TST's original lawyers made the fatal error of thinking that TST actually receives its rightful "equal treatment under the law." No, I'm afraid that judges are willfully ignorant about basic concepts like "recuse if you feel like you are biased" once it comes time to dogpile onto an oppressed minority religion.

The Judge hand-waved some basic notions like "free speech" and "Satanists have just as much a right as Christians to participate in the public square," and dismissed all but one claim for various reasons. But we were told that we could refile (that's what "Dismissed without prejudice" means).

Rather than file a whole other lawsuit, I figured "hey let's just have one lawsuit, that's twice as efficient for everyone!" Boy was I wrong. Basically, the magistrate chastised me because I waited two months to get started on discovery, on a case that had been running for 1.5 years. Fuck me for having other cases, I guess. And since I was "dilatory," I could take TST's dismissed claims and I could fuck all the way off.

So that put me in a bit of a pickle. TST needed a dismissal "with prejudice" or I can't appeal. But the Magistrate said I'm not allowed to bring those claims into TST 1. But I was told I could refile. And Magistrates lack the power to preclude claims. And, if I appealed the Magistrate's order, the District Judge was almost certain to affirm the Magistrate, which *might* preclude the claims (District Judges do have the power to preclude claims.)

So, I said "fuck the Magistrate, and the police while you're at it" and filed the claims (which I really can't overstate had been "dismissed without prejudice") as a separate lawsuit. I was entitled to filethem all along, so if the Magistrate wants to be inefficient, that sounds like "not-me" problem. Boy was I wrong.

I guess the moral of the story is, if a judge tells you that you are entitled to refile some dismissed claims as a separate lawsuit, the judiciary can take its "strong preference for judicial economy" and shove it all the way up their collective asses. Better to ask for forgiveness because, if you ask for permission first, you risk paying your chickenshit adversary $17,000. God forbid the insurance company take a loss.

The underlying orders of dismissal are on appeal. If you want to hear me say all the above in a professional tone and with all the legal authority to back up why I'm right about everything and the District Judge is a big dum-dum, the briefing is worth a read.

- Here is my opening brief.

- Here is the appendix (which has all the important record entries)

  - TST 1 and

  - TST 2; and

- Here is the addendum (which has all the orders at issue).

- Here is my reply, which explains why the City's response to my opening brief is full of shit.

You'll want the appendices and addendum handy to cite-check my claims about what the record says.

I didn't share the filemarked copies because, for some ungodly reason, efiling removes bookmarks and I think bookmarks are incredibly helpful.

You can get their response from PACER (case no. **21-3079**), but it's not worth reading because it is the legal equivalent of "nuh uh," except they didn't even respond to most of my points. I would share my copy, but it has all of my super-secret notes and highlighting on it.

I will appeal the sanctions order. And I am asking for reassignment if I win either appeal.

AMA re: TST legal stuff.

SER 57

# EXHIBIT 7

stormsmcgee comments on TST Court Update! (May 26, 2022) -- this o...          https://web.archive.org/web/20220527211543/https://www.reddit.com/r/...

r/SatanicTemple_Reddit    [ COMMENTS ]

Want to join? Log in or sign up in seconds. | **English**

**Welcome to Reddit,**

**the front page of the internet.**

[ BECOME A REDDITOR ]    and join one of thousands of communities.

▲
**93**
▼

self

\+

**TST Court Update! (May 26, 2022) -- this one is by TST's lawyer** [ Question / Discussion ]  (self.SatanicTemple_Reddit)

submitted 20 hours ago * by stormsmcgee

31 comments   share   save   hide   report

sorted by: **best**

┌─────────────────────────────────────────────────────────┐
│                    **Want to add to the discussion?**     │
│                       **Post a comment!**                 │
│                                                           │
│                  **CREATE AN ACCOUNT**                    │
└─────────────────────────────────────────────────────────┘

you are viewing a single comment's thread.
view the rest of the comments →

▲  [–] **SexDrugsRockRollYay**   13 points 20 hours ago
▼
   1. Do you feel that the losses in TST's cases thus far have been based on legitimate legal findings, or simply because of some unfair/illegal treatment from judges?

   2. You mention some work done by previous lawyers. In your professional opinion, would the end results have been different if you were at the helm?

   3. Why is the QS case so taboo to speak about?

   permalink   embed   save   report   reply

   ▲  [–] **stormsmcgee** [S] 16 points 19 hours ago*
   ▼
      │ Do you feel that the losses in TST's cases thus far have been based on legitimate legal findings, or simply because of some unfair/illegal treatment from judges?

      That's a hefty question. I think it's a combination of the federal judiciary being overtaken by the right-wing, in reaction to the ~1960s Warren Court, which has resulted in an aversion to civil rights generally, all on the one hand; and a general aversion to the name "Satan" on the other. A lot of what TST goes through is pretty well known everywhere. Particularly in the criminal "justice" system. But, TST is held to unfair standards. But it wouldn't be Satanism without "Satan" and "American Humanists" are disrespected in the courts similarly. Over time, TST will gain more popularity, will become accepted as normal, and will start getting equal treatment under the law. Everything boils down to the system's perception of clout.

      │ You mention some work done by previous lawyers. In your professional opinion, would the end results have been different if you were at the helm?

      Frankly, no, but only because TST 1 was filed before the *Scottsdale* loss. There, two councilors wrote literal op-eds in the local newspaper that they intended to exclude TST from the "all-comer" legislative prayer policy. Less than two months later, TST was excluded. The Judge just couldn't connect the dots because they blamed the City Manager, who answers to both of those politicians, but who did *not* publicly state that he is a bigot. Because he denied under oath that he was a bigot, that was

**t**

Search

┌─────────────────────────────────────────────────────────┐
│ this post was submitted on 27 May 2022                    │
│ **93** points (96% upvoted)                               │
│ shortlink:  `https://redd.it/uy`                          │
└─────────────────────────────────────────────────────────┘

username

password

☐ remember me    reset password

[ LOGIN ]

[ POST LINK / IMAGE ]    [ POST TEXT ]

Get an ad-free experience with special benefits, and directly support Reddit.

[ **Get Reddit Premium** ]

**r/SatanicTemple_Reddit**
[ JOIN ]
**111 BROWSING**                    **36,688 USERS**

Welcome to the UNOFFICIAL subreddit for The Satanic Temple and Satanists who identify with the Seven Tenets. This is the best place on Reddit for TST-related news, blogs, questions, memes, art, merch, discussion topics, and more. Enjoy your stay, and Hail Satan!

Menu:

**TST Satanism FAQ**: Information About TST Satanism

**Satanic Ministry**: Access the Resources Pertinent Towards Becoming a Minister of Satan

**Web-Resource Index**: Links to Free Online Resources and More

**Satanic Subreddit Index**: List of Pointers to Other Satanic Subs

**Give Feedback**: Help Guide the Subreddit's Development by Communicating Ideas to the Mods

SER 59

stormsmcgee comments on TST Court Update! (May 26, 2022) -- this o...          https://web.archive.org/web/20220527211543/https://www.reddit.com/r/...

## r/SatanicTemple_Reddit   COMMENTS

Want to join? Log in or sign up in seconds. | English

content to say "it's a fact issue, nothing we can do for you."

After *Scottsdale*, I attach every shred of evidence I can get from the public record that the defendant broke the law. TST is just held to egregious standards that another religion (cough, Christian Right) are just not.

| Why is the QS case so taboo to speak about?

TST is in litigation with QS. You don't talk about a lawsuit while it's ongoing. Everything you say in the public record *will* be used against you. The rules carve out, whole-cloth, the bar against hearsay just so a party can use an adversary's out-of-court statements against you. Thus, we don't talk about QS.

permalink   embed   save   parent   report   reply

 [–] **Damaged142**   Hail Satan!   2 points 18 hours ago

I wish you could speak about QS because they have pointed me to some of the court documents as well as a very well put together summary of the litigation so far... and while trying to not come across as offensive, I can't help but feel TSTs case/evidence as well as the overall approach seems... very poorly put together. The term, throwing spaghetti at the wall and see what sticks has been thrown around and tbh that's what it seems like. At lest to me, in this one particular case, as someone with no legal experience lol

permalink   embed   save   parent   report   reply

 [–] **stormsmcgee**  [S]  9 points 18 hours ago

At this stage of proceedings, it is very normal for the parties to go back and forth about what issues will be litigated. ==Plaintiffs always want to have as many options available because who is to say how the facts will shake out. Defendants always want to constrain the plaintiff's choices for the same reason. Litigation is zero-sum. If Plaintiff wants something, that is generally bad for Defendant. And vice versa.==

At the end of the day, TST is suing QS because QS stole TST's facebook page. The people we are suing publicly bragged that they "stole" the page. ==I wanted some federal statutes to apply because that would maximize TST's damages, would keep us in Federal court (as opposed to State court), and provided the option to collect attorney's fees for having to litigate this.== They have a diametrically opposite incentive. The Court ultimately agreed with them as to the Federal claims. The state claims survive. Maybe I overcomplicated things by bringing up the Federal issues, or maybe the Judge decided wrong. That will be for the Ninth Circuit to decide.

permalink   embed   save   parent   report   reply

 [–] **Krillpocalypse**   2 points 8 hours ago

If you're still willing to answer a question about this topic, I was hoping you could clarify something for me. I occasionally check the QS case on courtlistener, and it seems like earlier this month the case was dismissed in full. I admit that I am having a bit of trouble understanding all the legalese (even though I work tangentially with lawyers). Would you be willing to clarify what the status of the case is? Is it ongoing, is it dismissed with chance to appeal, is it a little of column A and a little of column B, etc.?

permalink   embed   save   parent   report   reply

 [–] **stormsmcgee**  [S]  6 points 6 hours ago

The case was *dismissed in part, not in full*. The surviving claims are tortious interference (defendants wrongfully interfered with the

**Rules:**
1. Follow the Seven Tenets of The Satanic Temple. Posted at the FAQ of this subreddit as well as on TST's website. You can find the page with them here.
2. No Visual Sexual Content. Decision is up to mods. If unsure ask. Common exceptions will be things like the school system's idea of "Sex Ed." If your post contains non-sexual nudity, please mark NSFW.
3. Posts Looking For Chapter Info Belong In The Stickied Thread.
4. No Proselytizing. Defined here as: To attempt to convert someone to one's own religious faith. This is a TST sub, but since membership here is not restricted to TST members, we ask only that you respect the choice of other Redditors in this regard.
5. No Doxing. *Any mention of another user's inexplicitly-disclosed personal info will result in a ban, severity of which will be determined according to the offense.* It is no secret that there are others who would like to see us harmed or harassed; our Reddit pseudonyms are an important line of defense against this. Do not act against this defense.

**Discord Channels:**
- SatanicTemple_Reddit
- Black Mass Appeal

**Similar Subreddits:**
- r/atheism
- r/secularhumanism
- r/TrueAtheism

**Satanic Arts/Media Subs:**
- r/MusicForDemons
- r/SatanicMusic
- r/satanicliterature
- r/SatanicProse
- r/SatanicArt
- r/black_phillip
- r/hellsomememes
- r/Satanic_Memes
- r/SatanicGaming

**General Satanic Subs:**
- r/satanists : English Common Sub
- r/Satanismus : Gemeinsames Deutsches Sub
- r/Religion_satanica : Sub Común Español
- r/satanizm : Türkçe Ortak Sub

**Holidays:**
- Jan. 22nd: Roe v. Wade Observance
- Feb. 15th: Lupercalia
  Based on the Roman festival of the same name, Lupercalia falls on February 15. In keeping with the ancient tradition, February 13th and 14th are observed as feast days leading up to the actual holiday. What we are translating this to in TST is a "hail yourself" day. This idea offers a parallel to the "others-centered" traditions of Sol Invictus.
- April 30th: Hexennacht

stormsmcgee comments on TST Court Update! (May 26, 2022) -- this o...        https://web.archive.org/web/20220527211543/https://www.reddit.com/r/...

**r/SatanicTemple_Reddit** [ COMMENTS ]

Want to join? Log in or sign up in seconds. | **English**

Facebook page), and conversion (defendants wrongfully deprived TST of the Facebook page). The difference between trespass to chattels and conversion is one of degree.

All three surviving claims are questions of Washington State law, not Federal law. Defendants have moved for dismissal from Federal Court because, they argue, TST cannot show that there is an "amount in controversy" of at least $75,000 (which is required for Federal jurisdiction). I have announced resistance to the motion. I need to come up with a credible justification that it is not-impossible a jury could legally award at least $75,000 in damages.

Since punitive damages are on the table, that really means I really only need to justify $12,500 in out-of-pocket damages. Punitive damages can be up to 6x compensatory damages (out-of-pocket losses). I've been mired in Belle Plaine since they filed the motion, so I haven't yet had an opportunity to evaluate the damages.

Alternatively, I have seen case law that says a Federal court has discretion to exercise jurisdiction over state law claims that arise from the same facts as a dismissed federal question. That will probably be part of the response as well.

My response is due at 11:59 pm, Pacific Time, on June 6.

permalink  embed  save  parent  report  reply

> ▲ [–] **Krillpocalypse** 3 points 4 hours ago
> ▼
> Thank you for taking the time to explain this to me! I try to read through the court documents when I can, but there's a lot and it's hard to follow sometimes when you're a non-lawyer.
>
> Since this post seems to be in response to the post yesterday, I'll assume you looked at the older post, in which case you may have seen where I said I was frustrated because I felt like you keep "shitting the bed", and I mentioned you by name since you're lead counsel. My frustrations are with when cases seem to go south due to more administrative or clerical issues, such as the Belle Plaine one with the multiple filing issues and with the Boston convocation then-mayoral-candidate deposition situation where the judge mentioned that part of the reason for dismissing the case was due to TST's counsel being overly aggressive. Obviously I don't know what's going on with every aspect of the court cases; I can't even understand everything I'm reading when I try. I just wanted to apologize to you about that - I do appreciate the work you're doing, and I do think that the cases being brought forth are important.
>
> permalink  embed  save  parent  report  reply
>
> > ▲ [–] **stormsmcgee** [S] 1 point 4 hours ago
> > ▼
> > More than happy to. I consider it part of my role as "TST's lawyer" to explain to TST's membership (not just TST's decisionmakers) what I am doing, why I am doing it, and how it affects the organization.
> >
> > Re: ¶ 2, thank you for the kind words. Please know that I only know this stuff because I eat, sleep, and breathe the practice of law. Non-lawyers aren't expected to know all of the ins-and-outs because that's what lawyers are for. But be wary that there are people out there who will prey on ignorance. Sometimes they will have a personal or financial interest in distorting the truth, and sometimes

the vorarephagesis. Revelry atop Mount Brocken. TST's Hexenacht is a solemn holiday to honor those who were victimized by superstition.

- June 6th: Devil's Night Observance

  666

- July 25th: Unveiling Day

  A centerpiece of our religious movement and icon of modern Satanism, the Baphomet with Children statue was commissioned by The Satanic Temple in 2014 and is created by Mark Porter with "respect for diversity and religious minorities" in mind. On July 25, 2015, The Satanic Temple unveiled Baphomet to a large crowd of devotees in Detroit, signaling the beginning of the new Satanic era. We observe this milestone in Satanic history by celebrating Unveiling Day.

- Sept. 30th: Blasphemy Day Observance

- Oct. 31st: Halloween

  Halloween is consistently described as evil, demonic, and satanic by those steeped in religious dogma. Costumes, candy, and facing fears are to be embraced.

- Dec. 25th: Sol Invictus

  The cult of Sol existed within Rome since its early days as a republic, and Invictus was an epithet used for Jupiter, Mars, and Apollo (among others). The festival celebrated these gods and may have also been used to celebrate the winter solstice, though this is debatable.

Satanist-Owned Businesses:

- Pins, Oils, and Perfumes: Hexenacht
- Satanic Ritual, Writing, and Art: Serpentinae
- PBN Satanic Tea Company: Pitchblacknorth
- Satanic Clothes, Jewelry, and More: Ashemadeva
- Satanic Art Prints, Clothes, and More: Darkartdepository

a community for 3 years

**MODERATORS**

**MESSAGE THE MODS**

Moderator list hidden. Learn More

theme @ r/eddited

SER 61

**r/SatanicTemple_Reddit**   COMMENTS

Want to join? Log in or sign up in seconds. | **English**

behind fluff, assessing the evidence for yourself, and then coming to a judgment based on logic and reason. And I double-commend you for being open to reconsidering a prior judgment based on new information.

Have you considered becoming a judge? We sure could use more like you.

permalink   embed   save   parent   report   reply

about
blog
about
advertising
careers

help
site rules
Reddit help center
reddiquette
mod guidelines
contact us

apps & tools
Reddit for iPhone
Reddit for Android
mobile website

<3
reddit premium
reddit coins

Use of this site constitutes acceptance of our User Agreement and Privacy Policy. © 2022 reddit inc. All rights reserved.
REDDIT and the ALIEN Logo are registered trademarks of reddit inc.

π

SER 62

# EXHIBIT 8



**Matt Kezhaya**
@matt_kezhaya

•••

Replying to @satanicherald and @QueerSatanic

Are these fuckwits still talking about me? Grow up, and file an answer so I can get at your financial records. I'm coming for you. Tell the judge on me again, I double dare you.

2:20 PM · Nov 16, 2022 · Twitter for Android

# EXHIBIT 9



# KEZHAYA LAW PLC

MATTHEW A. KEZHAYA
1202 NE MCCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

October 29, 2021

Hon. Arnold Pacho
     **By ECF only**

Re: <u>Satanic Temple v. Boston</u> (21-cv-10102) – explanatory statement

Dear Judge,

Subject to and without waiving the separate letter objection, I submit this letter in compliance with the Court's order requiring Plaintiff to, by October 29, 2021 at 9:00 am, file a statement: (1) which explains why the deposition of Councilor Michelle Wu was scheduled for November 2, 2021; and (2) which shall not address any other issue (doc. 36).

This case is a matter of public interest. As a case of public interest, I expected the notice of deposition would inspire (or force) Wu to think about *all* of the people from whom she was seeking a vote of confidence on November 2–no matter the color of their skin, the flavor of their creed, or the origin of their mother tongue. I expected that she would be inspired to, if not appear and give truthful testimony about why my client simply cannot seem to convince a single sitting Councilor to extent an equal right to participate in this "non-discriminatory" governmental exercise of religion–despite three demands since 2016–at least recognize that we are a nation committed to appreciate each other. Not in spite of our differences, but because of them.

I expected, perhaps naively, that a mayoral candidate for a city that holds stewardship over Bunker Hill, Faneuil Hall, and the USS Constitution would have paused to think about what her candidacy means. Maybe it would even result in that precious invite, that public acknowledgment that my client stands on equal footing in the eyes of the law as other religions.

And, if not, I expected that the matter would at least be something the public takes heed of. Perhaps, if not the above, the public may take note of the caliber of Wu's character: as one who asserts an interest in diversity and inclusion, provided of course that it is politically expedient.

At bottom, my litigation strategy on this matter involved pitting Wu's and the City's litigation goals (i.e., concocting a credible lie as to why my client will never receive an



# KEZHAYA LAW PLC

MATTHEW A. KEZHAYA
1202 NE MCCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

invite, but which is also somehow not unconstitutional religious discrimination) against Wu's personal goals (i.e. winning her mayoral election). My bet was that her self-interest would win out against the litigation, and she would choose to expend her limited time and efforts on her campaign as opposed to internalizing whatever post-hoc justification the City comes up with based on the extrinsic proof.

Or, I would accept as a consolation prize, that Michelle Wu would cut off her nose to spite her face by publicly announcing her self-appointed status as above the law. Contra. Jones v. Clinton, 72 F.3d 1354, 1358 (8th Cir.) ("[T]he President, *like all other government officials*, is subject to the same laws that apply to all other members of our society") (emphasis added) (cited with approval by the Supreme Court at Clinton v. Jones, 520 U.S. 681, 688, 117 S. Ct. 1636, 1641 (1997)).

Certainly, no *ordinary* citizen would be entitled to flaunt a subpoenaed deposition date by asserting they are "slightly busy" on that particular day. See https://twitter.com/wutrain/status/1453479768901423110 ("I will be slightly busy on this day.") No, an *ordinary* citizen would be expected to offer an alternative date of mutual agreeability. Contra. doc. 35 at pp. 2-5.

All of the foregoing is and was perfectly permissible under the Rules of Civil Procedure. By merely issuing the notice of deposition, I forced a cascading chain of events that has drawn public attention to this dispute, has reduced the City's ability to detriment my cause, and has increased the likelihood that my client would procure its sought-after invitation to participate in the prayer ceremony whether by judicial decree or by public pressure. The onus was then on the City to seek an alternative date–a offer they made and then reneged upon. Doc. 35 at pp. 2-5.

I feel no remorse for the action I took. As an attorney, it is my sworn duty to do anything short of breaking the law to see to it that my client's goals are recognized. This business of litigation is zero-sum. Everything I do which can benefit my client will cause an equal and opposite effect on the other side. I serve my purpose with all the zealous advocacy which my oath commands. And I expect nothing less from my adversaries.

Sincerely,
/s/ Matthew A. Kezhaya

CC: City's counsel of record (**by ECF**)

The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

UNITED FEDERATION OF CHURCHES,
LLC d/b/a THE SATANIC TEMPLE,

        Plaintiff,

        v.

DAVID ALAN JOHNSON, an individual;
LEAH FISHBAUGH, an individual;
MICKEY MEEHAM, an individual; and
NATHAN SULLIVAN, an individual,

        Defendants.

No. 2:20-cv-00509-RAJ

**DECLARATION OF NATHAN SULLIVAN IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

NOTED ON MOTION CALENDAR:
December 16, 2022

I, Nathan Sullivan, declare as follows:

1.      I am a former member of The Satanic Temple ("TST"). In 2014, I was a co-founder of TST's Washington Chapter ("TST-WA"). During my membership, I served in a volunteer capacity in an advisory role in a group referred to as the Strategy Council.

2.      As part of my volunteer work with TST-WA and the Strategy Council, I was aware that TST required TST-WA to appoint a person in the role of Media Liaison. The chapters were mandated to create the Media Liaison role at the explicit, written behest of TST's National Council. The Media Liaison was responsible for representing TST to the

DECLARATION OF NATHAN SULLIVAN IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 1

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

media at the local level. It was always my understanding that the Media Liaison had the authority to represent and speak for TST's interests.

3.      On or around August 5, 2016, Paul Case was appointed to the position of Media Liaison for TST-WA. In his work with TST, Paul Case uses the pseudonym Tarkus Claypool.

4.      Paul Case/Tarkus Claypool remained TST-WA's Media Liaison throughout the time of the events alleged in TST's lawsuit in 2020, including during March of 2020.

5.      In approximately late 2019, TST-WA appointed Leah Garvais as its Chapter Head. Leah Garvais uses the pseudonym Siri Sanguine in her work for TST. It is my understanding that before and after becoming TST-WA's Chapter Head, Leah Garvais/Siri Sanguine was also the treasurer of TST-WA and was also formerly a governor of the for-profit "Infernal Washington, LLC," which used "TST WA" as a business name.

6.      On or around December 13, 2019, for personal reasons I decided to take an indefinite leave of absence from my volunteer work with TST-WA, including my work on the Strategy Council. This decision was supported by TST-WA, including Leah Garvais/Siri Sanguine and Paul Case/Tarkus Claypool, who conveyed that they warmly supported my decision to take a leave of absence. Over the next few months, I was contacted only a few times by either of them (for example, to provide login information for an email account used to handle membership applications, which I readily provided) while I focused on personal matters. I believed that at that time I was in excellent standing with TST-WA.

7.      On March 12, 2020, while I was still on leave from my volunteer work with TST-WA, I received a mass email from Leah Garvais/Siri Sanguine. The email stated that TST-WA had been investigating a complaint made by another member, which had apparently been preceded by an argument between other council members. To my shock, the email accused me and others of having been involved in an alleged coalition ostensibly intended to attack and undermine TST's leadership. The email announced Leah Garvais/Siri Sanguine's

DECLARATION OF NATHAN SULLIVAN IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 2

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 69

decision to dissolve the committee I had served on and replace it with a smaller, handpicked group. At that point, I had no idea that anyone's membership was at stake.

8. On March 14, 2020, Leah Garvais/Siri Sanguine sent another mass email reiterating her plan to dissolve the existing committee and create a smaller Strategy Council.

9. A few hours later on March 14, 2020, Leah Garvais/Siri Sanguine sent yet another email to Mickey Meehan (a co-defendant in this suit), who at the time used the pseudonym Lenore Calavera. Garvais/Sanguine alleged that Meehan/Calavera had "stolen" a Facebook page she referred to as "TST WA Allies," that he had renamed to "Evergreen Memes for Queer Satanic Fiends" (referred to hereinafter as "Memes Page"[1]). She also stated that Mickey Meehan/Lenore Calavara was now banned from TST nationwide while Garvais awaited next steps from TST's International Council (formerly the National Council).

10. On the night of March 14, 2020, following Leah Garvais/Siri Sanguine's earlier emails, Paul Case/Tarkus Claypool sent an email to my co-defendant Mickey Meehan/Lenore Calvera that Mickey shared with me. In the email, Paul/Tarkus states he had seen that Mickey/Lenore had changed the name of "TST WA Allies" page and states that Mickey/Lenore was free to use the page (the Memes Page) "free and clear" and TST had no interest in reclaiming the page:

> Hi Lenore,
>
> I saw that you made some changes to the TST WA State Allies FB group. I just wanted to let you know that it's yours free and clear and we've no desire to claim it. You and ADJ built it and have done a great job doing so. I'm confident you'll both continue doing awesome work.
>
> Sorry the way things panned out, and I do mean all of it. I wish you and your family well, and respect your need to fight the fight your way.
>
> Rock on.
>
> Tarkus Claypool

---

[1] In its motion and pleadings, TST refers to the Memes Page as the "Allies page."

DECLARATION OF NATHAN SULLIVAN IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 3



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1  Media Liaison, The Satanic Temple of Washington.

2  Attached as **Exhibit 1** is a true and correct copy of the March 14, 2020 message from Paul

3  Case/Tarkus Claypool to Mickey Meehan/Lenore Calavera.

4        11.     The following day, on March 15, 2020, Leah Garvais/Siri Sanguine, Paul

5  Case/Tarkus Claypool, and other remaining advisors of TST-WA held an online TST town

6  hall meeting over Zoom, attempting to provide an explanation to the rest of the members of

7  TST-WA as to why so many members had suddenly been removed.

8        12.     During the recorded town hall meeting, at approximately 30:43 minutes into

9  the recording, Leah Garvais/Siri Sanguine displays a hand-drawn organizational chart that

10  depicts TST's internal hierarchy as follows: Executive Ministry -> International Council ->

11  Chapter Heads/Media Liaisons -> Members. Attached as Exhibit 1 is a true and correct photo

12  of the Zoom town hall meeting at approximately time stamp 30:43. The abbreviation "CH"

13  in the drawing being held up by Leah Garvais refers to Chapter Head and the abbreviation

14  "ML" refers to Media Liaison. I understood and continue to understand this chart to mean

15  that Chapter Heads and Media Liaisons are vested with authority to act on behalf of TST. An

16  electronic copy of a video of that town hall meeting is submitted as Exhibit 1 to the

17  Declaration of Jeremy Roller in Opposition to Plaintiff's Motion for Preliminary Injunction

18  ("Roller Decl.").

19        13.     In the same town hall meeting, Garvais/Sanguine explained that the reason we

20  (the defendants in this suit) were removed as members is that we had been cc-ed on an email

21  to TST from the former member who had made the complaint. Exhibit 1 to Roller Decl. at

22  35:40.

23        14.     In the same town hall meeting, Paul Case/Tarkus Claypool again states that

24  TST does not want the Memes Page back:

25      I do want to say that **we're not going to, you know, ask Lenore [Mickey
    Meehan] to give the page back in any way**. I wish them well. I wish them

26      well, and I hope that they continue growing that and make it a great success.
    Because they're going to fight their fight, their way. And so, let them do

DECLARATION OF NATHAN SULLIVAN IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 4

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

what they want to, and I wish them well, because both Lenore and ADJ did a wonderful job in the roles that they had. It just wasn't within the TST guidelines that we are beholden to. So I want to give them due credit, and just you know, wish them well with what they're going to plan to do with it in the future.

Paul Case/Tarkus Claypool's statement is at approximate timestamp 1:20:35 on the video.

15. I am aware that in its Motion for Preliminary Injunction, TST points to a comment I made in a Facebook post on March 15, 2020, in which I say that we "stole" the Memes Page from TST. At the time I made that statement, it was meant to be glib or tongue-in-cheek as TST had already let us know that we could use the Memes Page "free and clear." By being glib and using the word "stole," I was merely trying to express that I was upset at the events and also to express the fact that the Memes Page would no longer be affiliated with TST. At that time, because TST had twice represented that it had no interest in the page and we could use it "free and clear," it was clear to me, to my co-defendants, and to anyone who saw TST's Media Liaison's statement at the town hall meeting that we were free to use the Memes Page.

16. Consistent with telling us that we could use the Memes Page "free and clear," TST never asked us to give it control of the Memes Page. Although I am aware that TST worked through Facebook to remove some of my co-defendants as administrators on another Facebook page – the TST WA Chapter page – I am not aware of TST ever asking Facebook to remove us as administrators from the Memes Page. Nor did TST ever ask us to give them control of the Memes Page until this last June of 2022, when we filed our latest motion to dismiss and TST's attorney, Matt Kezhaya, then told our attorney, Jeremy Roller that TST was going to seek an injunction because it now wanted to control the Memes Page.

DECLARATION OF NATHAN SULLIVAN IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 5

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1        I declare under penalty of perjury of the laws of the United States that the foregoing

2    is true and correct.

3

4        DATED: December 12, 2022, at Seattle, Washington.

5

6                                              Nathan Sullivan

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF NATHAN SULLIVAN IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 6

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1

## CERTIFICATE OF SERVICE

2      I certify that on this date I electronically filed the foregoing document with the Clerk

3  of the Court using the CM/ECF system, thereby sending a notification of such filing to the

4  following parties:

5

**LYBECK PEDREIRA & JUSTUS, PLLC**

6

7  Benjamin Justus
   Chase Bank Building                    ☐ E-mail
8  7900 SE 28th Street, Fifth Floor        ☐ U.S. Mail
   Mercer Island, WA 98040                 ☒ E-filing
9  ben@lpjustus.com

10 **KEZHAYA LAW PLC**

11 Matthew A. Kezhaya                       ☐ E-mail
   1202 NE McClain Rd                      ☐ U.S. Mail
12 Bentonville, AR 72712                    ☒ E-filing
   matt@kezhaya.law
13

14

15

16 Dated this 12th day of December, 2022, at Seattle, Washington.

17                                         /s/ Janet Fischer
                                           Janet Fischer
18                                         Paralegal

19

20

21

22

23

24

25

26

DECLARATION OF NATHAN SULLIVAN IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 7

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

# EXHIBIT 1



## Evergreen Memes for Queer Satanic Fiends
1 message

**Tarkus Claypool** <tarkus.claypool@gmail.com>                                    Sat, Mar 14, 2020 at 9:09 PM
To: Lenore Calavera <lenorecalavera@gmail.com>

Hi Lenore,

I saw that you made some changes to the TST WA State Allies FB group. I just wanted to let you know that it's yours free and clear and we've no desire to claim it. You and ADJ built it and have done a great job doing so. I'm confident you'll both continue doing awesome work.

Sorry the way things panned out, and I do mean all of it. I wish you and your family well, and respect your need to fight the fight your way.

Rock on,

-Tarkus Claypool
Media Liaison, The Satanic Temple of Washington
(he/him)
--
CONFIDENTIALITY NOTICE
The content of this email is confidential and intended only for those parties who received the email directly from the tarkus.claypool@gmail.com address. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender.

The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

UNITED FEDERATION OF CHURCHES,
LLC d/b/a THE SATANIC TEMPLE,

                    Plaintiff,

            v.

DAVID ALAN JOHNSON, an individual;
LEAH FISHBAUGH, an individual;
MICKEY MEEHAM, an individual; and
NATHAN SULLIVAN, an individual,

                    Defendants.

No. 2:20-cv-00509-RAJ

**DECLARATION OF JEREMY ROLLER IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

NOTED ON MOTION CALENDAR:
December 16, 2022

I, Jeremy Roller, declare as follows:

    1.     I am a member of the law firm Arete Law Group PLLC, counsel for defendants David Johnson, Leah Fishbaugh, Mickey Meehan, and Nathan Sullivan (collectively, "Defendants") in this matter. I make this declaration upon personal knowledge and, if called to testify, could and would testify competently to the facts set forth herein.

    2.     Attached hereto as **Exhibit 1** is an electronic copy of a recording of a March 15, 2022 online (Zoom) meeting in mp4 format under the title "GMT20200315-220437_Town-Hall-_640x360 (1).mp4." The electronic copy of this recording was provided to me on December 6, 2022, by David Johnson. The electronic copy of the recording is being

DECLARATION OF JEREMY ROLLER
IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 1

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1  submitted to the Court on a thumb drive.   The file GMT20200315-220437_Town-Hall-

2  _640x360 (1).mp4 will be provided to opposing counsel today via FTP.

