# 23-35060

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

United Federation of Churches, LLC (dba "The Satanic Temple"),
*Plaintiff-Appellant,*

*v.*

David Alan Johnson, Leah Fishbaugh, Mickey Meehan, and
Nathan Sullivan,
*Defendants-Appellees.*

On appeal from the United States District Court
for the Western District of Washington,
No. 2:20-cv-00509
Hon. Richard A. Jones, Senior U.S. District Judge, presiding

## REPLY BRIEF FOR TST



| | |
|---|---|
| **Matt Kezhaya** | **matt@crown.law** |
| Ark. # 2014161 | direct: (479) 431-6112 |
| Minn. # 0402193 | general: (612) 276-2216 |

150 S. Fifth St., Suite 1850, Minneapolis, MN 55402

# TABLE OF CONTENTS

Table of contents.........................................................................2

Table of authorities ...................................................................3

Argument ....................................................................................6

    1: There is no "Facebook" exclusion to cyberpiracy liability....6

        1.1: The statute is concerned with falsified designations of
origin. ..............................................................................6

        1.2: Facebook is an "other domain registration authority." . 8

        1.3: The thieves were the "domain name registrants." ...... 10

        1.4: The thieves had a bad faith intent to profit. ................ 11

    2: Ecclesiastical abstention did not bar the defamation count. 18

        2.1: TST should have been treated as any secular
organization. .................................................................. 19

        2.2: There is no "religious organization" exclusion to
defamation. ................................................................... 24

        2.3: Subject matter jurisdiction is proper. ........................ 26

        2.4: Fishbaugh and Sullivan bear joint liability as
coconspirators. .............................................................. 27

Conclusion / prayer for relief ................................................. 28

Certificate of service............................................................... 29

Certificate of compliance......................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Bolduc v. Bailey*,
   586 F. Supp. 896 (D. Colo. 1984) .....................................21, 22

*Briggs & Stratton Corp. v. Nat'l Cath. Rep. Pub. Co.*,
   978 F. Supp. 1195 (E.D. Wis. 1997) ...................................... 24

*Chickasaw Nation v. United States*,
   534 U.S. 84 (2001) ................................................................. 7

*Church of Scientology of California v. Siegelman*,
   475 F. Supp. 950 (S.D.N.Y. 1979) ........................................ 23

*Dehlin v. Forget Me Not Animal Shelter*,
   200 Wash. App. 1072 (2017) ................................................. 28

*Friesland Brands, B.V. v. Vietnam Nat. Milk Co.*,
   228 F. Supp. 2d 399 (S.D.N.Y. 2002) ................................... 18

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) .............................................................. 20

*Hartwig v. Albertus Magnus Coll.*,
   93 F. Supp. 2d 200 (D. Conn. 2000) ..................................... 25

*Hubbard v. J Message Grp. Corp.*,
   325 F. Supp. 3d 1198 (D.N.M. 2018) .................................... 25

*Hyung Jin Moon v. Hak Ja Moon*,
   431 F. Supp. 3d 394 (S.D.N.Y. 2019) ................................... 24

*Kavanaugh v. Zwilling*,
    997 F. Supp. 2d 241 (S.D.N.Y. 2014) ..................................... 24

*Kelly v. Fleetwood Enters., Inc.*,
    377 F.3d 1034 (9th Cir. 2004)................................................. 27

*Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*,
    819 F.2d 875 (9th Cir. 1987) .................................................. 23

*Pit River Tribe v. Bureau of Land Mgmt.*,
    939 F.3d 962 (9th Cir. 2019) .................................... 7, 9, 10, 11

*Puri v. Khalsa*,
    844 F.3d 1152 (9th Cir. 2017)................................................. 19

*Rosenblatt v. Baer*,
    383 U.S. 75 (1966).................................................................. 26

*Satanic Temple, Inc. v. Newsweek Magazine LLC*,
    2023 WL 2403136 (S.D.N.Y. 2023) ...................................... 20

*Shurtleff v. City of Bos., Massachusetts*,
    142 S. Ct. 1583 (2022) (Kavanaugh, J., concurring) .............. 18

*St. Paul Mercury Indem. Co. v. Red Cab Co.*,
    303 U.S. 283 (1938).............................................................. 27

*Verizon California Inc. v. Navigation Catalyst Sys., Inc.*,
    568 F. Supp. 2d 1088 (C.D. Cal. 2008) .................................... 9