3          3.      Between Wednesday, June 22, 2022, and Friday, June 24, 2022, Plaintiff's

4  lead counsel, Matthew Kezhaya, and I had a series of email exchanges relating to Plaintiff's

5  intention to bring an application for temporary restraining order.   Attached hereto as **Exhibit**

6  **2** is a true and correct copy of that email exchange, including an email I had attached to my

7  June 23 email to Mr. Kezhaya, which is further described in the contemporaneously filed

8  Declaration of David A. Johnson in Opposition to Plaintiff's Motion for Preliminary

9  Injunction and Declaration of Nathan Sullivan in Opposition to Plaintiff's Motion for

10  Preliminary Injunction.

11

12          I declare under penalty of perjury of the laws of the United States that the foregoing

13  is true and correct.

14

15          Executed in Seattle, Washington, on December 12, 2022.

16

17                                          */s/ Jeremy Roller*

                                            Jeremy Roller

18

19

20

21

22

23

24

25

26

DECLARATION OF JEREMY ROLLER
IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 2

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**CERTIFICATE OF SERVICE**

I certify that on this date I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, thereby sending a notification of such filing to the following parties:

Benjamin Justus
Lybeck Pedreira & Justus, PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
(206) 687-7805
ben@lpjustus.com

Matthew A. Kezhaya
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
(479) 431-6112
matt@kezhaya.law

DATED: December 12, 2022, at Seattle, Washington.

*/s/ Janet Fischer*
Janet Fischer
Paralegal

DECLARATION OF JEREMY ROLLER
IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00509-RAJ – Page 3

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

# EXHIBIT 1

Filed in Physical Form

# EXHIBIT 2

| From: | Matthew A. Kezhaya |
|---|---|
| To: | Jeremy Roller |
| Cc: | Benjamin Justus; Sonia A. Kezhaya |
| Subject: | Re: TST v. Johnson -- demand for return of Allies page; notice of forthcoming motion for TRO/Prelim. Injunction. |
| Date: | Friday, June 24, 2022 4:58:04 PM |
| Attachments: | image001.png |
| | image.png |
| | image001.png |

Thanks for your patience.

My original email did not recognize your previously-noticed vacation. I apologize for causing you offense. This business is stressful enough even with vacations. At no point did I intend to even suggest that I would be interfering with your time off. I have a lot of cases to oversee and your notice of unavailability simply slipped my mind. As indicated in an earlier email, I have absolutely no intention of filing anything before July 9, other than the previously-addressed letter to the Court that the Rule 65 motion and the motion to amend are forthcoming but are delayed by your vacation.

I wish you had revealed your case theory before yesterday at close of business. We could have gotten on the same page sooner, rather than litigating serial motions to dismiss over the past 27 months. Maybe that would have saved our clients a lot of time and money; not to mention Court's time and attention. Based on your email, it appears that your clients intend to rely on the affirmative defense of waiver. See FRCP 8(c) (waiver is an affirmative defense); *E.g. Kellogg v. Nat'l R.R. Passenger Corp.*, 199 Wash. 2d 205, 229, 504 P.3d 796, 810 (2022) (waiver is universally the "intentional and voluntary relinquishment of a known right and can be made unilaterally and without consideration.") More particularly, your clients appear to be under the misimpression that Tarkus had the power to waive TST's claim. As detailed below, your clients are either mistaken about the law or are confused about the facts. Below, I address the errors in their analysis. This is not a Rule 11 warning letter. See FRCP 11(c). My purpose in this letter is to invite a discussion so that we can tailor our briefing to focus on the issues of dispute.

*1: Your clients waived their waiver defense.*

Your clients will have a threshold problem of overcoming an objection that they waived their waiver defense. *See Trinity Universal Ins. Co. of Kansas v. Ohio Cas. Ins. Co.*, 176 Wash. App. 185, 197, 312 P.3d 976, 983 (2013)

(an affirmative defense, including waiver, is waived by either (1) the
defendant's assertion of a defense is inconsistent with previous behavior;
or (2) the defendant is dilatory in asserting the defense). Defendants
waived their defense because they stated they "stole" the website (not it
was given to us); and did not file a timely answer which asserts the waiver
defense. FRCP 8(c), 12(a)(4).

## 1.1: Your clients acted inconsistently with their waiver defense by publicly declaring they "stole" the Allies page.

Your clients waived their defense by stating, one day after receiving
Tarkus's email, that they "stole" the Allies page. 2d Am. Compl. exhibit 5,
at 3 (doc. 26-5 at 3). That one declaration demonstrates that they knew
full well that TST did not waive any claims and they knew full well that
they had no lawful right to possess it. But their subjective beliefs are not
at issue. The law examines their actions, not their self-serving testimony.
By publicly declaring they "stole" the Allies page, your clients cannot
thereafter claim that TST "gave" them the Allies page.

## 1.2: Your clients were dilatory in noticing their waiver defense.

Further, your clients waived their defense by being dilatory in noticing
their waiver defense. At play is a policy that a defendant may not inhibit
the litigation process with "trial by ambush" tactics. *Lybbert v. Grant
Cnty., State of Wash.*, 141 Wash. 2d 29, 40, 1 P.3d 1124, 1130 (2000).
The email on which your clients rely was sent on March 14,
2020, *i.e.* more than two years ago. They have had more than an
adequate opportunity to notice this defense within the timing of the rules,
and yet they chose to sit on it until it was convenient for their case
strategy.

The rules do not allow for this tactic. Affirmative defenses are presented in
the answer. FRCP 8(c). There is a deadline to file the answer. FRCP 12(a).
That deadline is extended up to 14 days after an order denying a motion
to dismiss, unless the court orders otherwise. FRCP 12(a)(4). The Court
did not order otherwise. Doc. 31. Thus, your clients' timely Rule 12(b)(6)
motion extended the deadline to timely notice their affirmative defenses,
but only for 14 days after the order disposing of their Rule 12(b)(6)
motion to dismiss. FRCP 12(a)(4). The motion to dismiss was denied on
April 15, 2022. Doc. 31. Fourteen days later was April 29, 2022. Thus,
your clients' deadline to issue proper notice of their affirmative defenses
(waiver included) has lapsed. If this email was some new evidence not

previously available to your clients, I would be persuadable that they have not been dilatory. But, again, they have had this email for over two years. Thus, your clients failed to timely preserve their affirmative defense. Your Rule 12(b)(1) motion, hypothetically, could have further extended the deadline, but that was not filed by April 29, 2022.

## 2: Tarkus did not have the power to waive TST's claim.

Assuming without conceding that the Court will overrule the above objection, your clients' waiver defense still fails on the merits. While Tarkus was an "agent," he lacked both express and apparent authority to waive TST's chose in action. Thus, even if Tarkus had the intention of waiving TST's chose in action (he didn't), the waiver defense still fails.

## 2.1: We agree that Tarkus was an "agent."

At the relevant time of this email, Tarkus was the Media Liaison for TST. We agree that Tarkus was a common law "agent" of TST, *i.e.*:

> Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

*Restatement (Third) Of Agency* § 1.01 (2006); *Univ. of Washington v. City of Seattle*, 188 Wash. 2d 823, 837, 399 P.3d 519, 526 (2017) (explicitly adopted in Washington); *Ajemian v. Yahoo!, Inc.*, 478 Mass. 169, 176, 84 N.E.3d 766, 772 (2017) (same in Massachusetts).

Clearly Tarkus had authority to act for TST in *some* capacity. That was the apparent end of your clients' analysis, but it is not the end of ours.

## 2.2: Tarkus did not have authority to waive any claims to the Allies page.

The legal question at play in your clients' waiver defense is whether TST intentionally waived its chose in action. To support that claim, your clients assert that Tarkus was an agent. But that is missing a necessary step. To waive TST's claim, Tarkus first needed authority. *See Restatement (Third)*

*Of Agency* 2 Intro. Note (2006). Authority may be "actual" or "apparent." Tarkus had neither.

### 2.2.1: Tarkus did not have "actual" authority.

The scope of Tarkus's actual authority is the subject of an agreement. See Restatement (Third) Of Agency § 2.01 (2006) ("An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act"). To substantiate my claim, I have affiliation agreement documents. These documents are being withheld, for now, because they are sensitive operational materials that are not available to the public and are not to be made available to the public. If you agree to a protective order that these materials shall be attorneys-eyes-only (*i.e.*, made available to you or any successor counsel of record and your support staff), shall never be made available to the *Johnson* defendants or the public, and shall be destroyed upon demand, I will be happy to provide them to you. Otherwise, I need to move the Court for a protective order and you will have to take me at my word below.

Tarkus's agreement with TST is comprehensive. Tarkus's scope of authority entailed the power to *use* (not own) TST's "Protected Content." Affiliation Agreement at § 2. "Protected Content" is contractually-defined to include any TST Facebook page. Id. at § 1(b). Tarkus's right to *use* the page does not translate into an *ownership* interest. Tarkus had to ensure that TST had administrative access to the Allies page at all times. Affiliation Agreement at p. 3, § 4(c). Tarkus disclaimed any ownership over the Allies page (and any other "Protected Content"), and he even covenanted not to directly or indirectly aid others in contesting TST's ownership of the Allies page. Id. § 6(a). Not only did Tarkus not have actual authority to convey a Facebook page, the contract explicitly precludes a claim that he did have actual authority to claim it.

Plainly, TST's Allies page is both *a* Facebook page and is *TST's* Facebook page. *E.g.,* 2d Am. Compl. at Exhibit 3 (doc. 26-3); see also South Sound Satanists Operational Guide. The South Sound Satanists Operational Guide controls the Allies page (which, at the time, was named the "South Sound Satanists: Friends of TST"). The Operational Guide was in existence since May 2019, well before your clients co-opted my client's property in March 2020 (see screenshot of metadata, below).

The Operational Guide permitted your clients to access the page but, again, access is not ownership. The Operational Guide repeatedly reinforces that the Allies page is the property of TST, and that it is subject to TST's control at all times. Id. at art. II, pt. D, § 3(a)(1). I am informed that your clients were provided this Operational Guide. They had subjective knowledge that TST, and not Tarkus, had the sole ownership rights and sole control rights over the Allies page. Thus, there is no meritorious claim that Tarkus had any "actual" authority to waive TST's claim to exclusive ownership over the Allies page.



image.png

## 2.2.2: Tarkus did not have "apparent" authority.

Nor did Tarkus have any "apparent" authority to waive TST's claim to exclusive ownership over the Allies page. Such apparent authority must be rooted in a "manifestation," traceable to TST, which caused your clients to "reasonably believe" that Tarkus had the power to abandon the claim. See Restatement (Third) Of Agency § 1.03 (2006) (a manifestation occurs where "A person [here, TST] manifests assent or intention through written or spoken words or other conduct"); Restatement (Third) Of Agency § 2.03 (2006). As the proponent of the claim that Tarkus had authority to act in this way for TST, it is your clients' burden to prove the following: (1) there was a manifestation that Tarkus could abandon the claim; (2) that manifestation is traceable to TST; and (3) that manifestation affords a reasonable basis for your clients to believe that Tarkus had the power to abandon the claim. See State v. Bryant, 146 Wash. 2d 90, 104, 42 P.3d 1278, 1285 (2002) ("The burden of establishing agency rests upon the one who asserts it"); see also, generally, FRCP 8(c) (waiver is an affirmative defense).

Concededly, the email satisfies the first element. However, it does not, by itself, prove the second or third elements. The second element is missing

because Tarkus is legally distinct from TST and had no actual authority to act on behalf of TST in this manner. The third element is missing because no reasonable person can rely on the manifestations of the agent to prove the agent's scope of apparent authority. *State v. Bryant*, 146 Wash. 2d 90, 103–04, 42 P.3d 1278, 1285 (2002) ("Apparent authority of an agent can be inferred only from the acts and conduct of the principal; the extent of an agent's authority cannot be established by his own acts and declarations.") Thus, Tarkus's email is not, by itself, a meritorious ground to assert a waiver defense.

## 3: There is no waiver or laches in a Rule 65 motion.

Your email contemplates a defense that a Rule 65 motion is time-barred. You do not enunciate any particular equitable theory, so I assume it is one of waiver or laches. At no point has TST indicated that it waives the right to pursue injunctive relief before a final judgment on the merits. That TST seeks injunctive relief is evident from the caption on the original complaint as well as its prayer for relief. Nor is there any deadline for TST to move for such relief. Nor is there any form of reasonable and detrimental reliance, by your clients, upon TST not filing the motion sooner. Mostly because of your clients' strategy of filing serial Rule 12 motions, there has been no plan for discovery, trial preparation, and no other substantive activity. When this litigation began, it was in a lower priority category, relative to TST's other organizational goals. That has changed in light of your clients' repeated efforts (in connection with the cause of action here) to induce third parties into making defamatory claims about TST. Now that I am having to sue out a series of defamation claims all over the country because of your clients, my attention has been forced to this matter instead of the organization's otherwise more important goals. That change, caused by your clients, preempts any claim of "dilatory" conduct.

You do not otherwise rebut my points and authorities, so I assume there is no bona fide dispute about whether your clients are in possession of my client's property in violation of my client's exclusive property rights. Again, your clients publicly admitted to all of the necessary elements to the legal claims by stating they "stole" the Allies page. 2d Am. Compl. Exhibit 5, at 3 (doc. 26-5, at 3).

I do not address secret evidence.

You also make a cryptic reference to a "video by another TST agent in which that agent states--after the alleged misappropriation--that 'we're not going to ask [my client] to give the page back in any way.' " I do not address secret evidence. Present the proof and tie it to a discrete legal theory, with substantiating authorities, or do not waste my time with innuendo.

I am not impressed by Rule 11 bluffs.

You also make a cryptic threat of Rule 11 sanctions, but your email does not purport to satisfy the requirement of a Rule 11 letter. FRCP 11(c)(1). I am not impressed by bluffs. Serve the motion as contemplated by the rule, or do not waste my time. Be you forewarned that any Rule 11 motion will be met with a counter-demand for attorney's fees from you, personally, when it fails. FRCP 11(c)(2) ("If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion"); FRCP 11, 1993 amendment notes ("Monetary responsibility for such violations [a frivolous legal contention] is more properly placed solely on the party's attorneys.")

No waiver

My statements above are intended to prompt discussion for more productive briefing. Nothing in this email is intended to waive any argument, claim, defense or otherwise.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300

Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was
intended for a particular recipient.  If it appears that I sent this to you in
error, please inform me and delete this message.


On Fri, Jun 24, 2022 at 2:34 PM Matthew A. Kezhaya <matt@kezhaya.law> wrote:
> Likewise, *buon viaggio*.
>
> Matthew A. Kezhaya
>
> Arkansas office:
> Kezhaya Law PLC
> 1202 NE McClain Rd
> Bentonville, AR 72712
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> Minnesota office:
> Kezhaya Law PLC
> 333 N Washington Ave, #300
> Minneapolis, MN 55401
> p: (479) 431-6112
> f: (612) 349-2760
> e: matt@kezhaya.law
>
> This message may contain confidential or privileged information and was
> intended for a particular recipient.  If it appears that I sent this to you in
> error, please inform me and delete this message.
>
>
> On Fri, Jun 24, 2022 at 2:33 PM Jeremy Roller <jroller@aretelaw.com> wrote:
>> Thank you, and have a good weekend.
>>
>>
>> Jeremy
>>
>>
>> **Jeremy Roller**

**Signature Block7**

[image]

www.aretelaw.com | direct: (206) 428-3254

---

**From:** Matthew A. Kezhaya <matt@kezhaya.law>
**Sent:** Friday, June 24, 2022 12:31 PM
**To:** Jeremy Roller <jroller@aretelaw.com>
**Cc:** Benjamin Justus <ben@lpjustus.com>; Sonia A. Kezhaya <sonia@kezhaya.law>
**Subject:** Re: TST v. Johnson -- demand for return of Allies page; notice of forthcoming motion for TRO/Prelim. Injunction.


That is fair. There will be no form of a request for injunctive relief before July 9. We have also identified that we are contemplating a motion for leave to amend. That will also not be filed before July 9. I will, however, likely file a letter notice to the Court that these forthcoming motions are not being filed until or on after July 9 by agreement of counsel in light of your previously noticed vacation.


Matthew A. Kezhaya


Arkansas office:

Kezhaya Law PLC

1202 NE McClain Rd

Bentonville, AR 72712

p: (479) 431-6112

f: (612) 349-2760

e: matt@kezhaya.law


Minnesota office:

Kezhaya Law PLC

333 N Washington Ave, #300

Minneapolis, MN 55401

p: (479) 431-6112

f: (612) 349-2760

e: matt@kezhaya.law


This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.


On Fri, Jun 24, 2022 at 2:28 PM Jeremy Roller <jroller@aretelaw.com> wrote:

> Matt,
>
> Just tell me whether or not you are going to be filing a TRO application or PI motion between now and July 9. I need to know that. It's not too much to ask.
>
> Jeremy
>
> **Jeremy Roller**
>
> **Signature Block7**
> 
>
> www.aretelaw.com | direct: (206) 428-3254
>
> ---
>
> **From:** Matthew A. Kezhaya <matt@kezhaya.law>
> **Sent:** Friday, June 24, 2022 12:21 PM
> **To:** Jeremy Roller <jroller@aretelaw.com>
> **Cc:** Benjamin Justus <ben@lpjustus.com>; Sonia A. Kezhaya <sonia@kezhaya.law>
> **Subject:** Re: TST v. Johnson -- demand for return of Allies page; notice of forthcoming motion for TRO/Prelim. Injunction.

I will respond in good time.


Matthew A. Kezhaya


Arkansas office:

Kezhaya Law PLC

[1202 NE McClain Rd](#)

[Bentonville, AR 72712](#)

p: (479) 431-6112

f: (612) 349-2760

e: [matt@kezhaya.law](mailto:matt@kezhaya.law)


Minnesota office:

Kezhaya Law PLC

333 N Washington Ave, #300

Minneapolis, MN 55401

p: (479) 431-6112

f: (612) 349-2760

e: [matt@kezhaya.law](mailto:matt@kezhaya.law)


This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.


On Fri, Jun 24, 2022 at 2:20 PM Jeremy Roller <[jroller@aretelaw.com](mailto:jroller@aretelaw.com)> wrote:

Matt and Ben,

Can you get back to me on my inquiry at the end of my email below?  I need to figure out whether I need to try to get one of my partners up to speed on this matter in the next few hours.  Thanks.

Jeremy

**Jeremy Roller**



www.aretelaw.com | direct: (206) 428-3254

---

**From:** Jeremy Roller
**Sent:** Thursday, June 23, 2022 4:08 PM
**To:** Matthew A. Kezhaya <matt@kezhaya.law>
**Cc:** Benjamin Justus <ben@lpjustus.com>; Sonia A. Kezhaya <sonia@kezhaya.law>
**Subject:** RE: TST v. Johnson -- demand for return of Allies page; notice of forthcoming motion for TRO/Prelim. Injunction.

Matt,

Thank you for your email.  I must admit I am perplexed by it, both in timing and substantively.  Below and attached are a few points for your consideration.

1. As to timing, as you should know from the notice of unavailability I filed in early June, I am out of the office the weeks of June 27 and July 4.  If this were just a trip to visit family members somewhere in the U.S., I wouldn't have filed such a notice and likely would be able to deal with anything filed in this case or other matters.  But I am going abroad and do expect to be pretty close to fully disengaged.  Indeed, on the first half of the trip I will be hiking with my family in the Dolomites and am unlikely to have even cell phone service (and will certainly not have a computer in my backpack).  This case has been pending for

nearly two and a half years, and there is no reason why this proposed preliminary injunctive relief need be considered in the only period of time I have truly been out-of-pocket since before COVID.

2. Further as to timing, TST's long delay in seeking injunctive relief severely undermines its claim of irreparable harm. *See, e.g., Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (upholding district court's finding that delay of approximately three months before seeking preliminary injunction "undercut [Plaintiff's] claim of irreparable harm"); *see also Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action.") (quoting *Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959)).  Nothing prevented TST from bringing this request for preliminary injunctive relief 27 months ago.  That all this time has passed will severely undercut, if not be fatal to, TST's request for preliminary injunctive relief.  Much more, seeking a TRO now given that passage of time is plainly unwarranted.

3. The purpose of preliminary injunctive relief is to preserve the status quo pending determination of the action on the merits.  *L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1200 (9th Cir. 1980).  Here, the status quo— for years—has been that my clients have controlled the Allies page.  In limited circumstances, a court will issue a mandatory (as opposed to prohibitory) injunction, as TST threatens here.  But "[a] mandatory injunction goes well beyond simply maintaining the status quote pendente lite and is particularly disfavored."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).  Indeed, "[i]n general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages."  *Id.*  The mandatory injunction TST threatens is not based on alleged harm that comes close to meeting this high standard.

4. Finally, you are wrong that TST has an "indisputable" likelihood of success on the merits.  There are abundant reasons for that, but the attached email (along with other evidence in my clients' possession) is fatal to TST's claim as to the Allies page.  In this email, TST's Paul Case / Tarkus Claypool, writes that the Allies page is "yours free and clear and we've no desire to claim it."  Critically, this email was sent *after* the alleged appropriation about which TST complains.  Case / Claypool plainly was acting as an agent of TST.  Indeed, TST's Second Amended Complaint (and First Amended Complaint and original Complaint) relies upon Case / Claypool's demand for return of the Chapter page.  This is not the only evidence of TST's abandonment of any claim to the Allies page.  For example, my clients possess a video by another

TST agent in which that agent states—after the alleged misappropriation—that "we're not going to ask [my client] to give the page back in any way." Given this evidence, any TRO application or preliminary injunction motion seeking return of the Allies page would violate your and Mr. Justus's Rule 11(b) certifications that "it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," and that "the factual contentions have evidentiary support." Indeed, given that you now have this evidence (which I presume your client has not previously provided to you), you should drop the claims as to the Allies page. I don't invoke Rule 11 lightly – in 20+ years of practice I can count on one hand the number of times I have raised it – but it does apply here.

This is not an exhaustive recitation of the reasons TST's contemplated TRO application / PI motion is unwarranted.

Please confirm by tomorrow morning that TST will not seek a TRO or preliminary injunction relating to the Allies page. If TST is unwilling to do that, at a minimum please confirm that no such application or motion will be filed between now and my return from Italy on July 9.

Thank you.

Jeremy

**Jeremy Roller**

**Signature Block7**


www.aretelaw.com | direct: (206) 428-3254

---

**From:** Matthew A. Kezhaya <matt@kezhaya.law>
**Sent:** Wednesday, June 22, 2022 1:44 PM
**To:** Jeremy Roller <jroller@aretelaw.com>
**Cc:** Benjamin Justus <ben@lpjustus.com>; Sonia A. Kezhaya <sonia@kezhaya.law>
**Subject:** TST v. Johnson -- demand for return of Allies page; notice of forthcoming

motion for TRO/Prelim. Injunction.

Hi Jeremy,

Please see below for a formal demand for the immediate return of the Allies page to the exclusive control of my client. If your clients do not heed this demand, I will file a motion for temporary restraining order and for preliminary injunction. My points and authorities for the motion are under enumerated headers below. This letter is intended to satisfy my notice obligations under FRCP 65(a)(1) and (b)(1)(B).

## *Demand for the return of the Allies page*

I've seen in some of your briefing an objection that TST has not formally demanded the return of the Allies page. In recognition that a formal demand is not necessary to plead or prove the trespass to chattels or conversion claims, see doc. 31 at 27-28, please consider this email an immediate demand for the return of full control over the Allies page to TST. And I do mean this demand for full control shall be "immediate" *i.e.*, "occurring without delay; instant." *Black's Law Dictionary*, IMMEDIATE (11th ed. 2019).

Notwithstanding the formality of my demand, I assume your clients will continue to refuse to relinquish control of TST's property. In response, I will have to move for a temporary restraining order and preliminary restraining order. FRCP 65(a), (b). Each request requires two showings: (1) a likelihood of success on the merits; (2) irreparable harm; and (3) the balance of the equities favors immediate relief. I am prepared to show all points.

## *1: TST has a likelihood of success on the merits*

It confounds me, that your clients refuse to relinquish control over my client's property *because* success on the merits is inevitable. Indisputably, your clients are in possession of my client's property. The Allies page was created by an agent of TST in the course and scope of the agency to propagate TST's message. Facebook publishes all former names of every Facebook page; the subject

website began as "South Sound Satanists: Friends of TST." 2d Am. Compl., doc. 26-3, **Exhibit 3**. Your clients even eliminated any potential defense of a good faith mistake when they publicly bragged that they "stole" TST's website. 2d Am. Compl., doc. 26-3, **Exhibit 5** at 3. They knew the property was not theirs and they knew that it was unlawful for them to be in possession of it. Yet they took that property anyway.

It is bad enough that your clients are self-described "thieves." It is worse that they went even further by "stealing" their former principal's property for the purpose of making the initial capital contribution to their competitor organization. **Id.** at 3-4. That was a breach of their fiduciary duty of loyalty to their principal. See Restatement (Second) of Torts § 874 (1979); *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*, 110 Wash. App. 412, 433–34, 40 P.3d 1206, 1217–18 (2002); *Ward v. Costello*, No. 984871J, 2002 WL 31973253, at *7 (Mass. Super. Dec. 17, 2002); *Hanover Ins. Co. v.* Sutton, 46 Mass. App . Ct. 153, 167, 705 N.E.2d 279, 290 (1999) ("A person who owes a fiduciary duty to a corporation is prohibited from taking, for personal benefit, an opportunity or advantage that belongs to the corporation.")

Based on your clients own public admissions, it is indisputable that TST has a "likelihood of success on the merits."

## *2: TST is continuing to incur irreparable harm*

Not only does my client have a likelihood of success on the merits, my client will continue to suffer irreparable harm during the pendency of this litigation. Your clients are using my client's property to cause reputational harm to my client. E.g. **Exhibit 1** (publicly discouraging people from associating with TST, using TST's "stolen" advertising platform). Your clients repeatedly claim that they have a right to criticize TST. They do. They just need to do it within the bounds of the law, *i.e.*, by limiting their criticisms to matters of pure opinion (as opposed to provably-false facts or mixed opinions that impliedly suggest a provably-false factual premise); and they need to do only in connection with their own social media platforms. If they could just mind the legal limits of their criticisms, we could all go our separate ways in peace.

But they aren't. As stated above, it is an abuse of my client's property rights (and your clients' fiduciary duties) to use my client's property to make harmful statements about my client. Irrespective of any defamation liability, the reputational harm is *still* enjoinable through the trespass to chattel and conversion claims. *Galaxy Oil Co. v. Ameeti*, No. SACV2100311CJCKESX, 2021 WL 4047405, at *3 (C.D. Cal. Mar. 9, 2021) (applying California common law claims). Same for the tortious interference claim. *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058 (N.D. Cal. 2000).

Reputational harm is textbook "irreparable harm." E.g. *Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). As is plain from the posts and commentary on my clients' website, your clients' use of my clients' property is causing my client reputational harm. Thus, irreparable harm exists and TST is entitled to a TRO and a preliminary injunction.

You have previously objected that Washington's application of the common law *may* be different from other States' common law. Doc. 37 at 9. But that's a fallacious appeal to ignorance. It is your threshold burden to demonstrate that the end result is different under two States' laws. *Woodward v. Taylor*, 184 Wash. 2d 911, 917, 366 P.3d 432, 435 (2016). Washington, Massachusetts, and California, all receive the common law, unless the common law is repugnant to or inconsistent with Federal or State law. RCW §§ 1.12.030 and 4.04.010 (Washington); Mass. Const. Pt. 2, C. 6, art. VI (Massachusetts); Cal. Civ. Code § 22.2 (California).

Thus, irreparable harm exists under the common law, notwithstanding that some of my authorities come out of California or Massachusetts or the ALI's *Restatements of the Law*.

*3: The equities favor immediate injunctive relief.*

The motion also requires a balance of the equities. Magistrate Judge Ryu has found that the balance of the equities favors an injunction where the "Plaintiff essentially seeks to enjoin illegal activity and not legitimate business operations by [the] Defendant." *Zynga Game Network, Inc. v. Goh*, No. C-09-05297-SBA (DMR), 2011 WL 13376996 (N.D. Cal. Feb. 14, 2011), *report and recommendation adopted,* No. C 09-05297 SBA, 2011 WL 13376997 (N.D. Cal. Mar.

1, 2011).

As stated in § 1, your clients' use of my client's property is in violation of my client's exclusive rights. Your clients are engaging in ongoing illegal activity. It is not a legitimate business operation to "steal" someone's website. *Zynga*, above. Thus, the balance of equities clearly favor an immediate return.

### *4: There should be either no bond or a nominal bond.*

A bond is contemplated by the Rules. FRCP 65(c). The purpose of this security requirement is to compensate the enjoined party for any harm from a wrongful injunction. Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2954 (3d ed.). I can conceive of no credible argument that your clients would be "harmed" by a wrongful injunction. The property indisputably belongs to TST. The Defendants had no colorable claim to "steal" their principal's property. There is no harm in the loss of "their" social media platform. They should not have built the platform on property which belongs to another. Thus, there should be either no bond or a nominal bond.

## Summary

We can fight about damages during the litigation. But *pendente lite*, my client is entitled to exclusive control over its property. Your clients must return the property immediately, or I will move for immediate injunctive relief at my earliest opportunity. As you can see, the motion is all but drafted. I am not waiting for an affirmative response that the property will be returned. Please have your clients return full control of the Allies page, immediately and without any further modification.

Matthew A. Kezhaya

Arkansas office:

Kezhaya Law PLC

1202 NE McClain Rd

Bentonville, AR 72712

p: (479) 431-6112

f: (612) 349-2760

e: matt@kezhaya.law


Minnesota office:

Kezhaya Law PLC

333 N Washington Ave, #300

Minneapolis, MN 55401

p: (479) 431-6112

f: (612) 349-2760

e: matt@kezhaya.law


This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.



## Evergreen Memes for Queer Satanic Fiends

1 message

**Tarkus Claypool** <tarkus.claypool@gmail.com>                                     Sat, Mar 14, 2020 at 9:09 PM
To: Lenore Calavera <lenorecalavera@gmail.com>

Hi Lenore,

I saw that you made some changes to the TST WA State Allies FB group. I just wanted to let you know that it's yours free and clear and we've no desire to claim it. You and ADJ built it and have done a great job doing so. I'm confident you'll both continue doing awesome work.

Sorry the way things panned out, and I do mean all of it. I wish you and your family well, and respect your need to fight the fight your way.

Rock on,

 Tarkus Claypool
Media Liaison, The Satanic Temple of Washington
(he/him)
--

CONFIDENTIALITY NOTICE
The content of this email is confidential and intended only for those parties who received the email directly from the tarkus.claypool@gmail.com address. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender.

The Honorable Richard A. Jones

1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT
9                    FOR THE WESTERN DISTRICT OF WASHINGTON

10    UNITED FEDERATION OF CHURCHES,
      LLC d/b/a THE SATANIC TEMPLE,
11                                                No. 2:20-cv-00509-RAJ
12                        Plaintiff,              **NOTICE OF FILING OF**
                                                  **PHYSICAL MATERIALS WITH**
13            v.                                  **THE CLERK**

14    DAVID ALAN JOHNSON, an individual;          NOTED ON MOTION CALENDAR:
      LEAH FISHBAUGH, an individual;              December 16, 2022
15    MICKEY MEEHAM, an individual; and
      NATHAN SULLIVAN, an individual,

16                        Defendants.

17

18            The following is being filed in physical form with the Clerk's Office for the Western

19    District of Washington:

20            1.    A thumb drive containing an mp4 video file entitled "GMT20200315-

21                  220437_Town-Hall-_640x360 (1).mp4." This file is submitted as Exhibit 1 to the

22                  Declaration of Jeremy Roller in Opposition to Plaintiff's Motion for Preliminary

23                  Injunction and is described in the Declaration of David A. Johnson in Opposition

24                  to Plaintiff's Motion for Preliminary Injunction and in the Declaration of Nathan

25                  Sullivan in Opposition to Plaintiff's Motion for Preliminary Injunction.

26

NOTICE OF FILING OF PHYSICAL
MATERIALS WITH THE CLERK
No. 2:20-cv-00509-RAJ– Page 1



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1  The item will remain in the Clerk's custody until appropriate disposition pursuant to

2  the Local Rules and procedures of the United States District Court for the Western District

3  of Washington.

4  Dated: December 12, 2022                **ARETE LAW GROUP PLLC**

5
                                          By: */s/ Jeremy Roller*
6                                         Jeremy E. Roller, WSBA No. 32021
                                          1218 Third Avenue, Suite 2100
7                                         Seattle, WA 98101
                                          Phone:  (206) 428-3250
8                                         Fax:  (206) 428-3251
                                          jroller@aretelaw.com
9
                                          *Attorneys for Defendants David Alan*
10                                        *Johnson, Leah Fishbaugh, Mickey Meehan,*
                                          *and Nathan Sullivan*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ARĒTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I filed the foregoing document with the Clerk of the Court using the CM/ECF system, thereby sending a notification of such filing to the following parties:

Benjamin Justus
Lybeck Pedreira & Justus, PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
(206) 687-7805
ben@lpjustus.com

Matthew A. Kezhaya
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
(479) 431-6112
matt@kezhaya.law

DATED: December 12, 2022, at Seattle, Washington.