## Statutes

15 USC § 1125 ............................................................... 7, 10, 11

15 USC § 1127 ........................................................................ 6

**Treatises**

*Imputation of allegedly objectionable political or social beliefs or principles as defamation*, 62 A.L.R.4th 314 .............................................. 21

*Law of Defamation* § 6:74 (2d ed.) ............................................... 22

*Restatement (Second) of Torts* § 561 (1977) .................................... 20

*Restatement (Second) of Torts* § 566 (1977) .................................... 22

# ARGUMENT

## 1: There is no "Facebook" exclusion to cyberpiracy liability.

Resolution of this issue will repetitiously require consideration of the statutory phrase "domain name." 15 USC § 1127:

> The term "domain name" means any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet.

The District Court reversibly erred by injecting additional words to the above. This is forbidden. It is Congress's role to write statutes, it is the Judiciary's role to interpret the statute as written.

### 1.1: The statute is concerned with falsified designations of origin.

The opening brief asserts the threshold concern of statutory cyberpiracy liability is to prevent consumer confusion which can arise from an Internet-based platform falsely designating origin. The threshold concern of the statute is important because, it cannot be overstated, the "cardinal rule of statutory construction is to

determine the intent of Congress." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001); *Pit River Tribe v. Bureau of Land Mgmt.*, 939 F.3d 962, 970 (9th Cir. 2019). No part of the response disputes this.

Nor does the response contend with the fact that the enacted statute equates "domain name" with "site," as in 'website,' in three of the bad-faith factors. 15 USC § 1125(d)(1)(B), (IV)-(VI). Nor does the response contend with the fact that the thieves, in fact, trafficked in TST's website to cause consumer confusion as to the origin of the communications therein with a bad faith intent to profit off of TST's mark.[1] See ER-141:



---

[1] The thieves nitpick at the sufficiency of the complaint's pleading as to "bad faith." This argument is dealt with at **§ 1.4**.

Rather than address the essence of Congress's intent–which, it cannot be overstated, is the "cardinal rule" of statutory construction–the thieves point to an impertinent exclusion of "file names, screen names, and e-mail addresses." Response at 21-22 (citing 145 Cong. Rec. 14986, 15025 (1999)). It is unclear why the thieves point to this exclusion. At issue is not a file name, nor a screen name, nor an email address. At issue is a *website*, one located by entering an alphanumeric string, and one which factually caused the very harm to be excluded by the statute at bar.

### 1.2: Facebook is an "other domain registration authority."

Next, the thieves correctly point out that Facebook is not a "domain registration authority." Response at 22-23. This avoids the point. The argument is not that Facebook is a "domain registration authority," the point is that Facebook is an "*other* domain registration authority." Congress did not enact this statute under the belief that technology would remain static, Congress enacted this statute to extend the Lanham Act into the Internet age. The thieves do not

attack any part of the argument that Facebook is a third-party registrar of websites, which are located by entering an alphanumeric string which constitutes an electronic address. *Cf. Verizon California Inc. v. Navigation Catalyst Sys., Inc.*, 568 F. Supp. 2d 1088, 1092 (C.D. Cal. 2008) (the business of a domain name registrar is in "enabling a customer to reserve a chosen word (or combination of letters) for use in identifying that customer's website.")

Nor do the thieves attack any part of the argument that there is no principled distinction between a Facebook page and a Wordpress page. Opening brief, at 21 (citing *Wilens v. Doe Defendant No. 1*, 2015 WL 5542529 (N.D. Cal. 2018)). Instead, the thieves parrot the District Court's extra-textual argument that the statutory phrase "domain name" must mean something other than what Congress wrote. The applicable standard of review requires this Court to apply the statute as written. *Pit River*, 939 F.3d at 971. As written, the statue says nothing of ICANN, nor DNS, nor second-level domain names. The statute bars a person from trafficking in or using a "domain name" (*i.e.*, an alphanumeric string constituting an electronic

address which is disseminated by a third-party registrar) when that "domain name" includes a protected trademark. 15 USC § 1125(d)(1)(A)(ii)(III). The thieves both trafficked in and used TST's website, which was located by entering an alphanumeric string constituting an electronic address which was disseminated by Facebook as a third-party registrar. Thus, the statute applies.