/s/ Janet C. Fischer
Janet C. Fischer
Paralegal

NOTICE OF FILING OF PHYSICAL
MATERIALS WITH THE CLERK
No. 2:20-cv-00509-RAJ– Page 3



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

The Honorable Richard A. Jones

1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF WASHINGTON
9

10   UNITED FEDERATION OF
     CHURCHES, LLC d/b/a THE SATANIC
11   TEMPLE,                                      No. 2:20-cv-00509-RAJ

12                                                **DEFENDANTS' REPLY IN SUPPORT**
                        Plaintiff,                **OF MOTION TO DISMISS FOR LACK**
13                                                **OF SUBJECT MATTER**
                  v.                              **JURISDICTION**
14
     DAVID ALAN JOHNSON, an individual;           NOTED ON MOTION CALENDAR:
15   LEAH FISHBAUGH, an individual;               **June 10, 2022**
     MICKEY MEEHAM, an individual; and
16   NATHAN SULLIVAN, an individual,

17                      Defendants.

18

19

20

21

22

23

24

25

26

DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
No. 2:20-cv-00509-RAJ



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

## I.     INTRODUCTION

In its Response to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Motion"), Plaintiff, United Federal of Churches, LLC, d/b/a The Satanic Temple ("TST"), does not deny either ground for dismissing its Second Amended Complaint ("SAC"). TST does not address or even mention the arguments Defendants presented as to why this Court should decline to exercise supplemental jurisdiction over TST's remaining state law claims. Thus, these arguments are conceded.

TST also does not deny that it failed to plead diversity jurisdiction in its SAC. Specifically, TST does not deny that its SAC does not allege that there is diversity among the parties or that its claims meet the required amount in controversy. TST simply ignores this fatal pleading failure. Instead, without seeking leave to amend, TST essentially attempts to amend its SAC by asserting for the first time that diversity exists and that it has additional, unalleged damages that push the amount in controversy over $75,000. TST's belated assertions regarding diversity and the amount in controversy should not be considered. Because TST failed to plead diversity in its SAC, the analysis in this facial jurisdictional challenge ends and TST's claims should be dismissed for lack of subject matter jurisdiction.

Even if the Court were inclined to look beyond TST's failure to plead diversity, TST's belated assertion of additional damages does not cure the lack of subject matter jurisdiction. TST's newly asserted damages are not made in good faith, as demonstrated by TST's counsel's representation to Defendants' counsel that TST did not have $75,000 in damages, as well as TST's counsel's public statements revealing bad faith in asserting additional damages, including a public statement that he needs to "come up with" damages to survive this Motion and a public statement that he hopes the attorneys' fees in this case "squeeze[] every last penny from you living corpses [referring to Defendants], and anyone that gives [Defendants] the time of day." Declaration of Jeremy Roller ("Roller Decl.") ¶¶ 3, 5 & Exs. 1, 3.

DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 1

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 107

Further, as a matter of law, TST is not entitled to newly asserted punitive damages under Washington law. Similarly, TST's baffling new assertion of "bad-faith improved value" damages is also invalid due to entirely contradictory allegations in its SAC. TST is also precluded from seeking its newly asserted damages for wrongful profits based on breach of a fiduciary duty because it has not pleaded a fiduciary relationship or breach of a fiduciary duty and because these "profits" (which in reality are donations to assist Defendants in defending against this abusive litigation) are not tied to Defendants' few surviving state law claims.

In short, TST has not, and cannot, plead diversity jurisdiction and it does not dispute that it is not appropriate to exercise supplemental jurisdiction over its state law claims. This matter should be dismissed.

## II.    ARGUMENT

### A.    TST Does not Dispute That This Court Should Decline to Exercise Supplemental Jurisdiction.

Defendants' Motion explains why, given that TST's federal claims have been dismissed, this Court should decline to exercise supplemental jurisdiction over TST's remaining state common law claims. Motion at 6-9. TST does not address or even mention these arguments in its Response. Defendants' arguments for declining supplemental jurisdiction therefore are conceded. *Texas v. United States*, 49 F. Supp. 2d 27, 31 (D.D.C. 2014) ("[T]he failure to respond to an opposing party's arguments results in waiver as to the unaddressed contentions.").

### B.    TST Does not Deny That it has Failed to Plead Diversity Jurisdiction.

Defendants' Motion sets forth the clear, facial barrier to this Court's exercise of diversity jurisdiction over TST's remaining state law claims—TST did not plead diversity jurisdiction or the factual basis for diversity jurisdiction in its SAC. Motion at 4-6. Specifically, TST does not allege diversity jurisdiction exists under its "Jurisdiction and Venue" statement in the SAC. SAC ¶¶ 5-7. Nor does TST allege anywhere in the SAC that the parties are diverse or that its claims meet the required amount in controversy threshold. "Because federal courts are of limited jurisdiction, there is a presumption against the existence of diversity jurisdiction." *Loughlin v.*



1    *United States*, 393 F.3d 155, 171 (D.C. Cir. 2004) (quoting *Naartex Consulting Corp. v. Watt*, 722

2    F.2d 779, 792 (D.C. Cir. 1983) (internal citations omitted)). Accordingly, the party seeking to

3    invoke diversity jurisdiction bears the burden of pleading the required elements for such

4    jurisdiction. Stated another way, for a court to exercise diversity jurisdiction, a plaintiff must plead

5    diversity jurisdiction, including the diversity of the parties and the required amount in controversy.

6    When a plaintiff fails to plead diversity, the court cannot exercise diversity jurisdiction. *Rilling v.*

7    *Burlington N. R. Co.*, 909 F.2d 399, 400-01 (9th Cir. 1990) ("Since [Rilling] made no allegations

8    in the complaint respecting the citizenship of [Burlington] or the dollar value of the amount in

9    controversy, the district court could not properly exercise diversity jurisdiction over [his] claim.");

10   *Citizens Comm. to Save Land Grant Railroads v. Burlington N., Inc.*, 708 F.2d 1430, 1435 (9th

11   Cir. 1983) ("Since the plaintiffs made no allegations in the complaint respecting the citizenship of

12   [defendant] or the dollar value of the amount in controversy, the district court could not properly

13   exercise diversity jurisdiction over the bond-related claim. Moreover, since the district court

14   concluded that all other causes of action raised by plaintiffs that were allegedly based on federal

15   law were either insubstantial or not within the district court's jurisdiction, the district court

16   properly exercised its discretion to refuse pendent jurisdiction over claims of violation of the bond

17   indenture based on state law."); *Schlesinger v. Councilman*, 420 U.S. 738, 745, n.9, 95 S. Ct. 1300,

18   1306, 43 L. Ed. 2d 591 (1975) ("[A] complaint under § 1331 is fatally defective unless it contains

19   a proper allegation of the amount in controversy . . . ."); *Fukuda v. Wong*, CV 19-00661 ACK-

20   WRP, 2020 WL 110746, at *2 (D. Haw., Jan. 9, 2020) (plaintiff cannot invoke diversity

21   jurisdiction when plaintiff fails to adequately plead in his complaint the diverse citizenship of the

22   parties and the required amount in controversy).

23        TST does not deny that it did not plead diversity jurisdiction in its SAC, including failing

24   to allege complete diversity or that its claims meet the required amount in controversy. Instead of

25   demonstrating why its SAC adequately pleads diversity, TST ignores its faulty SAC and, without

26   seeking leave to amend (other than announcing its intention to seek leave to amend to add a new

DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 3

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1 | party—not allegations as to damages), it asserts in its Response *entirely new contentions and types*
2 | *of damages*. Specifically, unlike the SAC, in its Response TST alleges *for the first time*, that the
3 | parties are diverse. Response at 1, 3. It also asserts *for the first time* entirely new types and amounts
4 | of damages, such as punitive damages. As a matter of law, in a facial challenge to its SAC, TST
5 | cannot sidestep its fatal pleading errors and simply offer new allegations outside of the complaint.
6 | "The essential elements of diversity jurisdiction, including the diverse residence of all parties, must
7 | be affirmatively alleged in the pleadings." *In re Mexico City Aircrash*, 708 F.2d 400, 404 n. 4 (9th
8 | Cir. 1983). Where the plaintiff originally files in federal court, "the amount in controversy is
9 | determined from the face of the pleadings." *Crum v. Circus Circus Enterprises*, 231 F.3d 1129,
10 | 1131 (9th Cir. 2000). The allegations within the four corners of TST's SAC control, and TST does
11 | not deny that its SAC fails to allege diversity jurisdiction. Accordingly, as a matter of law, this
12 | Court lacks diversity jurisdiction over this case under 28 U.S.C. § 1332.

**C.    TST's new Unpled Damages Contentions are not in Good Faith and Fail as a Matter of Law.**

When determining the amount in controversy, the starting point is the amount pled in the complaint. "The general federal rule has long been to decide what the amount in controversy is from the complaint itself, unless it appears or is in some way shown that the amount stated in the complaint is not claimed 'in good faith.'" *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353, 81 S. Ct. 1570, 1573, 6 L. Ed. 2d 890 (1961). Here, the good faith analysis starts with the SAC. In the SAC, TST alleges far less than $75,000 in damages for its (only surviving) common law claims. That amount controls. TST is now contradicting its own SAC by asserting new unpled (and legally baseless) damages. Setting aside that the only damages that matter are those pled in the SAC, this attempted about-face plainly indicates the absence of good faith.

**1.    TST's Attorney Represented That TST Does not Have the Requisite Damages for Diversity Jurisdiction.**

Based on the allegations in the SAC, TST's counsel's representations in the pre-Motion meet-and-confer, as well as public statements by TST's counsel, TST's belated attempt to allege

DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 4

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1   new damages in its Response plainly is not in good faith. In the SAC, the only damages TST

2   alleges for its common law claims are $33,689.70 for alleged misappropriation of the "Chapter"

3   Facebook page, $1,037.52 for alleged misappropriation of the "Allies" Facebook page, and

4   $8,246.70 for hypothetical damages that *could have* occurred *if* Defendants had appropriated

5   Plaintiff's Twitter account, but which TST acknowledges Defendants did not do. SAC ¶ 77 & §

6   IV(3). Even including the hypothetical damages for the Twitter account (which TST agrees was

7   not appropriated), the total damages TST alleges for its common law claims is $42,973.92, far less

8   than the required jurisdictional threshold of $75,000. *Id.*

9          Defendants' counsel confirmed with TST's counsel that TST did not have claimed

10   damages sufficient for diversity jurisdiction. Prior to filing the Motion to Dismiss, Defendants'

11   counsel conferred with TST's counsel regarding Defendants' plan to file its Motion. Roller Decl.

12   ¶ 2. Despite that the SAC does not allege diversity jurisdiction, Defendants' counsel asked TST's

13   counsel whether TST would be arguing for diversity jurisdiction and claiming damages in excess

14   of $75,000. *Id.* In response, TST's counsel, Matthew Kezhaya, stated that TST could not claim

15   damages in excess of $75,000, and instead would rely upon supplemental jurisdiction to attempt

16   to avoid dismissal of this case from this Court. *Id.* TST's assertions of new damages in its Response

17   directly contradict that representation—indicating that TST's assertions of new damages that

18   exceed the jurisdictional amount are not in good faith, but rather are manufactured in an attempt

19   to keep this dispute in this Court.

20          TST's counsel has also made public statements to TST's supporters that to defeat the

21   Motion to Dismiss he needed to "come up with" $75,000 in damages, suggesting that the newly

22   alleged damages are not true damages, but rather are only asserted to feign diversity jurisdiction

23   and defeat this Motion. *Id.* ¶ 5 & Ex. 3 ("I need to come up with a credible justification that it is

24   not-impossible [sic] a jury could legally award at least $75,000 in damages."). TST's counsel has

25   also publicly stated he was shocked that Defendants had been forced to spend $80,000 in attorneys'

26   fees in this case: "I can't believe you morons [*i.e.*, Defendants] have spent more than $80,000

DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 5

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1   fighting to keep TST's Facebook page. You are pathetic." *Id.* ¶ 3 & Ex. 1. In other words, through
2   this comment TST's counsel admits that the value of the case is far less than $80,000. He further
3   has publicly explained that the reason he wanted to be in federal court with the now-dismissed
4   federal claims was to maximize damages and collect attorneys' fees. *Id.* ¶ 4 & Ex. 2 ("I wanted
5   some federal statutes to apply because that would maximize TST's damages, would keep us in
6   Federal court (as opposed to State court), and provided the option to collect attorney's fees for
7   having to litigate this."). This, too, suggests that TST's newly asserted damage contentions are
8   merely pretextual for the purpose of trying to remain in federal court.

9          TST's attorney has also made public statements reflecting the absence of good faith in
10  pursuing this matter—referring to Defendants as "morons" and "pathetic" and stating his hope that
11  they incur an unsustainable amount of attorneys' fees in defending against this matter. *Id.* ¶ 3 &
12  Ex. 1 ("I hope he [Defendants' attorney] squeezes every last penny from you living corpses, and
13  anyone that gives you the time of day."). Against this background, TST plainly is not asserting its
14  newly alleged damages in its Response in good faith. Setting aside that TST has failed to *plead*
15  damages in excess of $75,000, and instead is merely asserting such (implausible) damages in
16  response to this Motion, assertions of the amounts are not in good faith—and the case must be
17  dismissed—when "made solely for the purpose of obtaining federal jurisdiction." *Hamilton v.*
18  *Hartford Accident and Indem. Co.*, 425 F. Supp. 224, 226 (E.D. Pa. 1997) (citing *Arnold v.*
19  *Torccoli*, 344 F.2d 842 (2d Cir. 1965)); *see also Morales v. Allstate Texas Lloyds*, 410 F. Supp. 3d
20  816, 819-20 (S.D. Tex. 2019) ("[T]he sum demanded in good faith in the initial pleading shall be
21  deemed to be the amount in controversy."). Even if this Court ignores that TST's new damages
22  are unpled (as described above) and fail as a matter of law (as described below), the pleadings do
23  not control the amount in controversy when "made in bad faith." *Cavazos v. Allstate Vehicle &*
24  *Prop. Ins. Co.*, No 7:17-CV-368, 2017 WL 11317904, at *2 (S.D. Tex., Dec. 12, 2017) (in removal
25  context).

26

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**2. TST's Newly Asserted Damages are not Credible and Fail as a Matter of Law.**

TST's Response asserts for the first time over $392,927 in new damages that are not included in its SAC, including punitive damages of over $326,926 (Response at 3 and at Section II.K), a "bad-faith improved value" of the Allies Facebook page of over $42,973 (Response at 2-3, 5-6), lost donations and lost profits of $1 or more (Response at 3, 8-9), reputational damages of $1 or more (Response at 3, 9-10), and attorneys' fees as consequential damages of correcting reputational harm in the amount of $1 or more (Response at 3, 10-11). None of these newly asserted damages are credible or viable as a matter of law.

In considering these apparitional damages, the alleged conduct and claims should be considered. TST's common law claims for trespass, conversion, and tortious interference are based on Defendants' alleged use of two Facebook pages. TST alleges that Defendant Johnson, who was the administrator of TST's Washington Chapter Facebook page, improperly posted content that was critical of TST for two months in 2020 before Facebook removed Johnson as the administrator of the page at TST's Washington's Chapter's request. SAC ¶¶ 51-66 & Ex. 2. TST alleges that it lost between 20 and 30 members because of Johnson's critical posts during the two-month period. *Id.* ¶ 62. TST also alleges that Defendants wrongfully used a Facebook page originally called "TST WA Allies," which facilitated communications with individuals who did not want to identify as TST members, but who were interested in TST. SAC ¶ 32. Defendants changed the name of the TST Allies Page to "Evergreen Memes for Queer Satanic Friends [sic, Fiends]" on March 14, 2020, renounced affiliation with TST, and began posting content critical of TST. *Id.* ¶¶ 44-48, TST does not allege that it has ever sought the return of the Allies page. TST originally alleged $42,973.92 in damages for its common law claims based on this alleged conduct, and now, in its Response, suddenly claims nearly ten times that in additional damages.

**a. Punitive Damages are Barred on Washington Common Law Claims.**

TST's newly asserted claim for punitive damages should not be considered—not only because it is unpled, but also because Washington law plainly bars punitive damages for common

DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 7

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 113

law claims. As Washington's Supreme Court explained, "[s]ince its earliest decisions, this court has consistently disapproved punitive damages as contrary to public policy." *Dailey v. N. Coast Life Ins. Co.*, 129 Wn. 2d 572, 574, 919 P.2d 589, 590 (1996); *see also Pac. 5000, L.L.C. v. Kitsap Bank*, ___ P.3d ___, No. 55558-1-II, 2022 WL 2035630, at \*7 (Wash. Ct. App. June 7, 2022) ("[U]nlike other states, Washington prohibits punitive damages as a matter of public policy unless expressly allowed by statute."). It is black letter law that TST's unalleged claim for punitive damages is not viable.

TST acknowledges this clear ban on punitive damages, but nonetheless asks the Court to sidestep it by applying Massachusetts law. TST's arguments hold no water. For a conflict of law analysis for tort claims, a court must determine which state has the "most significant relationship" to the issue. *Korslund v. Dyncorp Tri-Cities Servs., Inc.*, 121 Wn. App. 295, 334-35, 88 P.3d 966, 985 (2004), *aff'd*, 156 Wn. 2d 168, 125 P.3d 119 (2005); *Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 580, 555 P.2d 997 (1976). In a tort case, Washington courts examine the following contacts to determine which state has the most significant relationship:

(a)     the place where the injury occurred,

(b)     the place where the conduct causing the injury occurred,

(c)     the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d)     the place where the relationship, if any, between the parties is centered.

*Korslund*, 121 Wn. App. at 334-35, citing Restatement (Second) of Conflicts of Law § 145(2).

All these factors here point to Washington. Both the alleged injuries and the alleged conduct took place in Washington. TST itself states in its SAC that Defendants are Washington residents and their actions took place in Seattle, Washington. SAC at ¶ 6-7. The conduct at issue is the alleged misuse of two Facebook pages that are aimed at Washington audiences—TST's "Washington Chapter" page and TST's "WA Allies" page. The Washington Chapter page is described in by TST in the SAC as being for the purpose of disseminating information for what

DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 8

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    was, at the time, the Seattle Chapter (SAC ¶ 29), and the TST WA Allies page by its name ("WA

2    Allies") is clearly targeted at a Washington audience. SAC ¶ 32. The alleged misconduct involves

3    allegations that Defendants exceeded their authority as members TST's Washington Chapter's

4    advisory council by posting critical content on the two Washington-focused Facebook pages. SAC

5    ¶¶ 13-17, 39-68. This conduct, occurring in Washington, by Washington residents, involving a

6    Washington organization (TST's Washington Chapter), and based on Defendants' conduct

7    involving TST's Washington Chapter Facebook pages, is clearly connected to Washington.

8          The relationship between the parties also plainly was based in Washington State. The

9    dispute, as described by TST in its SAC, at all times was between TST's "Washington leadership"

10   or TST's "Washington Chapterhead," on one hand, and Defendants (residents of Washington) who

11   are former members of TST's Washington Chapter, on the other. *See, e.g.*, SAC ¶¶ 41, 43, 44, &

12   49. In other words, the relationship was entirely Washington-based. There is not one reference to

13   Massachusetts in the SAC. Indeed, in response to Defendants' motions to dismiss its common law

14   claims, TST relied solely on Washington law.[1] *See* Response in Opposition to Motion to Dismiss

15   (Dkt. No. 12) at 13 (relying upon Washington *law*); Response in Opposition to Motion to Dismiss

16   SAC (Dkt. No. 28) at 9-14 (relying upon Washington law). Now, for the first time TST contends

17   that one sole connection to Massachusetts—that TST's two LLC members, who were not an active

18   part of this dispute, apparently live in Massachusetts—mandates application of Massachusetts

19   law.[2] This one slim connection, unrelated to the conduct described in the SAC relating to the

20

21   _____

22   [1] Because TST *prevailed* on saving some of its Washington common law claims by arguing against
     Defendants' motions to dismiss based on *Washington* law, TST should be judicially estopped from
23   now contending that Massachusetts law applies. "Judicial estoppel 'precludes a party from gaining
     an advantage by taking one position, then seeking a second advantage by taking an incompatible
     position.'" *O'Brien v. City of Tacoma*, No. C04-5458FDB, 2005 WL 2045882, at *2 (W.D. Wash.,
24   Aug. 24, 2005) (quoting *Risetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 587, 600 (9th
     Cir. 1996)). The judicial estoppel doctrine "applies to a party's stated position whether it is an
25   expression of intention, a statement of fact, *or a legal assertion*." *Wagner v. Prof'l Engineers in
     Cal. Gov't.*, 354 F.3d 1036, 1044 (9th Cir. 2004).

26   [2] Defendants having pointed out in the Motion that TST's original corporate disclosure used a false
     name—Calvin Soling—TST has since filed a corrected corporate disclosure statement, apparently

DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 9


ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1   Washington Chapter and its Facebook pages, is woefully insufficient to establish that
2   Massachusetts has a stronger connection to this case than Washington.

3       The main reason why TST advocates for Massachusetts law to apply to punitive damages
4   is that TST disagrees with Washington's policy prohibiting punitive damages. Response at 13-14
5   (arguing that Massachusetts' policy regarding punitive damages is better than Washington's
6   policy). However, that TST prefers Massachusetts' policy over Washington's is irrelevant. The
7   analysis focuses on which state has the most significant contacts with the dispute. The contacts in
8   this case overwhelmingly favor Washington, the state where the conduct occurred and the only
9   state with any relationship to the events at issue. *See, e.g., Korslund*, 121 Wn. App. at 335
10  (rejecting plaintiff's argument that Virginia's punitive damage law should apply where the
11  significant contacts of the case favored application of Washington law).

12          **b.   TST Pleads the Opposite of its Newly Asserted "Improved Value" Damages.**

13      In its Response, TST argues for the first time that it should be entitled to an award for the
14  "improved value" to the WA Allies page. It is unclear if this damage theory is recognized in
15  Washington. The only case cited by TST addresses reasonable rental damages under RCW
16  59.04.050 and does not address the common law principle upon which TST relies, as stated in
17  Restatement (Second) of Torts § 927. No matter. It is abundantly obvious that the doctrine cannot
18  apply here because TST has alleged the exact opposite in its SAC. Far to the contrary of alleging
19  that Defendants have improved the Washington Allies page, TST alleges that Defendants have
20  damaged TST by posting critical content on the Allies page, changing its name to "Evergreen
21  Memes for Queer Satanic Friends [sic, Fiends]" and allegedly causing TST reputational damage
22  due to critical content on the page. *See, e.g.*, SAC ¶¶ 39, 46-48, 88. Indeed, one of TST's now-
23  dismissed claims was based on the premise that Defendants' use of the Facebook pages tarnished
24  TST's trademark. SAC Count 5. The severe positional contradictions—alleging in the SAC that
25  Defendants have harmed TST and now arguing that they actually have increased value for TST—

26  _____
    now using Mr. Soling's true first name, Cevin. *See* Motion at 5 n.2; (Amended) Corporate
    Disclosure Statement (Dkt. No. 34).

DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 10



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1   are befuddling. This nonsensical theory of damages cannot support satisfying the amount in

2   controversy threshold for diversity jurisdiction.

3   **c. TST's Damage Request for Wrongful Profits Fails Because TST has not Alleged a Fiduciary Relationship or Breach of Fiduciary Duties.**

4   In its Response, TST also asserts for the first time that it is apparently seeking wrongfully

5   obtained profits, which are a form of damages for conversion of chattels by a fiduciary. Response

6   at 6-7 (citing Restatement (Second) of Torts § 927, comment j ("Conversion of a chattel by a

7   fiduciary)). TST's damage claim for wrongful profits cannot stand because it has not alleged in its

8   SAC any fiduciary relationship or any breach of a fiduciary duty.[3] TST cites no authority as to

9   how damages for breach of fiduciary duties should or could apply in this case. It shouldn't.

10  **d. The Newly Alleged $1 Damages do not Provide the Required Jurisdictional Amount.**

11  TST also alleges several categories of damages in the amount of $1 each: (1) lost donations

12  or lost profits under its three common law claims (Response at 8-9); (2) reputational harm

13  (Response at 9-10); and (3) consequential damages for attorneys' fees in remedying disparaging

14  statements.[4] These assertions of a combined $3 in damages, even when combined with the actually

15  pled alleged damages, fall far short of $75,000.

16  **D.  No Amendment Should be Permitted.**

17  In its Response, TST informs the Court that at some point it intends to file a motion to

18  amend its Complaint to add an additional plaintiff, The Satanic Temple, Inc. Because TST has not

19  yet moved the Court for leave to amend to add The Satanic Temple, Inc., Defendants will not

20  respond to the hypothetical motion to amend here, other than to note that if TST files such a motion

22  ___

23  [3] Even if such a damages theory could apply, TST does nothing to distinguish between such "profits" (which are not profits, but rather funds Defendants have raised to defend against TST's ill-conceived lawsuit) arising from the numerous dismissed federal and common law claims, and the remaining conversion / trespass to chattels claims.

25  [4] Damages related to remedying disparaging statements also appear to be an improper attempt to revive TST's defamation claim, which was dismissed with prejudice by this Court on February 26, 2021 (Dkt. No. 20), and for which TST's motion for reconsideration was denied by this Court on April 12, 2022 (Dkt. No. 30). TST simply cannot let go of its fatally flawed defamation claim.

DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 11



Defendants will object on the grounds that it is futile, belated, and unfairly prejudicial. TST has always known about its related corporate entity and there is no reason why The Satanic Temple, Inc. could not have been joined in this action at any point over the last two years.

TST has not sought leave to amend its SAC to properly plead diversity jurisdiction. In resolving this motion, this Court should not grant leave to amend. Liberality in allowing amendments is subject to limitations, including undue prejudice to the opposing party, bad faith by the movant, and futility. *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011). Further, "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Id.* TST has been allowed three bites at the apple through its original Complaint, its First Amended Complaint, and its current Second Amended Complaint. TST has had ample opportunity to plead diversity jurisdiction. TST knows that Defendants have limited financial means. Its efforts to multiply this litigation by, among other things, asserting implausible and possibly frivolous claims and arguments, are an attempt to punish former members for their critical opinions, as made abundantly clear by TST's counsel's public statements that he hopes the attorneys' fees in this case "squeezes every last penny from you living corpses [referring to Defendants], and anyone that gives [Defendants] the time of day." Roller Decl. ¶ 3 & Ex. 2.

Enough is enough. TST should not be allowed a fourth shot. To the extent TST wants to continue litigating its remaining common law claims, it can refile those claims in state court, which provides several cost-saving options for resolving this matter, including mandatory arbitration. *See* KCLCAR 2.1(a).

### III.    CONCLUSION

For the reasons set forth above and in Defendants' Motion, this case should be dismissed for lack of subject matter jurisdiction. TST should not be granted leave to amend. If it wishes to proceed on its common law claims against Defendants, those claims belong in King County Superior Court.



1    DATED: June 10, 2022.

2                              **ARETE LAW GROUP PLLC**

3                              By:  */s/ Jeremy Roller*
                               Jeremy E. Roller, WSBA No. 32021
4                              1218 Third Avenue, Suite 2100
                               Seattle, WA 98101
5                              Phone:  (206) 428-3250
                               Fax:  (206) 428-3251
6                              jroller@aretelaw.com

7                              *Attorneys for Defendants David Alan Johnson, Leah*
8                              *Fishbaugh, Mickey Meehan, and Nathan Sullivan*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 13



## CERTIFICATE OF SERVICE

I certify that on June 10, 2022 I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, thereby sending a notification of such filing to the following parties:

Benjamin Justus, WSBA No. 38855
LYBECK PEDREIRA & JUSTUS, PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
(206) 687-7805
ben@lpjustus.com

Matthew A. Kezhaya
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
(479) 431-6112
matt@kezhaya.law

DATED: June 10, 2022, at Seattle, Washington.

*/s/ Janet Fischer*
Janet Fischer
Paralegal

DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 14

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    The Honorable Richard A. Jones

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF WASHINGTON
9

10   UNITED FEDERATION OF CHURCHES,
     LLC d/b/a THE SATANIC TEMPLE,          No. 2:20-cv-00509-RAJ
11
                                            **DECLARATION OF JEREMY**
12              Plaintiff,                   **ROLLER IN SUPPORT OF**
                                            **DEFENDANTS' MOTION TO**
13         v.                               **DISMISS FOR LACK OF**
                                            **SUBJECT MATTER**
14   DAVID ALAN JOHNSON, an individual;     **JURISDICTION**
     LEAH FISHBAUGH, an individual;
15   MICKEY MEEHAM, an individual; and      NOTED ON MOTION CALENDAR:
     NATHAN SULLIVAN, an individual,        June 10, 2022
16
                Defendants.
17

18        I, Jeremy Roller, declare as follows:

19        1.     I am a member of the law firm Arete Law Group PLLC, counsel for

20   defendants David Johnson, Leah Fishbaugh, Mickey Meehan, and Nathan Sullivan

21   (collectively, "Defendants") in this matter.  I make this declaration upon personal knowledge

22   and, if called to testify, could and would testify competently to the facts set forth herein.

23        2.     Per Paragraph 6 of the Standing Order for Civil Cases Assigned to Judge

24   Richard A. Jones, on May 9, 2022, I conferred with Matthew Kezhaya and Benjamin Justus,

25   counsel for United Federation of Churches, LLC ("TST"), regarding a motion to dismiss the

26   Second Amended Complaint for lack of subject matter jurisdiction.   In that telephone

ROLLER DECLARATION IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 1


ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

conference I told Mr. Kezhaya that Defendants intended to move to dismiss for lack of subject matter jurisdiction. Despite the Second Amended Complaint's absence of damages exceeding $75,000 on the surviving state law claims, I asked Mr. Kezhaya whether plaintiff TST claimed damages in excess of $75,000. Mr. Kezhaya stated that TST could not claim damages in excess of $75,000, and instead would rely upon supplemental jurisdiction to attempt to avoid dismissal of this case from this Court.

3. On May 26, 2022, a post purportedly by Mr. Kezhaya, using the username "stormsmcgee" appeared on a "Reddit" page, https://www.reddit.com/r/SatanicTemple_Reddit/comments/uym4sv/tst_court_update_may_26_2022_this_one_is_by_tsts/. Mr. Kezhaya or someone else appears since to have edited this post to remove the insulting attacks on Defendants described below. However, I located the post in a collection of websites archived by a non-profit organization called the Internet Archive, using the search feature at www.archive.org, known as the "Wayback Machine." Attached hereto as **Exhibit 1** is a true and correct copy of a portion of the webpage https://web.archive.org/web/20220527005507/https://www.reddit.com/r/SatanicTemple_Reddit/comments/uym4sv/tst_court_update_may_26_2022_this_one_is_by_tsts/ as that site appeared on the Wayback Machine on June 7, 2022. In that post, Mr. Kezhaya wrote in part:

> I will not answer any questions related to the idiots that call themselves "QueerSatanic," or their idiot-conspiracy theories. My only comment on that topic is:
>
> I can't believe you morons have spent more than $80,000 fighting to keep TST's Facebook page. You are pathetic. You have no concept of civil liberties, or what is at stake by the ever-encroaching theocracy. Your lawyer is a gentleman and a scholar. I hope he squeezes every last penny from you living corpses, and anyone that gives you the time of day.

The individuals who Mr. Kezhaya referred to as "the idiots that call themselves 'QueerSatanic,'" "morons," and "living corpses" are Arete Law Group's clients, the Defendants in this case.[1]

---

[1] Defendants indeed have spent more than $80,000 defending against TST's claims. This obviously is a significant amount of money, but the expense has been necessary given TST's

ROLLER DECLARATION IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 2

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

4.     Later on the same day that Mr. Kezhaya published the post described above and attached as Exhibit 1, Mr. Kezhaya commented on his own Reddit post.  A true and correct copy of that comment, obtained from the Wayback Machine at webpage https://web.archive.org/web/20220527211543/https://www.reddit.com/r/SatanicTemple_Reddit/comments/uym4sv/tst_court_update_may_26_2022_this_one_is_by_tsts/ia7nt39/?context=8&depth=9 on June 7, 2022, is attached hereto as **Exhibit 2**.  In that comment, Mr. Kezhaya wrote in part:

> I wanted some federal statutes to apply because that would maximize TST's damages, would keep us in Federal court (as opposed to State court), and provided the option to collect attorney's fees for having to litigate this.

5.     The next day, May 27, 2022, Mr. Kezhaya commented on his own Reddit post once again.  A true and correct copy of that comment, obtained from the webpage https://www.reddit.com/r/SatanicTemple_Reddit/comments/uym4sv/tst_court_update_may_26_2022_this_one_is_by_tsts/ia76rxj/ on June 7, 2022, is attached hereto as **Exhibit 3**.  In that comment, Mr. Kezhaya wrote in part:

> All three surviving claims are questions of Washington State law, not Federal law.  Defendants have moved for dismissal from Federal Court because, they argue, TST cannot show that there is an "amount in controversy" of at least $75,000 (which is required for Federal jurisdiction).  I have announced resistance to the motion.  I need to come up with a credible justification that it is not-impossible [sic] a jury could legally award at least $75,000 in damages.
>
> Since punitive damages are on the table, that really means I really only need to justify $12,500 in out-of-pocket damages.  Punitive damages can be up to 6x compensatory damages (out-of-pocket losses).  I've been mired in Belle Plaine since they filed the motion, so I haven't yet had an opportunity to evaluate the damages.

---

multiple amended complaints, which have contained numerous, disparate claims, most of which have been dismissed by this Court.  Indeed, Defendants' expenses would be far greater if Arete Law Group were charging my typical hourly rate, which currently is in the $425-$450 range, as opposed to a discounted rate of $325 per hour—$60 per hour less than a $385 hourly rate that Judge Robart found "reasonable and sensible" more than eight years ago.  *See Getty Images (U.S.), Inc. v. Virtual Clinics*, No. C13-0626-JLR, 2014 WL 1744522, at *3 (W.D. Wash., April 29, 2014).



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1         6.    Attached hereto as **Exhibit 4** is a true and correct copy of a June 6, 2022 email

2    exchange between Mr. Kezhaya and me.