*1.3: The thieves were the "domain name registrants."*

Next, the thieves argue that they were not "domain name registrants." Response at 28-29. This argument is meritless. The complaint asserts that the thieves removed all TST-approved administrators and replaced the approved administrators with themselves. ER-137 (¶ 36). By replacing the approved administrators with themselves, the thieves made themselves the "domain name registrants." 15 USC § 1125(d)(1)(D). The error in the thieves' argument lies, again, in injecting words into the statute. *Pit River*, 939 F.3d at 971. The statute limits liability to the domain name registrants, not to the *original* domain name registrants.

Similarly, the thieves' argument errantly relies on ignoring the statutory text. *Pit River*, 939 F.3d at 971. The statute extends liability to those who "traffic[] in" or "use[]" a domain name. 15 USC § 1125(d)(1)(A). The thieves' argument would have the Court rewrite the statute to limit liability to those who "register[]" a domain name.

*1.4: The thieves had a bad faith intent to profit.*

Last, the thieves contend the complaint does not allege they had a bad faith intent to profit off TST's mark. Response at 29-30. Again, the thieves disregard the complaint. The complaint summarizes the bad faith intent to profit thusly:

> Bad faith is established by the manner in which Defendants hijacked the webpages, attempted to hijack the Twitter and email accounts, removed all approved administrators, gloated about the matter, and refused to return control of the websites to their rightful owners.

ER-142 (¶ 72). Notably absent from the thieves' argument is any application of the statutory "bad faith" factors. See 15 USC § 1125(d)(1)(B)(i). The Court could disregard this argument as

unsupported. Regardless, each factor is addressed in turn below.

By way of prefatory summary, the bad faith intent to profit is best demonstrated by the fact that the thieves stole TST's websites (which are located by entering the electronic addresses consisting of the alphanumeric strings including the text of the registered mark "The Satanic Temple"), they then "used" and "trafficked in" those domain names to solicit donations and sales of merchandise for their competitor organization, and all of this was wrongfully done to fulfill the twin goals of harming TST's mark and creating a competitor organization. Factor (V) is key in this analysis.

*1.41: Intellectual property rights of the person in the domain name.*

Factor (I) inquires into the defendant's rights, if any, of the domain name. The thieves had no rights to the domain name, which they subjectively understood by publicly stating that they "stole" the

website from TST. ER-86:

 **Nathan Von Sullivan** we have a meme page here that we stole from TST:
**Evergreen Memes for Queer Satanic Fiends**

and a small group of regional satanists that we're using as a sort of safe space and social club. I imagine i'll be setting up another Discord for us too

Like · Reply · 8w                                                            4

*1.42: The extent to which the domain name is the person's name.*

Factor (II) asks the extent to which there is overlap between the domain name and the person's name. There is none. The domain is "facebook.com/TheSatanicTempleWashington." ER-62 (¶ 61). The thieves' names are David Alan Johnson, Leah Fishbaugh, Mickey Meehan, and Nathan Sullivan. ER-52-53 (¶¶ 19-22).

*1.43: The person's prior use of the domain name for bona fide offerings.*

Factor (III) asks to what extent the person previously used the domain name in connection with the bona fide offering of any goods or services. There is none. The thieves' prior use of the domain was in connection with their service as TST's agents, they were not acting in their individual capacities. ER-56 (¶ 36).

*1.44: The person's bona fide noncommerical or fair use of the mark.*

Factor (IV) asks whether the person had a bona fide noncommercial or fair use of the mark in a site accessible under the domain name. This factor notes the connection between a website and a domain name. There was no bona fide noncommercial use of the mark. The thieves' purpose was to use the mark as the initial capital contribution for their competitor organization. ER-58 (¶ 45), ER-64 (¶ 78). Further, the thieves used the "site accessible under the domain name" to advertise merchandise. ER-71 (¶ 117). The thieves' intended to and factually did derive profit by using TST's mark.

*1.45: The person's intent to divert goodwill.*

Factor (V) asks the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site.

This factor is the essence of the lawsuit. The thieves intended to divert consumers away from TST and toward their nascent competitor organization. ER-70 (¶¶ 114, 116). More particularly, they diverted website traffic away from TST and toward a "site accessible under the domain name" by stealing TST's website and recharacterizing it as their own. Ibid. They did so with the purpose of commercial gain, specifically by selling competitor merchandise which was advertised on the "site accessible under the domain name." ER-71 (¶ 117). They further intended to tarnish or disparage TST's mark. E.g., ER-139 (¶ 41), ER-70 (¶ 113). And they intended to cause consumer confusion as to the "source, sponsorship, affiliation, or endorsement of the site" by diverting traffic from TST to their competitor organization. ER-137 (¶ 35). Again, this factor reiterates the connection between a website and the "domain name" through which the website is accessed.