3

4        I declare under penalty of perjury of the laws of the United States that the foregoing

5    is true and correct.

6

7        Executed in Seattle, Washington, on June 10, 2022.

8

9                              */s/ Jeremy Roller*
                          Jeremy Roller

ROLLER DECLARATION IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 4

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**CERTIFICATE OF SERVICE**

I certify that on this date I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, thereby sending a notification of such filing to the following parties:

Benjamin Justus
Lybeck Pedreira & Justus, PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
(206) 687-7805
ben@lpjustus.com

Matthew A. Kezhaya
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
(479) 431-6112
matt@kezhaya.law

DATED: June 10, 2022, at Seattle, Washington.

/s/ Janet Fischer
Janet Fischer
Paralegal

ROLLER DECLARATION IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 5



# EXHIBIT 1

Posted by 3 minutes ago

## TST Court Update! (May 26, 2022) -- this one is by TST's lawyer

Question / Discussion

Hello everyone! Thank you for your interest in TST's legal efforts. I'm Matt Kezhaya, TST's general counsel. I am recently the subject of a Federal Judge's ire, which is actually pretty normal in my law practice (TST cases and otherwise).

So I've been made aware that Mr. "Chip on my shoulder after Matt bailed out on a podcast taping because I misled him into believing I'm a TST supporter" Hail Satan Podcast guy is crowing about a sanctions order against me. I felt the community was entitled to know the other side of the story.

I'll start with the bottom line-upfront. Yes, I am ordered to pay about $17,000 of my own personal money because I have been a very naughty boy, or so the Judge says. I have a different take, of course. Basically this sanctions order is the product of a bait-and-switch scheme. TST was told that some of its claims were legally insufficient, and were to be dismissed from an ongoing lawsuit ("TST 1"). But, TST was assured that it was entitled to fix the claims and refile them. I asked the Court if I could fix the claims in the ongoing lawsuit ("TST 1") and a magistrate said "no." A magistrate is not allowed to preclude other lawsuits, and TST was told it could refile the dismissed claims, so I refiled the dismissed claims as "TST 2." The District Judge later affirmed the magistrate's then-six-month-old decision to tell me "no" and, since I already filed TST 2, TST 2 was to be dismissed without leave to refile and I owe the City's lawyers $17,000 for them having to get TST 2 dismissed. Again, bait-and-switch: "you can refile" turned into "how dare you refile."

That's the short version. If you're interested in the case, read on. If not, I'll be around to answer questions about TST's legal efforts. No promises on answering every question. If I think your question is harmful to the organization I'll probably ignore it, unless I feel like fucking with you. I'm TST's cheerleader, so please note that I am maximum biased in TST's favor. I will not answer any questions related to the idiots that call themselves "QueerSatanic," or their idiot-conspiracy theories. My only comment on that topic is:

> I can't believe you morons have spent more than $80,000 fighting to keep TST's Facebook page. You are pathetic. You have no concept of civil liberties, or what is at stake by the ever-encroaching theocracy. Your lawyer is gentleman and a scholar. I hope he squeezes every last penny from you living corpses, and anyone that gives you the time of day.

Not very "First Tenet," or whatever, but you can't teach an old war dog new tricks.

On with Belle Plaine.

This case arose from TST's efforts to get equal treatment to a "limited public forum" (a place where a government opens its private property for the purpose of accommodating expressive activity about a particular topic), which the City of Belle Plaine opened, "basically so the cross could stay in the Park" (that's a verbatim quote from the mayor, follow this link to see him say it for yourself, it's at 1:15 - 1:20). The full meeting can be found here. The primary purpose of that meeting was to hear out the local Catholic priest's religious objection to the City granting TST equal access to the forum.

Rewind about four months, and the City Council had a meeting to hear out a proposal to open the Park to private monuments. The full meeting can be found here. The proposal was prepared by the ADF (a Christian legal advocacy group) and presented by the Veterans Group, who were proponents of putting this Christian monument in the park.

At that meeting, Councilor Stier, who would later become the tie-breaking vote asks for assurances there would be no competitor monuments by an Atheist or Satanic group:

> I've seen monuments that are going up in Detroit right now that

SER-127

have [a] Satanic meaning to them. So, how can we up here, be

assured that, number one, these monuments won't go into that

Park?

The proponent of the proposal assured him that, indeed, the proposal is designed to allow in their good Christian monument to the contemplated exclusion of dirty Atheists or Satanists:

   There is [sic] specific criteria . . . [that] the monument would be

consistently seen in other memorial parks. A Satanic statute is

not consistently seen in other memorial parks. Your foxhole, for

an atheist foxhole thing, is not consistently seen in other

memorial parks.

The particularly astute among you might think "That's super illegal, they can't do that!" And you are correct. The City Attorney tells them as much:

   [T]his is illustrating my concern . . . The concern is that if the

intent is, or the effect of the criteria is, to eliminate certain

messages, that is constitutionally suspect–which is putting it

nicely. That is exactly what is not allowed: [which] is for the

government to establish rules which prevent certain religions

from speaking.

You can hear the above exchange for yourself by following this link.

Councilor Stier was also concerned about the FFRF having a monument, but the FFRF never did join in on the fun. They correctly figured that once we got involved, the Cross would go away.

The City attorney was very much against the proposal because, obviously, TST would be demanding equal access to this forum. We told them as much. Ultimately, the final policy was clear that everyone is allowed in, but your display would have to honor Belle Plaine veterans.

So, TST did what it is famous for and created a display that honors Belle Plaine veterans. It's beautiful. The artist even donated $40,000 worth of services, just because he supports the cause. But, once TST announced it was ready for some of that constitutionally-guaranteed equal access to the "free speech zone," the City delayed installation efforts until they closed the forum.

So, TST did what it is famous for and sued the government for a whole lot of constitutional violations. The problem is that this was before my involvement with TST, so the complaint not up to the task of overcoming judicial bias. Follow this link to see their complaint. Compare mine. See, TST's original lawyers made the fatal error of thinking that TST actually receives its rightful "equal treatment under the law." No, I'm afraid that judges are willfully ignorant about basic concepts like "recuse if you feel like you are biased" once it comes time to dogpile onto an oppressed minority religion.

The Judge hand-waved some basic notions like "free speech" and "Satanists have just as much a right as Christians to participate in the public square," and dismissed all but one claim for various reasons. But we were told that we could refile (that's what "Dismissed without prejudice" means).

Rather than file a whole other lawsuit, I figured "hey let's just have one lawsuit, that's twice as efficient for everyone!" Boy was I wrong. Basically, the magistrate chastised me because I waited two months to get started on discovery, on a case that had been running for 1.5 years. Fuck me for having other cases, I guess. And since I was "dilatory," I could take TST's dismissed claims and I could fuck all the way off.

So that put me in a bit of a pickle. TST needed a dismissal "with prejudice" or I can't appeal. But the Magistrate said I'm not allowed to bring those claims into TST 1. But I was told I could refile. And Magistrates lack the power to preclude claims. And, if I appealed the Magistrate's order, the District Judge was almost certain to affirm the Magistrate, which *might* preclude the claims (District Judges do have the power to preclude claims.)

So, I said "fuck the Magistrate, and the police while you're at it" and filed the claims (which I really can't overstate had been "dismissed without prejudice") as a separate lawsuit. I was entitled to file them all along, so if the Magistrate wants to be inefficient, that sounds like "not-me" problem. Boy was I wrong.

I guess the moral of the story is, if a judge tells you that you are entitled to refile some dismissed claims as a separate lawsuit, the judiciary can take its "strong preference for judicial economy" and shove it all the way up their collective asses. Better to ask for forgiveness because, if you ask for permission first, you risk paying your chickenshit adversary $17,000. God forbid the insurance company take a loss.

The underlying orders of dismissal are on appeal. If you want to hear me say all the above in a professional tone and with all the legal authority to back up why I'm right about everything and the District Judge is a big dum-dum, the briefing is worth a read.

- Here is my opening brief.
- Here is the appendix (which has all the important record entries)
  - TST 1 and
  - TST 2; and
- Here is the addendum (which has all the orders at issue).
- Here is my reply, which explains why the City's response to my opening brief is full of shit.

You'll want the appendices and addendum handy to cite-check my claims about what the record says.

I didn't share the filemarked copies because, for some ungodly reason, efiling removes bookmarks and I think bookmarks are incredibly helpful.

You can get their response from PACER (case no. **21-3079**), but it's not worth reading because it is the legal equivalent of "nuh uh," except they didn't even respond to most of my points. I would share my copy, but it has all of my super-secret notes and highlighting on it.

I will appeal the sanctions order. And I am asking for reassignment if I win either appeal.

AMA re: TST legal stuff.

**1 Comment**                                                                                           100% Upvoted

# EXHIBIT 2

## TST Court Update! (May 26, 2022) -- this one is by TST's lawyer    Question / Discussion

(self.SatanicTemple_Reddit)

submitted 20 hours ago * by stormsmcgee
31 comments  share  save  hide  report

---

sorted by: **best**

**Want to add to the discussion?**
Post a comment!

**CREATE AN ACCOUNT**

you are viewing a single comment's thread.
view the rest of the comments →

[–] **SexDrugsRockRollYay**  13 points 20 hours ago

1. Do you feel that the losses in TST's cases thus far have been based on legitimate legal findings, or simply because of some unfair/illegal treatment from judges?

2. You mention some work done by previous lawyers. In your professional opinion, would the end results have been different if you were at the helm?

3. Why is the QS case so taboo to speak about?

permalink  embed  save  report  reply

[–] **stormsmcgee** [S] 16 points 19 hours ago*

> Do you feel that the losses in TST's cases thus far have been based on legitimate legal findings, or simply because of some unfair/illegal treatment from judges?

That's a hefty question. I think it's a combination of the federal judiciary being overtaken by the right-wing, in reaction to the ~1960s Warren Court, which has resulted in an aversion to civil rights generally, all on the one hand; and a general aversion to the name "Satan" on the other. A lot of what TST goes through is pretty well known everywhere. Particularly in the criminal "justice" system. But, TST is held to unfair standards. But it wouldn't be Satanism without "Satan" and "American Humanists" are disrespected in the courts similarly. Over time, TST will gain more popularity, will become accepted as normal, and will start getting equal treatment under the law. Everything boils down to the system's perception of clout.

> You mention some work done by previous lawyers. In your professional opinion, would the end results have been different if you were at the helm?

Frankly, no, but only because TST 1 was filed before the *Scottsdale* loss. There, two councilors wrote literal op-eds in the local newspaper that they intended to exclude TST from the "all-comer" legislative prayer policy. Less than two months later, TST was excluded. The Judge just couldn't connect the dots because they blamed the City Manager, who answers to both of those politicians, but who did *not* publicly state that he is a bigot. Because he denied under oath that he was a bigot, that was good enough to justifying ruling against TST. And because a federal judge gave the City Manager the ol' "judicial certificate of believability," the appellate court was content to say "it's a fact issue, nothing we can do for you."

After *Scottsdale*, I attach every shred of evidence I can get from the public record that the defendant broke the law. TST is just held to egregious standards that another religion (cough, Christian Right) are just not.

> Why is the QS case so taboo to speak about?

TST is in litigation with QS. You don't talk about a lawsuit while it's ongoing. Everything you say in the public record *will* be used against you. The rules carve out, whole-cloth, the bar against hearsay just so a party can use an adversary's out-of-court statements against them. Thus, we don't talk about QS.

permalink    embed    save    parent    report    reply

[–] **Damaged142** ⬚Hail Satan!⬚ 2 points 18 hours ago

I wish you could speak about QS because they have pointed me to some of the court documents as well as a very well put together summary of the litigation so far... and while trying to not come across as offensive, I can't help but feel TSTs case/evidence as well as the overall approach seems... very poorly put together. The term, throwing spaghetti at the wall and see what sticks has been thrown around and tbh that's what it seems like. At lest to me, in this one particular case, as someone with no legal experience lol

permalink    embed    save    parent    report    reply

[–] **stormsmcgee** [S] 9 points 18 hours ago

At this stage of proceedings, it is very normal for the parties to go back and forth about what issues will be litigated. Plaintiffs always want to have as many options available because who is to say how the facts will shake out. Defendants always want to constrain the plaintiff's choices for the same reason. Litigation is zero-sum. If Plaintiff wants something, that is generally bad for Defendant. And vice versa.

At the end of the day, TST is suing QS because QS stole TST's facebook page. The people we are suing publicly bragged that they "stole" the page. ==I wanted some federal statutes to apply because that would maximize TST's damages, would keep us in Federal court (as opposed to State court), and provided the option to collect attorney's fees for having to litigate this.== They have a diametrically opposite incentive. The Court ultimately agreed with them as to the Federal claims. The state claims survive. Maybe I overcomplicated things by bringing up the Federal issues, or maybe the Judge decided wrong. That will be for the Ninth Circuit to decide.

permalink    embed    save    parent    report    reply

[–] **Krillpocalypse** 2 points 8 hours ago

If you're still willing to answer a question about this topic, I was hoping you could clarify something for me. I occasionally check the QS case on courtlistener, and it seems like earlier this month the case was dismissed in full. I admit that I am having a bit of trouble understanding all the legalese (even though I work tangentially with lawyers). Would you be willing to clarify what the status of the case is? Is it ongoing, is it dismissed with chance to appeal, is it a little of column A and a little of column B, etc.?

permalink    embed    save    parent    report    reply

[–] **stormsmcgee** [S] 6 points 6 hours ago

The case was dismissed in part, not in full. The surviving claims are tortious interference (defendants wrongfully interfered with the business relationship between TST and Facebook), trespass to chattels (defendants wrongfully interfered with TST's rightful

possession of the Facebook page), and conversion (defendants wrongfully deprived TST of the Facebook page). The difference between trespass to chattels and conversion is one of degree.

All three surviving claims are questions of Washington State law, not Federal law. Defendants have moved for dismissal from Federal Court because, they argue, TST cannot show that there is an "amount in controversy" of at least $75,000 (which is required for Federal jurisdiction). I have announced resistance to the motion. I need to come up with a credible justification that it is not-impossible a jury could legally award at least $75,000 in damages.

Since punitive damages are on the table, that really means I really only need to justify $12,500 in out-of-pocket damages. Punitive damages can be up to 6x compensatory damages (out-of-pocket losses). I've been mired in Belle Plaine since they filed the motion, so I haven't yet had an opportunity to evaluate the damages.

Alternatively, I have seen case law that says a Federal court has discretion to exercise jurisdiction over state law claims that arise from the same facts as a dismissed federal question. That will probably be part of the response as well.

My response is due at 11:59 pm, Pacific Time, on June 6.

permalink   embed   save   parent   report   reply

[–] **Krillpocalypse** 3 points 4 hours ago

Thank you for taking the time to explain this to me! I try to read through the court documents when I can, but there's a lot and it's hard to follow sometimes when you're a non-lawyer.

Since this post seems to be in response to the post yesterday, I'll assume you looked at the older post, in which case you may have seen where I said I was frustrated because I felt like you keep "shitting the bed", and I mentioned you by name since you're lead counsel. My frustrations are with when cases seem to go south due to more administrative or clerical issues, such as the Belle Plain one with the multiple filing issues and with the Boston convocation then-mayoral-candidate deposition situation where the judge mentioned that part of the reason for dismissing the case was due to TST's counsel being overly aggressive. Obviously I don't know what's going on with every aspect of the court cases; I can't even understand everything I'm reading when I try. I just wanted to apologize to you about that - I do appreciate the work you're doing, and I do think that the cases being brought forth are important.

permalink   embed   save   parent   report   reply

[–] **stormsmcgee** [S] 1 point 4 hours ago

More than happy to. I consider it part of my role as "TST's lawyer" to explain to TST's membership (not just TST's decisionmakers) what I am doing, why I am doing it, and how it affects the organization.

Re: ¶ 2, thank you for the kind words. Please know that I only know this stuff because I eat, sleep, and breathe the practice of law. Non-lawyers aren't expected to know all of the ins-and-outs because that's what lawyers are for. But be wary that there are people out there who will prey on ignorance. Sometimes they will have a personal or financial interest in distorting the truth, and sometimes they innocently misunderstand or misapply the truth because of personal or financial

SER-133

biases. I commend you for peering behind fluff, assessing the evidence for yourself, and then coming to a judgment based on logic and reason. And I double-commend you for being open to reconsidering a prior judgment based on new information.

Have you considered becoming a judge? We sure could use more like you.

permalink  embed  save  parent  report  reply

SER-134

# EXHIBIT 3



Posted by u/stormsmcgee 12 days ago

## TST Court Update! (May 26, 2022) -- this one is by TST's lawyer

Question / Discussion

**34 Comments**

**Sort By: Best**

**View all comments**

**Show parent comments**

 stormsmcgee **OP** · 12 days ago

The case was <u>dismissed in part, not in full</u>. The surviving claims are tortious interference (defendants wrongfully interfered with the business relationship between TST and Facebook), trespass to chattels (defendants wrongfully interfered with TST's rightful possession of the Facebook page), and conversion (defendants wrongfully deprived TST of the Facebook page). The difference between trespass to chattels and conversion is one of degree.

All three surviving claims are questions of Washington State law, not Federal law. Defendants have moved for dismissal from Federal Court because, they argue, TST cannot show that there is an "amount in controversy" of at least $75,000 (which is required for Federal jurisdiction). I have announced resistance to the motion. I need to come up with a credible justification that it is not-impossible a jury could legally award at least $75,000 in damages.

Since punitive damages are on the table, that really means I really only need to justify $12,500 in out-of-pocket damages. Punitive damages can be up to 6x compensatory damages (out-of-pocket losses). I've been mired in Belle Plaine since they filed the motion, so I haven't yet had an opportunity to evaluate the damages.

Alternatively, I have seen case law that says a Federal court has discretion to exercise jurisdiction over state law claims that arise from the same facts as a dismissed federal question. That will probably be part of the response as well.

My response is due at 11:59 pm, Pacific Time, on June 6.

5    Reply   Share

 Krillpocalypse · 11 days ago

Thank you for taking the time to explain this to me! I try to read through the court documents when I can, but there's a lot and it's hard to follow sometimes when you're a non-lawyer.

Since this post seems to be in response to the post yesterday, I'll assume you looked at the older post, in which case you may have seen where I said I was frustrated because I felt like you keep "shitting the bed", and I mentioned you by name since you're lead counsel. My frustrations are with when cases seem to go south due to more administrative or clerical issues, such as the Belle Plain one with the multiple filing issues and with the Boston convocation then-mayoral-candidate deposition situation where the

judge mentioned that part of the reason for dismissing the case was due to TST's counsel being overly aggressive. Obviously I don't know what's going on with every aspect of the court cases; I can't even understand everything I'm reading when I try. I just wanted to apologize to you about that - I do appreciate the work you're doing, and I do think that the cases being brought forth are important.

3      **Reply   Share**

 stormsmcgee **OP** · 11 days ago

More than happy to. I consider it part of my role as "TST's lawyer" to explain to TST's membership (not just TST's decisionmakers) what I am doing, why I am doing it, and how it affects the organization.

Re: ¶ 2, thank you for the kind words. Please know that I only know this stuff because I eat, sleep, and breathe the practice of law. Non-lawyers aren't expected to know all of the ins-and-outs because that's what lawyers are for. But be wary that there are people out there who will prey on ignorance. Sometimes they will have a personal or financial interest in distorting the truth, and sometimes they innocently misunderstand or misapply the truth because of personal or financial biases. I commend you for peering behind fluff, assessing the evidence for yourself, and then coming to a judgment based on logic and reason. And I double-commend you for being open to reconsidering a prior judgment based on new information.

Have you considered becoming a judge? We sure could use more like you.

# EXHIBIT 4

**Jeremy Roller**

| | |
|---|---|
| **From:** | Matthew A. Kezhaya <matt@kezhaya.law> |
| **Sent:** | Monday, June 6, 2022 3:09 PM |
| **To:** | Jeremy Roller |
| **Cc:** | Benjamin Justus; Sonia A. Kezhaya |
| **Subject:** | Re: TST v. Johnson -- request for stipulation to amend the complaint |

 Are you requesting that we withdraw the motion in light of your intention to attempt to amend (again)?  Or are you going to respond and cross-move to amend?

I asked about the former but announced that we will do the latter if your clients declined to so stipulate. Either way, the 12(b)(1) motion gets mooted. My purpose is to see if we can agree on alleviating the Court from having to address a moot motion.

Whatever the procedural step you plan to take, my clients will not consent to yet another amendment of your client(s)'s complaint.  TST, Inc. / UFC has had more than two years to determine whether TST, Inc. should be a plaintiff.

Unless the statute of limitations have passed or the scheduling order says otherwise, I fail to see any timeliness issues. Your clients opted to litigate the motions to dismiss in piecemeal fashion. That is their right under the rules, but they don't get to complain that this case is taking too long while also fighting tooth and nail about everything they can. We are just responding to your clients' objections as they come.

More importantly, nothing about the amendment as you've described it cures the Court's lack of subject matter jurisdiction / inappropriateness of exercising supplemental jurisdiction.  Indeed, in our May 9, 2022 pre-motion conference I specifically asked you whether your client could credibly allege over $75,000 in damages.  Your response was an unequivocal no.

I refrained from addressing the 12(b)(1) motion on the merits in my email because I didn't want to provoke a defensive reaction. As we substantiate in our forthcoming response, it is not-impossible your clients will be ordered to pay quite a bit more than $75,000 when we finally get to trial on this matter.

As for our meet-and-confer conversation, I remember it differently. I recall saying that I didn't think I had a credible basis to believe there was a $75,000 amount in controversy at that time. Since then, you filed the 12(b)(1) motion which gave me occasion to research all of the compensable categories of harm your clients have caused mine. In the course of that, I found that your clients owe TST, Inc. money as well as UFC, LLC.

In closing, I can't help but express surprise that your clients object to TST, Inc. being involved in this matter. One of their crowd pleasing complaints is to loudly state confusion about TST consisting of more than one legal entity, as if there is something untoward about that. This is an opportunity to substantiate their implicit claim with a credible legal argument.

Matthew A. Kezhaya

Arkansas office:
Kezhaya Law PLC

[1202 NE McClain Rd](#)
[Bentonville, AR 72712](#)
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

Minnesota office:
Kezhaya Law PLC
333 N Washington Ave, #300
Minneapolis, MN 55401
p: (479) 431-6112
f: (612) 349-2760
e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient. If it appears that I sent this to you in error, please inform me and delete this message.

On Mon, Jun 6, 2022 at 3:25 PM Jeremy Roller <[jroller@aretelaw.com](#)> wrote:

> Matt,
>
> Thanks for your email.
>
> I am a little confused as to what you are asking and why you are asking it now. Are you requesting that we withdraw the motion in light of your intention to attempt to amend (again)? Or are you going to respond and cross-move to amend? Please explain.
>
> Whatever the procedural step you plan to take, my clients will not consent to yet another amendment of your client(s)'s complaint. TST, Inc. / UFC has had more than two years to determine whether TST, Inc. should be a plaintiff. More importantly, nothing about the amendment as you've described it cures the Court's lack of subject matter jurisdiction / inappropriateness of exercising supplemental jurisdiction. Indeed, in our May 9, 2022 pre-motion conference I specifically asked you whether your client could credibly allege over $75,000 in damages. Your response was an unequivocal no.
>
> Your clients' quest to unjustifiably punish my clients has gone on too long, and in any event, belongs in State Court. If you want to add TST, Inc. to this morass, the appropriate approach is to consent to dismissal from federal court and re-file the surviving state law claims in King County Superior Court.
>
> Thank you.

Jeremy


**Jeremy Roller**



[www.aretelaw.com](http://www.aretelaw.com) | direct: (206) 428-3254

---

**From:** Matthew A. Kezhaya <matt@kezhaya.law>
**Sent:** Monday, June 6, 2022 11:21 AM
**To:** Jeremy Roller <[jroller@aretelaw.com](mailto:jroller@aretelaw.com)>
**Cc:** Benjamin Justus <[ben@lpjustus.com](mailto:ben@lpjustus.com)>; Sonia A. Kezhaya <sonia@kezhaya.law>
**Subject:** TST v. Johnson -- request for stipulation to amend the complaint


Hey Jeremy,


In the course of researching and responding to your clients' Rule 12(b)(1) motion, I think The Satanic Temple, Inc. is a necessary party. That requires some clarification of nomenclature, which I address below. In short, "TST, Inc." is the non-profit entity for TST, and that entity has suffered reputational harm and consequential damages arising out of the facts leading to suit (the "cause of action" as used in res judicata jurisprudence).


To clarify the nomenclature, "The Satanic Temple," or "TST," is the name of a particular sect of Satanism which is given legal structure by a constellation of legal entities. Since there has been no need to refer to our current plaintiff ("UFC, LLC") as anything other than "TST," I have been using that name because that is the naming convention people use in this subculture.


UFC, LLC (our current plaintiff) is the original entity which developed the IP rights to the name "The Satanic Temple." That entity has always been for-profit, arising out of a now-defunct tenet that churches should pay taxes. In 2014, the Chapter page was created. SAC Exhibit 2. The Chapter page is definitely property of UFC, LLC.

3

SER 141

Sometime before 2017, TST's leadership (i.e., the religion's leadership) resolved that voluntarily paying taxes was no longer in TST's best interests. In late-2017, that led to TST forming a corporation called "The Satanic Temple" (no "Inc.") In 2019, the articles of incorporation were amended to name the entity "The Satanic Temple, Inc." In late-2018, the Allies page was created. The Allies page may be property of TST, Inc. or it may be property of UFC, LLC.

All of this comes to a head because, in light of a detailed analysis of all of TST's compensable damages (i.e., the *religion's* damages), I found that the complaint glosses over the distinction between "TST" (the religion), "UFC" (the entity that holds the trademark rights to the name "The Satanic Temple"), and "TST, Inc." (the non-profit entity).

I think the complaint needs to clarify the distinction because it addresses the asserted property wrongs (e.g., did Defendants steal the Allies page from the LLC, or the Inc., or both?); and damages therefore (did Defendants foreseeably and intentionally cause reputational harm to the Inc. in addition to the LLC?).

Somewhat relatedly, there is a basis to seek the improved value of the Allies page but the restatement is coy about whether that improved value is because of a conversion/trespass claim by analogy to a breach of fiduciary duty; or whether that improved value requires pleading a breach of fiduciary duty claim. Restatement (Second) of Torts § 927c cmt. *j* (1971); see also Restatement (Second) of Torts § 874, cmt. *a* and *c* (1979). The distinction is probably irrelevant because the same harm is compensable as improvements made to property owned by another. Id., cmt. *f*. But I'd rather include the breach of fiduciary duty and be safe.

The underlying theory to add a breach of fiduciary duty claim is that Defendants may not lawfully compete with TST on the subject of their agency. Restatement (Second) of Agency §§ 387 and 393 (1958). Defendants were entrusted with knowledge about the Allies page as part of the agency. SAC ¶¶ 17, 36. They breached their duty of loyalty by interfering with TST's use of the Allies page, regardless whether they had the power to access the page after their termination from the advisory council. There are probably other breaches of fiduciary duties I may find while detailing out the complaint, as well.

Based on the foregoing, TST desires the Defendants' stipulation to amend the complaint. One claim is proposed to be added: a breach of fiduciary duty claim. One plaintiff is proposed to be added: The Satanic Temple, Inc., who has suffered reputational harm and consequential damages arising out of this cause of action. While I'm in there, I might as well clean up the pleadings as to diversity jurisdiction and get rid of all the extraneous counts which have been dismissed.

Our response to the 12(b)(1) motion is due today so I'd like a stipulation by end of business. I know this is late notice, but this issue didn't occur to me until I called you about an hour ago. If I don't hear from you before end of day, I'll have a note at the bottom of the response summarizing the above and indicating that Ben and I gave you the maximum amount of notice we could before filing a response which requests leave to amend. If I hear back from you with a "no," I'll note your objection in the same note.

Matthew A. Kezhaya

Arkansas office:

Kezhaya Law PLC

1202 NE McClain Rd

Bentonville, AR 72712

p: (479) 431-6112

f: (612) 349-2760

e: matt@kezhaya.law

Minnesota office:

Kezhaya Law PLC

333 N Washington Ave, #300

Minneapolis, MN 55401

p: (479) 431-6112

f: (612) 349-2760

e: matt@kezhaya.law

This message may contain confidential or privileged information and was intended for a particular recipient.  If it appears that I sent this to you in error, please inform me and delete this message.

1

The Honorable Richard A. Jones

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF WASHINGTON
9

10   UNITED FEDERATION OF CHURCHES,
     LLC d/b/a THE SATANIC TEMPLE,

11                                              No. 2:20-cv-00509-RAJ

12                   Plaintiff,                 **DEFENDANTS' MOTION TO
                                                DISMISS FOR LACK OF
13          v.                                  SUBJECT MATTER
                                                JURISDICTION**
     DAVID ALAN JOHNSON, an individual;
14   LEAH FISHBAUGH, an individual;             NOTE ON MOTION CALENDAR:
     MICKEY MEEHAM, an individual; and          **June 10, 2022**
15   NATHAN SULLIVAN, an individual,

16                   Defendants.

17          David Alan Johnson, Leah Fishbaugh, Mickey Meehan, and Nathan Sullivan

18   (collectively, "Defendants") move to dismiss the Second Amended Complaint ("SAC") filed

19   against them by United Federation of Churches, LLC d/b/a The Satanic Temple ("The Satanic

20   Temple" or "TST") for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

21                          **I.      INTRODUCTION**

22          This case involves a dispute between a religious organization, TST, and its former

23   members, Defendants, regarding views about the tenets and practices of TST.

24          Following two rounds of motions to dismiss for failure to state a claim upon which

25   relief can be granted, this Court dismissed all of TST's federal law claims with leave (in part)

26   to amend.  TST elected not to amend its complaint.  Accordingly, the operative complaint is

MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 1

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

　
now devoid of claims under federal law. TST has not alleged (nor can it) that this Court has diversity jurisdiction. Rather, TST apparently relies upon supplemental jurisdiction to keep this case in this Court. However, it is inappropriate for this Court to exercise supplemental jurisdiction when the case has not progressed past the pleading stage. This Court should dismiss TST's remaining state law claims without prejudice, permitting TST to renew those claims (should it wish) against Defendants in King County Superior Court.

## II.     PROCEDURAL HISTORY[1]

TST has filed three complaints in this case.

The first complaint asserted two claims under federal law—alleged violation of the Computer Fraud and Abuse Act ("CFAA") and a "cyberpiracy" claim under the Anti-Cybersquatting Consumer Protection Act ("ACPA")—along with several state law claims. Complaint (Dkt. No. 1). In its original Complaint, TST asserted federal question jurisdiction over the federal claims and supplemental jurisdiction over the state law claims. *Id.* ¶ 4. This Court granted Defendants' motion to dismiss for failure to state a claim upon which relief can be granted, dismissing all claims with leave to amend except for TST's defamation claim, which was dismissed with prejudice. Order Granting Motion to Dismiss (Dkt. No. 20). TST moved for reconsideration of the Court's dismissal as to the ACPA and defamation claims. Motion for Reconsideration (Dkt. No. 21). This Court denied that motion just over a month ago. Order Denying Motion for Reconsideration (Dkt. No. 30).

While the motion for reconsideration was pending, TST filed a First Amended Complaint, which re-asserted the CFAA claim, re-pled one of the state law claims, dropped the ACPA claim and one of the state law claims for which the Court authorized amendment,

---

[1] This Court has summarized the factual allegations relevant to Defendants' motions to dismiss for failure to state a claim upon which relief can be granted in its orders on Defendants' motions. *See* Order Granting Motion to Dismiss (Dkt. No. 20) at 1-4; Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Second Amended Complaint (Dkt. No. 31) at 2-7. Defendants' do not repeat TST's (highly contested) allegations as they are not salient to this motion and because many of them are now irrelevant to the matter, given this Court's dismissal of TST's federal claims.

MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 2



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

and added two state law claims. First Amended Complaint (Dkt. No. 22). Following a pre-motion to dismiss conference, the Parties stipulated to permitting TST to amend its complaint yet again, which this Court approved. *See* Stipulated Motion for Leave to File Second Amended Complaint (Dkt. No. 24); Minute Order (Dkt. No. 25).

TST filed its Second Amended Complaint in May of 2021. *See* Second Amended Complaint (Dkt. No. 26). In that complaint TST re-asserted its CFAA claim, asserted the state law claims it had alleged in the First Amended Complaint, and asserted a new claim under federal law, this time for trademark dilution under the Federal Trademark Dilution Revision Act of 2006 ("FTDRA"). *Id.* As with its original Complaint and First Amended Complaint, TST asserted federal question jurisdiction over the federal claims and supplemental jurisdiction over the state law claims. *Id.* ¶ 5.

Defendants promptly moved to dismiss all claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. *See* Motion to Dismiss Second Amended Complaint (Dkt. No. 27). This Court granted in part and denied in part Defendants' motion to dismiss, dismissing the CFAA claim in its entirety (largely with prejudice, but with leave to amend in part), dismissing the FTDRA claim with leave to amend, dismissing in part two of the state law claims (while allowing those state law claims to proceed in part), and permitting a tortious interference with business expectancy claim to move forward. Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Second Amended Complaint (Dkt. No. 31).

Although the Court granted TST leave to amend TST's CFAA claim (in part) and its FTDRA claim, TST elected not to do so. Accordingly, the "live" claims remaining in TST's Second Amended Complaint all arise from state law: a tortious interference with business expectancy claim and trespass to chattels/conversion claims as to the "Allies" page and business documents. *Id.* at 32; *see also* Second Amended Complaint ¶¶ 82-105.

MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 3

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 147

## III.     ARGUMENT

### A.  Fed. R. Civ. P. 12(b)(1) Standard

A complaint may be dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).  *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).  Specifically, "[r]ule 12(b)(1) presents a threshold challenge to the court's jurisdiction . . . [and] the court is obligated to determine whether it has subject matter jurisdiction in the first instance." *Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16, 21 (D.D.C. 2007).  On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing the court's jurisdiction and a "federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989) (citation omitted); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994).

A Fed. R. Civ. P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be facial or factual.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In resolving a facial attack, the challenger asserts that the allegations of the complaint are insufficient on their face to invoke the court's jurisdiction.  *Id.*  Where a defendant makes a facial challenge, the court must accept as true the allegations and consider those allegations in the light most favorable to the non-moving party.  *See, e.g.*, *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

### B.  This Court Does not Possess Diversity Jurisdiction Over this Case

United States district courts have original jurisdiction over all civil actions in which the amount in controversy is more than $75,000 and the action is between citizens of diverse states.  28 U.S.C. § 1332(a)(1).  Accordingly, TST must show (1) that the parties are in complete diversity, and (2) that the amount in controversy exceeds $75,000, exclusive of interest and costs.  *Id.*; *see also Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003).  TST has failed to plead diversity of citizenship.  Even overlooking

MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 4

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

TST's failure to plead diversity of the parties, TST has not (and cannot) plead that the amount in controversy threshold is satisfied.

### 1. TST has not Pled Diversity of Citizenship

A civil action falls within a federal district court's diversity jurisdiction only of diversity of citizenship among all parties is complete, *i.e.*, there is no plaintiff and no defendant who are citizens of the same state. *Wisconsin Dep't of Corrections v. Schacht*, 524 U.S. 381, 288, 118 S. Ct. 2047, 141 L. Ed. 2d 364 (1998).

TST has not pled complete diversity. *See* Second Amended Complaint ¶ 5. Further, TST has failed to file a corporate disclosure statement as required by the Western District of Washington Local Civil Rules necessary to invoke diversity jurisdiction. *See* LCR 7.1(b) ("In diversity actions . . . the corporate disclosure statement must also list those states in which the party, owners, partner, or members are citizens."). Rather, TST's corporate disclosure statement merely states that its members include Calvin Soling and Doug Misicko, without identifying the state(s) of which Mr. Soling and Mr. Misicko are citizens.[2] *See* Corporate Disclosure Statement (Dkt. No. 5). Disclosure of Mr. Soling's and Mr. Misicko's citizenship is essential for determining TST's citizenship for diversity jurisdiction purposes because "an LLC is a citizen of every state of which its owners/members are citizens." *Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006).

### 2. TST Has not (and Cannot) Establish the Jurisdictional Threshold

Even if TST could establish complete diversity of citizenship, it cannot establish the $75,000 amount in controversy threshold for diversity jurisdiction to exist. Conclusory allegations that the damages are in excess of the jurisdictionally required amount are

---

[2] Curiously, TST discloses "Calvin Soling" as a member of TST. But records from the Corporations Division of the Massachusetts Secretary of State's Office, including reports filed by TST and signed by "Cevin Soling" under penalty of perjury, show "Cevin Soling" as TST's manager and an individual authorized to execute documents on TST's behalf. *See* https://corp.sec.state.ma.us/CorpWeb/CorpSearch/CorpSummary.aspx?sysvalue=9kp5dqzT St0jbYQEV9kdTswZ2QL6AH_LXMff99hAcl3c-

MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 5


ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 149

insufficient to confer jurisdiction. *Matheson*, 319 F.3d at 1090-91. But TST has not even made conclusory allegations that its damages exceed $75,000 as required by 28 U.S.C. § 1332(a). Rather, other than praying for $100,000 in statutory damages under FTDRA, *see* Prayer ¶ 4, the only damages TST claims are $33,689.70 for alleged misappropriation of the "Chapter" page, $1,037.52 for alleged misappropriation of the "Allies" page, and $8,246.70 as the value of the alleged unsuccessful appropriation of the Twitter page, for a total of $42,973.92. Complaint ¶ 77. Not only is this amount well below the $75,000 jurisdictional threshold, but (1) these damages are alleged only in connection with the (now dismissed) CFAA claim, and (2) these damages include over $8,000 in hypothetical damages for alleged attempted wrongdoing, which TST admits failed.

TST has not (and cannot) allege that more than $75,000 is in controversy in this dispute. Accordingly, even if TST had (or could) establish diversity of citizenship, this Court would not possess diversity jurisdiction over this dispute. 28 U.S.C. § 1332(a)(1).

## C. The Court Should Decline to Exercise Supplemental Jurisdiction Over the Surviving State Law Claims

Federal district courts have supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. Defendants do not dispute that this Court possessed jurisdiction over TST's state law claims when TST had "live" federal claims, as both the state and federal claims formed part of the same "case or controversy." But when a federal district court dismisses all claims over which it has original jurisdiction, the court "may decline to exercise supplemental jurisdiction" over the remaining claims. 28 U.S.C. § 1367(c)(3).

The exercise of supplemental jurisdiction is "a doctrine of discretion, not of plaintiff's right." *Blake v. Pallan*, 554 F.2d 947, 958 (9th Cir. 1977). Indeed, federal courts "have indicated a strong preference for the dismissal of pendent or ancillary claims whenever the district court disposes of the federal claims prior to trial." *United States v. Zima*, 766 F.2d

MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 6

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 150

1153, 1158 (7th Cir. 1985). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988); *see also Lundy v. Catholic Health System of Long Island, Inc.*, 711 F.3d 106, 118 (2d Cir. 2013) ("Once all federal claims have been dismissed, the balance of factors will usually point toward a declination" of the exercise of supplemental jurisdiction) (internal quotations omitted). Usually, "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966). "Where, as here, the court has dismissed before trial the only basis for Federal jurisdiction, the court should decline to exercise jurisdiction over the pendent state claims." *Somin v. Total Cmty. Mgmt. Corp.*, 494 F. Supp. 2d 153, 160 (E.D.N.Y. 2007)

The "strong preference" for dismissal of state law claims after federal claims have been dismissed applies with particular force when, as here, the federal claims are dismissed at the pleading stage. *See, e.g.*, *Rossi v. Gemma*, 489 F.3d 26, 39 (1st Cir. 2007) ("At the time the district court made its ruling [declining to exercise supplemental jurisdiction], it had dismissed all federal claims on the pleadings, and so dismissal of the state claims was perfectly reasonable."); *Ross ex rel. Ross v. Board of Educ. of Twp. High Sch. Dist. 211*, 486 F.3d 279, 285 (7th Cir. 2007) (affirming district court's declination of supplemental jurisdiction, particularly "given the fact that [plaintiff's] federal claims were dismissed at such an early stage on a purely legal ground"); *Nolz v. Connecticut Comm'n on Human Rights and Opportunities*, 438 F. Supp. 3d 148, 154 (D. Conn. 2020) (declining to exercise supplemental jurisdiction upon dismissal of federal claims on motion to dismiss); *Cooper v. Pressler & Pressler, LLP*, 912 F. Supp. 2d 178, 189 (D.N.J. 2012) (declining to exercise supplemental jurisdiction after dismissal of federal claims on Fed. R. Civ. P. 12(b)(6) motion

MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 7

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    when no answers or motions other than the motion to dismiss had been filed, no scheduling

2    or settlement conferences had been conducted by the court, and the parties had yet to engage

3    in discovery). Indeed, "[a]s a general principle, the unfavorable disposition of a plaintiff's

4    federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of

5    any supplemental state-law claims." *Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1177

6    (1st Cir. 1995).

7          In these circumstances, *i.e.*, when the case has not proceeded past the pleading stage,

8    "[e]xercising supplemental jurisdiction would neither promote judicial economy nor

9    convenience to the parties because the case is still in its early stages." *Multi Denominational*

10   *Ministry of Cannabis and Rastafari, Inc. v. Gonzales*, 474 F. Supp. 2d 1133, 1148 (N.D. Cal.

11   2007); *see also Steshenko v. Albee*, 42 F. Supp. 3d 1281, 1295 (N.D. Cal. 2014) (declining to

12   exercise supplemental jurisdiction after dismissal of federal claims when "case has yet to

13   proceed beyond the pleadings, and thus few judicial resources are wasted by dismissing the

14   case at this stage" and when "dismissal promotes comity by allowing the California courts to

15   interpret state law concerning the state law claims in the first instance."). Federal courts in

16   Washington have even declined to exercise supplemental jurisdiction when the case has

17   proceeded *past* the pleading stage to the summary judgment stage, where federal claims were

18   dismissed on summary judgment. *See, e.g.*, *Blocktree Props., LLC v. PUD No. 2 of Grant*

19   *Cty.*, 447 F. Supp. 3d 1030, 1046 (E.D. Wash. 2020), *aff'd sub nom. Cytline, LLC v. PUD*

20   *No. 2 of Grant Cty.*, No. 20-35324, 2021 WL 928655 (9th Cir., Mar. 11, 2021). In contrast,

21   where "the case ha[s] passed through every phase of litigation but trial," the exercise of

22   supplemental jurisdiction may be appropriate. *Delgado v. Pawtucket Police Dep't*, 668 F.3d

23   42, 48 (1st Cir. 2012).

24          Just as this Court should decline to exercise supplemental jurisdiction after dismissal

25   of TST's CFAA (and FTDRA) claim, other courts have done the same. *See, e.g.*, *Power*

26   *Equip. Maintenance, Inc. v. AIRCO Power Servs., Inc.*, 953 F. Supp. 2d 1290, (S.D. Ga. 2013)

MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 8

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    (finding that, upon dismissal of CFAA claim, "notions of fairness and comity would suggest

2    that a case now composed of claims based entirely on state law should be tried in a state

3    court").

4            None of the factors courts consider when determining whether to exercise

5    supplemental jurisdiction counsel in favor of this Court retaining jurisdiction.  Although the

6    case has been pending for two years, to date the Court has considered only whether TST has

7    stated claims upon which relief can be granted.  This Court engaged in nuanced analysis of

8    TST's claims, and rejected all three federal claims and one state law claim, defamation, which

9    was dismissed on First Amendment grounds.  All that remains are three state law claims:

10   tortious interference with business expectancy, trespass to chattels, and conversion.  Comity

11   principles favor allowing a Washington State court to apply and interpret Washington State

12   law as to those claims.  *See, e.g.*, *Steshenko*, 42 F. Supp. 3d at 1295.  Further, declining to

13   exercise supplemental jurisdiction will not waste judicial resources (and indeed will conserve

14   this Court's judicial resources), as the Court has only addressed the sufficiency of TST's

15   pleadings.  The Court has not, for example, presided over discovery, held any conferences,

16   or decided any summary judgment motions.  *Ross*, 486 F.3d at 285; *Cooper*, 912, F. Supp.

17   2d at 189.  Finally, TST will not be unfairly prejudiced as ample time remains for TST to re-

18   assert its surviving state law claims within the three-year limitations period set forth in RCW

19   4.16.080, in addition to any applicable tolling under 28 U.S.C. § 1367(d).

20                          **IV.    CONCLUSION**

21           For the foregoing reasons, TST's Second Amended Complaint should be dismissed

22   because TST has not (and cannot) demonstrate diversity jurisdiction and the Court should

23   decline to exercise supplemental jurisdiction over the remaining state law claims, particularly

24   given that this case has not progressed past the pleading stage.

25

26

MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 9

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

DATED: May 13, 2022.

**ARETE LAW GROUP PLLC**

By: /s/ Jeremy E. Roller
Jeremy E. Roller, WSBA No. 32021
1218 Third Avenue, Suite 2100
Seattle, WA 98101
Phone:  (206) 428-3250
Fax:  (206) 428-3251
jroller@aretelaw.com

*Attorneys for Defendants David Alan Johnson,*
*Leah Fishbaugh, Mickey Meehan, and Nathan*
*Sullivan*

MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 10

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1

**CERTIFICATION OF CONFERENCE**

2        The undersigned counsel certifies that, per Paragraph 6 of the Standing Order for

3 Civil Cases Assigned to Judge Richard A. Jones, on May 9, 2022, counsel for Defendants

4 conferred with Matthew Kezhaya and Benjamin Justus, counsel for United Federation of

5 Churches, LLC, regarding a motion to dismiss the Second Amended Complaint for lack of

6 subject matter jurisdiction.  The parties were unable to reach an accord that would eliminate

7 the need for this motion.

8

9 DATED: May 13, 2022.

                                                **ARETE LAW GROUP PLLC**
10
                                                By: */s/ Jeremy E. Roller*
11                                              Jeremy E. Roller, WSBA No. 32021
                                                1218 Third Avenue, Suite 2100
12                                              Seattle, WA 98101
                                                Phone:  (206) 428-3250
13                                              Fax:  (206) 428-3251
                                                jroller@aretelaw.com
14
                                                *Attorneys for Defendants David Alan Johnson,*
15                                              *Leah Fishbaugh, Mickey Meehan, and Nathan*
                                                *Sullivan*
16

17

18

19

20

21

22

23

24

25

26

MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 11

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**CERTIFICATE OF SERVICE**

I, Janet Fischer, certify that on May 13, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, thereby sending a notification of such filing to the following parties:

Benjamin Justus
Lybeck Pedreira & Justus, PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
(206) 687-7805
ben@lpjustus.com

Matthew A. Kezhaya
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
(479) 431-6112
matt@kezhaya.law

DATED: May 13, 2022, at Seattle, Washington.

_/s/ Janet Fischer_
Janet Fischer
Paralegal

MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
No. 2:20-cv-00509-RAJ – Page 12

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

The Honorable Richard A. Jones

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

8
9
10

UNITED FEDERATION OF
CHURCHES, LLC d/b/a THE SATANIC
TEMPLE,

        Plaintiff,

    v.

DAVID ALAN JOHNSON, an individual;
LEAH FISHBAUGH, an individual;
MICKEY MEEHAM, an individual; and
NATHAN SULLIVAN, an individual,

        Defendants.

No. 2:20-cv-00509-RAJ

**DEFENDANTS' REPLY IN SUPPORT
OF MOTION TO DISMISS SECOND
AMENDED COMPLAINT**

NOTED ON MOTION CALENDAR:
**July 2, 2021**


ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

# I.    INTRODUCTION

The Satanic Temple's ("TST") Response to Defendants' Motion to Dismiss ("Response") fails to show that TST has adequately pled any of its claims. TST's Second Amended Complaint ("SAC") must be dismissed.

# II.    ARGUMENT

## A.  The Satanic Temple Fails to State a Hacking Claim under the CFAA

### 1.  TST Fails to Allege Access was not Authorized by the Computer Owners

TST devotes not one word to a fundamental flaw in its CFAA hacking claim—that it fails to allege that any of the owners of the computers at issue here (Facebook, Twitter, or Google) revoked Defendants' authorization to access those computers.  Indeed, as to the Chapter Page, TST affirmatively alleges that at the time of the conduct at issue Facebook *explicitly determined that Johnson's access and alteration were authorized. See* SAC ¶ 63.  Because TST has failed to allege that the computer owners did not permit Defendants to access those computers, the CFAA claim must be dismissed. *Courser v. Allard*, 969 F.3d 604, 619 (6th Cir. 2020).

### 2.  TST Fails to Plead that it Revoked Defendants' Authority to Access Computers

Applicable caselaw is abundantly clear that to assert a CFAA claim based upon "access[] . . . without authorization" against a defendant who had authority to access a protected computer, a plaintiff must plead that it entirely and *explicitly* revoked the defendant's authority. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) ("a defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked *explicitly*") (emphasis added); *Ticketmaster L.L.C. v. Prestige Entm't, Inc.*, 306 F. Supp. 3d 1164, 1175-76 (C.D. Cal. 2018); *Domain Name Comm'n v. DomainTools, LLC*, 449 F. Supp. 3d 1024, 1027 (W.D. Wash. 2020).

*123 Los Robles LLC v. Metzler*, No. 2:17-CV-00392-RGK-SK, 2017 WL 10311210 (C.D. Cal., Aug. 14, 2017), is instructive. In that case, after discovering that Metzler, the limited liability company's managing member and bookkeeper, had embezzled over $100,000 from the company,

REPLY IN SUPPORT OF
MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 1

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

the other members of the company removed Metzler as managing member. 2017 WL 10311210, at *1. They further instructed that the company's bank disable Metzler's ability to access the company's banking records, which the bank failed to do. *Id.* Almost three years later, the company discovered that Metzler had been accessing its banking records "continuously and systematically" and asserted a CFAA hacking claim against him. The *123 Los Robles* Court found that despite Metzler's removal as managing member and bookkeeper, the purported revocation of his authority to access the company's banking records from a protected computer was insufficiently explicit to support a CFAA claim. *Id.* at *3.

> TST's revocation allegations are limited to the following:
>
> On March 12, 2020, TST's Washington leadership removed Defendants from their advisory positions.
>
> Defendants' positions on the advisory council entailed the authorization to manage the Chapter's social media activity. By removing Defendants from their advisory positions, the Washington Chapter leadership revoked Defendants' authorization to manage the Chapter's social media activity and revoked Defendants' authorization to serve as custodians of records.
>
> . . .
>
> Following Meeham's [sic, Meehan's] usurpation of the Allies page, the Washington Chapterhead removed all defendants from administrative access privileges to the remaining social media accounts. More specifically, the Chapterhead removed all administrative privileges of Johnson, Fishbaugh, Meeham [sic, Meehan], and Sullivan to the Facebook Chapter account and the Twitter and Google accounts referenced herein.

SAC ¶¶ 43-44, 49. These allegations fall well short of explicit revocation of authority as required in the Ninth Circuit. Removal of Defendants from their "advisory positions," which TST suggests implicitly caused removal of "administrative privileges" to the social media accounts, is as insufficiently explicit as the LLC's removal of Metzler as managing member and bookkeeper. *123 Los Robles*, 2017 WL 10311210, at *3. Further, even if the allegation of "remov[al] of all administrative privileges" were explicit, such purported removal is not the same as a complete and explicit revocation of authority to access the social media accounts. Accordingly, TST has failed adequately to plead that authority to access those accounts was explicitly revoked.

REPLY IN SUPPORT OF
MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 2

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1

       **3.   TST Fails to Plead that it Informed Defendants of any Revocation of Authority**

2

       "In cases in which the employer rescinded authorization, the Ninth Circuit has required

3

that revocation be 'unequivocally conveyed' to the defendant." *123 Los Robles*, 2017 WL

4

10311210, at *2 (quoting *United States v. Nosal (Nosal II)*, 844 F.3d 1024, 1028 (9th Cir. 2016)).

5

Even if this Court finds that TST explicitly revoked Defendants' authority to access the social

6

media accounts, TST's demand for return of the Chapter page and threatening litigation are

7

insufficient to show that the purported revocation was "unequivocally conveyed" to Defendants.

8

*Id.*; *see also DomainTools*, 449 F. Supp. 3d at 1027; *Power Ventures*, 844 F.3d at 1068; Dismissal

9

Order at 8 (rejecting TST's contention that "it demanded return of the Facebook pages" as

10

insufficient revocation of authority, in part, because it failed to describe "how that revocation was

11

communicated").

12

       **4.   TST Fails Adequately to Plead it Meets the $5,000 "Loss" Threshold**

13

       In a striking mis-statement of the law, TST asserts that the $5,000 "loss" threshold "is

14

irrelevant at the pleading stage. . . . The $5,000 jurisdictional threshold only matters under 18

15

U.S.C. § 1030(a)(4) . . . But, as the Court pointed out, TST relies on 18 U.S.C. § 1030(a)(2)(C)."

16

Response at 6. Before addressing this incorrect statement of law, now that TST explicitly has

17

disavowed a claim under 18 U.S.C. § 1030(a)(4) in favor of 18 U.S.C. § 1030(a)(2)(C), yet another

18

ground for dismissal is apparent. Subparagraph 1030(a)(2)(C) prohibits access without

19

authorization or in excess of authorized access to obtain "information from any protected

20

computer." 18 U.S.C. § 1030(a)(2)(C). Although TST contends that "Defendants obtained

21

information about the approved administrators," Response at 4, the SAC is *devoid* of any allegation

22

that Defendants' alleged improper access to the protected computers allowed them to obtain

23

"information" in violation of 18 U.S.C. § 1030(a)(2)(C). Rather, the obvious gravamen of the SAC

24

is that Defendants' alleged improper access allowed them to *add* information to those computers

25

that TST did not like. Accordingly, TST's CFAA claim must be dismissed for failure to allege

26

Defendants improperly accessed the computers to obtain information.

REPLY IN SUPPORT OF
MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 3

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

Turning to TST's assertion that the $5,000 threshold is not relevant here, while TST correctly observes that the $5,000 threshold is an element for a CFAA claim under 18 U.S.C. § 1030(a)(4), TST completely ignores 18 U.S.C. § 1030(g), which provides in relevant part that "[a] civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)."[1] The only subclause of subsection (c)(4)(A)(i) that conceivably could apply here is (I)—"loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."[2] Accordingly, to withstand a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a CFAA civil plaintiff must plausibly allege "loss" exceeding $5,000. *DomainTools*, 449 F. Supp. 3d at 1030.

TST "alternatively" argues that it has pled a sufficient loss, pointing to two categories: "(1) the lost ability to communicate to an audience which TST had built through years of effort (SAC, ¶¶ 51-68); and (2) the 20-30 lost members."[3] Response at 7. In the SAC the only specifics TST offers as to the amount of its loss are:

> There is a cognizable dollar value to social media accounts. Preliminary estimates of the "loss" related to the misappropriation of the Chapter page is $33,689.70, plus $1,037.52 for the Allies page. The Twitter page, if successfully misappropriated, would have lost $8,246.70.[4]

SAC ¶ 77. As to the first category of loss, TST has alleged nothing to quantify the conclusory value of the alleged lost ability to communicate with its audience. The number appears to have been pulled out of thin air. The second category of loss fares no better. TST alleges no facts indicating the value of the alleged lost 20-30 members. Does TST estimate its damages based on the amount of donations per member? On membership fees? Something else? Did TST

---

[1] In contrast to TST's false contention that no $5,000 threshold need be established in its Response, its SAC recognizes that to assert a civil claim under the CFAA a $5,000 loss is required. *See* SAC ¶ 70.

[2] The remaining subclauses of subsection (c)(4)(A)(i) listed in 18 U.S.C. § 1030(g) are "(II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals; (III) physical injury to any person; (IV) a threat to public health or safety; [and] (V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security." Not one of those subclauses is supported by the SAC's allegations.

[3] TST also asserts in its brief that it suffered "damage . . . to the website." Response at 8. But the SAC lacks any quantification of the "loss" value of that purported damage.

[4] TST offers no "loss" figure relating to the alleged hacking of the Google account.

REPLY IN SUPPORT OF
MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 4



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1  commission a marketing expert to determine the value of the purportedly temporarily lost website?

2  We have no idea. Such conclusory loss allegations fall well short of supporting the $5,000 loss

3  element of a civil CFAA hacking claim. *Delacruz v. State Bar of Cal.*, No. 16-cv-06858-BLF,

4  2018 WL 3077750, at *8 (N.D. Cal., Mar. 12, 2018); *Brodsky v. Apple Inc.*, No. 19-CV-00712-

5  LHK, 2019 WL 4141936, at *8 (N.D. Cal., Aug. 30, 2019).

6      Moreover, the revenue allegedly lost from TST members who allegedly left due to

7  Defendants' actions simply does not apply to the $5,000 loss threshold. Although "lost revenue

8  incurred because of an interruption of service falls within the definition of 'loss,' . . . claims of lost

9  business opportunities, damaged reputation, loss of assets, and other missed revenue . . . do not

10  constitute 'loss.'" *Eagle v. Morgan*, No. 11-4303, 2011 WL 6739448, at *9 (E.D. Pa., Dec. 22,

11  2011). In other words, if, for example, members of TST were unable to donate due to interruption

12  of service on the Facebook page, such lost revenue *might* count toward the loss threshold. But that

13  is not what TST is alleging. Rather, TST contends that because of Defendants' actions as to the

14  social media accounts, some of its members became disaffected and did not donate. This is not

15  due to "interruption of service," but rather, if anything, a "lost business opportunit[y], damaged

16  reputation, . . . and other missed revenue," which plainly "do not constitute 'loss.'" *Id.*

17      TST also contends that attorney's fees qualify as a "loss." Response at 7. While attorney's

18  fees incurred in *remediating* harm from a CFAA may count as a "loss," attorney's fees incurred in

19  *prosecuting* a CFAA claim do not. *Wichansky v. Zowine*, 150 F. Supp. 3d 1055, 1071-72 (D. Ariz.);

20  *Wilson v. Moreau*, 440 F. Supp. 2d 81, 110 (D.R.I. 2006), *aff'd* 492 F.3d 50 (1st Cir. 2007). TST

21  has pled that it incurred $6,000 in preparing its complaint. SAC ¶ 79. That is plainly a litigation

22  expense that courts do not count for the $5,000 CFAA loss threshold.

23      Finally, TST does nothing to address that its loss allegation as to the Allies page is only

24  slightly more than $1,000. Because "loss" is evaluated on a computer-by-computer basis, TST

25  cannot meet the $5,000 threshold as to the Allies page. *Hayes v. Packard Bell NEC, Inc.*, 193 F.

26  Supp. 2d 910, 912 (E.D. Tex. 2001).



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**5. TST Fails to Allege Fishbaugh's and Sullivan's Involvement in the Alleged CFAA Violations or how Meehan's Alleged Actions were Fraudulent**

TST does not address (1) that it failed to allege Fishbaugh's and Sullivan's involvement in the purported CFAA violations, (2) how Meehan's alleged actions were fraudulent, or (3) the entirely conclusory "loss" allegation as to Johnson's alleged attempted hacking of the Twitter account. Accordingly, TST's claims against Sullivan, Fishbaugh, Meehan, and Johnson (as to the Twitter account) must be dismissed for failure to allege essential elements or plead the fraudulent aspect of an 18 U.S.C. § 1030(a)(4) claim with particularity. *See* Motion at 14-16.

**B. TST Fails Adequately to Plead a Claim for Tortious Interference**

A tortious interference claim requires that the interference be "wrongful by some measure beyond the fact of the interference itself." *Moore v. Commercial Aircraft Interiors, LLC*, 168 Wn. App. 502, 510, 278 P.3d 197 (2012). TST correctly notes that the "wrongful" element can be established by reason of a statute or other regulation, or a recognized rule of common law, or an established standard of trade or profession. Response at 10 (citing *Pleas v. City of Seattle*, 112 Wn.2d 794, 803-04, 774 P.2d 1158 (1989)). Yet, TST does not even attempt to explain how it has met this requirement and indeed, it has not. It has not alleged any violation of a statute, regulation, common law or an established standard or trade or profession.

Instead, TST argues that Defendants published derogatory messages about TST on its Facebook pages for the purpose of harming it, and that this conduct should satisfy the improper purpose/wrongful means element. Response at 10-11. This argument is essentially a repackaging of its defamation claim that the Court dismissed on First Amendment grounds. Dkt. No. 20. As with its defamation claim, TST again points to Defendants' criticisms, including that TST leadership are cozy with the alt-right, are white supremacists, and do not conform to the Defendants' impression of Satanism. Response at 11 (citing, *inter alia,* SAC ¶¶ 52 and 55). These are the very types of statements that the Court found it was barred from delving into by the ecclesiastical abstention doctrine. Dkt. No. 20 at 18 ("That would require the Court or jury to

REPLY IN SUPPORT OF
MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 6

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 163

define the beliefs held by The Satanic Temple and to determine that ableism, misogyny, racism, fascism, and transphobia fall outside those beliefs. That the Court cannot do without violating the First Amendment."). TST should not be allowed to perform an end-run around the First Amendment or the Court's Order by restyling its defamation claim as a tortious interference claim. Just as the First Amendment required dismissal of the defamation claim, so does it require dismissal of a tortious interference claim based on the same statements. *See, e.g.*, *Ogle v. Church of God*, 153 F. App'x 371, *4 (6th Cir. 2005) (First Amendment barred the exercise of subject matter jurisdiction over claim for tortious interference with business relationships); *Jennison v. Prasifka*, 391 S.W.3d 660, 668 (Tex. App. 2013) (ecclesiastical abstention doctrine applied to tortious interference claim); *Cmty. Econ. Dev., Inc. v. Cote*, No. TTD CV 07-5001261-S, 2008 WL 5481209, at *4 (Conn. Super. Ct., Dec. 1, 2008) ("Thus, it has been held that the ministerial exception is . . . equally applicable to defamation and tortious interference claims linked to church discipline where religious doctrine, faith or internal organization is involved."); *Goodman v. Temple Shir Ami, Inc.*, 712 So. 2d 775, 777 (Fla. Dist. Ct. App. 1998) (dismissing tortious interference and defamation claims pursuant to the ecclesiastical abstention doctrine).[5]

In addition, TST answers Defendants' point that TST has not alleged any damages relating to the Allies page not by identifying any factual allegations relating to damages, but by pointing to its conclusory statement it has suffered damages. Response at 11 (citing SAC ¶ 89). "The court, however, need not accept as true a legal conclusion presented as a factual allegation." *Kische USA, LLC v. Simsek*, No. C16-0168JLR, 2016 WL 6273261, at *2 (W.D. Wash., June 29, 2016). TST points to *Kische* for the proposition that damages do not need to be plead with specificity. However, they *do* require at least *some* factual basis. For example, in *Kische* the court found that the factual allegations that the plaintiff lost business relationships with suppliers and major retail clients was sufficient to allege damages. *Id.* at *10. Here, TST has not pled any such facts relating to damages for Defendants' use of the Allies page, *e.g.*, it has not alleged that it lost members or

---

[5] As noted in the Motion to Dismiss at 16, n. 6, TST's tortious interference claim as to the Chapter page also fails because TST has not alleged that its relationship with the Chapter page has been terminated. TST has not disputed this point.



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1   lost income related to the use of the Allies page. Without any factual allegations in support of

2   damages, the mere conclusory statement that it has been damaged is not enough. *Ashcroft v. Iqbal,*

3   556 U.S. 662, 678 (2009). This is particularly true for TST's conclusory statement that it suffered

4   reputational damages as such damages must be pled with particularity. *Kische*, 2016 WL 6273261,

5   at *7 ("Injury to a business's reputation or goodwill generally constitutes special damages and, as

6   such, must be pleaded with particularity;" dismissing claim for reputational damages where

7   plaintiff offered only "generalized, largely conclusory allegations of reputational injury").

8   **C.  TST's Conversion and Trespass Claims as to the Chapter Page are Moot**

9          TST does not allege damages for its trespass and conversion claims but instead only seeks

10  injunctive relief. SAC ¶ 99 ("Based on the foregoing, TST is entitled to injunctive relief in the

11  form of a permanent injunction enjoining Defendants from accessing any of TST's "protected

12  computers" under threat of contempt, an order to return TST's membership related documents and

13  destroy any copies thereof, and costs and attorney's fees to be computed after entry of the

14  decree."); ¶ 105 (not alleging any damages for the conversion claim but instead stating that both

15  the trespass to chattels and conversion claims should be decided in tandem). Pursuant to Article

16  III of the U.S. Constitution, TST has the burden of establishing that its claim for injunctive relief

17  is still a live controversy. Motion to Dismiss at 17-19. However, as to the injunctive relief for the

18  Chapter page, TST has failed to do so. TST does not deny that its requested injunctive relief

19  seeking return of the Chapter page has been moot for well over a year, when it regained

20  administrative control of the Chapter page. *See* SAC ¶ 4. Nor does TST point to any facts that

21  indicate it could be wronged again, such as facts showing that Defendants continue to have the

22  ability to access the Chapter page. *See* Response at 13. Thus, TST's conversion and trespass claims

23  as to the Chapter page are moot and must be dismissed.

24  **D.  TST's Fails to Allege Conversion and Trespass as to Documents and the Allies Page**

25         When property is provided to a bailee, a refusal to return property upon demand is required

26  for the bailee's retention of the property to become conversion or trespass. *Burton v. City of*



1    *Spokane*, 16 Wn. App. 2d 769, 771, 482 P.3d 968 (2021) (citing *Judkins v. Sadler-Mac Neil,* 61

2    Wn.2d 1, 5, 376 P.2d 837 (1962)); *Guar. Nat. Ins. Co. v. Mihalovich*, 72 Wn. 2d 704, 710, 435

3    P.2d 648 (1967) ("[I]f a bailee merely holds over after the end of the period for which the chattel

4    was bailed to him, he may be liable for a breach of contract, but he is not guilty of conversion or

5    of any other tort. He has not deprived the owner of the possession, for there is nothing to show that

6    the plaintiff may not have the chattel again whenever he desires it.") (quoting *Salmond on the Law*

7    *of Torts* (9th ed. 1936), s 78, p. 310). The same analysis applies to trespass to chattels claims, *i.e.*,

8    when a party is originally in rightful custody of property, he is not liable for trespass to chattels

9    unless, upon demand, he refuses to return the property. *See, e.g.*, *In re Alan Wood Steel Co.*, 2 B.R.