*1.46: The person's use of the domain name*

Factor (VI) asks whether the person offered to assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct. Again, this factor points to the connection between a "domain name" and the website to which the domain name points. This factor is substantiated by the thieves' first misuse of the Allies page. See ER-59 (¶ 46). There, the thieves decry TST's insistence on the Allies page being used to publish statements about Satanism, not leftist politics. The stated purpose of the theft was to disaffiliate the website from TST. Id. ("**This page is no longer affiliated with The Satanic Temple.**") Disaffiliation implies a reaffiliation with something else which, here, is the thieves' use of the domain to harm TST. ER-58 (¶ 45). The statement of disaffiliation also excludes any bona fide intent to use the domain name to market goods or services for TST.

*1.47: The person's provision of materially misleading information.*

Factor (VII) asks whether the person provided "material and misleading false contact information when applying for the registration of the domain name," or "the person's intentional failure to maintain accurate contact information."[2] Both applicable aspects of this factor are satisfied by the removal of TST's approved administrators and replacement with the thieves' names. ER-137 (¶ 36). The "material falsity" relevant is the false suggestion to Facebook that the thieves are authorized to control TST's website to the exclusion of TST's approved administrators, both in adding the thieves' own names and in removing TST's administrator's names. But for this materially false claim, Facebook would have returned the website to TST's authorized administrators upon request. See ER-50 (¶ 4).

*1.48: The person's acquisition of multiple domain names.*

Factor (VIII) asks whether the person has acquired multiple domain names which the person knows are identical or confusingly

---

[2] Third clause omitted as irrelevant.

similar to other marks, without regard to the goods or services of the parties. This factor is substantiated by the fact that the thieves stole both the Allies page and the Chapter page. ER-137-138 (¶¶ 36, 39).

*1.49: TST's mark is not "famous."*

Factor (IX), the final factor, asks the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c). Concededly, TST's mark is not "famous" in this sense because it is not a household name. *See Friesland Brands, B.V. v. Vietnam Nat. Milk Co.*, 228 F. Supp. 2d 399, 412 (S.D.N.Y. 2002) ("only marks approaching household names may qualify as 'famous.'")

## 2: Ecclesiastical abstention did not bar the defamation count.

The opening brief also asserts error in the District Court's holding that religious plaintiffs may never recover for defamation. E.g. *Shurtleff v. City of Bos., Massachusetts*, 142 S. Ct. 1583, 1594 (2022) (Kavanaugh, J., concurring) ("a government *violates* the

Constitution when (as here) it *excludes* religious persons, organizations, or speech because of religion from public programs, benefits, facilities, and the like") (emphasis in original). By excluding religious organizations from recovery for defamation, the District Court's holding plainly violates the Constitution.

For ease of discussion, the two subpoints of the opening brief are swapped in this reply. It is helpful to consider the two subpoints in reverse order because an understanding of the statements at issue and why they are provably false (which arise under the neutral principles of law approach) help to distinguish the thieves' red herring cases.

### 2.1: TST should have been treated as any secular organization.

The District Court could and should have utilized the neutral principles of law approach. *See Puri v. Khalsa*, 844 F.3d 1152, 1162 (9th Cir. 2017) (abstention is not proper where the dispute can be addressed without delving into doctrinal matters, *i.e.*, through application of neutral principles of law). At issue is the "falsity" prong of

a defamation claim. The thieves made provably false statements of fact about TST's doctrine and affiliations which have a tendency to undermine TST's charitable mission by alienating TST from the giving public. *Restatement (Second) of Torts* § 561, cmt. *b* (1977) (this is the very definition of a religious organization's right to sue for defamation). The clearest examples are:

- "I witnessed male members of the organization exploit their position and influence to behave inappropriately and disrespectfully towards women." (ER-163); *accord. Satanic Temple, Inc. v. Newsweek Magazine LLC*, 2023 WL 2403136, at *5 (S.D.N.Y. 2023) (false claims of covered up sexual abuse about a church is actionable defamation);[3] and

---

[3] The thieves falsely claim that *Newsweek* involved "no First Amendment issues." Response, at 38 n. 15. Perhaps they meant no "Free Exercise Clause" or no "Establishment Clause" issues. The cited section extensively discusses whether TST is a public figure, which is a common Free Speech Clause concern. *E.g. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 324 (1974) (cited by the *Newsweek* Court, at *4). Even then, the cited statement addresses this same question as to whether a religion can recover for defamation: "An opposite

- "the Temple serve mostly as a vehicle for Doug's personal vendettas." (ER-165); *accord. Bolduc v. Bailey*, 586 F. Supp. 896 (D. Colo. 1984) (charge that priest improperly transferred church property to himself was defamatory *per se*).