10    161, 163 (Bankr. E.D. Pa. 1980) ("When a bailee, originally in rightful custody of property,

11    wrongfully refuses to surrender the property *on demand* to the owner, an action either for the full

12    value (conversion) or for damages (trespass to chattels) will lie.") (emphasis added); *Zapata v.*

13    *Ford Motor Credit Co.*, 615 S.W.2d 198, 201 (Tex. 1981) ("A detention of personalty lawfully

14    obtained, *after demand*, is a wrongful act constituting a trespass.") (emphasis added). TST fails to

15    address the undisputed fact that this case involves a bailment. Specifically, TST does not dispute

16    the fact that the Defendants lawfully obtained possession of the membership documents and the

17    Allies page as councilors on TST's advisory council. TST also does not dispute that it has not

18    alleged that it ever asked Defendants to return either the membership documents or the Allies

19    page.[6] Absent any allegation that TST demanded return of the property and Defendants refused,

20    its conversion and trespass to chattels claims fail as a matter of law.[7]

21

22

23

24    [6] Nor has TST alleged that it asked Facebook to give it administrative privileges for the Allies page.

25    [7] Indeed, one the cases cited by TST, *Burton,* supports this point. In *Burton,* the police, who lawfully obtained a
26    crime victim's property were sued by the victim's mother after the police refused to return the property after
   repeated demands. The case illustrates that the demand/refusal was an essential element to turning the police's
   lawful possession of the victim's property into a potential conversion. This case differs significantly from *Burton*
   because TST has never alleged that it ever asked for the return of the property and that Defendants refused.

REPLY IN SUPPORT OF
MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 9

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    **E.  TST's FTDRA Claims Must be Dismissed[8]**

2        **1.  TST Fails to Plead Facts Supporting the Alleged Use**

3        TST explains that the essence of its FTDRA claim is that Defendants have a competing

4    organization that is using TST's marks in the organization's name and that Defendants are using

5    the Allies page to promote the organization in competition with TST. Response at 15. Defendants

6    moved to dismiss the FTDRA claim because TST has failed to allege *any* facts in support of its

7    conclusory assertion that such a competing organization exists and is using TST's marks in its

8    name or otherwise. Motion to Dismiss at 20-22. TST completely fails to address this argument.

9    Instead, TST simply repeats the same conclusory statement that there is a competing organization

10   and, based on a third party's comment to a Facebook post, that it was initially planned to be named

11   either "The Satanic Temple 2: Electric Boogaloo" or "Satanic Washington-Archived Temple

12   Chapter." Response at 15; Motion to Dismiss at 20-22. TST does not point to a single factual

13   allegation in the SAC that plausibly suggests that such an organization exists, *i.e.*, no facts as to

14   when it was established, what type of organization it is, what its current name is, where it is located,

15   who runs it, whether it has any members, etc.[9] Absent even a single alleged fact that would allow

16   the Court plausibly to infer the existence of a competing organization that is using TST's marks to

17   compete against it, TST's has failed adequately to plead that its marks are being used.

18       **2.  TST Fails Adequately to Allege Commercial Use of Its Marks**

19       TST has also failed adequately to allege that its marks are being used for a commercial

20   purpose. The FTDRA expressly provides that any noncommercial use of a mark is not actionable

21   as either dilution by blurring or tarnishment. 15 U.S.C. § 1125(c)(3)(C). TST does not address or

22   dispute Defendants' argument that their alleged use of TST's mark for purposes of their critical

23   commentary does not constitute a commercial use. Motion to Dismiss at 21-23. And indeed

24

---

25   [8] TST does not dispute that if the Court dismisses the CFAA and FTDRA claims there is no remaining basis for
     federal question jurisdiction over any remaining state law claims. Thus, if the Court dismisses the CFAA and FTDA

26   claims, it should decline to exercise supplemental jurisdiction over any remaining state law claims.

     [9] If a competing organization actually existed, TST would have undoubtedly included it as a party in this action.

REPLY IN SUPPORT OF
MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 10



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

FTDRA expressly provides that use of marks for criticism is a fair use. 15 U.S.C. § 1125(c)(3)(A).[10] Instead, TST continues to loop back to its unsupported conclusory allegation that Defendants are running an organization that is competing with TST for donations, members, and merchandise sales and that this competition constitutes commercial use. Response at 16. Again, lacking a single factual allegation indicating the existence of a competing organization this argument is insufficient to establish commercial use.

### 3. TST Fails to Allege that It has a Famous Trademark in the Allies Page

In addition to not establishing the required elements of commercial use, TST also fails adequately to plead dilution by blurring or tarnishment. A dilution claim requires that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment. "A mark is famous 'if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner.'" *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe*, 131 F. Supp. 3d 196, 215 (S.D.N.Y. 2015) (quoting 15 U.S.C. § 1125(c)(2)(A)). Courts have recognized that "the inclusion . . . of the phrase 'widely recognized by the general consuming public of the United States' 'was intended to reject dilution claims based on niche fame, *i.e.* fame limited to a particular channel of trade, segment of industry or service, or geographic region.'" *Solid 21, Inc. v. Jomashop Inc.*, No. 19-CV-1179 (MKB), 2020 WL 9816843, at *11 (E.D.N.Y. Nov. 30, 2020) (quoting *Luv N' Care Ltd. v. Regent Baby Prods. Corp.*, 841 F. Supp. 2d 753, 757–58 (S.D.N.Y. 2012)). Failure to allege facts that indicate that the mark is famous beyond a niche audience requires dismissal. *Id* (dismissing dilution claim for failing adequately to allege the mark was famous).[11]

---

[10] "The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection: . . . (ii) identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner."

[11] *See also, e.g.*, *Stroud v. Richmond*, No. 4:17-CV-01469-KAW, 2017 WL 3782700, at *2 (N.D. Cal. Aug. 31, 2017) (dismissing dilution claim for failing to allege that the mark was famous); *Wellnext LLC v. OVM LLC*, No.

TST claims that the Allies page (entitled "TST WA Allies") bears TST's trademark and that by using the Facebook page to sell products for a competing organization Defendants are liable for dilution by blurring. Response at 16-17. However, in addition to alleging no facts to support the existence of the alleged competing organization, TST does not identify what the alleged trademark on the Allies page is (is it the name "TST WA Allies"?) and does not allege that the unidentified trademark is famous or that it is famous beyond a niche audience. Without these required allegations, TST's dilution claim fails as a matter of law. Further, the harm that TST alleges for its tarnishment claim makes it clear that TST's true concern is that Defendants had the audacity to criticize TST's practices and beliefs. TST argues that Defendants have harmed TST by falsely associating TST "with ableism, misogyny, racism, fascism, transphobia, and the endorsement of brutality, as well as political extremist organizations." Response at 18. (This is the same allegation upon which TST based its dismissed defamation claim). However, the FTDRA expressly provides that it does not apply to the use of a mark for criticism or commentary. 15 U.S.C. § 1125(c)(3)(A). TST has failed to adequately allege claims under the FTDRA.

**F.  TST Should not be Permitted to Amend.**

Liberality in granting leave to amend is subject to limitations, including undue prejudice to the opposing party, bad faith by the movant, and futility. *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011). Further, "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Id.* TST has been allowed three bites at the apple through its original Complaint, its First Amended Complaint, and its current Second Amended Complaint. TST has had more than adequate opportunities to plead viable claims against Defendants. TST knows that Defendants have limited financial means and its repeated attempts to fish for claims against them is nothing more than an attempt to punish former members for their critical opinions. Enough is enough.

---

17-CV-62107, 2018 WL 7048129, at *5 (S.D. Fla. Feb. 16, 2018) (dismissing dilution claim for failure to allege beyond a conclusory statement that the mark was famous).

REPLY IN SUPPORT OF
MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 12



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

DATED: July 2, 2021.

**ARETE LAW GROUP PLLC**

By: */s/ Jeremy Roller*
Jeremy E. Roller, WSBA No. 32021
1218 Third Avenue, Suite 2100
Seattle, WA 98101
Phone:  (206) 428-3250
Fax:  (206) 428-3251
jroller@aretelaw.com

*Attorneys for Defendants David Alan Johnson, Leah*
*Fishbaugh, Mickey Meehan, and Nathan Sullivan*

REPLY IN SUPPORT OF
MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 13


ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**CERTIFICATE OF SERVICE**

I, Janet Fischer, certify that on July 2, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, thereby sending a notification of such filing to the following parties:

Benjamin Justus
Lybeck Pedreira & Justus, PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
(206) 687-7805
ben@lpjustus.com

Matthew A. Kezhaya
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
(479) 431-6112
matt@kezhaya.law

DATED: July 2, 2021, at Seattle, Washington.

/s/ Janet Fischer
Janet Fischer
Paralegal

REPLY IN SUPPORT OF
MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 14


ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

The Honorable Richard A. Jones

1

2

3

4

5

6

7

8            UNITED STATES DISTRICT COURT
    FOR THE WESTERN DISTRICT OF WASHINGTON

9

10   UNITED FEDERATION OF CHURCHES,
     LLC d/b/a THE SATANIC TEMPLE,

11                                          No. 2:20-cv-00509-RAJ

12                    Plaintiff,            **DEFENDANTS' MOTION TO
                                            DISMISS SECOND AMENDED
13         v.                               COMPLAINT**

     DAVID ALAN JOHNSON, an individual;
14   LEAH FISHBAUGH, an individual;         NOTE ON MOTION CALENDAR:
     MICKEY MEEHAM, an individual; and      **July 2, 2021**
15   NATHAN SULLIVAN, an individual,

16                    Defendants.

17

18

19

20

21

22

23

24

25

26

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

David Alan Johnson, Leah Fishbaugh, Mickey Meehan, and Nathan Sullivan (collectively, "Defendants") move to dismiss the Second Amended Complaint ("SAC") filed against them by United Federation of Churches, LLC d/b/a The Satanic Temple ("The Satanic Temple" or "TST") under Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(b)(1).

## I. INTRODUCTION

This case involves a dispute between a religious organization, TST, and its former members, Defendants, regarding views about the tenets and practices of TST. Defendants posted critical content on two of TST's Facebook pages, a Chapter page and an "Allies" page. At TST's request and after the filing of the original complaint, Facebook removed Defendants as administrators of the Chapter page and TST retains exclusive control of that page. TST does not allege that Defendants have accessed the Chapter page since then. TST does not allege that it ever asked either Facebook or Defendants to return the Allies page.

In April of 2020, TST brought various claims against the Defendants for their Facebook posts, including defamation, "hacking" under the Computer Fraud and Abuse Act ("CFAA"), cyberpiracy under the Anticybersquatting Consumer Protection Act ("ACPA"), tortious interference, and violation of the Washington Consumer Protection Act ("CPA"). *See* Complaint (Dkt. No. 1). The Court dismissed all claims for failure to state a claim upon which relief could be granted. Order Granting Motion to Dismiss (Dkt. No. 20) (the "Dismissal Order"). The defamation claim was dismissed with prejudice; the CFAA, ACPA, tortious interference, and CPA claims were dismissed with leave to amend. *Id.*

Though TST admits that its main request for injunctive relief (*i.e.*, return of the Chapter page) has been moot since May 2020, *see* SAC ¶ 4, TST still seeks to punish these dissenting former members for the critical posts by reasserting a CFAA "hacking" claim and a tortious interference claim. TST has not tried to salvage its CPA or cyberpiracy claims; rather it asserts new trespass to chattels, conversion, and trademark dilution claims.

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 1

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 173

For its CFAA claim, TST has not alleged that Defendants, who were Facebook page administrators at the time of the acts complained of, did anything more than use the pages to post critical content. TST acknowledges that Facebook had determined that Defendants were permitted to post per Facebook's (the website owner's) policies at the time of the posts. This allegation, among other fatal defects, mandates dismissal of the CFAA claim.[1]

TST's tortious interference claim also fails as a matter of law. TST fails adequately to plead the fourth element of improper purpose/means because it does not allege the interference was wrongful by some measure beyond the fact of the interference itself. In addition, for the Allies Facebook page, TST does not allege the fifth element of damages.

Grasping at any straw to try to punish Defendants, TST asserts new claims for common law conversion and trespass, based on Defendants' use of the Facebook pages and Defendants' alleged possession of documents. However, the claims relating to the documents and Allies page fail because TST does not allege that it ever demanded return of the rightfully obtained documents or the Allies page, or that Defendants refused to return them. Absent the required demand and refusal, there is no conversion or trespass to chattels.

The conversion and trespass claims relating to the Chapter Facebook page also fail because they are moot. TST admits that its prior request for injunctive relief (*i.e.*, return of the Chapter page) is now largely moot, yet it continues to seek injunctive relief to enjoin *future* access to the page. TST offers no facts, or even any speculation, indicating how the now-removed Defendants could access the Chapter page. Absent any facts showing that the now-resolved situation could reoccur, the claims are moot and must be dismissed.

Finally, TST's claim under the Federal Trademark Dilution Revision Act ("FTDRA") also fails as a matter of law because it fails adequately to allege use of the mark, or that the use is commercial. The core of TST's use allegations is the conclusory and unsupported statement that the Defendants are using its trademark in the name of their

---

[1] The CFAA claim must be dismissed for additional reasons as described below. *See* Sections III.B.1.b-d, *infra*.

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 2



1  purported organization allegedly called "The Satanic Temple 2: Electric Boogalo." SAC ¶

2  111. TST has not alleged any facts indicating the actual existence of such a competing

3  organization. Nor has TST alleged that Defendants have used its marks for a commercial

4  purpose. Instead, the alleged facts show that Defendants were engaged in criticism of their

5  former church, which is non-commercial, protected speech that falls outside of the FTDRA.

6      For these and other reasons, the SAC must be dismissed in its entirety. In the

7  alternative, in the event the Court dismisses the CFAA and FTDRA claims (the source of

8  the Court's original jurisdiction) but one or more of the state law claims survive, the Court

9  should dismiss any remaining claims for lack of subject matter jurisdiction.

10                              **II.    FACTS**

11      For purposes of this Motion to Dismiss only, the following allegations are taken as

12  true (though many are vigorously disputed). TST is a religious organization. SAC ¶ 8. At

13  the relevant time, TST was organized at local levels in Chapters. *Id.* TST uses social media

14  accounts such as Facebook, Twitter, and Google to communicate with its members and to

15  create and store documents. *Id.* ¶¶ 26-29. TST's Washington Chapter created Facebook

16  pages and a Twitter account between 2014 and 2018. *Id.* ¶¶ 29-32.

17      TST's Washington Chapter was led by two individuals, one serving as Chapterhead

18  and the other serving as Media Liaison. *Id.* ¶ 14. Until March 12, 2020, the Chapterhead

19  was assisted by an advisory council. *Id.* ¶ 17. Defendants were councilors on the advisory

20  council. *Id.* In connection with their positions, Defendants managed the Chapter's social

21  media with other councilors and had administrative rights to TST's social media accounts.

22  *Id.* ¶¶ 17, 36. TST contends that its Code of Conduct formed the contours of administrators'

23  authorization to access its social media accounts. *Id.* ¶¶ 34-35 & Ex. 4. In their positions on

24  the advisory council, Defendants also had access to certain materials, including membership

25  listings, internal policies and procedures, and meeting notes. *Id.* ¶¶ 37-38.

26

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 3

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1         On March 12, 2020, TST removed Defendants from the council because of

2    interpersonal conflicts with Chapter leadership and other councilors. *Id.* ¶ 43. On March 14,

3    2020, Defendant Meehan removed other administrators from TST's "Allies" Facebook page

4    and changed the name to "Evergreen Memes for Queer Satanic Friends." *Id.* ¶ 46. Meehan

5    then began posting material allegedly in violation of TST's Code of Conduct. *Id.* ¶ 47.

6         The Washington Chapterhead purportedly removed Defendants from administrative

7    access privileges to the remaining social media accounts. *Id.* ¶ 49. On March 18, 2020,

8    Defendant Johnson allegedly accessed TST's Twitter account, removed approved

9    administrators, replaced them with the other Defendants, followed a number of alleged

10   unspecified extremist groups, and changed the description on the account. *Id.* ¶ 50. On

11   March 20, 2020, Defendant Fishbaugh allegedly attempted to change the password to the

12   Chapter's Google-based email account, although there is no allegation that they succeeded.

13   *Id.* ¶ 56. TST recovered the Twitter and email accounts. *Id.* ¶ 68. TST does not allege the

14   Defendants have accessed, attempted to access, or have any means of accessing these

15   accounts since Defendants were removed as administrators.

16        On March 20, 2020, Defendant Johnson removed other administrators from TST's

17   "Chapter" Facebook page and posted to that page regarding his and others' apparent

18   ejection from TST. *Id.* ¶¶ 51-52. The Chapter's media liaison emailed Johnson and asked

19   him to return the Chapter Facebook page, but Johnson did not respond. *Id.* ¶¶ 53-54. In the

20   following days Johnson re-posted articles about TST on that Facebook page. *Id.* ¶ 55. On

21   March 22, 2020, Johnson changed the name of the Chapter Facebook page from "The

22   Satanic Temple Washington" to "Satanic Washington State – Archived Temple Chapter"

23   and modified the profile picture. *Id.* ¶ 57. TST's attorney sent a letter to Defendant Johnson

24   asking him to relinquish control of the Chapter Facebook page, but Johnson did not

25   respond. *Id.* ¶¶ 64-65. TST claims to have lost between 20 and 30 members due to allegedly

26   false claims that Johnson published to the Chapter page. *Id.* ¶ 62.

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 4

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 176

1    TST requested control of the Chapter page from Facebook, but Facebook initially

2   refused and instead stated that this was a "Page admin issue" not involving "infringements

3   of [TST's] legal rights." *Id.* ¶ 63. However, Facebook later removed Defendants as

4   administrators and gave control of the Chapter page to TST. *Id.* ¶¶ 4, 66 & Ex. 2. Since

5   then, TST does not allege that Defendants have accessed, attempted to access, or have any

6   means of accessing the Chapter Facebook page. TST also does not allege that it ever sought

7   return of the Allies Facebook page from Defendants or Facebook. *Id.* ¶ 32.

8    TST further alleges that prior to these events, Defendants obtained certain

9   documents, such as membership listings, internal policies and procedures, and meeting

10   notes. *Id.* ¶¶ 37-38, 59. Nowhere does TST provide an inventory of the documents to which

11   it claims to have lost access, allege that it asked for the return of these documents, or allege

12   that Defendants have refused to return them.

13                            **III.    ARGUMENT**

14   **A. Applicable Standards**

15   **1.   Fed. R. Civ. P. 12(b)(6) Standard**

16    To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6) "a complaint must

17   contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

18   on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not

19   akin to a probability requirement, but it asks for more than a sheer possibility that a

20   defendant has acted unlawfully. . . . Where a complaint pleads facts that are merely

21   consistent with a defendant's liability, it stops short of the line between possibility and

22   plausibility of entitlement to relief." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

23   556-57 (2007)). Absent facial plausibility, a plaintiff's claims must be dismissed. *Id.*

24   Dismissal is appropriate where the complaint "fails to state a cognizable legal theory . . . to

25   support a claim." *Singleton v. Intellisist, Inc.*, No. C17-1712RSL, 2018 WL 2113973, at *1

26   (W.D. Wash., May 8, 2018). "Determining whether a complaint states a plausible claim for

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1  relief will . . . be a context-specific task that requires the reviewing court to draw on its

2  judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In addition, a court should

3  not accept as true allegations that state legal conclusions. *See id.* at 678-79.

4  **2. Fed. R. Civ. P. 12(b)(1) Standard**

5  A complaint may be dismissed for lack of subject matter jurisdiction under Fed. R.

6  Civ. P. 12(b)(1). *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Specifically,

7  "[r]ule 12(b)(1) presents a threshold challenge to the court's jurisdiction . . . [and] the court

8  is obligated to determine whether it has subject matter jurisdiction in the first instance."

9  *Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16, 21 (D.D.C. 2007). A Rule

10  12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be facial or factual.

11  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In resolving a facial

12  attack, the challenger asserts that the allegations of the complaint are insufficient on their

13  face to invoke the court's jurisdiction. *Id.* Where a defendant makes a facial challenge, the

14  court must accept as true the allegations and consider those allegations in the light most

15  favorable to the non-moving party. *See, e.g.*, *Price v. Socialist People's Libyan Arab*

16  *Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

17  **B. The Satanic Temple's Second Amended Complaint Should be Dismissed**

18  Even taking all allegations in the SAC as true, TST has failed to state a claim upon

19  which relief can be granted. In addition, the trespass and conversion claims relating to the

20  Chapter Facebook page must be dismissed as moot. Because all claims against Defendants

21  fail, the SAC should be dismissed in its entirety.

22  **1. The Satanic Temple has Failed to State a Hacking Claim under the CFAA**

23  The CFAA imposes criminal and civil liability for various acts of computer

24  hacking.[2] 18 U.S.C. § 1030(a). "The CFAA is an 'anti-hacking' statute and not a

25  _____

26  [2] A plaintiff may maintain a civil action only if certain factors are met, specifically (1) loss within a year of at least $5,000 in value, (2) modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of one or more individuals, (3) physical injury to any person, (4) a threat to public health or safety, or (5) damage affecting a computer used by or for the United States

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 6



ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1  misappropriation statute." *Zoom Imaging Sols., Inc. v. Roe*, 219CV01544WBSKJN, 2019

2  WL 5862594, at *10 (E.D. Cal., Nov. 8, 2019). "The plain language of the CFAA 'target[s]

3  the unauthorized procurement or alteration of information, not its misuse or

4  misappropriation.'" *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012). In the Ninth

5  Circuit "the phrase 'exceeds authorized access' in the CFAA does not extend to violations

6  of use restrictions." *Id.* Applying this law, this Court dismissed TST's first CFAA claim

7  because its assertion "that Defendants 'exceeded authorized access' by violating TST's

8  Code of Conduct has been expressly rejected by the Ninth Circuit." Dismissal Order at 9.

9        In an attempt to salvage its CFAA hacking claim, TST reverses its position

10  regarding whether Defendants were authorized to access the various social media accounts

11  that are the subject of that claim. *Compare* Complaint ¶ 30 ("Defendants, each, were

12  entrusted with administrative rights to the above-described social media accounts . . . .")

13  *with* SAC ¶ 44 ("By removing Defendants from their advisory positions, the Washington

14  Chapter leadership revoked Defendants' authorization to manage the Chapter's social

15  media activity . . . .") & ¶ 49; *see also* Dismissal Order at 6 ("[TST] does not currently

16  allege or argue that Defendants' actions were done 'without authorization.' In fact, it

17  alleges the opposite.").

18        Setting aside the implausibility of such a stark reversal of allegations, TST's CFAA

19  hacking claim fails for multiple reasons, any one of which is fatal.

20        **a.  TST Admits Access was Authorized by the Computer Owner**

21        TST has *not* pled that the owner of the websites at issue (Facebook) did not

22  authorize Defendants' use, access, and changes to those websites. Rather, TST pleads that

23  at the time of the acts, Facebook determined that Defendants were authorized to do

24

25

26  Government in furtherance of the administration of justice, national defense, or national security. 18 U.S.C. § 1030(g); 18 U.S.C § 1030(c)(4)(A)(i)(I)-(V). The only factor cited by TST for its right to bring this lawsuit is alleged loss of at least $5,000. SAC ¶¶ 70, 77.



1  everything of which TST complains. TST admits that Facebook owns the websites at issue,

2  and that it and Defendants were simply users. SAC ¶ 23.

3         In certain circumstances a party other than a computer owner may assert a CFAA

4  claim for damages the party suffers due to unauthorized access to a third-party's computer.

5  *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004). However, here TST has not

6  pled that Facebook—the owner of the website—did not authorize Defendants to access or

7  alter the Facebook pages. Indeed, TST has affirmatively alleged that at the time of the

8  conduct upon which its CFAA claim is based, Facebook *explicitly determined that Johnson*

9  *was authorized to access and alter the Chapter Page. See* SAC ¶ 63 ("Facebook refused to

10  correct the matter, mislabeling the issue as a 'Page admin issue' to the exclusion of

11  'infringement of your [TST's] legal rights.'"); *see also* SAC ¶ 66 ("Facebook did not

12  respond [to demand that Facebook grant control of the page to TST] and did not return

13  control of the Chapter page until after the original complaint.").

14         Because TST has failed to allege that Facebook did not permit Defendants to use the

15  Facebook pages, and indeed affirmatively has alleged that Facebook found that Johnson

16  was permitted to act as an administrator for the Chapter Page, Defendants cannot have acted

17  without authorization or in excess of authorized use as defined by the CFAA. *Cf. Courser v.*

18  *Allard*, 969 F.3d 604, 619 (6th Cir. 2020) (affirming dismissal of CFAA claim on grounds

19  that plaintiff failed sufficiently to allege damages and that "the computers . . . searched

20  [allegedly in violation of the CFAA] belonged to the House, not [plaintiff]"). Accordingly,

21  TST's CFAA claim must be dismissed.

22          **b.  TST has Failed to Allege that It Explicitly Revoked Defendants'**
             **Authority to Access the Computers or that It Informed Defendants**

23               **of any Revocation of Authority**

24         In a complete reversal from its original complaint, TST now contends not that

25  Defendants exceeded authorization with respect to the Facebook pages, but rather that

26

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

Defendants obtained access to those pages without authorization.[3] TST concedes that Defendants did have authorization to access those Facebook pages, but has now changed its story to allege that the access was revoked. TST's revocation allegations are limited to the following:

> On March 12, 2020, TST's Washington leadership removed Defendants from their advisory positions.
>
> Defendants' positions on the advisory council entailed the authorization to manage the Chapter's social media activity. By removing Defendants from their advisory positions, the Washington Chapter leadership revoked Defendants' authorization to manage the Chapter's social media activity and revoked Defendants' authorization to serve as custodians of records.

SAC ¶¶ 43-44.

> TST continued:

> Following Meeham's [sic, Meehan's] usurpation of the Allies page, the Washington Chapterhead removed all defendants from administrative access privileges to the remaining social media accounts. More specifically, the Chapterhead removed all administrative privileges of Johnson, Fishbaugh, Meeham [sic, Meehan], and Sullivan to the Facebook Chapter account and the Twitter and Google accounts referenced herein.

*Id.* ¶ 49. Following TST Chapterhead's amorphous removal of "all defendants from administrative access privileges to the remaining social media accounts," TST alleges that Johnson continued to access and change the Facebook Chapter page "despite having a subjective awareness that he no longer had authorization to use TST's Facebook Chapter page." *See, e.g., id.* ¶¶ 51, 52, 55, 57.

In its original Complaint, TST attempted to shoehorn revocation of authority into the conclusory allegation that "it demanded the return of the Facebook pages" from Defendants. *Id.* ¶ 49. This Court found that inadequate:

> At most, it has pled in a conclusory fashion that "it demanded return of the Facebook pages" from Defendants. Dkt. # 1 ¶ 49. This is insufficient. Apart from being conclusory, this allegation does not state when the revocation

---

[3] As this Court observed, "[a] protected computer may be improperly accessed in one of two ways, (1) by 'obtaining access without authorization' or (2) by 'obtaining access with authorization but then using that access improperly.'" Dismissal Order at 5 (quoting *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065 (9th Cir. 2016)).



occurred, how the revocation was communicated, and what actions Defendants undertook afterward. Without such allegations, The Satanic Temple's comparison to *Craigslist* and *Ticketmaster* is strained and unpersuasive.

Dismissal Order at 8.[4] The SAC fares little better and falls well short of alleging explicit revocation of authority necessary to state a CFAA claim.

As the Ninth Circuit Court of Appeals has observed, "a defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked *explicitly*." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) (emphasis added). As stated in *Power Ventures*, the revocation of authority must be explicit. *Id.*; *Ticketmaster L.L.C. v. Prestige Entm't, Inc.*, 306 F. Supp. 3d 1164, 1175-76 (C.D. Cal. 2018) (finding that despite demands that defendants "cease and desist from any further violations of Ticketmaster's rights" the demands "do not actually revoke access authority"); *Domain Name Comm'n v. DomainTools, LLC*, 449 F. Supp. 3d 1024, 1027 (W.D. Wash. 2020) ("If the computer owner has not affirmatively rescinded the defendant's right to access the computer, any existing authorization/permission remains."); *123 Los Robles LLC v. Metzler*, No. 2:17-CV-00392-RGK-SK, 2017 WL 10311210, at *3 (C.D. Cal., Aug. 14, 2017) (finding that despite defendant's removal from position of limited liability company managing member and bookkeeper, purported revocation of authority to access computer was insufficiently explicit to support CFAA claim).

Abundant caselaw shows that to state a claim for unauthorized access to a protected computer a plaintiff must plead that a defendant who previously had permission to access the computer received notification of revocation of that authority. *See, e.g.*, *DomainTools*, 449 F. Supp. 3d at 1027 (letter demanding defendant use computer in accordance with terms of use did not revoke permission and that permission was only revoked after defendant received letter revoking "defendant's right to access the .nz servers entirely");

---

[4] *Craigslist* and *Ticketmaster* refer to *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962 (N.D. Cal. 2013), and *Ticketmaster L.L.C. v. Prestige Entm't W., Inc.*, 315 F. Supp. 3d 1147 (C.D. Cal. 2018).

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 10



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1   *123 Los Robles*, 2017 WL 10311210, at *3 (lack of "explicit[] notifi[cation] that LLC had

2   revoked authorization to access Plaintiff's financial records" warranted dismissal of CFAA

3   claim); *Power Ventures*, 844 F.3d at 1068 (defendant violated CFAA "after receiving

4   written notification from Facebook" that permission to access computer had been revoked).

5   TST falls short of alleging that it "explicitly revoked" Defendants' authorization to

6   access TST social media websites. Instead, TST merely alleges that "[b]y removing

7   Defendants from their advisory positions, the Washington Chapter leadership revoked

8   Defendants' authorization to manage the Chapter's social media activity" and that "the

9   Washington Chapterhead removed all defendants from administrative access privileges to

10  the remaining social media accounts." SAC ¶¶ 44, 49. Alleged removal of "administrative

11  access privileges" is not explicit revocation of authority to access a computer. But even if

12  purportedly stripping "administrative access privileges" could constitute "explicit

13  revocation" of authority to access a computer, TST has failed to allege that it informed

14  Defendants of such revocation. Without such an allegation, TST's CFAA claim fails.[5] *123

15  Los Robles*, 2017 WL 10311210, at *3; *Power Ventures*, 844 F.3d at 1068; *DomainTools*,

16  449 F. Supp. 3d at 1027; *see also* Dismissal Order at 8 (rejecting TST's contention that "it

17  demanded return of the Facebook pages" as insufficient revocation of authority, in part,

18  because it failed to describe "how that revocation was communicated").

---

[5] The closest TST gets to alleging that it communicated the purported revocation of authority to access the social media websites is that "[o]n March 20 at 11:29pm, the Chapter's media liaison emailed Johnson a cease-and-desist instruction, stating 'I'd like you to return the Facebook page back to us please.'" SAC ¶ 53 & Ex. 7. But that email does not explicitly revoke Johnson's permission to access the Facebook Chapter page. To the contrary, it is simply a request to "re-add me [Tarkus Claypool] and Siri as admins." *Id.* Ex. 7. The email does not inform Johnson that he may not access the Facebook Chapter page. Indeed, this Court has already found that this request was "conclusory" and failed to meet the required explicit revocation of authority necessary to maintain a CFAA claim. Dismissal Order at 8. Similarly, TST's lawyer, in a letter threatening a lawsuit for trademark and copyright infringement, asked that Johnson return the Chapter page by letter dated March 23, 2020. But TST alleges no more than that Johnson retained control after that letter was sent. SAC ¶¶ 64-65 & Ex. 9. Without alleging "what actions Defendants undertook afterward" the CFAA claim fails. Dismissal Order at 8. TST does not allege that it ever sought the return of the Allies page.

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 11



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**c. TST Fails Adequately to Plead it Meets the $5,000 "Loss" Threshold**

Among other requirements, to assert a private claim for an alleged CFAA violation, a plaintiff must establish that the violation causes "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C § 1030(c)(4)(A)(i)(I). "Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, costs incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Accordingly, "'loss' refers to the monetary injuries imposed on plaintiff by defendant's conduct." *DomainTools*, 449 F. Supp. 3d at 1030. "The CFAA's definition of loss includes lost revenue incurred because of an interruption of service, . . . , but does not include claims for lost business opportunities, damaged reputation, and other missed revenue opportunities." *Advanced Fluid Systems, Inc. v. Huber*, 28 F. Supp. 3d 306, 330 (M.D. Pa. 2014) (internal citation omitted).

TST's "loss" allegations are sparse and fall well below the level required to assert a plausible CFAA claim. TST's allegations as to loss are limited to the following:

> There is a cognizable dollar value to social media accounts. Preliminary estimates of the "loss" related to the misappropriation of the Chapter page is $33,689.70, plus $1,037.52 for the Allies page. The Twitter page, if successfully misappropriated, would have lost $8,246.70. The aggregate sum being $42,973.92—well in excess of the $5,000 jurisdictional requirement.

> Defendants were aware that the social media accounts had an economic value to TST. The social media accounts were the primary means for TST to communicate with the general public and TST's supporters, and those communications help to foster the kind of relationship that results in charitable donations to support TST's organizational purposes. By depriving TST of its social media accounts, Defendants intended to diminish those donations and divert donations to their competitor organization, provisionally named "The Satanic Temple 2: Electric Boogaloo." Exhibit 5 at p. 4.

> Further compounding the losses are TST's attorney's fees for investigating this matter, entering futile demands for corrective action: both of Facebook and from Defendants, and drafting this complaint. TST will continue to

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 12

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 184

incur losses in the costs and fees related to this lawsuit. TST's costs and attorney's fees well exceed the $6,000 incurred in researching and drafting the original complaint.

SAC ¶¶ 77-79.