More generally, the thieves falsely attributed TST with objectionable political beliefs. See ER-60 (¶ 52); ER-90 (accusing TST's leadership of "coziness with the alt-right in general"); ER-70 (¶ 114) (falsely accusing TST as promoting "ableism, misogyny, racism, fascism, transphobia, and the endorsement of police brutality" to divert away "TST's current members and interested potential members of the public"); *accord. Imputation of allegedly objectionable political or social beliefs or principles as defamation*, 62 A.L.R.4th 314 (collecting authorities).

In fact, TST does *not* have an organizational policy or practice of

---

conclusion [such as the opinion at bar] would effectively render all religions (and many non-profits) per se public figures." *Newsweek*, at *5.

misogyny, etc.; does *not* serve "mostly as a vehicle for Doug's personal vendettas;" and does *not* carry the organizational affiliations and doctrines the thieves claimed. ER-138 (¶ 40). These are all actionable defamation as provably false mixed opinions. *See generally Restatement (Second) of Torts* § 566 (1977). Even if there is some religious connotation to the statements, being about a religious organization's doctrines and affiliations, the preexisting opinion framework affords "precisely the correct level of constitutional protection" to the defendants. *Law of Defamation* § 6:74 (2d ed.).

The thieves avoid the opening brief's point that the mixed opinion framework should have controlled by claiming the implied facts behind their statements still cannot be falsifiable. Response at 38, n. 16. Facts are *always* falsifiable, that is the difference between a fact and an opinion. For the same reason that one cannot falsely claim a priest is embezzling money from a church (*Bolduc v. Bailey*, 586 F. Supp. 896 (D. Colo. 1984)), one also cannot falsely claim the church engages in sexual misconduct, financial misconduct, or has political affiliations which would alienate the church's membership. *See also*

*Church of Scientology of California v. Siegelman*, 475 F. Supp. 950, 953 (S.D.N.Y. 1979) ("It does not follow that simply because a religious organization is a party to an action that that action should be immediately categorized as a theological dispute.")

The only alternative to the neutral principles of law approach, above, is the deference approach. *Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*, 819 F.2d 875, at 878 n. 1 (9th Cir. 1987). When the thieves stated, *e.g.*, "from the top-down, TST is a crypto-fascist organization" (ER-170), the District Court should have inquired of TST's official stance on fascism and should have "accept[ed] such decisions as final." *Id.* The thieves cry "blasphemy law!" at this straightforward application of well-settled legal precedent. Response, at 37. Histrionics may play well on social media, but this argument is not taking place in the comments section of TST's stolen website. The thieves made provably false claims of fact for the purpose of harming a religious organization's ability to go about its business. That isn't "blasphemy," it's defamation. The thieves have three other elements they can defend on, falsity is not one of them.

*2.2: There is no "religious organization" exclusion to defamation.*

The opening brief explains why there is no "religious organiza-tion" exclusion to defamation. In response, the thieves regurgitate the District Court's analysis without addressing the opening brief's points and authorities.

The thieves parrot the District Court's citation to *Hyung Jin Moon v. Hak Ja Moon*, 431 F. Supp. 3d 394, 413 (S.D.N.Y. 2019). Yet the thieves do not respond to the opening brief's explanation that *Moon* turned on a dispute over who rightfully controls the church. Open-ing brief at 26. Who controls the church is a matter of church polity rules. *Moon*, at 407; *Briggs & Stratton Corp. v. Nat'l Cath. Rep. Pub. Co.*, 978 F. Supp. 1195 (E.D. Wis. 1997). *Moon* is not helpful here be-cause TST's leadership is not in dispute.