Starting with TST's allegation that attorney's fees should be applied to the $5,000 loss threshold, although some courts have recognized that attorney's fees incurred in *remediating* harm from a CFAA violation may count as a "loss," attorney's fees incurred in *prosecuting* a CFAA claim are not such a "loss." *Wichansky v. Zowine*, 150 F. Supp. 3d 1055, 1071-72 (D. Ariz. 2015) ("litigation expenses . . . are not a cognizable loss under the CFAA"); *Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) (expert witness fees are not a "loss"); *Wilson v. Moreau*, 440 F. Supp. 2d 81, 110 (D.R.I. 2006), *aff'd* 492 F.3d 50 (1st Cir. 2007) ("loss" does not include litigation expenses). As to attorney's fees, the only dollar figure TST alleges is $6,000 for preparation of the original complaint. Those fees do not count as a "loss." Further, this alleged "loss" is far less specific and plausible than the allegation of "loss in an amount far in excess of the $5,000 statutory minimum . . . [that] includes . . . the costs [plaintiff] has incurred in investigating and responding to [defendant's] misconduct" that Judge Lasnik found insufficient in *DomainTools*. *DomainTools*, 449 F. Supp. 3d at 1030.

TST asserts that the three alleged CFAA violations, *i.e.*, as to the Chapter and Allies Facebook pages and as to the Twitter page, caused it to suffer $42,973.92 in "losses." SAC ¶ 77. But there are no facts alleged to support that figure. What are the losses? Costs incurred in recovering the allegedly hacked websites? Decreased donations from TST's members? Something else? We have no idea. Conclusory allegations of loss are insufficient to support this element of a CFAA claim. *Delacruz v. State Bar of Cal.*, No. 16-cv-06858-BLF, 2018 WL 3077750, at *8 (N.D. Cal., Mar. 12, 2018) (allegation that plaintiff "incurred over $45,000 in damages and loss per year by conducting a damages assessment to the impairment of the integrity of [his] confidential and information" is "nothing more

1    than a conclusory allegation" insufficient to support a CFAA claim); *Brodsky v. Apple Inc.*,

2    No. 19-CV-00712-LHK, 2019 WL 4141936, at *8 (N.D. Cal., August 30, 2019).

3         Setting aside the totally conclusory nature of the "aggregate sum [of] $42,973.92" in

4    alleged losses, to the extent TST contends that the alleged improper access resulted in fewer

5    "communications . . . to foster the kind of relationship that results in charitable donations to

6    support TST's organizational purposes," SAC ¶ 78, such alleged losses are not actionable

7    under the CFAA. *See, e.g.*, *Eagle v. Morgan*, No. 11-4303, 2011 WL 6739448, at *9 (E.D.

8    Pa., Dec. 22, 2011) (loss of business relations are "precisely the type of damages that courts

9    repeatedly have deemed beyond the purview of the CFAA").

10         Finally, TST's CFAA claim fails for lack of a sufficient loss allegation as to the

11    Allies page because TST alleges only $1,037.52 for that alleged violation. SAC ¶ 77.

12    Because the "loss" is considered on a computer-by-computer, not aggregate, basis, TST

13    cannot meet the $5,000 threshold as to the Allies page. *Hayes v. Packard Bell NEC, Inc.*,

14    193 F. Supp. 2d 910, 912 (E.D. Tex. 2001); *Thurmond v. Compaq Computer Corp.*, 171 F.

15    Supp. 2d 667, 681 (E.D. Tex. 2001). Further, as to the Twitter page TST alleges that "if

16    successfully misappropriated, [it] would have lost $8,246.70." The "loss" must have been

17    actually suffered, not speculative loss had the alleged hacking been successful. *See* 18

18    U.S.C. § 1030(g) (requiring actual "damage or loss by reason of a violation").

19            **d.  TST Fails to Allege Fishbaugh's and Sullivan's Involvement in the**
20                **Purported CFAA Violations or how Meehan's Alleged Actions were**
                 **Fraudulent**

21         "Rule 9(b) plainly applies to section 1030(a)(4)'s requirement that the defendant's

22    acts further the intended fraud." *Oracle America, Inc. v. Service Key, LLC*, No. C 12-00790

23    SBA, 2012 WL 6019580, at *6 (N.D. Cal., Dec. 3, 2012); *see also Synopsys, Inc. v.*

24    *Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1072 (N.D. Cal. 2018) ("For the §

25    1030(a)(4) claim, defendants [sic, plaintiff] must also allege facts supporting a knowing

26    intent to defraud defendants with particularity under Rule 9."). Accordingly, "[t]o satisfy

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 14

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

the heightened pleading requirements for fraud or fraud-based claims, the pleadings must allege 'the who, what, when, where, and how' of the alleged fraudulent conduct, *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) and 'set forth an explanation as to why [a] statement or omission complained of was false and misleading." *Oracle America*, 2012 WL 6019580, at *7.

TST has fallen well below this standard as to Defendants Fishbaugh, Sullivan, and Meehan for the alleged fraudulent conduct and as to Defendant Johnson regarding the Twitter account:

- TST has failed to allege any conduct by Sullivan relating to alleged hacking other than acknowledging the alterations to the Allies page. *See* SAC ¶ 48.

- As to Fishbaugh, TST alleges only that "Fishbaugh attempted to change the password to the Chapter's Google-based email account by changing the recovery email and changing the phone number." SAC ¶ 56. Most fundamentally, TST fails to plead any CFAA violation as to Fishbaugh because TST fails to allege that the loss from this alleged misconduct exceeds the $5,000 threshold as required by 18 U.S.C. § 1030(g). Ignoring that stark failure, the SAC is further devoid of any allegation that this conduct was fraudulent, much less describing the "who, what, when, where, and how" of the alleged fraudulent conduct as required by Rule 9(b).

- As to Meehan, TST alleges only that he exceeded authorization for the "Allies" Facebook page by removing other administrators, changing the name of that page, and posting a "manifesto." SAC ¶ 46. TST fails to explain how that conduct was fraudulent (particularly where the alleged "manifesto" explicitly states that "[t]his page is no longer affiliated with The Satanic Temple."). *Id.*

- As to Johnson's alleged hacking of the Twitter account, TST admits that the alleged acts were not successful. *See* SAC ¶ 77. Further, TST's allegation of a theoretical "loss" in the amount of $8,246.70 that would have occurred had the hacking been successful is

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    entirely conclusory, and therefore fails to meet the $5,000 loss threshold. *See* Section

2    III.B.1.c, *supra*. Accordingly, TST's claim against Johnson as to the Twitter account fails.

3           Thus, in addition to failing to allege, to the level required for a CFAA violation, that

4    Defendants were not authorized to access these computers, TST's claims against Sullivan,

5    Fishbaugh, Meehan, and Johnson (as to the Twitter account) must also be dismissed for

6    failure to allege essential elements for a 18 U.S.C. § 1030(a)(4) claim or to plead the

7    fraudulent aspect of that claim with particularity as required by Rule 9(b).

8           **2.    TST's Tortious Interference Claim Fails**

9           TST alleges a tortious interference claim based on the Chapter Facebook page

10   (which it controls[6]) and the Allies Facebook page (for which it has never requested control

11   from either Facebook or Defendants). Tortious interference with a contractual or business

12   relationship has five elements: (1) a business relationship or expectancy, (2) defendant's

13   knowledge of the relationship, (3) intentional interference resulting in the termination of the

14   relationship, (4) improper purpose/means, and (5) damages. *Woods View II, LLC v. Kitsap*

15   *Cty.*, 188 Wn. App. 1, 29-30, 352 P.3d 807, 821 (2015); *Pac. Nw. Shooting Park Ass'n v.*

16   *City of Sequim*, 158 Wn.2d 342, 351, 144 P.3d 276 (2006).

17          In the SAC, TST again fails to satisfy the second element. In dismissing the original

18   Complaint, the Court found that TST's allegation that "Defendants had subjective

19   knowledge of the business" was too conclusory to satisfy the second element of a tortious

20   interference claim. Dismissal Order at 15. In the SAC, TST again includes an entirely

21   conclusory statement that "[a]t the relevant time, Defendants had subjective knowledge of

22   the business relationship between Facebook and TST." SAC ¶ 85. Although TST also

23   alleges that Facebook is well-known as a separate company from the organizations that

24

25   _____

     [6] TST's claim as to the Chapter Facebook page also fails because TST has not alleged that its relationship with
26   the Chapter Facebook page has been terminated. *Woods View II, LLC v. Kitsap Cty.*, 188 Wn. App. 1, 29-30,
     352 P.3d 807, 821 (2015) (a necessary element of a tortious interference claim is "intentional interference
     resulting in termination of relationship").

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 16

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1   have pages on its proprietary network, this does not establish Defendants' knowledge and

2   does nothing to make the allegation any less conclusory.

3        For both the Chapter and Allies page, TST fails to adequately plead the fourth

4   element of improper purpose/means. For this element, the plaintiff must allege the

5   interference is "wrongful by some measure beyond the fact of the interference itself, such as

6   a statute, regulation, recognized rule of common law, or an established standard of trade or

7   profession." *Moore v. Commercial Aircraft Interiors, LLC,* 168 Wn. App. 502, 510, 278

8   P.3d 197, 200 (2012). TST fails to do this. Instead, it merely alleges that "Defendants

9   abused TST's social media presence as a channel to publish derogatory messages directly to

10  TST's intended audience and to falsely suggest that the Washington Chapter was replaced

11  by Defendants' competitor organization." SAC ¶ 88. TST does not allege a violation of a

12  statute, regulation, common law rule or professional standard.

13       In addition, as to the Allies page, TST fails to allege any damages. Although it

14  alleges that it lost approximately 20 to 30 members due to content that the Defendants

15  posted to the Chapter page (SAC ¶ 62), it does not allege any damages relating to the Allies

16  page, which in its original Complaint TST said had "about 500 followers." The closest TST

17  comes is one completely conclusory, factually unsupported statement that the value of the

18  Allies page is $1,037.52. SAC ¶ 77. This entirely conclusory statement is insufficient as a

19  matter of law to allege damages. *Ashcroft*, 556 U.S. at 678 ("Threadbare recitals of the

20  elements of a cause of action, supported by mere conclusory statements do not suffice.").

21     **3.  TST's Trespass and Conversion Claims Must Be Dismissed**

22       **a.  The Trespass and Conversion Claims Relating to the Chapter**

23                **Facebook Page are Moot**

24       Article III of the U.S. Constitution limits the exercise of federal judicial power to

25  actual cases and controversies. *N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346,

26  1350 (9th Cir. 1984). The case or controversy requirement deprives federal courts of

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 17

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 189

1     jurisdiction to hear moot cases. *Tur v. YouTube, Inc.*, 562 F.3d 1212, 1214 (9th Cir. 2009)

2     ("Mootness is jurisdictional."). For a federal court to have subject matter jurisdiction over a

3     claim, Article III of the Constitution requires an actual, live controversy between the parties

4     at each stage of the proceedings. *Timbisha Shoshone Tribe v. Dep't of Interior*, 824 F.3d

5     807, 812 (9th Cir. 2016). A case becomes moot when interim events have eradicated the

6     effects of the defendant's act or omission, and there is no reasonable expectation that the

7     alleged violation will recur. *See, e.g.*, *County of Los Angeles v. Davis,* 440 U.S. 625, 631

8     (1979); *Lodge 1380, Broth. of Ry. etc. v. Dennis,* 625 F.2d 819, 822 (9th Cir. 1980).

9         Those who seek to invoke the jurisdiction of the federal courts must satisfy the

10    threshold requirement imposed by Article III by alleging an actual live case or controversy.

11    *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974). Past exposure to illegal conduct does not in

12    itself show a present live controversy requiring injunctive relief if unaccompanied by any

13    continuing, present adverse effects. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

14    Instead, in the context of seeking injunctive relief, a plaintiff must show a real or immediate

15    threat that the plaintiff will be wronged again—a "likelihood of substantial and immediate

16    irreparable injury." *Id.* at 111 (quoting *O'Shea*, 414 U.S. at 502). In this case, TST has

17    failed to meet this threshold showing for its trespass and conversion claims relating to the

18    Chapter Facebook page.

19         TST asserts claims for trespass to chattels and conversion based in part on

20    Defendants' alleged misuse of the Chapter Facebook page while they were administrators

21    of the pages. However, TST admits that the main injunctive relief it had been seeking in its

22    original Complaint (the return of the Chapter Facebook page) is now moot. SAC ¶ 4

23    ("Since the filing of the original Complaint, the rightful Washington Chapter leadership has

24    reclaimed the Facebook page. This moots the need of injunctive relief to return the website

25    to its rightful owners . . ."). Despite being mooted, TST continues to seek "injunctive relief

26    in the form of a permanent injunction enjoining Defendants from accessing any of TST's

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 18

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 190

'protected computers' under threat of contempt . . . " *Id.* ¶¶ 4, 99. TST has not even attempted to make any showing entitling it to injunctive relief against possible future access to the Facebook page. The SAC states that Facebook removed the Defendants as administrators of the Chapter Facebook page and TST has been in full control of the Facebook page since that time. SAC ¶¶ 4, 66 & Ex. 2. There is not a single allegation that Defendants' conduct while they were administrators of the Chapter Facebook page could reoccur now that they have been removed as administrators. TST has not alleged that Defendants have tried to access the administrative controls of the Chapter Facebook page after Facebook delivered administrative access to TST or that there is any means by which they could do so. Absent even a single allegation in support of establishing a live controversy for which the requested injunctive relief relating to the Chapter Facebook page would be appropriate, TST has failed to meet its threshold of establishing a live controversy and jurisdiction under Article III of the Constitution. For this reason, its trespass and conversion claims relating to the Chapter Facebook page must be dismissed as moot.

### b. TST's Trespass and Conversion Claims Relating to the Allies Page and Certain Documents Fail

In conversion or trespass claims based on a bailee's retention of personal property, a plaintiff must plead that it demanded the return of the property and the defendant wrongfully refused. *See, e.g.*, *Judkins v. Sadler-Mac Neil*, 61 Wn. 2d 1, 5, 376 P.2d 837, 839 (1962) ("The rule is stated succinctly in Restatement, Torts (1934), § 237: 'One in possession of a chattel as bailee or otherwise, who *on demand, refuses* to surrender its possession to another entitled to the immediate possession thereof, is liable for its conversion.'") (emphasis added); *Shaffer v. Walther*, 38 Wn. 2d 786, 792-93, 232 P.2d 94, 98 (1951) (quoting *Lee Tung v. Burkhart*, 59 Or. 194, 202, 116 P. 1066, 1068 (1911) ("Where one has the lawful possession of the goods of another, and has not converted them, this action will not lie until there has been a *refusal to deliver them on demand made*.")

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

(emphasis added)); *see also* David DeWolf, Keller W. Allen, 16 Washington Practice, Tort Law and Practice § 14:15 (trespass to chattels is an intentional tort and requires the intentional interference with the possession or physical condition of personal property in the possession of another without justification); Restatement (Second) of Torts § 217 (same).

TST alleges that Defendants had access to and control over certain unspecified paper and electronic documents and the Allies Facebook page prior to being terminated from their roles on the advisory council. SAC ¶¶ 17, 20, 36-37. In other words, TST alleges that the Defendants were bailees[7] of the Allies Facebook page and the documents. TST now asserts that Defendants continue to possess the documents and the Allies page, *id.* ¶¶ 38, 46, 59. However, TST does not allege that it ever requested the return of control of the Allies Facebook page – either from Defendants or from Facebook – or that Defendants refused such request. Similarly, nowhere in the SAC does TST allege that it ever asked the Defendants to return the documents at issue or that Defendants refused such request. Absent any allegations relating to a demand for return and a refusal to return, TST fails to allege an intentional refusal to surrender personal property as required for conversion and trespass to chattels claims. Thus, these claims, too, fail as a matter of law.

**4. TST's Dilution Claim Must Be Dismissed.**

TST's fifth claim under the FTDRA also fails as a matter of law because it fails adequately to allege any supporting facts relating to a purported use of TST's mark, or that the alleged use was commercial. To establish trademark dilution under the FTDRA, a trademark holder must prove four elements: (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment. *New Flyer Indus. Canada ULC v. Rugby Aviation, LLC*,

---

[7] A "bailee" "is someone who receives personal property from another, and has possession of but not title to the property." Black's Law Dictionary (11th ed. 2019).

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 20

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1  405 F. Supp. 3d 886, 905 (W.D. Wash. 2019); *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628,

2  634 (9th Cir. 2008).

3        The FTDRA expressly provides that "[a]ny noncommercial use of a mark" is not

4  actionable as trademark dilution. *Sporting Times, LLC v. Orion Pictures, Corp.*, 291 F.

5  Supp. 3d 817, 826-27 (W.D. Ky. 2017) (quoting 5 U.S.C. § 1125(c)(3)(C)) (the artistic use

6  of a mark in a film was not actionable "as the film does more than merely propose a

7  commercial transaction"). Commercial speech is "that which does no more than propose a

8  commercial transaction." *Id.* (citing *Mattel, Inc. v. MCA Records*, 296 F.3d 894, 903 (9th

9  Cir. 2002)). "All speech which is not purely commercial 'is entitled to full First

10  Amendment protection.'" *Id.* (quoting *Mattel*, 296 F.3d at 906 (citation omitted)). In other

11  words, "the exemption for noncommercial speech is used 'as a somewhat inexact,

12  shorthand reference to 'speech protected by the First Amendment.'" *Id.* at 827 (quoting *Am.*

13  *Family Life Ins. Co. v. Hagan*, 266 F.Supp.2d 682, 694-95 (N.D. Ohio 2002) (citations

14  omitted)); *see also, e.g.*, *Mossack Fonseca & Co., S.A. v. Netflix Inc.*, No. CV 19-9330-

15  CBM-AS(X), 2020 WL 8509658, at *3 (C.D. Cal. Dec. 23, 2020) (Netflix's use of the

16  plaintiff's logo in movie scene for the artistic purpose of making the scene realistic was not

17  purely commercial and thus was protected under the First Amendment). One form of

18  protected, non-commercial use of trademarks is criticism and commentary. *See, e.g.*,

19  *Lamparello v. Falwell*, 420 F.3d 309, 318-19 (4th Cir. 2005) (in context of a cybersquatting

20  claim under Lanham Act, court held that noncommercial uses of trademark, such as for

21  comment, criticism, and parody were beyond the scope of the Lanham Act).

22        TST fails to allege any facts in support of its conclusory allegation that the

23  Defendants are using its marks at all, much less for a commercial purpose. The core of

24  TST's allegations relating to the use of its marks is the conclusory and completely

25  unsupported statement that the Defendants purportedly founded a competing organization

26  called either "The Satanic Temple 2: Electric Boogalo" or "Satanic Washington – Archived

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 21

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    Temple Chapter," which uses TST's trademark name "The Satanic Temple" in its name.

2    SAC ¶ 111. The sole fact alleged in support of this purported use is TST's Exhibit 5 at 4.

3    *See* SAC ¶ 87. This Exhibit shows Defendant Sullivan in a Facebook comments

4    conversation with a third-party in which the third-party appears to suggest several possible

5    names for a new religious organization:

6            The Satanic Temple 2: Electric Boogalo?

7            The Satanic Temple 2: The Second One?

8            S2: The Mighty Satanists?

9    SAC, Ex. 5 at 4. Defendant Sullivan responds to these (obviously farcical) suggestions with

10   the comment: "Satanism Reloaded actually." *Id.* This Exhibit comes nowhere near

11   providing the required factual allegations for the assertion that Defendants have organized

12   and are running a competing religious organization that is using TST's trademark in its

13   name. Indeed, there are <u>no</u> facts as to what the purported organization is called (*i.e.*, is the

14   name the first, second or third (farcical) name suggested by the third-party?). Nor are there

15   any other basic facts that would indicate the existence of an organization. For example,

16   when was it founded? What type of organization is it? Where is it located? Who runs it?

17   Does it have any members? Etc., etc., etc. In short, there are no alleged facts indicating that

18   Defendants are using TST's marks through a competing organization. Although the court

19   must accept as true a complaint's well-pled facts, conclusory allegations of law and

20   unwarranted inferences will not defeat an otherwise proper Rule 12(b)(6) motion to dismiss.

21   *Hoefs v. Sig Sauer Inc.*, No. 3:20-CV-05173-RAJ, 2021 WL 615300, at *1 (W.D. Wash.

22   Feb. 17, 2021) (citing *Vazquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007);

23   *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)); *Ashcroft,* 556 U.S.

24   at 678 ("Threadbare recitals of the elements of a cause of action, supported by

25   mere conclusory statements do not suffice."). Here, absent any facts showing that its marks

26   are being used at all, TST's FTDRA claim based on that conclusory assertion must fail.

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 22

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    In addition, even if TST had alleged facts that indicated the existence of

2    Defendant's purported competing organization that is using its marks (which it has not), it

3    has failed to allege that Defendants are using its marks for a commercial purpose. TST

4    alleges that Defendants' purported competing organization used its marks for the purpose of

5    criticizing it by suggesting that TST "promotes ableism, misogyny, racism," SAC ¶ 114,

6    and "suggesting that TST is not a religious organization, but is instead an extremist political

7    organization." SAC ¶ 116. These comments, on their face, are not proposing a commercial

8    transaction but instead are offering criticisms of TST. As critical commentary, the

9    comments are protected by the First Amendment and fall well outside the scope of the

10   FTDRA. *Mattel*, 296 F.3d at 906 ("All speech which is not purely commercial 'is entitled to

11   full First Amendment protection.'") (citation omitted).

12   TST also alleges that Defendants are using the Allies page to sell merchandise.

13   However, TST does *not* allege that either the Allies page or the merchandise sold through

14   that page uses its tradename (The Satanic Temple). Although TST conclusorily alleges that

15   the t-shirts use "derivative marks," it does not identify what the purported derivative marks

16   are, that they are protected trademarks that are famous and distinctive, or that the

17   Defendants' alleged use of the marks is likely to cause dilution. Without these required

18   factual allegations, TST's FTDRA claim based on the Allies page fails as a matter of law.

19   **C. The Court Should Dismiss this Case with Prejudice**

20   Given that TST has amended its complaint multiple times since first filing the

21   original Complaint in April of 2020 and the futility of further amendment, this Court should

22   dismiss the SAC with prejudice. *Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d

23   1047, 1058 (9th Cir. 2011).

24   **D. Because the CFAA and FTDA Claims Should be Dismissed, the Court Should
     Decline to Exercise Jurisdiction Over any Surviving State Law Claims**

25

26   A district court may assert supplemental jurisdiction over claims that "form part of

the same case or controversy" over which a district court has original jurisdiction. 28

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 23

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

U.S.C. § 1367(a). However, if a district court dismisses all claims over which it has original jurisdiction, the court "may decline to exercise supplemental jurisdiction" over the remaining claims. 28 U.S.C. § 1367(c)(3). If all original jurisdiction claims are dismissed before trial, it is common practice to decline to exercise jurisdiction over any remaining state law claims. *Blocktree Properties, LLC v. PUD No. 2 of Grant Cty*, 447 F. Supp. 3d 1030, 1046 (E.D. Wash. 2020), *aff'd sub nom. Cytline, LLC v. PUD No. 2 of Grant Cty.*, No. 20-35324, 2021 WL 928655 (9th Cir., Mar. 11, 2021); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Usually, "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

TST has asserted that this Court has jurisdiction over this case pursuant to its original jurisdiction of the CFAA and trademark dilution claims and supplemental jurisdiction of the state law common law claims. SAC ¶ 5. If the Court dismisses the CFAA and FTDRA claims for failure to state a claim (as it should), there is no remaining basis for federal question jurisdiction. TST has not alleged a basis for the Court to assert diversity jurisdiction over the remaining state law claims. Thus, if the Court dismisses the CFAA and FTDA claims, to the extent any of the common law claims survive the Court should decline to exercise supplemental jurisdiction over them.

## IV.     CONCLUSION

For the foregoing reasons, TST's Second Amended Complaint must be dismissed in its entirety for failure to state a claim upon which relief can be granted and because its trespass and conversion claims seeking injunctive relief for the Chapter Facebook page are moot. In the alternative, in the event the Court dismisses the CFAA and FTDA claims but one or more of the state law claims survive, the Court should decline to exercise supplemental jurisdiction over any such remaining claims pursuant to 28 U.S.C. § 1367(c)(3).

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    DATED: June 7, 2021.

2                                    **ARETE LAW GROUP PLLC**

3                                    By: */s/ Jeremy E. Roller*
                                     Jeremy E. Roller, WSBA No. 32021
4                                    1218 Third Avenue, Suite 2100
                                     Seattle, WA 98101
5                                    Phone: (206) 428-3250
                                     Fax: (206) 428-3251
6                                    jroller@aretelaw.com

7                                    *Attorneys for Defendants David Alan Johnson,*
8                                    *Leah Fishbaugh, Mickey Meehan, and Nathan*
                                     *Sullivan*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 25

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1

## CERTIFICATION OF CONFERENCE

2      The undersigned counsel certifies that, per Paragraph 6 of the Standing Order for

3  Civil Cases Assigned to Judge Richard A. Jones, on April 14, 2021, and continuing for

4  several days thereafter, counsel for Defendants conferred with Matthew Kezhaya, counsel

5  for The Satanic Temple, regarding a potential motion to dismiss the First Amended

6  Complaint.  Although that conferral process ultimately resulted in The Satanic Temple

7  dropping its request for punitive damages, it did not produce an accord that would eliminate

8  the need for this motion as to The Satanic Temple's Computer Fraud and Abuse Act,

9  tortious interference, trespass to chattels, or conversion claims.  Following The Satanic

10 Temple's filing of its Second Amended Complaint, on June 3, 2021, counsel for Defendants

11 conferred with Mr. Kezhaya regarding a motion to dismiss the Second Amended

12 Complaint.  The parties were unable to reach an accord that would eliminate the need for

13 this motion.

14

15 DATED: June 7, 2021.

16                                         **ARETE LAW GROUP PLLC**

17                                         By: */s/ Jeremy E. Roller*
                                            Jeremy E. Roller, WSBA No. 32021
18                                          1218 Third Avenue, Suite 2100
                                            Seattle, WA 98101
19                                          Phone:  (206) 428-3250
                                            Fax:  (206) 428-3251
20                                          jroller@aretelaw.com

21                                          *Attorneys for Defendants David Alan Johnson,*
                                            *Leah Fishbaugh, Mickey Meehan, and Nathan*
22                                          *Sullivan*

23

24

25

26

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**CERTIFICATE OF SERVICE**

I, Janet Fischer, certify that on June 7, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, thereby sending a notification of such filing to the following parties:

Benjamin Justus
Lybeck Pedreira & Justus, PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
(206) 687-7805
ben@lpjustus.com

Matthew A. Kezhaya
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
(479) 431-6112
matt@kezhaya.law

DATED: June 7, 2021, at Seattle, Washington.

*/s/ Janet Fischer*
Janet Fischer
Paralegal

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 27

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

The Honorable Richard A. Jones

1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF WASHINGTON

9

10  UNITED FEDERATION OF CHURCHES,
    LLC d/b/a THE SATANIC TEMPLE,

11                                           No. 2:20-cv-00509-RAJ

12              Plaintiff,                    **DEFENDANTS' OPPOSITION TO
                                             PLAINTIFF'S MOTION FOR
13       v.                                   RECONSIDERATION**

14  DAVID ALAN JOHNSON, an individual;
    LEAH FISHBAUGH, an individual;           NOTED ON MOTION CALENDAR:
15  MICKEY MEEHAM, an individual; and        **March 12, 2021**
    NATHAN SULLIVAN, an individual,

16              Defendants.

17

18

19

20

21

22

23

24

25

26

OPPOSITION TO MOTION
FOR RECONSIDERATION
No. 2:20-cv-00509-RAJ



## I.    INTRODUCTION

"Motions for reconsideration are disfavored. The court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence." LCR 7(h)(1). The Satanic Temple has not even attempted to meet these standards. As to the ACPA claim, instead of showing any error The Satanic Temple proposes a novel and unsupported interpretation of the ACPA—one that would exponentially expand the ACPA to potentially billions of social media users. The Satanic Temple's proposed interpretation is contradicted by the language of the ACPA, its legislative history, case law, and the realities of how the internet and domain names work. There are no grounds for reconsideration of the Court's correct ruling.

The Satanic Temple also fails to establish any grounds for reconsidering dismissal of the defamation claim. Instead of showing a manifest error of law, The Satanic Temple merely offers a conclusory rehash of the same arguments the Court previously considered and rejected. The Satanic Temple's Motion for Reconsideration should be denied.

## II.    ARGUMENT

### A.  The Satanic Temple has Failed to Show Manifest (or any) Error in Dismissal of the ACPA Claim.

#### 1.  The ACPA Applies Only to Second-Level Domain Names That Have Been Registered With or Assigned by a Registration Authority.

"The paradigmatic harm that the ACPA was enacted to eradicate" is "the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark." *Lamparello v. Falwell*, 420 F.3d 309, 318-19 (4th Cir. 2005) (quoting *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004)). "The Act was also intended to stop the registration of multiple marks with the hope of selling them to the highest bidder." *Id.* Thus, to establish liability for "cyberpiracy" under the ACPA, a plaintiff must prove "(1) the defendant registered, trafficked in, or used a

OPPOSITION TO MOTION
FOR RECONSIDERATION
No. 2:20-cv-00509-RAJ – Page 1

1    domain name; (2) the domain name is identical or confusingly similar to a protected mark

2    owned by the plaintiff; and (3) the defendant acted 'with bad faith intent to profit from that

3    mark.'" *Multifab, Inc. v. ArlanaGreen.com*, 122 F. Supp. 3d 1055, 1066 (E.D. Wash.

4    2015).

5            As the Court correctly observed, by definition a domain name must be registered by

6    a domain name registrar or registry. Order at 10 (the ACPA defines "domain name" as "any

7    alphanumeric designation which is registered with or assigned by a domain name registrar,

8    domain name registry, or other domain name registration authority as part of an electronic

9    address on the Internet") (quoting 15 U.S.C. § 1127). As the Court also noted, numerous

10   courts have defined a "domain name" as consisting of only two parts: a "top-level" domain

11   and a "second-level" domain. *Id.* (quoting *Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 698

12   (9th Cir. 2010)). The top-level domain ("TLD") includes the portion of the domain name to

13   the right of the period, such as .com, .gov, .net, etc. *Id.* Each TLD is divided into second-

14   level domains identified by the designation to the left of the period, such as "example" in

15   "example.com" or "example.net." *Id.* The Court further correctly found that *only* these two

16   domain levels are covered by the ACPA, and no court has found that the ACPA applies to

17   any URL component beyond top-level and second-level domains. Order at 13 (citing

18   *GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 725 (N.D. Tex. 2010)

19   ("The court has found no case, and [plaintiff] has cited none, that holds that a portion of a

20   web address other than a second or top level domain constitutes a 'domain name' within the

21   meaning of the ACPA.")).

22           The Satanic Temple offers no authority that contradicts either of these two

23   fundamental aspects of the definition of a domain name, *i.e.*, (1) a domain name consists

24   only of a top-level and second-level domain, (2) which is registered with or assigned by a

25   domain name registrar, domain name registry, or other domain name registration authority.

26   Nor has it shown that the Facebook account at issue here meets these required elements—

OPPOSITION TO MOTION
FOR RECONSIDERATION
No. 2:20-cv-00509-RAJ – Page 2

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    and indeed it does not. The Satanic Temple's claim is based on a *post*-domain portion of its

2    Facebook URL.[1] This part of the URL was not issued by a DNS registry or included on a

3    DNS registry and is not part of the top-level or second-level domain.

**2.  The Satanic Temple's Novel Theory is not Supported by any Authority.**

5    Instead of establishing any error of law, The Satanic Temple argues that the Court

6    should adopt a novel—and entirely unsupported—interpretation of the ACPA. The Satanic

7    Temple suggests that under the ACPA, social media companies, such as Facebook, should

8    be considered domain name registration authorities, and that post-domain URLs issued by

9    social media companies should be considered domain names under the ACPA. Motion for

10   Reconsideration at 2-5. In addition to being entirely unsupported by the language of the

11   ACPA, its legislative history, and case law, The Satanic Temple's theory demonstrates a

12   fundamental misunderstanding of how the domain name system works.

13   In brief summary, the internet domain name system ("DNS") is overseen by an

14   entity called the Internet Corporation for Assigned Names and Numbers ("ICANN").[2]

15   ICANN is a not-for-profit corporation formed in 1998 and selected by the U.S. Department

16   of Commerce to administer the internet DNS with input from a governmental advisory

17   committee, in which the U.S. Department of Commerce participates. *Vizer v.*

18   *VIZERNEWS.COM*, 869 F. Supp. 2d 75, 77-78 (D.D.C. 2012) (citing *ICANN*, National

19   Telecommunications & Information Administration, U.S. Department of Commerce,

20   http://www.ntia.doc.gov/category/icann). The DNS links user-friendly names, such as

21   "uscourts.gov," to unique numeric addresses that identify servers connected to the internet.

22

23   ───────────────

[1] The URL at issue is https://www.facebook.com/**TheSatanicTempleWashington**/") (bolded portion is the

24   post-domain path at issue).

25   [2] "The Court may take judicial notice of a fact, such as the role of ICANN, which is not subject to 'reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Vizer v.*

26   *VIZERNEWS.COM*, 869 F. Supp. 2d 75, 77 n.3 (D.D.C. 2012) (citing Fed. R. Evid. 201(b) and *United States v. Philip Morris USA, Inc.*, No. 99-2496, 2004 WL 5355971, at *1-*2 (D.D.C., Aug. 2, 2004)).