Likewise, the thieves parrot the District Court's reliance on *Ka-vanaugh v. Zwilling*, 997 F. Supp. 2d 241, 250 (S.D.N.Y. 2014). But they do not respond to the opening brief's point that this, too, turned on interpretation of church polity rules as to whether the plaintiff

was, in fact, still a member of the cloth. Opening brief at 27. Identi-
cally situated is the thieves' next case: *Hartwig v. Albertus Magnus
Coll.*, 93 F. Supp. 2d 200 (D. Conn. 2000). The statements at issue
there were whether the defendants had "misrepresented his [the
plaintiff's] priestly status." *Id.*, at 219. Again, this is application of
church polity rules. *See id.* (the plaintiff there argued "canon law
supports the position that once ordained as a Roman Catholic priest
he remains such for life.") At issue are not competing interpretations
of church polity rules, so *Hartwig* is equally useless to the thieves as
was *Kavanaugh*.

Nor does the thieves' next case offer any support: *Hubbard v. J
Message Grp. Corp.*, 325 F. Supp. 3d 1198 (D.N.M. 2018). At issue
there were statements that the plaintiff's soul has been part of several
sex cults and that the plaintiff's soul was sexually or financially
predatory within the church. *Id.*, at 1221. But the statements at issue
are not about souls, nor a minister's standing within the Temple,
nor are they more broadly about the parties' competing views on
Satanic doctrine. The statements at issue are false accusations of

– 25 –

sexual misconduct, false accusations of financial misconduct, and false accusations of objectionable political beliefs. These are well-recognized grounds for defamation liability and liability accrues to the benefit of the plaintiff regardless whether the plaintiff is a for-profit company, a secular charity, or a religious organization. To affirm the District Court's opinion is a holding that society may withhold equal access to society's "pervasive and strong interest in preventing and redressing attacks upon reputation" (*Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966)), solely because the plaintiff is a religious organization.

*2.3: Subject matter jurisdiction is proper.*

Next, the thieves object that the complaint does not adequately demonstrate damages as to the defamation claim to sustain diversity jurisdiction by itself. Response at 38-39. They suggest the Court should affirm dismissal for lack of subject matter jurisdiction. Id. The problem is that the District Court dismissed the defamation claim "with prejudice." ER-129. A dismissal on this ground would

have to be "*without* prejudice." *Kelly v. Fleetwood Enters., Inc.*, 377 F.3d 1034, 1036 (9th Cir. 2004) (dismissing a complaint without prejudice when the amount in controversy requirement was not met). Presuming the Court agrees with the thieves, the appropriate relief is to vacate the below order of dismissal as to the defamation claim. Alternatively, the Court should remand for a consideration in the first instance as to whether it is legally impossible for TST to recover at least $75,000. *See St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938).

### 2.4: Fishbaugh and Sullivan bear joint liability as coconspirators.

Last, the thieves argue that the judgment should be affirmed as to Fishbaugh or Sullivan for want of specific statements made by them. Response at 39-40. As pleaded, the four acted in tandem to accomplish an unlawful purpose by a joint agreement. ER-137 (¶ 35) (the conspiracy was "to misappropriate and shut down substantially all the internet presence of TST's Washington Chapter"); *compare Dehlin v. Forget Me Not Animal Shelter*, 200 Wash. App. 1072

(2017) ((1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy.'") Fishbaugh and Sullivan were parties of a wrongful agreement to harm TST's reputation. That they did not electronically sign any of the defamatory statements does not save them from joint liability.

## Conclusion / prayer for relief

**WHEREFORE** the Court should:

(1) Reverse and remand the dismissal of the cyberpiracy claim; and

(2) Vacate and remand the dismissal of the defamation claim.

Respectfully submitted by:



_s/Matt Kezhaya_                             **matt@crown.law**
Ark. # 2014161                        direct: (479) 431-6112
Minn. # 0402193                      general: (612) 276-2216

150 S. Fifth Street, Suite 1850, Minneapolis, MN 55402

## CERTIFICATE OF SERVICE

**NOTICE IS GIVEN** that I, Matt Kezhaya, efiled this document by up-loading it to the CM/ECF system on August 18, 2023 which sends service to registered users, including all other counsel of record in this cause. Paper service to follow upon the Clerk's instruction. _s/Matt Kezhaya_

## CERTIFICATE OF COMPLIANCE

This document complies with the page limitation of Ninth Cir. R.32-1 (principal briefs: 14,000 word limit; reply brief: 7,000 word limit) because, excluding the parts of the document exempted by FRAP 32(f), this document contains **3,788** words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this document has been prepared in a proportionally spaced type-face using MS Office 365 in 14pt "Calisto MT" font. Headers are in 15pt "Calisto MT" font.

The electronic version of the brief has been scanned for viruses and is virus-free. _s/Matt Kezhaya_