OPPOSITION TO MOTION
FOR RECONSIDERATION
No. 2:20-cv-00509-RAJ – Page 3

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1   *Id.* at 78 (citing *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1159 (9th Cir. 2010); *Domain Name*

2   *System,* National Telecommunications & Information Administration, U.S. Department of

3   Commerce, http://www.ntia.doc. gov/category/domain-name-system (describing the

4   domain name system and ICANN)).

5          ICANN itself is not a registrar. Instead, it coordinates the DNS by entering into

6   Registry Agreements with Internet registries. *Id.* Each top-level domain name—such as

7   .com, .net, or .org—is operated by one of the authorized registries that maintains

8   information on each registered domain name and ensures that each name registered in its

9   domain is unique. Registries also offer a variety of services, such as permitting consumers

10  to check if a particular name within its domain has been registered and, if so, the expiration

11  date for this registration. *Id.* For example, Verisign, Inc. ("Verisign") is the registry for

12  ".com" and ".net" domains and is responsible for registering names on these domains in

13  accordance with its Registry Agreement with ICANN. Because Verisign is prohibited from

14  accepting requests for domain names directly from consumers, Verisign only accepts and

15  registers domain names received from registrars. *Id.*; *Dotster, Inc. v. ICANN*, 296 F. Supp.

16  2d 1159, 1160 (C.D. Cal. 2003); *Vizer,* 869 F. Supp. 2d at 78 (citing *What Does ICANN*

17  *Do?,* ICANN, http://www.icann.org/en/about/participate/what); *see also Office Depot, Inc.*

18  *v. Zuccarini,* 596 F.3d 696, 699 (9th Cir. 2010).

19         The Satanic Temple argues that Facebook, in its role as a social media company,

20  should be considered an "other domain name registration authority" under Section 1127

21  because Facebook users register their Facebook accounts with Facebook. Motion for

22  Reconsideration at 2. This argument fails to acknowledge or understand that a registration

23  authority means something very specific in the DNS industry: it is a registry under a

24  Registry Agreement with ICANN or an authorized registrar for that registry that registers

25  domain names with the registry. The Satanic Temple has alleged no facts that Facebook, as

26  a social media provider, operates as an authorized DNS registration authority, *i.e.*, that

OPPOSITION TO MOTION
FOR RECONSIDERATION
No. 2:20-cv-00509-RAJ – Page 4

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

Facebook has entered a Registry Agreement with ICANN or that it registers domain names with an authorized DNS registry, much less that it has registered the particular URL at issue here. The fact that Facebook's users register their Facebook accounts with Facebook is irrelevant—that has nothing to do with the registration of domain names under the DNS process overseen by ICANN.

In other words, without any supporting authority, The Satanic Temple is proposing an entirely new and different system from the DNS, whereby social media companies who do not provide any of the authorized DNS services—but instead provide social media accounts to their users—should somehow be considered "domain name registration authorities" under the ACPA. This proposition is entirely unsupported. Indeed, the ACPA's legislative history underscores that the plain language of the definition of domain name in 15 U.S.C. § 1127 refers only to authorized DNS registries who register second-level domain names. ACPA co-sponsor Senator Patrick Leahy's comments on the bill are illuminating:

> Domain names are narrowly defined to mean alphanumeric designations registered with or assigned by domain name registrars or registries, or other domain name registration authority as part of an electronic address on the Internet. *Since registrars only register second level domain names, this definition effectively excludes file names, screen names, and e-mail addresses and, under current registration practice, applies only to second level domain names.*
>
> *The terms "domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name" in Section 3002(a) of the Act, amending 15 U.S.C. 1125(d)(2)(a), is intended to refer only to those entities that actually place the name in a registry, or that operate the registry*, and would not extend to other entities such as the ICANN or any of its constituent units, that have some oversight or contractual relationship with such registrars and registries. Only these entities that actually offer the challenged name, placed it in a registry, or operate the relevant registry are intended to be covered by those terms.

1    145 Cong. Rec. 14986, 15025 (1999) (emphasis added) (p. 15025 is attached as Exhibit 1
2    for the Court's convenience).
3          If The Satanic Temple's proposal to expand the ACPA to social media companies
4    were accepted, the ACPA would suddenly expand well beyond the DNS and registered
5    domain names and would apply to potentially billions[3] of social media accounts that are not
6    registered with the DNS. Such a vast shift in the scope of the ACPA should be left to
7    Congress, not the courts.

8          **3.  The Satanic Temple Failed to Plead an Essential Element of an ACPA**
9              **Claim.**

10         Even if this Court accepts The Satanic Temple's re-writing of the ACPA, which it
11   should not, the Court must dismiss its ACPA claim because it has failed to plead an
12   essential element of such a claim, *i.e.*, that Defendants had a bad faith intent to profit from
13   their use of the Facebook page. *See* Motion at 12-13; Reply at 9-10.

14   **B.  The Court Properly Dismissed The Satanic Temple's Defamation Claim.**

15         The Satanic Temple's motion is devoid of grounds for reconsideration of dismissal
16   of its defamation claim. The Satanic Temple appears to argue that the doctrine of
17   ecclesiastical abstention means the Court should turn its civil judicial decision-making role
18   over to the church and allow the church to decide if the statements at issue are defamatory.
19   Motion for Reconsideration at 5-6 ("As the Court found, the defamation claim will require a
20   showing that TST does not promote, e.g., fascism. If that is an unavoidable question of
21   TST's doctrine, then well-settled law binds the Court to TST's position."). This is an
22   incorrect statement of the law. As the case cited by The Satanic Temple explains, the
23   doctrine of ecclesiastical abstention only requires a court to defer to a church's decision if
24   *the plaintiff* is challenging an internal decision by the church's tribunal implementing

25

26
     _____
     [3] The Court may take judicial notice that Facebook alone has over three billion users.
     https://about.fb.com/company-info/

OPPOSITION TO MOTION
FOR RECONSIDERATION
No. 2:20-cv-00509-RAJ – Page 6

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1   church rules. *Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*, 819 F.2d 875, 878

2   n.1 (9th Cir. 1987) ("Ecclesiastical abstention thus provides that civil courts may not

3   redetermine the correctness of an interpretation of canonical text or some decision relating

4   to government of the religious polity. Rather, we must accept as a given whatever the entity

5   decides."); *see also Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*,

6   426 U.S. 696, 724-25, 96 S. Ct. 2372, 2387-88, 49 L. Ed. 2d 151 (1976) ("[T]he First and

7   Fourteenth Amendments permit hierarchical religious organizations to establish their own

8   rules and regulations for internal discipline and government, and to create tribunals for

9   adjudicating disputes over these matters. When this choice is exercised and ecclesiastical

10  tribunals are created to decide disputes over the government and direction of subordinate

11  bodies, the Constitution requires that civil courts accept their decisions as binding upon

12  them.").

13          This case, however, does not involve *a plaintiff* who is challenging a church

14  tribunal's application of its own rules or governing system. Instead, the plaintiff, The

15  Satanic Temple, has brought a civil action against its former members, alleging that they

16  made defamatory statements regarding The Satanic Temple's beliefs and practices. The

17  Satanic Temple cites no case suggesting that the Court must defer to The Satanic Temple to

18  decide its own civil defamation claim against Defendants. To the contrary, as the Court

19  correctly found, in the context of a civil defamation claim involving a church's practices or

20  beliefs, the doctrine of ecclesiastical abstention requires the Court to dismiss the claim. *See*

21  Order at 18-19; *see also, e.g.*, *Hartwig v. Albertus Magnus Coll.*, 93 F. Supp. 2d 200, 219

22  (D. Conn. 2000) (dismissing defamation claim where review of the claim would require the

23  court to delve into and weigh competing views of church doctrine).

24          The Satanic Temple also contradicts its own argument. On one hand it argues that

25  because the defamation claim involves church doctrine, it asks the Court to defer to The

26  Satanic Temple to decide if the statement at issue is defamatory. Yet, immediately after this

OPPOSITION TO MOTION
FOR RECONSIDERATION
No. 2:20-cv-00509-RAJ – Page 7

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1   argument The Satanic Temple offers the same conclusory argument that it made in its

2   Opposition to Defendants' Motion to Dismiss that "TST's doctrine is not really at issue."

3   Motion for Reconsideration at 6. In addition to being inconsistent, the Court has already

4   addressed and rejected this exact argument. Order at 18. In violation of LCR 7(h)(1) The

5   Satanic Temple simply rehashes the same argument it already made.

6       The Court's ruling was correct. The defamation claim asserts that certain

7   Defendants "falsely ascrib[ed] extremist ideologies and affiliations to T[he Satanic

8   Temple]." Order at 17 (quoting Complaint ¶ 92). The ideologies include ableism,

9   misogyny, racism, transphobia, and endorsement of police brutality, and the affiliations

10  include Neo-Nazis and the alt-right. *Id.* at 17-18 (citing Complaint ¶ 36 & Ex. 5 at 2). The

11  Court correctly found that to determine if the statements were defamatory, the Court or jury

12  must necessarily determine if they were false. *Id.* (citing *Herron v. KING Broad. Co.*, 776

13  P.2d 98, 101 (Wash. 1989); *Hyung Jin Moon v. Hak Ja Han Moon*, 431 F. Supp. 3d 394,

14  413 (S.D.N.Y. 2019), *aff'd,* 833 F.App'x 876 (2d Cir. 2020); *Kavanagh v. Zwilling*, 997

15  F. Supp. 2d 241, 250 (S.D.N.Y.), *aff'd*, 578 F. App'x 24 (2d Cir. 2014)). The Satanic

16  Temple does not dispute (or even address) that as an element of a defamation claim the

17  Court would have to decide the truth or falsity of the statements. The Satanic Temple also

18  does not dispute (or discuss) that a determination as to whether the statements were false

19  necessarily would require the Court or jury to define the beliefs held by The Satanic Temple

20  and to determine that ableism, misogyny, racism, fascism, and transphobia fall outside of

21  those beliefs. Order at 18. Instead, without any analysis, The Satanic Temple merely offers

22  the conclusory assertion that The Satanic Temple's doctrine "is not really at issue."

23                          **III.    CONCLUSION**

24      For the foregoing reasons, The Satanic Temple's Motion for Reconsideration should

25  be denied.

26

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    DATED: March 29, 2021.

2                                   **ARETE LAW GROUP PLLC**

3                                   By: */s/ Jeremy E. Roller*
                                    Jeremy E. Roller, WSBA No. 32021
4                                   1218 Third Avenue, Suite 2100
                                    Seattle, WA 98101
5                                   Phone: (206) 428-3250
                                    Fax: (206) 428-3251
6                                   jroller@aretelaw.com

7                                   *Attorneys for Defendants David Alan Johnson,*
                                    *Leah Fishbaugh, Mickey Meehan, and Nathan*
8                                   *Sullivan*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

OPPOSITION TO MOTION
FOR RECONSIDERATION
No. 2:20-cv-00509-RAJ – Page 9

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

SER 209

1

**CERTIFICATE OF SERVICE**

2      I, Janet Fischer, certify that on March 29, 2021, I electronically filed the foregoing

3   document with the Clerk of the Court using the CM/ECF system, thereby sending a

4   notification of such filing to the following parties:

5      Benjamin Justus, WSBA No. 38855
6   LYBECK PEDREIRA & JUSTUS, PLLC
    Chase Bank Building
7   7900 SE 28th Street, Fifth Floor
    Mercer Island, WA 98040
8   (206) 687-7805
    ben@lpjustus.com
9

10

11   DATED: March 29, 2021, at Seattle, Washington.

12                                    /s/ Janet Fischer
                                      Janet Fischer, Legal Assistant
13

14

15

16

17

18

19

20

21

22

23

24

25

26

OPPOSITION TO MOTION
FOR RECONSIDERATION
No. 2:20-cv-00509-RAJ – Page 10

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

# <u>EXHIBIT 1</u>



# Congressional Record

### United States of America

## PROCEEDINGS AND DEBATES OF THE 106th CONGRESS, FIRST SESSION

*Vol. 145*    WASHINGTON, FRIDAY, NOVEMBER 19, 1999    *No. 165*

# Senate

---

### REVISED NOTICE—NOVEMBER 17, 1999

If the 106th Congress, 1st Session, adjourns sine die on or before November 18, 1999, a final issue of the Congressional Record for the 106th Congress, 1st Session, will be published on December 3, 1999, in order to permit Members to revise and extend their remarks.

All material for insertion must be signed by the Member and delivered to the respective offices of the Official Reporters of Debates (Room HT–60 or S–123 of the Capitol), Monday through Friday, between the hours of 10:00 a.m. and 3:00 p.m. through December 1. The final issue will be dated December 3, 1999, and will be delivered on Monday, December 6, 1999.

If the 106th Congress does not adjourn until a later date in 1999, the final issue will be printed at a date to be announced.

None of the material printed in the final issue of the Congressional Record may contain subject matter, or relate to any event that occurred after the sine die date.

Senators' statements should also be submitted electronically, either on a disk to accompany the signed statement, or by e-mail to the Official Reporters of Debates at "Records@Reporters".

Members of the House of Representatives' statements may also be submitted electronically by e-mail or disk, to accompany the signed statement, and formatted according to the instructions for the Extensions of Remarks template at http://clerkhouse.house.gov. The Official Reporters will transmit to GPO the template formatted electronic file only after receipt of, and authentication with, the hard copy, signed manuscript. Deliver statements (and template formatted disks, in lieu of e-mail) to the Official Reporters in Room HT–60.

Members of Congress desiring to purchase reprints of material submitted for inclusion in the Congressional Record may do so by contacting the Congressional Printing Management Division, at the Government Printing Office, on 512–0224, between the hours of 8:00 a.m. and 4:00 p.m. daily.

By order of the Joint Committee on Printing.

WILLIAM M. THOMAS, *Chairman.*

---

### NOTICE

Effective January 1, 2000, the subscription price of the Congressional Record will be $357 per year, or $179 for 6 months. Individual issues may be purchased for $3.00 per copy. The cost for the microfiche edition will remain $141 per year; single copies will remain $1.50 per issue. This price increase is necessary based upon the cost of printing and distribution.

MICHAEL F. DiMARIO, *Public Printer.*

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.

S14895



Printed on recycled paper.

Case 2:25-cv-05423-DDP-JC Document 251 Filed 03/29/21 Page 14 of 221

and child poisoner created by the movie.

There is a world of difference between these sorts of sites and those which use deceptive naming practices to draw attention to their site for example, whitehouse.com, or those who use domain names to misrepresent the goods or services they offer, for instance, dellmemory.com, which may be confused with the Dell computer company.

We must also recognize certain technological realities. For example, merely mentioning a trademark is not a problem. Posting a speech that mentions AOL on my web page and calling the page aol.html, confuses no one between my page and America Online's site. Likewise, we must recognize that while the Web is a key part of the Internet, it is not the only part. We simply do not want to pass legislation that may impose liability on Internet users with e-mail addresses, which may contain a trademarked name. Nor do we want to crack down on newsgroups that use trademarks descriptively, such as alt.comics.batman.

In short, it is important that we distinguish between the legitimate and illegitimate use of domain names, and the cybersquatting legislation that we pass today does just that.

Due to the significant flaws in S. 1255, the Senate Judiciary Committee reported and the Senate passed a complete substitute to that bill. On July 29, 1999, Senator HATCH and I, along with several other Senators, introduced S. 1461, the "Domain Name Piracy Prevention Act of 1999." This bill then provided the text of the Hatch-Leahy substitute amendment that the Senate Judiciary Committee reported unanimously to S. 1255 the same day. This substitute amendment, with three additional refinements contained in a Hatch-Leahy clarifying amendment, was passed by the Senate on August 5, 1999.

This Hatch-Leahy substitute provided a better solution than the original, S. 1255, in addressing the cybersquatting problem without jeopardizing other important online rights and interests.

Following Senate passage of the bill, the House passed a version of the legislation, H.R. 3208, the "Trademark Cyberprivacy Prevention Act", which has been modified for inclusion in the FY 2000 Omnibus Appropriations bill.

This legislation, now called the "Anti-Cybersquatting Consumer Protection Act", would amend section 43 of the Trademark Act by adding a new section to make liable for actual or statutory damages any domain name registrant, who with bad-faith intent to profit from the goodwill of another's trademark, without regard to the goods or services of the parties, registers, traffics in or uses a domain name that is identical or confusingly similar to a distinctive trademark or dilutive of a famous trademark. The fact that the domain name registrant

did not compete with the trademark owner would not be a bar to recovery. This legislation also makes clear that personal names that are protected as marks would also be covered by new section 1125.

Furthermore, this legislation should not in any way frustrate the global efforts already underway to develop inexpensive and expeditious procedures for resolving domain name disputes that avoid costly and time-consuming litigation in the court systems either here or abroad. In fact, the legislation expressly provides liability limitations for domain name registrars, registries or other domain name registration authorities when they take actions pursuant to a reasonable policy prohibiting the registration of domain names that are identical or confusingly similar to another's trademark or dilutive of a famous trademark. The ICANN and WIPO consideration of these issues will inform the development by domain name registrars and registries of such reasonable policies.

Uses of infringing domain names that support liability under the legislation are expressly limited to uses by the domain name registrant or the registrant's authorized licensee. This limitation makes clear that "uses" of domain names by persons other than the domain name registrant for purposes such as hypertext linking, directory publishing, or for search engines, are not covered by the prohibition.

Other significant sections of this legislation are discussed below:

Domain names are narrowly defined to mean alphanumeric designations registered with or assigned by domain name registrars or registries, or other domain name registration authority as part of an electronic address on the Internet. Since registrars only register second level domain names, this definition effectively excludes file names, screen names, and e-mail addresses and, under current registration practice, applies only to second level domain names.

The terms "domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name" in Section 3002(a) of the Act, amending 15 U.S.C. 1125(d)(2)(a), is intended to refer only to those entities that actually place the name in a registry, or that operate the registry, and would not extend to other entities, such as the ICANN or any of its constituent units, that have some oversight or contractual relationship with such registrars and registries. Only those entities that actually offer the challenged name, placed it in a registry, or operate the relevant registry are intended to be covered by those terms.

Liability for registering a trademark name as a domain name requires "bad faith intent to profit from that mark". The following non-exclusive list of nine factors are enumerated for courts to consider in determining whether such bad faith intent to profit is proven:

(i) the trademark or the intellectual property rights of the domain name registrant in the domain name;

(ii) whether the domain name is the legal name or the nickname of the registrant;

(iii) the prior use by the registrant of the domain name in connection with the bona fide offering of any goods or services;

(iv) the registrant's legitimate noncommercial or fair use of the mark at the site accessible under the domain name;

(v) the registrant's intent to divert consumers from the mark owner's online location in a manner that could harm the mark's goodwill, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the site;

(vi) the registrant's offer to sell the domain name for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of goods or services or the registrant's prior conduct indicating a pattern of such conduct;

(vii) the registrant's intentional provision of material, false and misleading contact information when applying for the registration of the domain name, intentions, failure to maintain accurate information, or prior conduct indicating a pattern of such conduct;

(viii) the registrant's registration of multiple domain names that are identical or similar to or dilutive of another's trademark; and

(ix) the extent to which the mark is or is not distinctive.

Significantly, the legislation expressly states that bad faith shall not be found "in any case in which the court determines that the person believed and had reasonable grounds to believe that the case of the domain name was a false use or otherwise lawful." In other words, good faith, innocent or negligent uses of a domain name that is identical or confusingly similar to another's mark or dilutive of a famous mark are not covered by the legislation's prohibition.

In short, registering a domain name while unaware that the name is another's trademark would not be actionable. Nor would the use of a domain name that contains a trademark for purposes of protest, complaint, parody or commentary satisfy the requisite scienter requirement.

Bad-faith intent to profit is required for a violation to occur. This requirement of bad-faith intent to profit is critical since, as Professor Litman pointed out in her testimony, our trademark laws permit multiple businesses to register the same trademark for different classes of products. Thus, she explains:

Although courts have been quick to impose liability for bad faith registration, they have been far more cautious in disputes involving a domain name registrant who has a legitimate claim to use a domain name and registered it in good faith. In a number of cases,

1

2                                                 The Honorable Richard A. Jones

3

4

5

6

7                       UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

8

9

| United Federation of Churches, LLC (dba "The Satanic Temple"), | ) ) ) | No. 2:20-cv-00509-RAJ |
|---|---|---|
| Plaintiff, | ) ) ) | PLAINTIFF'S MOTION FOR RECONSIDERATION |
| v. | ) ) | NOTE FOR MOTION CALENDAR: **March 12, 2021** |
| David Alan Johnson (aka "ADJ"), Leah Fishbaugh, Mickey Meeham, and Nathan Sullivan, | ) ) ) ) ) | |
| Defendants. | ) ) | |

Pursuant to LCR 7(h), Plaintiff United Federation of Churches, LLC (dba "The Satanic Temple") ("TST") moves the Court for reconsideration of its prior Order Granting Motion to Dismiss (Doc. 20) as to Counts 2 and 5 of the Complaint (Doc. 1), for the following reasons.

## I.    <u>Cyberpiracy</u>

The complaint asserted entitlement to Cyberpiracy relief, which was established by the Anticybersquatting Consumer Protection Act of 1999 ("**ACPA**"). As a matter of first impression, the Court found that prohibited "cyberpiracy" categorically excludes relief where the pirated material is located by navigating to a Facebook page, i.e. by entering a particular Vanity URL. But the Court did not engage in a statutory interpretation analysis.

PLAINTIFF'S MOTION FOR RECONSIDERATION - 1

No. 2:20-cv-00509-RAJ

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
206-230-4255 Fax 206-230-7791

1        This case involved a novel issue of statutory construction.  The cardinal rule of statutory

2   construction is to determine the intent of Congress.  *Chickasaw Nation v. United States*, 534 U.S.

3   84, 94, 122 S. Ct. 528, 535, 151 L. Ed. 2d 474 (2001); *Pit River Tribe v. Bureau of Land Mgmt.*,

4   939 F.3d 962, 970 (9th Cir. 2019); *Heppner v. Alyeska Pipeline Serv. Co.*, 665 F.2d 868, 870

5   (9th Cir. 1981).

6

7        A statute is "ambiguous" when it is susceptible to more than one reasonable interpretation.

8   *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 556 (9th Cir. 2016).  That can be the result of

9   the reference to the language itself, of the specific context in which the language is used, or of

10  the broader context of the statute as a whole. *Pit River Tribe*, 939 F.3d at 970.

11       First, we look to the language itself.  In defining "domain name," Congress refers to the

12  "alphanumeric designation" which amounts to "part of an electronic address on the Internet." 15

13  USC § 1127.  Such a designation is a "domain name" if it is "registered with or assigned by,"

14  importantly, an "other domain name registration authority." *Id.*

15

16       Congress defined a "domain name" as something that is registered by a "domain name"

17  registration authority.  This definition is little more than a circle.  As a result, the definition is

18  not, by itself, particularly helpful to understand what exactly Congress was outlawing when

19  prohibiting the cyberpiracy of a "domain name."

20

21       The issue is whether Facebook is a "other domain name registration authority."  It is.  Users

22  register with Facebook to obtain an account associated with a unique electronic address

23  comprised of an alphanumeric string chosen by the user.  Facebook is in a position of authority

24  over these accounts pursuant to its Terms of Use agreement.  Third parties interact with the

25  network through specially-designed software applications.  And, without getting unnecessarily

26

PLAINTIFF'S MOTION FOR RECONSIDERATION - 2

No. 2:20-cv-00509-RAJ

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255   Fax 206-230-7791

1    technical, Facebook is not a "domain name registry" or a "domain name registrar" in the

2    traditional senses.

3         Next, we look to the specific context in which the phrase "domain name" is used. The specific

4    context supports a finding that Facebook is an "other domain name registration authority"

5    because Facebook provides an Internet-based instrument which can be abused in bad faith to

6

7    tarnish a famous mark and defraud the general public.

8         The statutory phrase "domain name" is used in connection with the prevention of cyberpiracy.

9    15 USC §§ 1125(d) and 8131.  Cyberpiracy involves the bad faith trafficking of a "domain

10   name." 15 USC § 1125(d)(1)(A).  Bad faith is the subject of a detailed nine-factor test.  See 15

11   USC § 1125 (d)(1)(B).  In three of the "bad faith" factors, Congress considered a "domain name"

12   synonymous with a "site." 15 USC § 1125(d)(1)(B)(i)(IV)-(VI).

13

14        A "domain name" is an instrumentality of bad faith, so understanding the bad faith can be

15   helpful to understand the instrumentality.  Broadly speaking, the factors paint the picture of a

16   person who obtained an Internet address that will attract people interested in a famous mark, with

17   the goal of tarnishing the mark or ransoming the address to the owner of the mark.  15 USC §

18   1125 (d)(1)(B).

19        A Facebook page fits precisely in this statutory context.  Just as a person could create a

20   website at the URL "thesatanictemple.com," a person could also create a website at the URL

21   "facebook.com/thesatanictemple".  Both the second-level domain (*thesatanictemple*.com) and

22   the Vanity URL (../*thesatanictemple*) are websites at an internet address which is registered with

23

24   some kind of authority in the business of purveying a website address.

25        And, just as a person could obtain the second-level domain in bad faith to profit off the mark,

26   so too could a person traffic in the Facebook page with the same bad faith intent.  No

PLAINTIFF'S MOTION FOR RECONSIDERATION - 3

No. 2:20-cv-00509-RAJ

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
206-230-4255   Fax 206-230-7791

SER 216

1  hypotheticals are needed here: Defendants pirated the Facebook webpage to direct defamatory
2  statements about the mark at the mark's audience, creating confusion as to the source,
3  sponsorship, affiliation, or endorsement of the "site."  See 15 USC § 1125(d)(1)(B)(i)(V);
4  compare Complaint ¶ 62 ("I'm confused as to why a TST Facebook page is being used to attack
5  TST.")
6

7      It is a distinction without a meaningful difference that this is cyberpiracy in the context of a
8  Facebook page instead of a second-level domain.  The harm asserted in the complaint is the same
9  harm sought to be outlawed by the statute.

10     We last look to the broader context of the statute.  The broader context of the Lanham Act is
11  to protect goodwill and avoid consumer confusion.  87 C.J.S. Trademarks, Etc. §§ 2-3.  The
12  specific statutory sections at issue are plainly relevant to the cross-section between the Lanham
13  Act's purposes and the Internet.
14

15     It is plain from the statutory text alone that these statutes seek to extend the purposes of the
16  Lanham Act into the Internet age.  As detailed above, a second-level domain and a Facebook
17  page, both, fall within the cross-section of the Lanham Act's purposes and the Internet.  This
18  factor further suggests that a Facebook page can be a "domain name."  Given that the Court came
19  to a different conclusion, there are at least two reasonable interpretations to be drawn from this
20  language.  As a result, the statutory meaning of "domain name" is ambiguous.  We must dig into
21  the legislative history.
22

23     The legislative history also supports application of this Act to these facts.  The legislative
24  history is provided by Senate Report 106-140. See **Exhibit 1**.  Congress considered a "domain
25  name" to be: (1) synonymous with a website; (2) located at an alphanumeric electronic address;
26  (3) provided by a registration authority; (4) a potential instrument of harm to goodwill or

PLAINTIFF'S MOTION FOR RECONSIDERATION - 4

No. 2:20-cv-00509-RAJ

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255  Fax 206-230-7791

SER 217

consumer confusion (i.e. not a screenname). Report at pp. 6-10. A Facebook page meets every one of these categories.

The only basis for an alternative finding is the drafters' errant prediction that users who registered with the second-level domains would always be creating sub-sites as third-level domains ("*thesatanictemple*.facebook.com"). Sometimes that pans out. *See Wilens v. Doe Defendant No. 1*, 2015 WL 5542529, at \*3 (N.D. Cal. Sept. 18, 2015) ("*jeffreywilens2*.wordpress.com") But not always. Facebook users instead register under vanity URLs. There is no meaningful reason why a Wordpress page should be subject to a Cyberpiracy claim, but Facebook should, solely based on how the two companies structure the Internet addresses for their users. A Facebook page can, as here, cause the exact same harm sought to be prohibited by the Act. Thus, the Court should find that TST stated a Cyberpiracy claim.

## II.   Defamation

The Court found that the doctrine of ecclesiastical abstention bars TST's defamation claim because it would entail a determination of whether TST's doctrine promotes, e.g., fascism. Application of the authorities provided would either bind the Court to TST's interpretation that its doctrine does not promote fascism or would be addressed by neutral principles of law. Either way, the Court should find that a defamation claim is viable and was properly stated.

As the Court correctly found, there are two approaches to this issue, either of which requires reconsideration. *Puri v. Khalsa*, 844 F.3d 1152, 1164 (9th Cir. 2017). Courts have two principle options to address a dispute without delving into doctrinal matters. *Id.* at 1163.

Where the dispute requires extensive inquiry into religious law or church governance, the court must "accept as a given whatever the entity decides." *Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*, 819 F.2d 875, 878 (9th Cir. 1987). This "deference" option does have

PLAINTIFF'S MOTION FOR RECONSIDERATION - 5

No. 2:20-cv-00509-RAJ

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
206-230-4255   Fax 206-230-7791

SER 218

1    the benefit of simplicity.  As the Court found, the defamation claim will require a showing that

2    TST does not promote, e.g., fascism.  If that is an unavoidable question of TST's doctrine, then

3    well-settled law binds the Court to TST's position.

4        Or, if the dispute can be resolved by application of solely secular legal rules, the court may

5    apply those neutral principles of law.  *Puri*, 844 F.3d at 1162; *see also Jones*, 443 U.S. at 602-

6    606.  Here, that would involve the Court simply treating TST like it would any other organization.

7    This is the preferred approach in the Ninth Circuit.  *Puri*, 844 F.3d at 1166-67.

8

9        Partly, the Court's Order is based on *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 250

10   (S.D.N.Y.), aff'd, 578 F. App'x 24 (2d Cir. 2014).  In *Kavanaugh*, the First Amendment barred a

11   defamation claim against a church which had defrocked the plaintiff following an ecclesiastical

12   trial for the sin of sexual abuse of a minor.  The Court was bound to the Church's position.

13   Contrast here.  Defendants do not point to any "canon law" at issue and there is no "substantive

14   sin" which requires Court consideration.  TST's doctrine is not really at issue.

15

16       The Court also relied on *Hyung Jin Moon v. Hak Ja Han Moon*, 431 F. Supp. 3d 394

17   (S.D.N.Y. 2019), aff'd as modified sub nom. *Moon v. Moon*, 833 F. App'x 876 (2d Cir. 2020).

18   In *Moon*, the dispute was over who had the right to be the successor to the recently-deceased

19   leader of the church.  The deference approach was not available because "the deference approach

20   presupposes that the identity of the church's authoritative decision-making body is undisputed."

21   *Id.*, 431 F.Supp. 3d at 407.  Contrast here.  Defendants do not contest that TST's leaders are the

22   "real" leaders of The Satanic Temple.

23

24       **Wherefore,** TST prays this Court grant reconsideration and vacate the Order of dismissal as

25   to Counts 2 and 5.

26

PLAINTIFF'S MOTION FOR RECONSIDERATION - 6

No. 2:20-cv-00509-RAJ

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255   Fax 206-230-7791

1    Respectfully submitted this 12th day of March, 2021.

2
                          LYBECK PEDREIRA & JUSTUS, PLLC
3

4                         By: */s/ Benjamin Justus*
                          Benjamin Justus (#38855)
5                         Attorneys for Plaintiff
                          Chase Bank Building
6                         7900 SE 28th St., Fifth Floor
                          Mercer Island, WA 98040
7                         206.687.7805 /phone  206.230.7791 /fax
                          ben@lpjustus.com / email Justus
8

9                         And: */s/ Matthew A. Kezhaya*
                          Matthew A. Kezhaya (AR#2014161), admitted pro hac vice
10                        Attorney for Plaintiff
                          Kezhaya Law PLC
11                        1202 NE McClain Rd
                          Bentonville, AR 72712
12                        479.431.6112 /ph  479.282.2892 /fax
                          matt@kezhaya.law / email Kezhaya
13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S MOTION FOR RECONSIDERATION - 7

No. 2:20-cv-00509-RAJ

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA  98040
206-230-4255   Fax 206-230-7791

SER 220

1  **CERTIFICATE OF SERVICE**

2    I hereby certify that on the 12th day of March, 2021, I electronically filed PLAINTIFF'S

3  MOTION FOR RECONSIDERATION with the Clerk of the Court using the CM/ECF system,

4  which will send notification of such filing to all parties of record.

5
     Dated at Seattle, Washington, the 12th day of March, 2021.
6

7                                  By:  ___/s/ Benjamin Justus___
                                        Benjamin Justus
8

9  **CERTIFICATION OF CONFERENCE**

10   The undersigned counsel certifies that, per Paragraph 6 of the Standing Order for Civil Cases

11 Assigned to Judge Richard A. Jones (Doc. 7), on March 12, 2021, counsel for Plaintiff conferred

12 with counsel for Defendants regarding the foregoing motion. The parties were unable to reach an

13 accord that would eliminate the need for the motion.

14
     Dated at Seattle, Washington, the 12th day of March, 2021.
15

16
                                   By:  ___/s/ Benjamin Justus___
17                                      Benjamin Justus

18

19

20

21

22

23

24

25

26

PLAINTIFF'S MOTION FOR RECONSIDERATION - 8

No. 2:20-cv-00509-RAJ

Lybeck Pedreira & Justus PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
206-230-4255 Fax 206-230-7791